# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF LOUISIANA

Tesla, Inc.,                                                    )
                                                               )   CIVIL ACTION NO. _____
Tesla Lease Trust,                                             )
                                                               )
and                                                            )   JUDGE:
                                                               )
Tesla Finance, LLC                                             )
                                                               )   MAGISTRATE JUDGE:
         *Plaintiffs*,                                         )
                                                               )
              v.                                               )
                                                               )
Louisiana Automobile Dealers Association, in                   )
itself and on behalf of its members, executive                 )
Committee, and board of directors,                             )
                                                               )
Gregory Lala, in his Official Capacity as Chairman             )
of the Louisiana Motor Vehicle Commission,                     )
                                                               )
Allen O. Krake, in his Official Capacity as a                  )
Commissioner of the Louisiana Motor Vehicle                    )
Commission and his private capacity,                           )
                                                               )
Ford of Slidell, LLC d/b/a Supreme Ford of Slidell,            )
                                                               )
V. Price LeBlanc, Jr., in his Official Capacity as a           )
Commissioner of the Louisiana Motor Vehicle                    )
Commission and his private capacity,                           )
                                                               )
LeBlanc Automobiles, Inc. d/b/a/ Lexus of New                  )
Orleans                                                        )
                                                               )
Eric R. Lane, in his Official Capacity as a                    )
Commissioner of the Louisiana Motor Vehicle                    )
Commission and his private capacity,                           )
                                                               )
Gerry Lane Enterprises, Inc. d/b/a Gerry Lane                  )
Chevrolet,                                                     )
                                                               )
Kenneth "Mike" Smith, in his Official Capacity as              )
a Commissioner of the Louisiana Motor Vehicle                  )
Commission and his private capacity,                           )

P.K. Smith Motors, Inc.,                                            )
                                                                   )
Keith P. Hightower, in his Official Capacity as a                  )
Commissioner of the Louisiana Motor Vehicle                        )
Commission and his private capacity,                               )
                                                                   )
Holmes Motors, L.L.C. d/b/a Holmes Honda,                          )
                                                                   )
Keith M. Marcotte, in his Official Capacity as a                   )
Commissioner of the Louisiana Motor Vehicle                        )
Commission and his private capacity,                               )
                                                                   )
Morgan Pontiac, Inc. d/b/a Morgan Buick GMC                        )
Shreveport,                                                        )
                                                                   )
Wesley Randal Scoggin, in his Official Capacity as                 )
a Commissioner of the Louisiana Motor Vehicle                      )
Commission and his private capacity,                               )
                                                                   )
Airline Car Rental, Inc. d/b/a Avis Rent a Car,                    )
                                                                   )
Scott A. Courville, in his Official Capacity as a                  )
Commissioner of the Louisiana Motor Vehicle                        )
Commission,                                                        )
                                                                   )
Donna S. Corley, in her Official Capacity as a                     )
Commissioner of the Louisiana Motor Vehicle                        )
Commission and her private capacity,                               )
                                                                   )
Shetler-Corley Motors, Limited,                                    )
                                                                   )
Terryl J. Fontenot, in his Official Capacity as a                  )
Commissioner of the Louisiana Motor Vehicle                        )
Commission and his private capacity,                               )
                                                                   )
T & J Ford, Inc.,                                                  )
                                                                   )
Maurice C. Guidry, in his Official Capacity as a                   )
Commissioner of the Louisiana Motor Vehicle                        )
Commission and his private capacity,                               )
                                                                   )
Golden Motors, LLC,                                                )
                                                                   )
Raney J. Redmond, in his Official Capacity as a                    )
Commissioner of the Louisiana Motor Vehicle                        )
Commission,                                                        )

Joseph W. "Bill" Westbrook, in his Official Capacity )
as a Commissioner of the Louisiana Motor Vehicle )
Commission, )
                                                                )

Stephen Guidry, in his Official Capacity as a )
Commissioner of the Louisiana Motor Vehicle )
Commission, )
   )

Joyce Collier LaCour, in her Official Capacity as a )
Commissioner of the Louisiana Motor Vehicle )
Commission, )
   )

Thomas E. Bromfield, in his Official Capacity as a )
Commissioner of the Louisiana Motor Vehicle )
Commission, )
   )

and )
   )

Edwin T. Murray, in his Official Capacity as a )
Commissioner of the Louisiana Motor Vehicle )
Commission, )
   )

       *Defendants.* )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

The people of Louisiana should have the freedom to buy, lease, and service the car of their choosing. Yet, Louisiana consumers' freedom is being unduly restricted by protectionist, anti-competitive, and inefficient state regulation and laws being implemented and enforced by representatives of the same entrenched automotive industry that lobbied for the passage of this anti-consumer regulation in the first place. As a result, those representatives have effectively shut out of Louisiana the consumer-centric, free-market solution that is a more efficient, consumer friendly business model for today's automotive consumer. Tesla Motors, Inc., Tesla Lease Trust, and Tesla Finance LLC (collectively, "Tesla") bring this action to vindicate their rights under the

U.S. Constitution and federal and state law, and to protect Louisianians' ability to buy, lease, and service Tesla's critically acclaimed, all-electric vehicles in the State of Louisiana.

## INTRODUCTION

1.      Tesla, Inc. is an American manufacturer of the most advanced, zero-emissions electric cars on the market. Since its founding, Tesla has employed a unique sales, leasing, distribution, and service model in which it engages consumers directly. As a disruptive market entrant whose value is based on its innovative technology, both selling and leasing Tesla's cars requires significant time in order to educate customers about the benefits of its products. Consequently, Tesla determined that it could not succeed by selling, leasing, and servicing its vehicles through a traditional network of third-party dealers—and the high-pressure, commissions-driven environment they foster.

2.      So Tesla does not use local, in-State dealers to sell, lease, or service Tesla vehicles anywhere in the world. Instead, Tesla sells and leases its cars at uniform and transparent prices based on the configuration and options that a customer selects for the vehicle.

3.      Similarly, to ensure the highest quality service and best customer experience, Tesla provides warranty repair and services for Tesla vehicles directly.

4.      Tesla's results, measured by sales and Tesla's superlative survey rankings, show that this model has immense procompetitive benefits for consumers, providing them access to an array of unique products and exceptional service.

5.      Although consumers have embraced Tesla—indeed, *because* consumers have embraced Tesla—Tesla's *competitors* have pursued every avenue to bar Tesla from the market. Groups of industry incumbents, including some dealer associations across the country, have viewed Tesla as a threat to their local monopoly power over automobile distribution. Rather than try to compete with Tesla, some of these well-connected dealers have tried to block Tesla from

4

local markets altogether by promoting protectionist legislation and by coopting state regulatory authority.

6.      Unfortunately, in the State of Louisiana, many of Tesla's competitors have undertaken these same anti-consumer, anti-competitive activities.

7.      Tesla's private competitors and Louisiana lawmakers have taken a two-pronged approach to keep Tesla's products from the citizens of Louisiana—systematically targeting Tesla's leasing and warranty repair and servicing operations.

8.      *First*, the State Legislature—at the behest of Tesla's competitors—expanded the "direct sales ban" to prohibit Tesla's unique sales model. *See* La. Stat. § 32:1261(A)(1)(k). Under this provision, it is "unlawful" for Tesla to "sell or offer to sell a new or unused motor vehicle directly to a consumer" in Louisiana without using a dealer. *Id.*

9.      In other words, if Tesla wishes to sell its vehicles in the State of Louisiana, it must forgo its successful (and necessary) business model and instead franchise Tesla sales to local, in-State dealers, with all of the anti-consumer effects and higher prices that would entail.

10.     The direct sales ban interferes with interstate commerce in violation of the Commerce Clause of the Constitution and irrationally singles out Tesla in violation of the Equal Protection Clause of the Fourteenth Amendment.

11.     *Second*, the members and leadership of the private Louisiana Automobile Dealers Association ("Dealers Association")—including the individual named Dealerships—have conspired to prohibit Tesla from engaging in the remaining activities that state law allows: leasing Tesla vehicles and providing warranty repair and services for Tesla vehicles in Louisiana.

12.     Principals and controlling owners of members of the Dealers Association comprise a controlling majority of the governmental Louisiana Motor Vehicle Commission ("Commission")—on which they are required by law to be active market participants.

13.     Accordingly, the Commissioners—no less than the Dealers Association's membership, from which the Commissioners are drawn—have strong incentives, including financial incentives, to keep Tesla from Louisiana consumers.

14.     The Commission's campaign against Tesla seeks to eliminate a competitive threat to its Commissioners' own private businesses and has been conducted without any active or substantive supervision or oversight by the Governor or any other executive agency.

15.     Indeed, Tesla has uncovered communications between the Dealers Association's members and the Commission evidencing a common purpose to exclude Tesla from operating in Louisiana.

16.     Although Louisiana law (unconstitutionally) prohibits Tesla from *selling* its vehicles in Louisiana, nothing in Louisiana law prohibits Tesla from *leasing* its vehicles in Louisiana or providing warranty repairs and services for the many Tesla vehicles in Louisiana in its function as a "fleet owner." La. Stat. § 32:1261(A)(l)(t)(vi).

17.     Yet the Commissioners—pursuing their personal financial interests and in coordination with the Dealers Association and its members—have asserted authority over Tesla and have adopted an interpretation of Louisiana law that allows or will allow the Commission to take action even against Tesla's lawful activities including leasing and providing warranty repair and services for Tesla vehicles in Louisiana.

18.     The Commission's attempts to bar Tesla from Louisiana is evidence of the grave Due Process problem that Louisiana has created: because of its controlling majority of members

drawn from the Dealers Association and the Dealerships, the Commission's composition ensures that Tesla is regulated by its direct competitors, who have a direct pecuniary interest in barring Tesla from the market.

19.     In addition to the constitutional problems, this conspiracy among the Dealers Association, its members, the Dealerships, and the named Commissioners themselves violates federal and state antitrust laws and state prohibitions against unfair trade practices.

## PARTIES AND STANDING

**Plaintiffs**

20.     Plaintiff Tesla, Inc. is an American company that designs, develops, and manufactures electric vehicles and provides service and support to owners of its vehicles. Tesla, Inc. is incorporated in Delaware and has its principal place of business in Texas. Tesla's mission is, among other things, to accelerate the world's transition to electric mobility by bringing to market a full fleet of increasingly affordable electric vehicles. Currently, Louisiana law prohibits Tesla, Inc. from directly selling its groundbreaking vehicles to Louisiana's consumers.

21.     Plaintiff Tesla Lease Trust is a Delaware statutory trust, and its initial beneficiary is Tesla Finance LLC. Tesla Lease Trust is the title holder to the Tesla vehicles that are leased under a leasing program managed by Tesla Finance LLC. Tesla Lease Trust holds a license under Louisiana law authorizing it to lease vehicles in Louisiana. Tesla Lease Trust was formed in Delaware.

22.     Plaintiff Tesla Finance LLC is a wholly owned subsidiary of Tesla, Inc. and is the beneficial owner of the leasing assets held in Trust by Tesla Lease Trust and, as an agent of the

Tesla Lease Trust, originates, services, administers, and collects leases for Tesla Lease Trust. Tesla Finance LLC is incorporated in Delaware and has its principal place of business in California.

23.     Tesla operates within Louisiana to lease and provide warranty repair and servicing for Tesla vehicles.

**Defendant Louisiana Automobile Dealers Association**

24.     **Defendant Louisiana Automobile Dealers Association** is a trade association "representing nearly 350 new motor vehicle car and heavy truck dealers in Louisiana." La. Auto. Dealers Ass'n, About Us, https://bit.ly/3OTQDyQ.

25.     The Dealers Association is a resident of Louisiana.

26.     The Dealers Association is controlled by auto dealers in Louisiana who use the traditional franchise dealer sales model. Under that model, vehicle manufacturers franchise local, in-State third-party dealers to sell, lease, and service their vehicles.

27.     The Dealers Association, its leadership, and its members have publicly and privately opposed Tesla doing business in Louisiana because Tesla does not use franchised dealers to sell, lease, or service Tesla vehicles—and consequently the Dealers Association views Tesla as a competitive threat in those markets.

28.     Among other strategies, the Dealers Association has sought to block Tesla from operating in Louisiana by: (1) lobbying for an amendment to the direct sales ban to bar Tesla from engaging in direct sales to Louisiana consumers; (2) opposing Tesla from leasing Tesla vehicles in Louisiana, including through collusion with the Commission acting through Dealers Association members who serve on the Commission; and (3) opposing Tesla performing warranty repairs on Tesla vehicles in Louisiana, including through collusion with the Commission acting through Dealers Association members who serve on the Commission.

29.     The Dealers Association's intermingled and close relationship with the Commission is significant. As described below at ¶¶ 39, 47-83, a controlling nine-member majority of the Commission are members of the Louisiana Auto Dealers Association.

30.     Defendant Commissioner Eric Lane, for instance, served on the Board of the Dealers Association in 2018 when the Commission began investigating Tesla for warranty repairs of Tesla vehicles.

31.     And, in June 2020, Defendant Allen Krake—a current Commissioner and former Chairman of the Commission—openly acknowledged that the Commission "board is made up of many motor dealers who compete with Tesla" and that for "five years" the Commission and the Dealers Association had "met numerous times in attempts for LADA [the Dealers Association] to convince LMVC [the Commission] to revise it interpretations" regarding Tesla's operations in Louisiana. *See* Exhibit 1.

**Defendant Commissioners of the Louisiana Motor Vehicle Commission and their Dealerships**

32.     The Louisiana Legislature created the Louisiana Motor Vehicle Commission to regulate and license the distribution and sale of motor vehicles and the dealers, manufacturers, and distributors of motor vehicles in Louisiana. *See* La. Stat. § 32:1253.

33.     The Commission is statutorily entrusted with enforcement of the direct sales ban and the other provisions at issue in this lawsuit like the warranty servicing ban for entities that do not, for example, qualify as a fleet owner.

34.     As explained further below, Louisiana law both grants franchisee dealers a monopoly on sales of vehicles in Louisiana and *requires* the Commission to be constituted with such franchised dealers.

35.     Consequently, Tesla is regulated by its direct market competitors but—unlike other franchised dealers—has no opportunity to gain representation on the Commission.

36.     The Commission technically has 18 total members, but only 15 of the Commissioners exercise the vast majority of the Commission's statutory authority. The remaining three non-licensee members comprising the Commission's Consumer Board have narrow duties.

37.     Under Louisiana law, 15 of the 18 total Commissioners are required to be licensees of the Commission *and* retain their licenses while they serve as Commissioners. La. Stat. § 32:1253(A)(2) (requiring those Commissioners to be "an actively engaged licensee of the commission . . . for not less than five consecutive years prior to such appointment, and be a holder of such a license at all times while a member of the commission").

38.     A licensee is "any person who is required to be licensed by the commission," and includes "motor vehicle dealers" that "hold[ ] a bona fide franchise in effect with a manufacturer or distributor of new motor vehicles"—who are "the sole and only persons entitled to sell, publicly solicit, and advertise the sale of new motor vehicles as such." *Id.* § 32:1252, 35(a).

39.     A controlling majority of nine Commissioners are motor vehicle dealers that directly compete with Tesla in the market for automobile sales, leasing, and servicing. This controlling majority includes Defendants Krake, LeBlanc, Lane, Smith, Hightower, Marcotte, Corley, Fontenot, and Maurice Guidry.

40.     To be sure, not all 15 of those Commissioners are auto dealers in direct competition with Tesla: Louisiana law requires six Commissioners to be engaged in different parts of the industry, though they may also be affiliated with dealers that directly compete with Tesla.[1]

---

[1] Currently, the Commission's Chairman is a licensee at a recreational vehicle dealership, not a traditional auto dealership. *See infra* ¶ 84. But the designated Commissioner "primarily engaged

10

41.     Each licensee Commissioner's private dealership business is listed on the Commission's directory of Commissioners. *See* La. Motor Vehicle Comm'n, Commission Members, https://bit.ly/3a3Mcm9.

42.     Finally, the remaining three Commissioners are "public member[s]" who do not hold licenses, and this "consumer board" has the "*sole function* of hearing and deciding matters concerning brokers and disputes between manufacturers, distributors, converters, motor vehicle lessor franchisors, or representatives and motor vehicle dealers, recreational products dealers, specialty vehicle dealers, [and] motor vehicle lessors." La. Stat. § 32:1253(A)(3)(a) (emphasis added).

43.     The three public members comprising the Commission's Consumer Board did not take part in the Commission's initial attempts to interfere with Tesla's operations in Louisiana.

44.     Apart from the three public members of the consumer board, Plaintiffs sue each individual member of the Commission in both their official capacities as Commissioners and in their private capacities as licensees and dealers in competition with Tesla and as members of the Dealers Association.

45.     All Commissioners are residents of Louisiana and do business in Louisiana.

46.     All Dealerships are residents of Louisiana and do business in Louisiana.

### Nine Controlling Dealers Association Members and their Dealerships

47.     **Defendant Allen O. Krake** is a Commissioner and resident of Metairie, Louisiana.

---

in the business of heavy truck sales," for example, is a licensee at a franchised dealership for passenger vehicles. *See infra* ¶¶80-81. Generally, the Commission's structure—where nine of the 15 most powerful members are non-specialized industry participants—means that these nine members are likely to primarily sell passenger vehicles. Consequently, the Commission is designed to have at least a nine-member majority of franchised dealers. And even some of the six specialty members may also be affiliated with franchised dealers, providing such dealers an even greater majority.

48.     Krake is also the CEO of Supreme Automotive Group and is listed on the Commission's directory as a licensee at **Defendant Ford of Slidell, LLC d/b/a Supreme Ford of Slidell**, which is domiciled in Slidell, Louisiana.

49.     According to Supreme Automotive Group's website, the company "represent[s] five franchises in four cities across the southeast [Louisiana]," including "Ford, Nissan, Chevrolet, Toyota, [and] Cadillac." Supreme Auto Group, About Us, https://bit.ly/3y8LoV0.

50.     Krake is a member of the Dealers Association that directly conspired with the Commission to take action against Tesla. *See infra* ¶ 158.

51.     In fact, Krake is a member of the Dealers Association's 2022-23 Board of Directors. *See* La. Auto. Dealers Ass'n, Board of Directors, https://bit.ly/3usCTTE.

52.     **Defendant V. Price LeBlanc, Jr.** is a Commissioner and a resident of Metairie, Louisiana.

53.     LeBlanc is also listed under the Commission's directory as a licensee at **Defendant LeBlanc Automobiles, Inc. d/b/a Lexus of New Orleans**, which is domiciled in Metairie, Louisiana.

54.     Lexus of New Orleans is a Lexus-franchised dealership.

55.     On information and belief, LeBlanc and/or his dealership are members of the Dealers Association.

56.     **Defendant Eric R. Lane** is a Commissioner and a resident of Baton Rouge, Louisiana.

57.     Lane is also listed on the Commission's directory as a licensee at **Defendant Gerry Lane Enterprises, Inc. d/b/a Gerry Lane Chevrolet**, which is domiciled in Baton Rouge, Louisiana.

58.     Defendant Gerry Lane Chevrolet is a Chevrolet-franchised dealership.

59.     Lane is a member of the Dealers Association and served on the Board of the Dealers Association in 2018 when the Commission began investigating Tesla for warranty repairs of Tesla vehicles.

60.     **Defendant Kenneth "Mike" Smith** is a Commissioner and resident of Winnfield, Louisiana.

61.     Smith is also listed on the Commission's directory as a licensee at **Defendant P.K. Smith Motors, Inc.**, which is domiciled in Winnfield, Louisiana.

62.     Defendant P.K. Smith Motors, Inc. is a Buick-, Chevrolet-, and GMC-franchised dealership.

63.     Smith is a member of the Dealers Association and served on the Dealers Association's 2021-22 Board of Directors. *See* La. Auto. Dealers Ass'n, Up to Speed: LADA's Quarterly Newsletter 6 (Aug. 2021), https://bit.ly/3T9QQRn.

64.     **Defendant Keith P. Hightower** is a Commissioner and a resident of Shreveport, Louisiana.

65.     Hightower is also listed on the Commission's directory as a licensee at **Defendant Holmes Motors, L.L.C. d/b/a Holmes Honda**, which is domiciled in Shreveport, Louisiana.

66.     Defendant Holmes Honda is a Honda-franchised dealership.

67.     On information and belief, Hightower and/or his dealership(s) are members of the Dealers Association.

68.     **Defendant Donna S. Corley** is a Commissioner and a resident of Crowley, Louisiana.

69.     Corley is also listed on the Commission's directory as a licensee at **Defendant Shetler-Corley Motors, Limited**, which is domiciled in Crowley, Louisiana.

70.     Defendant Shetler-Corley Motors, Limited is a Ford-franchised dealership.

71.     On information and belief, Corley and/or her dealership(s) are members of the Dealers Association

72.     **Defendant Terryl J. Fontenot** is a Commissioner and a resident of Ville Platte, Louisiana.

73.     Fontenot is also listed on the Commission's directory as a licensee at **Defendant T & J Ford, Inc.**, which is domiciled in Ville Platte, Louisiana.

74.     Defendant T&J Ford, Inc, is a Ford-franchised dealership.

75.     On information and belief, Fontenot and/or his dealership(s) are members of the Dealers Association.

76.     **Defendant Maurice C. Guidry** is a Commissioner and a resident of Cut Off, Louisiana.

77.     Guidry is also listed on the Commission's directory as a licensee at **Defendant Golden Motors, LLC**, which is domiciled in Cut Off, Louisiana.

78.     Defendant Golden Motors, LLC is a Buick- and Chevrolet-franchised dealership.

79.     On information and belief, Guidry and/or his dealership(s) are members of the Dealers Association.

80.     **Defendant Keith M. Marcotte** is a resident of Shreveport, Louisiana and the statutorily mandated Commissioner "primarily engaged in the business of heavy truck sales." La. Stat. § 32:1253(A)(2).

81.     Marcotte is also listed on the Commission's directory as at licensee at **Defendant Morgan Pontiac, Inc. d/b/a Morgan Buick GMC Shreveport**, which is domiciled in Shreveport, Louisiana.

82.     Defendant Morgan Buick GMC Shreveport is a Buick- and GMC-franchised dealership.

83.     On information and belief, Marcotte and/or his dealership(s) are members of the Dealers Association.

### *Six Additional Licensee Commissioners*

84.     **Defendant Gregory Lala** is the Chairman of the Commission and a resident of Madisonville, Louisiana.

85.     Lala is also the Owner and CEO of—and listed on the Commission's directory as a licensee at—Dixie Motors, L.L.C. d/b/a Great American RV Superstores, which is domiciled in Hammond, Louisiana.

86.     **Defendant Stephen L. Guidry, Jr.** is domiciled in Mandeville, Louisiana and the statutorily mandated Commissioner "primarily engaged in the business of sales finance." *Id.*

87.     Guidry is also listed on the Commission's directory as a licensee at Dixie Motors, L.L.C. d/b/a Great American RV Superstores—the same dealership as Chairman Lala.

88.     **Defendant Wesley Randal Scoggin** is a resident of Shreveport, Louisiana and the statutorily mandated Commissioner "primarily engaged in the business of lease or rental." La. Stat. § 32:1253(A)(2).

89.     Scoggin is also listed on the Commission's directory as a licensee at **Defendant Airline Car Rental, Inc. d/b/a Avis Rent A Car.**

90.     **Defendant Joseph W. "Bill" Westbrook** is a resident of Natchez, Louisiana and the statutorily mandated Commissioner "primarily engaged in the business of recreational vehicle sales." *Id.*

91.     Westbrook is also listed on the Commission's directory as a licensee at Braxton Creek RV, LLC, which is domiciled in Indiana.

92.     **Defendant Scott A. Courville** is a resident of Pineville, Louisiana and the statutorily mandated Commissioner "primarily engaged in the business of motorcycle sales." *Id.*

93.     Courville is also listed on the Commission's directory as a licensee at CHL Enterprises, L.L.C. d/b/a Loewer Powersports & Equipment, which is domiciled in Pineville, Louisiana.

94.     **Defendant Raney J. Redmond** is a resident of Lafayette, Louisiana and the statutorily mandated Commissioner "primarily engaged in the business of marine product sale." *Id.*

95.     Redmond is also listed on the Commission's directory as a licensee at Redmond's Marine, LLC.

### *The Commission's 3-Member Consumer Board*

96.     **Defendant Joyce Collier LaCour** is a resident of Gonzales, Louisiana and sued in her official capacity as a Commissioner on the 3-member consumer board.

97.     **Defendant Thomas E. Brumfield** is a resident of Amite, Louisiana and sued in his official capacity as a Commissioner on the 3-member consumer board.

98.     **Defendant Edwin T. Murray** is a resident of New Orleans, Louisiana sued in his official capacity as a Commissioner on the 3-member consumer board.

## JURISDICTION AND VENUE

99.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1343(a) because most of Plaintiffs' claims arise under the U.S. Constitution and federal law. Specifically, Plaintiffs' claims arise under the Equal Protection Clause of the Fourteenth Amendment, the Commerce Clause, the Civil Rights Act, 42 U.S.C. § 1983, and the Sherman Act, 15 U.S.C. §§ 1-38.

100.     This Court also has jurisdiction over this action under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the parties are citizens of different states: The Plaintiffs are residents of Delaware, Texas, and Utah and all the Defendants are residents of Louisiana.

101.     This Court also has jurisdiction over Plaintiffs' claims arising under state law because Plaintiffs' "state and federal claims [ ] derive from a common nucleus of operative fact." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966); *accord Union City Barge Line, Inc. v. Union Carbide Corp.*, 823 F.2d 129, 142 (5th Cir. 1987); *see also* 28 U.S.C. § 1367.

102.     This Court has authority to grant legal and equitable relief under the Civil Rights Act, 28 U.S.C. § 1343(a); 42 U.S.C. § 1983. In enforcing, administering, and adhering to state law, Defendant Commissioners—and those subject to their supervision, direction, or control—will at all relevant times act under color of state law. And state law violates Plaintiffs' constitutional rights under the Equal Protection and Due Process Clauses of the Fourteenth Amendment and the Commerce Clause of Article I, Section 8 of the Constitution.

103.     This Court also has authority to issue injunctive relief under the All Writs Act, 28 U.S.C. § 1651.

104.     This Court similarly has the power under the Declaratory Judgment Act, 28 U.S.C. § 2201(a), to "declare the rights and other legal relations of any interested party seeking such declaration."

105.     This Court's jurisdiction is properly exercised over Defendant Commissioners in their official capacities, *Ex parte Young*, 209 U.S. 123 (1908), as Plaintiffs seek declaratory and injunctive relief against enforcement of state law.

106.     This Court has personal jurisdiction over all Defendants, as all Defendants are residents of the State of Louisiana.

107.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because at least one Defendant resides in the district. Venue is also proper in this District and Division under § 1391(b)(2) because the events giving rise to this civil action occurred in Jefferson Parrish—the location of the Commission.

## THE ANTICOMPETITIVE CAMPAIGN AGAINST TESLA

### Tesla's Groundbreaking Vehicles and Innovative Sales Model

108.     Tesla, Inc. is an American company whose mission is to accelerate the advent of sustainable transport and energy. Among other things, Tesla, Inc. designs, manufactures, and sells the world's most advanced zero-emissions, all-electric vehicles. And, while many other companies have moved manufacturing jobs overseas, Tesla designs, builds, sells, leases, and services cars here in the United States, employing thousands in well-paying jobs.[2]

109.     To sell and lease its groundbreaking vehicles, Tesla uses a unique model that differentiates itself from—and often puts it at odds with—traditional automobile manufacturers and dealers.

---

[2] Tesla also manufacturers vehicles in Germany and China.

18

*Tesla's Vehicles*

110.    Tesla's groundbreaking vehicles have revolutionized the automobile market in the United States.

111.    In 2021, Tesla accounted for 4 of the 12 best-selling electric vehicles in the United States.[3]

112.    The market for electric vehicles is dynamic. In the first quarter of 2022, 172,748 electric vehicles were sold in the United States—representing 5.3% of all new cars.[4]

113.    Electric vehicles sales exceeded 5% of all vehicles sales in the United States for the first time in the fourth quarter of 2021.[5]

114.    Tesla manufacturers a variety of different models that serve different consumer needs and market segments.

115.    Tesla began bringing vehicles to market just five years after its founding. Its first offering was the Tesla Roadster, released in 2008, which was the first commercially produced, highway-capable, all-electric vehicle made in the United States. The Roadster was a high-performance sports car with a battery range of 245 miles, the longest range of any production vehicle up until that time.

---

[3] Annie White, *12 Bestselling Electric Vehicles of 2021*, Car and Driver (Jan. 19, 2022), https://bit.ly/3Pddfdw [hereinafter "Car and Driver 2021"].
[4] Tom Randall, *US Crosses the Electric-Car Tipping Point for Mass Adoption*, Bloomberg (July 9, 2022), https://bloom.bg/3yBLo0a.
[5] *Id.*

116.    Building on the Roadster's success, in 2012, Tesla introduced the Model S, a full-sized, all-electric luxury sedan.[6] In 2021, the Model S was number 9 on the list of best-selling electric vehicles in the United States.[7]

117.    In September 2015, Tesla began delivery of its third vehicle, the Model X, a luxury sport utility vehicle. In 2021, the Model X was number 11 on the list of best-selling electric vehicles in the United States.[8]

118.    In March 2016, Tesla began accepting reservations for its fourth vehicle, the Model 3, a lower-cost sedan. Much like Tesla's previous offerings, the Model 3 "achieved NHTSA 5-star safety ratings in every category and subcategory" and "the IIHS Top Safety Pick+ award, with top ratings in all crashworthiness and front crash prevention categories."[9] In 2021, the Model 3 was number 2 on the list of best-selling electric vehicles in the United States.[10]

119.    In March 2019, Tesla unveiled the Model Y, a small SUV "able to carry 7 passengers and their cargo."[11] After going on sale in 2020, by 2021 the Model Y was the best-selling electric vehicle in the United States.[12] Indeed, the Model Y was number 17 on the list of *all* best-selling vehicles in the United States.[13]

120.    All of these vehicles sold in the United States are also manufactured in the United States.

---

[6] The most recent variant of Model S has a range of 396 miles per charge. Tesla, Model S, https://bit.ly/3bYZEbF.
[7] Car and Driver 2021.
[8] *Id.*
[9] Tesla, Model 3, https://bit.ly/3ys0FAm.
[10] Car and Driver 2021.
[11] Tesla, Model Y, https://bit.ly/3AxwV7T.
[12] Car and Driver 2021.
[13] *Id.*

121.    In fact, Tesla is ranked first overall in Cars.com's American Made Index, which "rank[s] all qualifying vehicles built and bought in the U.S. . . . through" the same "five criteria: assembly location, parts content, engine origins, transmission origins and U.S. manufacturing workforce."[14]

122.    In addition to Tesla being ranked first overall among manufacturers, all of Tesla's four vehicles—Model 3, Model S, Model X, and Model Y—ranked in the top 10 overall for individual vehicles in this index.[15]

### Tesla's Sales and Leasing Model

123.    Tesla attributes much of its success to its unique direct sales/lease-and-service model. Tesla markets, sells, and leases its vehicles directly to consumers over the Internet (at www.tesla.com) and through a worldwide network of stores owned and operated by Tesla. In contrast to other vehicle manufacturers, Tesla does not sell or lease its vehicles through third-party dealers.

124.    Similarly—to ensure the highest quality service—warranty repair and services for its vehicles are performed through Tesla-owned service facilities.[16] Tesla's vehicles have lower servicing and maintenance costs, as electric vehicles have unique servicing requirements relative to traditional gas-powered vehicles.

---

[14] Patrick Masterson, *2022 Cars.com American-Made Index: Which Cars Are the Most American?*, Cars.com (June 21, 2022), https://bit.ly/3z38eiJ.

[15] *Id.*

[16] Tesla does work with external partners to provide body repair on Tesla vehicles. *See* Tesla, Collision Support, https://bit.ly/3As7Gnf. Otherwise, Tesla provides its own warranty repair and services—and those services are what is at issue in this litigation.

125.    Surveys routinely rank Tesla's service centers for service related performance. At present, Tesla lawfully operates stores and/or service facilities in 35 states and the District of Columbia.

126.    Selling and leasing a Tesla car is very different from selling/leasing a traditional, gas-powered car. Accordingly, Tesla's retail operations are tailored to both educate consumers about electric vehicles and showcase Tesla's products and services. Electric vehicle ownership is simply far different than owning and operating a traditional, gas-powered car. Thus, potential Tesla customers will encounter knowledgeable employees ready to provide information about, among other things, (a) how electric cars work; (b) what it means that Tesla cars are "dual motor" and have regenerative braking; (c) how the car can be charged at home (*e.g.*, what equipment is needed, what charging will cost, and how long it will take); (d) how Tesla's network of charging stations, called "Superchargers," facilitate long-distance travel; (e) maintenance costs (because electric cars have no oil to change or engine to tune); (f) the difference in fuel costs; and (g) tax incentives for electric vehicle owners.

127.    Tesla also sells its cars at uniform and transparent list prices, which depend solely on the configurations of, and options for, each car. Tesla customers pay the same price whether they purchase through Tesla's website, at a local store, or at a store in a different State. This system eliminates the add-ons, dealer markup, and other fees that are omnipresent at third-party automobile dealers.

128.    Tesla also compensates its employees in a manner that encourages a low-pressure retail experience and high-quality repair service. Tesla has sales employees who are primarily salaried and whose role is to educate consumers about Tesla cars, rather than push for a same-day sale that will yield a commission. Tesla also primarily compensates its service employees by the

hour, eliminating the incentive that dealerships often have to rush through jobs or upsell customers on unnecessary "repairs."

**The Dealers Association's and the Dealerships' Efforts to Bar Tesla From Louisiana**

129.    As of now, there are approximately 3011 registered Tesla vehicles in Louisiana.

130.    While customers have welcomed Tesla with open arms, Tesla's competition in Louisiana—primarily franchised dealers—have gone to extraordinary lengths to bar Tesla from Louisiana.

*The direct sales ban.*

131.    In 2017, the Dealers Association and the Dealerships—along with some of the Commissioners—successfully lobbied the Louisiana Legislature to prohibit Tesla from directly selling its vehicles to customers in Louisiana.[17]

132.    In a July 17, 2018, email, the Dealers Association's President Will Green referred to "our bill in 2017," acknowledging the Dealers Association's involvement in the 2017 amendment. Ex. 2.

133.    Before this amendment, Louisiana only prohibited manufacturers from competing with their own franchised dealers. *See* Amendment Notes to 2017 Amendments, La. Stat. § 32:1261.

---

[17] Plaintiffs do *not* challenge the enactment of this law as part of their antitrust or unfair trade practice claims, discussed below at ¶¶ 203-222, 275-304. Nevertheless, "a plaintiff may properly include evidence of immune lobbying activity in its antitrust allegations insofar as that evidence serves to illustrate the context and motive underlying the alleged anticompetitive conduct." *Steward Health Care Sys., LLC v. Blue Cross & Blue Shield of Rhode Island*, 997 F. Supp. 2d 142, 163 (D.R.I. 2014); *accord United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 n.3 (1965) (An activity "barred from forming the basis for a suit, may nevertheless be introduced if it tends reasonably to show the purpose and character of the particular transactions under scrutiny."); *Household Goods Carriers' Bureau v. Terrell*, 417 F.2d 47, 52 (5th Cir. 1969), *on reh'g*, 452 F.2d 152 (5th Cir. 1971) (same).

134.    Specifically, the pre-2017 statute provided no manufacturers may "sell or offer to sell a new or unused motor vehicle directly to a consumer except as provided in this Chapter, *or to compete with a licensee in the same-line* makes, models, or classifications operating under an agreement or franchise from the aforementioned manufacturer." La. Stat. § 32:1261(A)(1)(k)(i) (2016) (emphasis added).

135.    Under the pre-2017 version of the law, therefore, if Tesla had both manufactured vehicles and franchised local dealers in Louisiana to sell those vehicles, then Tesla could not directly sell its vehicles to customers in Louisiana in competition with its own franchised dealers. But Tesla was free to directly sell vehicles if it did not franchise local, in-State dealers.

136.    After the Legislature amended the direct sales ban, however, Tesla may not sell new or used cars directly to consumers in Louisiana without using a local, in-state dealer: It is now unlawful for a manufacturer "[t]o sell or offer to sell a new or unused motor vehicle directly to a consumer." La. Stat. § 32:1261(A)(1)(k)(i).

137.    This amendment was the direct result of the Dealers Association, the Dealerships, and (on information and belief) some of the individual Commissioners' joint efforts to bar Tesla from Louisiana.

138.    Consequently, under current law, Louisiana residents can only purchase motor vehicles manufactured by Tesla outside of Louisiana.

139.    In practice, this means Louisiana residents must go to a neighboring State like Tennessee or Mississippi to secure a Tesla vehicle.

140.    And once they have taken their vehicles back into Louisiana, the Dealers and the Association are acting to prevent Tesla from servicing those vehicles.

***The Dealers Association aggressively pursues its anti-competitive, anti-Tesla agenda.***

141.    Though current law allows Tesla to lease and service Tesla vehicles in Louisiana, the Dealers Association, the Dealerships, and the Commission have initiated efforts to stop even that.

142.    Louisiana residents can lease Tesla vehicles in and outside of Louisiana through Tesla.

143.    Tesla also offers warranty repairs and services to Tesla vehicles. Louisiana law generally prohibits manufacturers from "operat[ing] a satellite warranty and repair center" that "authoriz[es] a person to perform warranty repairs . . . who is not a motor vehicle dealer." La. Stat. § 32:1261(A)(1)(t)(i). Louisiana law, however, carves out an exception for "fleet owners," which a manufacturer may authorize to perform warranty repairs "if the manufacturer determines that the fleet owner has the same basic level of requirements . . . that are required of a franchise dealer." *Id.* § 32:1261(A)(1)(t)(ii). "Fleet owner" means "a person, including a government entity, who is approved and authorized by a manufacturer to perform warranty repairs and owns or leases vehicles for its own use or a renting or leasing company that rents, maintains, or leases vehicles to a third party." *Id.* § 32:1261(A)(1)(t)(i).

144.    "The commission has no authority over a fleet owner." *Id.* § 32:1261(A)(1)(t)(v).

145.    Tesla is a "fleet owner" under the statute.

146.    If Tesla were not permitted to service Tesla vehicles in Louisiana, fewer Louisiana residents would purchase or lease Tesla vehicles.

147.    Nevertheless, the Dealers Association, Dealerships, and Commission have also engaged in a concerted effort to reinterpret state law to prohibit Tesla from operating in Louisiana.

148.    In a public records request, Tesla uncovered communications between the Dealers Association's members/Dealerships and the Executive Director of the Commission illustrating coordination between the two bodies to use the Commission's regulatory authority to bar Tesla from Louisiana entirely.

149.    In 2018, Tesla announced that it would open a service center in New Orleans.

150.    This prompted an outcry among the Dealers Association's members and Dealerships, who scrambled to reach out to their allies on the Commission.

151.    Specially, on July 11, 2018, Ray Brandt—the former Chairman of the Commission and a member of the Dealers Association—forwarded an article to the Commission's Executive Director, Lessie House, entitled "Tesla plan N.O. service, delivery center." Ex. 3.

152.    In response, the Executive Director responded, "FYI. And to let you know I am on it." *Id.*

153.    On July 17, 2018, Mat Baer of Bohn Brothers Investments, another member of the Dealers Association, brought the New Orleans service center to House's attention. Ex. 4.

154.    House again responded: "We are on top of this." *Id.*

155.    In the same email that confirmed the Dealers Association's role in the 2017 direct sales ban, the Dealers Association's CEO and president said he "spoke to [Defendant] Lessie [House] at the LMVC [the Commission] and she re-stated her position that she feels the law is clear that they [Tesla] cannot get a license." Ex. 2.

156.    Further in the email chain, Paul Stodred of Courtesy Automotive Group, Louisiana's largest dealer group, remarks that Tesla's plan to open a service center "is not good for the future of our business if the state lets this happen." *Id.*

157.     This email was then forwarded to Ms. House, to which she responded—yet again—
"On top of it." *Id.*

158.     Later, on March 2, 2020, the Dealers Association wrote a letter to Defendant Allen
Krake—then-Chairman of the Commission and a member of the Dealers Association—and
provided "suggestions related to what LADA [the Dealers Association] believes are important
regulations that it would like the Commission to enact." Ex. 5.

159.     Among other things, the Dealers Association requested regulations that would
make it difficult for Tesla to operate in Louisiana, including regulations (1) prohibiting the leasing
of motor vehicles by manufacturers and (2) "clarifying the intent of the fleet exemption" that
currently permits Tesla to service Tesla vehicles. *Id.*

160.     The Dealers Association further disclosed the Dealers Association's desire to
remove Tesla from competition, remarking that "[d]isplacement of competition is clearly a logical
result of the regulatory directive and authority given the LMVC [the Commission] by the
legislature." *Id.*

161.     While the Dealers Association and Dealerships control the Commission, they have
also sought to pursue their anti-Tesla agenda by having their allies seek to influence and apply the
Dealers Association and Dealerships' incorrect interpretation of the law.

162.     On June 4, 2020, State Representative Phillip Devillier requested a formal opinion
from the Louisiana Attorney General on two questions:

   A.  Is it a violation of La. R.S. 32: I 261 A(1)(k)(i) and (ii) for a manufacturer or distributor
       to lease new vehicles directly to consumers?

   B.  May a manufacturer or distributor (or any subsidiary thereof) perform warranty
       services directly without using a dealer? La. R.S. 32:1261A(l)(s) and (t)?

Ex. 6.

163. In this letter, Rep. Devillier provided the Attorney General with his suggestions of the correct answers to these questions—which aligned perfectly with the Dealers Association's agenda to bar Tesla from operating in Louisiana. *Id.*

164. The Attorney General then requested the Commission's position.

165. As of July 30, 2020, the Commission's official position was that certain Tesla leasing and servicing activities were lawful. *See* Ex. 1.

166. Specifically, the Commission provided its opinion that: (1) "It is not a violation of law for a manufacturer or distributor to lease new vehicles directly to consumers"; and (2) "a manufacturer or distributor (or any subsidiary thereof) may perform warranty services directly without using a dealer, as specifically provided in La. R.S. 32:1261(t)(i), (ii), (iii) and (iv), when the manufacturer or distributor or subsidiary is a fleet owner and performs warranty work on its own fleet." *Id.*

167. Regarding leasing, the Commission concluded: "Despite arguments seeking to bootstrap the statute which clearly prohibits direct *sales* by manufacturers/distributors to consumers into also prohibiting direct *leasing* to consumers by analogy, no such prohibition against direct *leasing* exists. . . . The legislature is not opposed to amending the law to address changes in the automotive industry, including this law specifically. . . . For many years the LMVC [the Commission] has regularly issued Lessor licenses to entities that are not franchised motor vehicle dealers who lease new and unused motor vehicles directly to consumers." *Id.*

168. And regarding servicing, the Commission concluded: "A manufacturer or distributor (or any subsidiary thereof) may perform warranty services directly without using a dealer, as specifically provided in La. RS. 32:1261(t)(i), (ii), (iii) and (iv), when the manufacturer or distributor or subsidiary is a fleet owner and performs warranty work on its own fleet." *Id.*

169.     The Commission also recognized the grave concerns that arise from a contrary and strained interpretation of the law and the Dealer Association's inappropriate attempts to pursue anti-competitive, self-interested activities targeted to eliminate Tesla from the Louisiana market.

170.     In a section entitled "The Danger of Legal Liability for LMVC [the Commission] and Its Commissioners," the Commission outlined the potential for antitrust violations:

> The LMVC board is made up of many motor dealers who compete with Tesla. The motor vehicle dealers on the LMVC commission are all franchised dealers. Tesla is not represented on the LMVC board and does not have franchised dealers.
>
> The questions (or variations thereof) contained in the Opinion Request letter have been discussed at length between the LMVC and LADA for well over five years, the parties having met numerous times in attempts for LADA to convince LMVC to revise its interpretations. The LMVC has always openly held (and directly stated to LADA) that it would issue a license to Tesla if Tesla met the statutory guidelines. The LMVC has no authority to act outside the statutes and has always advised the LADA that the way to have the LMVC change its regulatory actions is to have the law changed. Year after year LADA took no action on these issues in the legislature until 2017.
>
> In 2017 LADA successfully worked to have the statute amended to provide that a manufacturer or distributor or subsidiary, *even one without a dealer network*, is prohibited from *selling* new and unused motor vehicles directly to consumers. La. R.S.32:1261A(1)(k)(i). This amendment would seem to require the LMVC to deny a manufacturer or distributor license to Tesla or a subsidiary if it intends to use its non-franchise dealer business model to sell new and unused motor vehicles directly to consumers.
>
> . . .
>
> Tesla's non-franchise business model has been a contentious issue with franchise dealers around the country and has resulted in much litigation. The Opinion Request in this case requests that your office issue an opinion that supports the contentions of the LADA, a trade association comprised of franchise dealers.
>
> As a commission including many franchised dealers, any actions by the LMVC which are determined to be anti-competitive or a restraint on trade designed to protect the franchised dealers serving on the LMVC board, could subject the commission and its commissioners to civil and even criminal liability. Reading or analogizing additional language that the legislature clearly did not pass into statutes that it did pass, which results in competitive advantages for LMVC commission members, represents a clear risk of this liability.
>
> Should the LMVC act outside of the clearly articulated directives of the legislature expressed in La. RS. 32:1261(A)(1)(s), La. R.S. 32:1261A(1)(t)(i), La. R.S. 32:1261A(1)(t)(v), and La. R.S. 32:1261A(1)(t)(vi), the LMVC (*i.e.*, the state of

Louisiana) places at risk its immunity from liability imposed by the federal anti-trust law.

Ex. 1.

171.    In spite of the Commission's position, the Attorney General adopted Rep. Devillier's (and therefore the Dealer Association's) interpretation of state law: "manufacturers, distributors, or their subsidiaries, [1] may *not* lease directly to consumers in Louisiana without the use of a dealer [under the State's direct sales ban], [2] nor may they perform warranty services directly without using a dealer." La. Att'y Gen. Op. No. 20-0059, 2020 WL 5289959, at *1 (Aug. 10, 2020).

172.    But, even before the Attorney General issued his opinion, the Commission targeted Tesla and began an alleged investigation of Tesla Lease Trust.

173.    On information at belief, at the Dealers Association, its members, and the Dealerships' urging, the Commission started taking steps to bar Tesla's leasing and servicing activities in Louisiana.

**The Commission's First Steps Towards Barring Tesla Lease Trust From Louisiana**

174.    On August 5, 2020—five days *before* the release of the Attorney General opinion—the Commission issued a subpoena to Tesla Lease Trust for records dating back to September 1, 2019, regarding Tesla Lease Trust's activities in Louisiana. Tesla Lease Trust responded. On September 23, 2020, the Commission issued a second subpoena to Tesla Lease Trust for various records dating back to October 1, 2013. This subpoena was withdrawn by mutual agreement of the parties.

175.    On February 12, 2021, the Commission issued a third subpoena for any records identifying vehicles leased in Louisiana by Tesla Lease Trust and "identifying and/or referencing warranty service and/or warranty repair performed on any and all motor vehicles" in Louisiana from June 1, 2019, to the present. *See* Ex. 7.

176.     This third subpoena appeared to target Tesla Lease Trust over Tesla's performance of warranty repairs in alleged violation of La. Stat. § 32:1261(A)(l)(t)(i), under a strained interpretation of "fleet owner" by the Commission.

177.     The Commission's unjustifiable interpretation of the statutory requirements of "fleet owner" is however, in line with the Dealers Association and its members' "recommendations."

178.     On March 1, 2021, Tesla Lease Trust responded and objected to the February 12, 2021, subpoena because Tesla Lease Trust is a "fleet owner" under La. Stat. § 32:1261(A)(l)(t)(i) exempt from the restrictions imposed by La. Stat. § 32:1261(A)(l)(t)(i). Accordingly, the Commission has no authority over Tesla Lease Trust (or Tesla, Inc. and Tesla Finance LLC) under La. Stat. § 32:1261(A)(l)(t)(v), and no authority to request records relating to warranty repair work.

179.     In asserting authority over Tesla, however, by issuing the subpoena, the Commission has taken the position that Tesla is not a fleet owner.

180.     On April 14, 2021, the Commission's Executive Director filed a motion to compel before the Commission requesting that the Commission order Tesla Lease Trust to respond to the February 12, 2021, subpoena.

181.     Because of the Commission's and the Commissioners' ties to the Dealers Association, the Dealerships, and the traditional automotive industry in Louisiana more generally, Tesla submitted public records requests on April 20, 2021, and May 12, 2021, in an effort to further determine if the Commission and its Commissioners maintained any pre-dispositions or bias toward Tesla that could improperly influence its investigation.

182.    Between April 26, 2021, and April 28, 2021, the Commission—through a Commission attorney, Adrian F. LaPeyronnie—produced some limited documents in response to Tesla's April 20, 2021, request.

183.    The Commission has only produced a few responsive documents in response to Tesla's second, May 12, 2021, request.

184.    Many of the sparse documents the Commission has produced to date have contained substantial redactions without a privilege log.

185.    The Commission has failed to explain the basis for the redactions and has declined to produce a privilege log.

186.    At the same time LaPeyronnie reviewed Tesla's records requests and made determinations about which documents should be produced, he served as prosecutor on the Commission's motion to compel Tesla Lease Trust to produce records pursuant to the February 12, 2021, subpoena.

187.    In light of the Commission's recalcitrant responses to Tesla's records requests, on May 7, 2021, Tesla Least Trust unsuccessfully moved to continue the Commission's hearing on the motion to compel. This continuance would have allowed the Commission to complete review of the public records request and determine potential bias.

188.    A week later, on May 14, 2021, Tesla Lease Trust filed an opposition to the Commission's motion to compel and again requested a continuance based on concerns regarding Tesla Lease Trust's ability to receive a fair and impartial adjudication before the Commission.

189.    On May 17, 2021, the Commission held a hearing on the motion to compel. The Commission declined to continue the hearing, despite LaPeyronnie admitting that the Commission had not finished its response to Tesla's public records request.

190.    At the hearing, counsel for Tesla Lease Trust requested a determination on whether Tesla Lease Trust qualified as a fleet owner and requested findings of fact that Tesla Lease Trust qualified as a fleet owner. As counsel explained, because the Commission "has *no authority* over a fleet owner," La. Stat. § 32:1261(A)(l)(t)(v) (emphasis added), the Commission cannot investigate Tesla Lease Trust until it determines that it does not qualify as a fleet owner.

191.    The Commission refused to determine whether Tesla Lease Trust qualified as a fleet owner and ordered Tesla Lease Trust to respond to the February 12, 2021, subpoena.

192.    The Commission stayed Tesla Lease Trust's supposed obligation to comply with the February 12, 2021, subpoena to allow Tesla Lease Trust to seek judicial review of the Commission's ruling granting the motion to compel filed by its Executive Director.

193.    On June 1, 2021, Tesla Lease Trust filed a motion for rehearing on the additional grounds that the Commission lacked the legislative authorization to issue an investigative subpoena (as opposed to an adjudicative subpoena) and that it lacked jurisdiction to hear a motion to compel, which must instead be heard by the district court.

194.    On July 12, 2021, the Commission held a hearing, at which it rejected Tesla Lease Trust's arguments and denied rehearing.

195.    An overwhelming majority (but not all) of the Commissioners who adjudicated the motion to compel were Tesla's direct competitors.

196.    Eight Commissioners presided over the hearing on the motion to compel: Defendants Westbrook, Lala, LeBlanc, Lane, Scoggin, Courville, Maurice Guidry, and Corley, all of whom voted against Tesla Lease Trust and voted to compel Tesla Lease Trust to respond to the Commission's unlawful subpoena.

**State Court Proceedings**

197.     Tesla Lease Trust sought state court remedies to challenge the Commission's subpoenas.

198.     On August 26, 2021, Tesla filed a petition for judicial review in Louisiana state court, requesting that the court reverse the Commission's judgment to enforce the subpoena or, in the alternative, to remand for the Commission to affirmatively determine whether it has jurisdiction over fleet owner Tesla Lease Trust.

199.     On January 10, 2022, the Commission moved to dismiss Tesla's petition for review.

200.     On May 5, 2022, the court denied the Commission's motion to dismiss. That case is still ongoing.

201.     In this case, Plaintiffs do not seek to enjoin or otherwise interfere with those state-court proceedings.

202.     Rather, these administrative and state court proceedings are evidence of the ongoing unlawful conspiracy to bar Tesla from doing business in Louisiana.

**CLAIMS**

**COUNT I –**
**15 U.S.C. §§ 1, 15, 26**
**VIOLATION OF FEDERAL ANTITRUST LAW**
**(DEALERS ASSOCIATION, DEALERS ASSOCIATION MEMBERS, DEALERSHIPS,**
**AND COMMISSIONERS IN THEIR OFFICIAL AND PRIVATE CAPACITIES)**

203.     Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

204.     The Dealers Association, its members, the Dealerships, and the named Commissioners are actual or potential participants in the market for the sale, leasing, and servicing of passenger vehicles generally—and electric and luxury electric vehicles specifically—in Louisiana and have incentives to (and in fact seek to) restrict competition, innovation, services,

and customer choice in the relevant market for the sale, leasing, and servicing of vehicles in Louisiana.

205.    Tesla is in the markets for (or seeks to be in the markets for) the sale, leasing, and warranty servicing of passenger vehicles generally—and electric and luxury electric vehicles specifically—in Louisiana.

206.    For automotive sales and leasing, the relevant market in which to evaluate the conduct of the Defendants and the anticompetitive effect of their collective pernicious activities is the motor vehicle sales and leasing market in Louisiana—in which motor vehicle dealers, including the defendant Dealerships, and Tesla are the sellers or lessors of the motor vehicles, and consumers are the buyers or lessees of the motor vehicles and services.

207.    For automotive warranty repairs and service, the relevant market in which to evaluate the conduct of the Defendants and the anticompetitive effect of their collective pernicious activities is the motor vehicle repair and service market in Louisiana—in which motor vehicle dealers, including the Defendant dealerships, and Tesla are the sellers of warranty repair and service work, and consumers are the buyers of the repair and service work.

208.    The relevant geographic market is properly limited to Louisiana. The Commission purports to exercise authority over all manufacturers of motor vehicles, motor vehicle dealers, and entities that provide warranty repair and service work that are not fleet owners to Louisiana residents in Louisiana.

209.    Defendants' actions substantially and adversely affect interstate commerce in the "Relevant Market" as described herein. Defendants provide sales and leasing services and repair and service work in interstate commerce and certain of the Defendants compete directly with Tesla in those lines of commerce.

210.    Specifically, the Dealers Association, its members, the Dealerships, and the named Commissioners knowingly formed, joined, and entered a conspiracy with a unity of purpose to restrain trade. The Commission's first steps toward threatening Tesla's participation in the market for leasing and warranty servicing of vehicles in Louisiana was its issuing of subpoenas to Tesla Lease Trust relating to Tesla's warranty work and leasing even though Tesla was a "fleet owner," an entity over which the Louisiana legislature has made clear that the Commission has no authority over.

211.    Their agreement to do so is evidenced in part by their joint efforts to bar Tesla from direct sales in Louisiana, from their communications regarding Tesla's service and leasing operations in Louisiana, their concerted efforts to change the Commission's interpretation of state law, and their response to Tesla's planned service center in New Orleans.

212.    By using their power and asserted regulatory authority, the Commissioners in furtherance of the conspiracy and unified purpose have initiated a costly investigation of Tesla and have threatened Tesla's continued participation in the market through enforcement of their anti-competitive pernicious interpretation of state law.

213.    Their actions will injure competition in Louisiana and will harm consumer choice, limit the services available to consumers, and hamper and restrict innovation in the leasing and warranty servicing of vehicles in Louisiana.

214.    As a direct, proximate, and foreseeable result of their actions, Tesla has and will suffer injury.

215.    Furthermore, the market for car sales, leasing, and warranty servicing will also be harmed as consumers will have reduced choice and reduced services and will fail to benefit from innovation.

216.    And were Tesla to funnel sales, leasing, and warranty servicing through authorized dealers and third-parties, Louisiana consumers would face multiple harms. They would receive a worse consumer sales experience and receive poorer warranty repairs and services. And to secure this diminished experience, consumers would pay more for Tesla vehicles and services—and cars more generally.

217.    Defendant Commissioners, in pursuing an unauthorized investigation of state law and in interpreting state law in a manner that bars Tesla from servicing vehicles (in furtherance of the conspiracy to unreasonably restrain trade) are not acting under any clearly articulated and affirmatively stated policy or legislation. There is no legal authority supporting their actions.

218.    There is no state officer, including the Governor, the legislature, or any other executive agency that actively and substantively supervises, approves or otherwise directs the Commission's investigations, nor enforcement related proceedings and decisions. There is no state review mechanism that provides a "realistic assurance" that the Commissioners' anticompetitive conduct "promotes state policy, rather than merely the [Commissioners'] individual interests." *N. Carolina State Bd. of Dental Exam'rs v. FTC*, 574 U.S. 494, 515 (2015) (citation omitted).

219.    While the state has created the Occupational Licensing Review Commission ("OLRC") and charged the OLRC and the legislature's Commerce Committee with the responsibility to review an agency's Rules, neither the OLRC nor the Commerce Committee has exercised the required active supervision over the Commission's activities which are the subject of this suit.

220.    Accordingly, Tesla requests a declaration that the Dealers Association, its members, the Dealerships, and the named Commissioners have conspired to restrain trade in violation of federal law.

221.    Tesla further seeks injunctive relief against the Dealers Association, its members, the Dealerships, and the named Commissioners prohibiting their unlawful and anticompetitive behavior.

222.    Tesla further seeks damages for decreased sales and leasing arising from Defendants' attempts to prevent Tesla from servicing vehicles in Louisiana.

## COUNT II –
## 42 U.S.C. § 1983
## VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES (COMMISSIONERS IN THEIR OFFICIAL CAPACITY)

223.    Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

224.    The composition of the Commission violates Tesla's right to a neutral arbiter, and accordingly violates the Due Process Clause of the Fourteenth Amendment.

225.    The Due Process Clause provides that no State "shall [] deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.

226.    The Supreme Court has held that where an administrative board is comprised of a litigant's competitors and a particular outcome in the proceeding could simply "*possibly* redound to the personal benefit of members of the Board," that board is "constitutionally disqualified from hearing" disputes involving that litigant. *Gibson v. Berryhill*, 411 U.S. 564, 578-79 (1973) (emphasis added).

227.    This Court has already concluded that the "Commission as composed will be found to be inherently biased" against manufacturers. *Nissan Motor Corp. in U.S.A. v. Royal Nissan, Inc.*, 757 F. Supp. 736, 740 (E.D. La. 1991). In that case, the Court concluded that that "[a]lthough the Commissioners may not have a direct financial interest" in preventing a dealership from opening, "enough of an indirect and institutional financial interest exists to raise a question as to the impartiality of the Commissioners." *Id.*

228.    If anything, those concerns are even more acute here where Tesla would disrupt the dealer model that dominates the Commission's membership, as addressed above at ¶¶24-31, 34-39. Even the Commission's former Chairman (and current Commissioner) has acknowledged that the Dealers Association "is made up of many motor dealers who compete with Tesla." Ex. 1.

229.    The Commission's communications with Dealers Association members, addressed above, illustrate that the Commission responded to Dealers Association members' concerns about Tesla participating in the Louisiana market—repeatedly informing Tesla's competitors that the Commission was "on it."

230.    And the Commission and the Dealers Association have "met numerous times in attempts for LADA [the Dealers Association] to convince LMVC [the Commission] to revise its interpretations." Ex. 1.

231.    The Dealers Association and the Dealerships' efforts have paid off.

232.    Simply put, Tesla's place in Louisiana's market cannot exist at the whim of its hostile competitors.

233.    The Commission's plain bias is exemplified by the initial steps that the Commission has taken to restrain and ultimately prohibit Tesla from leasing and servicing Tesla vehicles in Louisiana.[18]

234.    Though these two issues described below are *illustrative* of the regulatory issues the Commission is constitutionally unfit to resolve, they are not the only issues on which the Commission's plain bias deprives Tesla of a neutral arbiter.

---

[18] Though the Commission's subpoena is an example of this unconstitutional oversight, Tesla's claim is not limited to the subpoena or similar regulatory actions: The Commission could use its authority to drive Tesla out of the market entirely.

235.    Specifically, the Commission has issued subpoenas to Tesla Lease Trust regarding Tesla Lease Trust's operations in Louisiana, as described above at ¶¶174-176.

236.    In so doing, the Commission has taken the position that Tesla may not service Tesla vehicles under the State's fleet owner exception—because otherwise "[t]he commission has no authority over a fleet owner" and would not be able to issue such subpoenas. La. Stat. § 32:1261(A)(1)(t)(v).

237.    In other words, by issuing the subpoena, the Commissioners have necessarily determined that Tesla is not a fleet owner and thus cannot lawfully service Tesla vehicles in Louisiana.[19]

238.    That would leave Tesla customers with precious few options to service their vehicles in Louisiana as Tesla's ability to service vehicles in Louisiana would be dramatically restricted, if not eliminated.

239.    Though Tesla has challenged the propriety of those subpoenas in state court, the Commission's efforts will not end at issuing subpoenas, particularly given that the Commission has taken an identical position in that litigation.

240.    The Commission explicitly stated in its state court filings related to Tesla's Petition for Judicial Review that Tesla Leasing Trust appears to be performing warranty work in violation of the restriction on manufacturers providing warranty service. Commission Reply to Motion to Dismiss at 5, *Tesla Lease Trust v. La. Motor Vehicle Comm'n*, No. 820-801 (La. D. Ct. May 3,

---

[19] Tesla does not ask this Court to enjoin those proceedings or to issue any declaration on the requirements of state law. Rather, Tesla asks this Court to declare that—whatever the proper construction of state law—the Commission as currently structured is not constitutionally fit to answer those questions consistent with Due Process.

2022) ("TLT's actions and inactions make for a credible appearance that TLT is in violation of La. R.S. 1261.A(1)(t)(i)[.]").

241.     Accordingly, the Commission has at least two interests that give rise to Due Process concerns.

242.     *First*, the Commissioners' franchised dealerships compete directly with Tesla in the market for vehicle sales, leasing, and servicing.

243.     The Commission using its authority to bar a competitor plainly redounds to the franchised dealer Commissioners' benefit.

244.     *Second*, the franchised-dealer Commissioners have a general interest in the franchised dealer model, under which manufacturers cannot interact directly with consumers for any reason, and instead must go through franchised dealers.

245.     As the State's largest dealer himself stated, Tesla's entry into Louisiana is "not good for the future of our business." Ex. 2.

246.     The Commission's efforts to do what is "good for the future" of its own Commissioners' franchised-dealer businesses, while purportedly "regulating" Tesla, does not comport with due process of law.

247.     Accordingly, Tesla requests a declaration that the Commission is unconstitutionally constituted and cannot exercise regulatory authority over Tesla's leasing and servicing activities.

248.     Tesla further requests a permanent injunction against the Commissioners' regulation of Tesla's leasing and servicing activities.

## COUNT III –
## 42 U.S.C. § 1983,
### VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES (COMMISSIONERS IN THEIR OFFICIAL CAPACITIES)

249.     Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

250.     Louisiana's direct sales ban violates the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States.

251.     The Equal Protection Clause of the Fourteenth Amendment prohibits Louisiana from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend XIV, § 1. "To state a claim for equal protection, the plaintiff must prove that similarly situated individuals were treated differently." *Hines v. Quillivan*, 982 F.3d 266, 272 (5th Cir. 2020) (quotation omitted).

252.     The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

253.     A State violates the Equal Protection Clause where it treats one set of persons differently from others who are similarly situated and there is no rational basis for the differential treatment. *St. Joseph Abbey v. Castille*, 712 F.3d 215, 218-23 (5th Cir. 2013).

254.     Likewise, if a State's law is based on animus, the law fails rational basis review. *E.g.*, *Johnson v. Bredesen*, 624 F.3d 742, 747 (6th Cir. 2010) ("A plaintiff may demonstrate that the government action lacks a rational basis . . . by demonstrating that the challenged government action was motivated by animus or ill-will.") (internal quotation marks omitted).

255.     The direct sales ban—and any effect that ban has on Tesla's ability to lease— violates Tesla's right to equal protection because the State's distinction between manufacturer-owned dealerships (like Tesla) and franchised dealerships that are not owned by manufacturers, lacks a legitimate justification because both kinds of dealerships are similarly situated in all material respects.

256. Furthermore, the warranty servicing ban for non-fleet owners, La. Stat. § 32:1261(A)(1)(t)(i)—to the extent it even applies to Tesla—violates Tesla's right to equal protection because it does not serve any legitimate government interest.

257. These irrational classifications do not further any legitimate government interest and exist solely for the purpose of protecting Louisiana's incumbent franchised auto dealers from economic competition. This is not a legitimate governmental purpose: "[N]either precedent nor broader principles suggest that mere economic protection of a particular industry is a legitimate governmental purpose." *E.g.*, *St. Joseph Abbey*, 712 F.3d at 222-23 (collecting cases).

258. Moreover, the State's classifications are based on particular animus against Tesla.

259. As addressed above at ¶¶ 131-137, the State amended its direct sales ban specifically to respond to Tesla's entrance into the market in Louisiana.

260. Accordingly, Tesla requests a declaration that Louisiana's direct sales ban (and any effect that ban has on Tesla's ability to lease) and the servicing ban for non-fleet owners violate the Equal Protection Clause of the Fourteenth Amendment.

261. Tesla further requests a permanent injunction against the Commissioners' enforcement of the direct sales ban and the servicing ban for non-fleet owners against Tesla.

### COUNT IV –
### 42 U.S.C. § 1983,
### VIOLATION OF THE COMMERCE CLAUSE OF
### THE CONSTITUTION OF THE UNITED STATES
### (COMMISSIONERS IN THEIR OFFICIAL CAPACITIES)

262. Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

263. Louisiana's direct sales ban violates the Commerce Clause.

264. The United States Constitution empowers Congress "[t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3. The Supreme Court has recognized that the Commerce Clause also restricts state and local governments from impeding the free flow of goods

from one state to another or otherwise "unduly restrict[ing] interstate commerce." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019).

265.    Thus, the Commerce Clause prevents states from promulgating protectionist policies, *i.e.*, regulatory measures aimed to protect in-state economic interests by burdening out-of-state competitors.

266.    Louisiana impermissibly discriminates against interstate commerce by impeding the flow of out-of-state-manufactured vehicles into Louisiana by expressly favoring in-state interests (Louisiana franchised dealers) over out-of-state interests (Tesla) in two ways.

267.    *First*, in order for out-of-State vehicle manufacturers to sell their vehicles to customers in Louisiana, they must go through local, in-State dealers.

268.    Prohibiting a non-franchising manufacturer from selling or leasing cars in Louisiana does not advance any legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives. As applied to Tesla, the only possible purpose behind the direct sales ban—and its effect on leasing—is to protect Louisiana's local, in-State franchised auto dealers from economic competition. This is not a legitimate governmental purpose.

269.    The direct sales ban—and any effect it has on Tesla's ability to lease vehicles—violates the Commerce Clause for the independent reason that it imposes a burden on interstate commerce that "is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). As explained above, the only "benefit" of the direct sales ban is economic protection for local dealers, which is not a legitimate purpose under the Commerce Clause.

270.    *Second*, Louisiana prohibits out-of-State non-fleet owners from providing warranty repairs and servicing for vehicles in the state, and grants local interests a monopoly over servicing.

271.     Prohibiting a non-fleet owner from servicing Tesla vehicles in Louisiana does not advance any legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives. As applied to Tesla, the only possible purpose behind the ban on servicing by non-fleet owners is to protect Louisiana's local, in-State franchised auto dealers from economic competition. This is not a legitimate governmental purpose.

272.     Like the direct sales ban, the warranty servicing ban for non-fleet owners violates the Commerce Clause for the independent reason that it imposes a burden on interstate commerce that "is clearly excessive in relation to the putative local benefits." *Id.*

273.     Accordingly, Tesla requests a declaration that the direct sales ban and the servicing ban for non-fleet owners violate the Commerce Clause.

274.     Tesla further requests a permanent injunction against the Commissioners' enforcement of the direct sales ban and the servicing ban for non-fleet owners against Tesla.

**COUNT V –**
**LA. STAT. §§ 51:129, 137,**
**VIOLATION OF STATE ANTITRUST LAW**
**(DEALERS ASSOCIATION, DEALERS ASSOCIATION MEMBERS, DEALERSHIPS,**
**AND COMMISSIONERS IN THEIR OFFICIAL AND PRIVATE CAPACITIES)**

275.     Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

276.     Complementing federal law's protections against anti-competitive behavior, Louisiana has enacted a similar scheme to protect competition in Louisiana. La. Stat. § 51:121, *et seq.*

277.     Because Louisiana's "antitrust statutes [] are 'virtually identical' to their federal counterpart . . . 'the United States Supreme Court's interpretation should be a persuasive influence on the interpretation of [Louisiana's] state enactment.'" *Free v. Abbott Labs., Inc.*, 176 F.3d 298, 299 (5th Cir. 1999) (quoting *La. Power and Light Co. v. United Gas Pipe Line Co.*, 493 So.2d 1149, 1158 (La. 1986)); *accord R & R Motorsports, LLC v. Textron Specialized Vehicles, Inc.*,

2022 WL 1984145, at *2 (E.D. La. June 6, 2022) ("the U.S. Supreme Court's interpretation of the Sherman Act provides guidance in interpreting Louisiana's state statutes.") (citing *La. Power*, 493 So. 2d at 1149); *John River Cartage, Inc. v. Louisiana Generating, LLC*, 300 So.3d 437, 448-49 (La. App. 2020) ("This statute is virtually identical to Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, *et seq.*, and federal analysis of the Sherman Antitrust Act is persuasive, though not controlling.").

278.    The Dealers Association, its members, the Dealerships, and the named Commissioners are actual or potential participants in the market for the sale, leasing, and servicing of passenger vehicles generally—and electric and luxury electric vehicles specifically—in Louisiana and have incentives to (and in fact seek to) restrict competition, innovation, services, and customer choice in the relevant market for the sale, leasing, and warranty servicing of vehicles in Louisiana.

279.    Tesla is in the markets for (or seeks to be in the markets for) the sale, leasing, and servicing of passenger vehicles generally—and electric and luxury electric vehicles specifically—in Louisiana.

280.    For automotive sales and leasing, the relevant market in which to evaluate the conduct of the Defendants and the anticompetitive effect of their collective pernicious activities is the motor vehicle sales and leasing market in Louisiana—in which motor vehicle dealers, including the defendant Dealerships, and Tesla are the sellers and lessors of the motor vehicles, and consumers are the buyers and lessees of the motor vehicles and services.

281.    For automotive warranty repairs and service, the relevant market in which to evaluate the conduct of the Defendants and the anticompetitive effect of their collective pernicious activities is the motor vehicle repair and service market in Louisiana—in which motor vehicle

dealers, including the Defendant dealerships, and Tesla are the sellers of warranty repair and service work, and consumers are the buyers of the repair and service work.

282.    The relevant geographic market is properly limited to Louisiana. The Commission purports to exercise authority over all manufacturers of motor vehicles, motor vehicle dealers, and entities that provide repair and service work that are not fleet owners to Louisiana residents in Louisiana.

283.    Specifically, the Dealers Association, its members, the Dealerships, and the named Commissioners knowingly formed, joined, and entered a conspiracy with a unity of purpose to restrain trade. The Commission's first steps toward threatening Tesla's participation in the market for leasing and warranty servicing of vehicles in Louisiana was its issuing of subpoenas to Tesla Lease Trust relating to Tesla's warranty work and leasing even though Tesla was a "fleet owner," an entity over which the Louisiana legislature has made clear that the Commission has no authority over.

284.    Their agreement to do so is evidenced in part by their joint lobbying efforts to bar Tesla from direct sales in Louisiana, from their communications regarding Tesla's warranty service and leasing operations in Louisiana, their concerted efforts to change the Commission's interpretation of state law, and their response to Tesla's planned service center in New Orleans.

285.    By using their power and asserted regulatory authority, the Commissioners in furtherance of the conspiracy and unified purpose have initiated a costly investigation of Tesla and have threatened Tesla's continued participation in the market through enforcement of their interpretation of state law.

286.    Their actions will injure competition in Louisiana and will harm consumer choice, limit the services available to consumers, and hamper and restrict innovation in the leasing, and servicing of vehicles in Louisiana.

287.    As a direct, proximate, and foreseeable result of their actions, Tesla has and will suffer injury.

288.    Furthermore, the market for car sales, leasing, and warranty servicing will also be harmed as consumers will have reduced choice and reduced services and will fail to benefit from innovation.

289.    And were Tesla to funnel sales, leasing, and warranty servicing through authorized dealers and third-parties, Louisiana consumer would pay more for Tesla vehicles and services—and cars more generally.

290.    Defendant Commissioners, in their official capacity, in pursuing an unauthorized investigation of state law and in interpreting state law in a manner that bars Tesla Lease Trust from servicing vehicles—in furtherance of the conspiracy to unreasonably restrain trade—are not acting under any clearly articulated and affirmatively stated policy or legislation. Further, the Defendant Commissioners who own competing Dealerships, would exercise their authority unlawfully in furtherance of the conspiracy to unreasonably restrain trade to eliminate Tesla Lease Trust's ability to lease vehicles in the state of Louisiana. There is no legal authority supporting their actions nor has the Governor, the legislature, or any other executive agency actively and substantively supervised, approved or otherwise directed their conduct.

291.    Accordingly, Tesla requests a declaration that the Dealers Association, its members, the Dealerships, and the named Commissioners have conspired to restrain trade in violation of state law.

292.     Tesla further seeks injunctive relief against the Dealers Association, its members, the Dealerships, and the named Commissioners prohibiting their unlawful and anticompetitive behavior.

**COUNT VI –**
**LA. STAT. § 51:1405,**
**VIOLATION OF STATE UNFAIR TRADE PRACTICES ACT**
**(DEALERS ASSOCIATION, DEALERS ASSOCIATION MEMBERS,**
**DEALERSHIPS, AND NAMED COMMISSIONERS)**

293.     Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

294.     The Dealers Association, its leadership, its members, and the Dealerships' actions violate Louisiana's Unfair Trade Practices Act.

295.     The Act broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," and permits "[a]ny person who suffers any ascertainable loss of money . . . as a result of the use or employment by another person of an unfair or deceptive method" to sue. La. Stat. §§ 51:1405(A), 1409(A).

296.     "What constitutes unfair and/or deceptive practices is not specifically defined, but is determined on a case by case basis." *Jefferson v. Chevron U.S.A. Inc.*, 713 So. 2d 785, 792 (La. App. 1998) (citation omitted); *accord IberiaBank v. Broussard*, 907 F.3d 826, 839 (5th Cir. 2018) (citation omitted); *Hingel v. Exxon Corp.*, 1999 WL 893574, at *4 (E.D. La. Oct. 15, 1999) ("The statutory language is very broad and, as a result, Louisiana courts determine what constitutes an unfair or deceptive practice on a case by case basis.").

297.     "Louisiana courts have used a two-prong test, finding a practice unfair when (1) it offends established public policy, or (2) it is unethical, oppressive, unscrupulous, or substantially injurious." *Hingel*, 1999 WL 893574, at *4.

298.     Under this test, even "[o]therwise legal actions can be found unfair or deceptive if they produce unfair or deceptive results." *Id.*

299.     Specifically, the Dealers Association, its leadership, its members, the Dealerships, and the named Commissioners' concerted action to co-opt the Commission to bar Tesla from Louisiana is contrary to public policy because it violates the Louisiana Legislature's statutory decision to permit leasing and warranty servicing.

300.     The Dealers Association, its leadership, its members, and the Dealerships' concerted action to co-opt the Commission to bar Tesla from Louisiana is "unethical, oppressive, unscrupulous, [and] substantially injurious." *Id.* Tesla has been required to—and will be required to continue to—expend resources fighting against these attempts to bar Tesla from the market.

301.     Moreover, Tesla has lost sales and leases of Tesla vehicles to residents of Louisiana who—absent the coordinated effort to make Tesla vehicle warranty servicing more difficult—lease or purchase Tesla vehicles.

302.     Accordingly, Tesla requests a declaration that the Dealers Association, its leadership, its members, and the Dealerships' actions violate state prohibitions on unfair trade practices.

303.     Tesla further requests a permanent injunction against those unfair trade practices.

304.     Tesla further requests damages for the lost sales and leases resulting from the Defendants' anti-competitive conduct.

**COUNT VII –
28 U.S.C. § 2201,
DECLARATORY RELIEF
(ALL DEFENDANTS)**

305.     Plaintiffs incorporate all prior paragraphs as though fully set forth herein.

306.     As relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

307.    This Court should exercise its authority to declare that the Commission's composition does not comport with due process, the direct sales ban is unconstitutional, and that the Dealers Association, its members, the Dealerships, and the named Commissioners' conduct violates state and federal law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A. Declare that the Commission as currently constituted by state law cannot regulate Tesla consistent with Due Process, and thus that its attempts to prevent Tesla from leasing and servicing vehicles are unconstitutional.

B. Declare that the direct sales ban and the servicing ban cannot be enforced against Tesla.

C. Permanently enjoin Louisiana Officials from enforcing the direct sales ban and servicing ban against Tesla.

D. Declare that the conspiracy among the Dealers Association, its members, the Dealerships, and the named Commissioners violates state and federal law.

E. Enjoin the Dealers Association, its members, the Dealerships, and the named Commissioners from violating state and federal law by coopting the Commission to bar Tesla from leasing and servicing Tesla Vehicles in Louisiana.

F. Award Plaintiffs damages for Defendants' anti-competitive behavior in violation of federal and state antitrust laws and state unfair trade practices claims.

G. Enter judgment in favor of Plaintiffs.

H. Award Plaintiffs their attorneys' fees and costs incurred in bringing this action, including attorneys' fees and costs under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims

against state officials and fees and costs under 15 U.S.C. § 15 for successful antitrust claims.

I.  Award Plaintiffs all other such relief as the Court deems proper and just.

Respectfully submitted,


ADAMS AND REESE LLP

*/s/ Mark R. Beebe*_____
Mark R. Beebe T.A. (#19487)
Diana Cole Surprenant (#333990)
Jennifer C. Bergeron (#37854)
Jeffrey M. Surprenant (#38908)
701 Poydras Street, Suite 4500
New Orleans, LA  70139
Telephone: (504) 581-3234
Facsimile: (504) 566-0210
Mark.Beebe@arlaw.com
Diana.Surprenant@arlaw.com
Jennifer.Bergeron@arlaw.com
Jeff.Surprenant@arlaw.com

And

LEHOTSKY KELLER LLP
Kyle D. Hawkins*
Todd Disher*
919 Congress Ave., Suite 1100
Austin, TX  78701
Telephone:  (521) 693-8350
Kyle@lehotskykeller.com
Todd@lehotskykeller.com

And

Steven P. Lehotsky*
Scott A. Keller*
Jeremy Evan Maltz*
200 Massachusetts Ave., NW
Washington, DC  20001
Steve@lehotskykeller.com
Scott@lehotskykeller.com
Jeremy@lehotskykeller.com

And

53

Katherine C. Yarger*
700 Colorado Blvd., #407
Denver, CO  80206
Katie@lehotskykeller.com

*Motion for Admission *Pro Hac Vice* forthcoming