Recat Counter 835

FILED FOR RECORD 08/27/2021 10:48:01
Mandy Plaisance, DY CLERK
JEFFERSON PARISH, LA

Filed by: FAX

Date: 8/26/21

Time: 4:13pm

Deputy Clerk: M Plaisance

(SEE ATTACHED LOG)

24TH JUDICIAL DISTRICT COURT FOR THE PARISH OF JEFFERSON

STATE OF LOUISIANA

NO. 820-801

TESLA LEASE TRUST

DIVISION

I

VERSUS

LOUISIANA MOTOR VEHICLE COMMISSION

FILED: _____

_____
DEPUTY CLERK

## PETITION FOR JUDICIAL REVIEW

The Petition for Judicial Review of Tesla Lease Trust, a Delaware corporation headquartered in California and licensed to do business in the State of Louisiana, through undersigned counsel, respectfully represents:

1.

Made defendant is the Louisiana Motor Vehicle Commission (the "Commission"), a Louisiana administrative agency created within the office of the Governor to administer the provisions of Title 32, Chapter 6 of the Louisiana Revised Statues, entitled "Distribution and Sale of Motor Vehicles" (La. Rev. Stat. §32:1251 *et seq.*). The Commission is located in Jefferson Parish, Louisiana and may be served through its Executive Director, Lessie A. House, at 3017 Kingman Street, Metairie, Louisiana 70006.

2.

Petitioner seeks judicial review of the Commission's Judgment against Tesla Lease Trust rendered at the May 17, 2021 hearing, signed on June 10, 2021, and received by counsel for Tesla on July 6, 2021, ordering Tesla Lease Trust to produce to the Commission (i) all documents identifying and referencing warranty service and/or warranty repair performed on all motor vehicles at 2801 Tchoupitoulas Street, New Orleans Louisiana from June 1, 2019 to the present, and (ii) all documents identifying and/or referencing all motor vehicles leased in Louisiana by Tesla Lease Trust between June 1, 2019 and the present. A copy of this judgment is attached hereto as Exhibit 1.

1

EXHIBIT
A

3.

Tesla Lease Trust applied for rehearing on June 1, 2021. A hearing was held on July 12,

2021. A judgment was signed on July 27, 2021 denying Tesla Lease Trust's motion for rehearing.

A copy of this judgment is attached hereto as Exhibit 2.

4.

This Petition for Judicial Review is brought timely pursuant to the Louisiana

Administrative Procedures Act, La. Rev. Stat. §49:950 *et seq.*, and in particular under La. Rev.

Stat. §49:964, within thirty days of the Commission's judgment denying Tesla Lease Trust's

motion for rehearing and seeks review of the Commission's June 10, 2021 Judgment against Tesla

Lease Trust.

5.

The Court's review of the Commission's administrative proceedings and Judgment is

governed by La. Rev. Stat. §49:964(G), which provides that:

G.   The court may affirm the decision of the agency or remand the case for further
proceedings. The court may reverse or modify the decision if substantial rights of
the appellant have been prejudiced because the administrative findings, inferences,
conclusions, or decisions are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority of the agency;

(3) Made upon unlawful procedure;

(4) Affected by other error of law;

(5) Arbitrary or capricious or characterized by abuse of discretion or clearly
unwarranted exercise of discretion; or

(6) Not supported and sustainable by a preponderance of evidence as determined
by the reviewing court. In the application of this rule, the court shall make its
own determination and conclusions of fact by a preponderance of evidence
based upon its own evaluation of the record reviewed in its entirety upon
judicial review. In the application of the rule, where the agency has the
opportunity to judge the credibility of witnesses by first-hand observation of
demeanor on the witness stand and the reviewing court does not, due regard
shall be given to the agency's determination of credibility issues.

## BACKGROUND AND PROCEDURAL HISTORY

6.

Tesla, Inc. ("Tesla"), is an American manufacturer of the most advanced, zero-emissions electric cars on the market. Since its founding, Tesla has employed a unique sales, leasing, and distribution model in which it sells and leases vehicles directly to consumers. As a new market entrant whose value is based on its innovative technology, selling and leasing Tesla's cars requires significant time in order to educate customers about the benefits of its products. As such, Tesla does not use dealers to sell and lease Tesla vehicles anywhere in the world. Similarly, to ensure the highest quality service and best customer experience, Tesla does not contract with third parties to service its cars but instead services Tesla vehicles directly. This model has been extremely successful for Tesla, which produced and delivered over 200,000 vehicles in the second quarter of 2021 alone, and has been beneficial for customers who have access to an array of unique products and exceptional service.

7.

Tesla Lease Trust is a wholly owned subsidiary of Tesla, Inc. It leases Tesla motor vehicles throughout the country and holds a license under Louisiana law authorizing it to lease vehicles in Louisiana.

8.

Louisiana law prohibits Tesla from operating certain aspects of its business model within Louisiana. In particular, Louisiana law prohibits motor vehicle manufacturers, like Tesla from selling new or used cars directly to consumers in Louisiana without using a dealer. *See* La. Rev. Stat. §32:1261(A)(1)(t)(i). But individuals can purchase motor vehicles manufactured by Tesla Inc. outside of Louisiana. And individuals can lease Tesla vehicles in and outside of Louisiana.

9.

Louisiana law also generally prohibits motor vehicle manufacturers from operating a satellite warranty and repair center or authorizing someone to perform warranty repairs in Louisiana. *See* La. Rev. Stat. §32:1261(A)(1)(t)(i); *see also id.* §32:1252(51) ("'Satellite warranty and repair center' means a motor vehicle repair facility, other than at a motor vehicle dealer franchised location, approved by a manufacturer or distributor and authorized to perform warranty

3

and other repairs on motor vehicles."). The Louisiana Legislature, however, has broadly exempted "fleet owners" from this service ban. A fleet owner is defined as "a person, …who is approved and authorized by a manufacturer to perform warranty repairs and owns or leases vehicles for its own use or a renting or leasing company that rents, maintains, or leases vehicles to a third party." *See id.* A repair facility operated by a fleet owner "shall not be deemed a satellite warranty and repair center" under the law and "shall not be required to be licensed by the commission." La. Rev. Stat. §32:1261(A)(1)(t)(vi). And Louisiana law mandates that the Commission "has no authority over a fleet owner." *Id.* Under this "fleet owner" provision, Tesla and Tesla Lease Trust are able to perform warranty repairs on Tesla vehicles in Louisiana, and the Commission "has no authority" over those operations pursuant to Louisiana law.

10.

The Louisiana Auto Dealers Association is comprised of auto dealers in Louisiana who use the traditional franchise dealer sales model. It has publicly opposed Tesla Inc. and Tesla Lease Trust doing business in Louisiana because Tesla Inc. and Tesla Lease Trust do not use franchised dealers to sell, lease, or service Tesla vehicles—and because the Louisiana Auto Dealers Association therefore views Tesla and Tesla Lease Trust as competitors for both vehicle sales and service. Among other strategies, the Louisiana Auto Dealers Association has sought to block Tesla from operating in Louisiana including opposing Tesla Lease Trust performing warranty repairs on Tesla vehicles in Louisiana.

11.

The Louisiana Auto Dealers Association's intermingled and close relationship with the Commission is significant. Half of the Commission is comprised of members of the Louisiana Auto Dealers Association. The body's Commissioner, Eric Lane, served on the Board of the Louisiana Automotive Dealers Association in 2018 when the Commission began investigating Tesla and Tesla Lease Trust for warranty repairs of Tesla vehicles. In June 2020, Allen Krake, Chairman of the Commission, openly acknowledged that the Commission "board is made up of many motor dealers who compete with Tesla" and that for the past "five years" the Commission and the Louisiana Auto Dealers Association had "met numerous times in attempts for LADA to

4

convince LMVC to revise it interpretations" regarding Tesla's operations in Louisiana. *See* Exhibit 3 at Ex. J at LMVC_000052.

12.

This appeal concerns the latest effort by the Commission and the Louisiana Auto Dealers Association to target Tesla and Tesla Lease Trust's warranty repair operations in Louisiana.

13.

On August 5, 2020, the Commission issued a subpoena/subpoena duces tecum upon Tesla Lease Trust seeking records dating back to September 1, 2019 regarding its activities in Louisiana, to which Tesla Lease Trust responded.

14.

On September 23, 2020, the Commission issued a second subpoena/subpoena duces tecum upon Tesla Lease Trust for various records dating back to October 1, 2013. This subpoena was withdrawn by mutual agreement of the parties.

15.

On February 12, 2021, the Commission issued a third subpoena for any records identifying vehicles leased in Louisiana by Tesla Lease Trust and "identifying and/or referencing warranty service and/or warranty repair performed on any and all motor vehicles" in Louisiana from June 1, 2019 to the present, apparently for the purpose of determining whether Tesla Lease Trust is performing warranty repairs in violation of La. Rev. Stat. §32:1261(A)(1)(t)(i). A copy of this subpoena is attached as Exhibit 4.

16.

On March 1, 2021, Tesla Lease Trust responded and objected to the February 12, 2021 subpoena on the grounds that Tesla Lease Trust is a "fleet owner" under La. Rev. Stat. §32:1261(A)(1)(t)(i) exempt from the restrictions imposed by La. Rev. Stat. §32:1261(A)(1)(t)(i), and as such, the Commission has no authority over Tesla Lease Trust under La. Rev. Stat. §32:1261(A)(1)(t)(v) and no authority to request records relating to leases and warranty repair work.

17.

On April 14, 2021, the Executive Director of the Commission, Lessie A. House, filed a motion to compel before the Commission requesting that the Commission order Tesla Lease Trust to respond to the February 12, 2021 subpoena.

18.

Because of the Commission's and the Commissioners' ties to the Louisiana Auto Dealers Association and the traditional automotive industry in Louisiana, Tesla and Tesla Lease Trust submitted public records requests on April 20, 2021 and May 12, 2021, in an effort to further determine if the Commission and its Commissioners maintained any pre-dispositions or bias toward Tesla that could improperly influence its investigation.

19.

Between April 26, 2021 and April 28, 2021, Adrian F. LaPeyronnie, a Commission attorney produced some documents on behalf of the Commission pertaining to the first records request. Several of these documents contained substantial redactions, and no privilege log was included. The Commission refused to produce any documents in response to the second request. To date, Mr. LaPeyronnie has not explained the basis for the redactions, and has refused to produce unredacted versions of the documents (or provide a privilege log) or produce documents responsive to the second records request.

20.

In addition to reviewing Tesla's and Tesla's Lease Trust's records requests and making a determination about which documents should be produced, Mr. LaPeyronnie was at the same time serving as prosecutor on the Commission's motion to compel Tesla Lease Trust to produce records pursuant to the February 12, 2021 subpoena.

21.

On May 7, 2021, Tesla Lease Trust moved to continue the hearing on the Commission's motion to compel to allow the Commission to complete review of the public records request and determine potential bias. The Commission denied the motion to continue.

6

22.

On May 14, 2021, Tesla Lease Trust filed an opposition to the Commission's motion to compel and again requested a continuance based on concerns regarding Tesla Lease Trust's ability to receive a fair and impartial adjudication before the Commission.

23.

On May 17, 2021, the Commission held a hearing on the motion to compel brought by Mr. LaPeyronnie on behalf of the Commission's Executive Director. The Commission declined to continue the hearing, despite Mr. LaPeyronnie representing that the Commission's response to the public records request was not complete.

24.

At the hearing, counsel for Tesla Lease Trust requested a determination on whether Tesla Lease Trust qualified as a fleet owner and requested findings of fact that Tesla Lease Trust qualified as a fleet owner. As counsel explained, because the Commission "has *no authority* over a fleet owner," La. Rev. Stat. §32:1261(A)(1)(t)(v) (emphasis added), the Commission cannot investigate Tesla Lease Trust until it determines that it does not qualify as a fleet owner.  The Commission refused to determine whether Tesla Lease Trust qualified as a fleet owner, denied the motion to compel, and ordered Tesla Lease Trust to respond to the February 12, 2021 subpoena.

25.

The Commission stayed Tesla Lease Trust's supposed obligation to comply with the February 12, 2021 subpoena to allow Tesla Lease Trust to seek judicial review of the Commission's ruling granting the motion to compel filed by its Executive Director.

26.

On June 1, 2021, Tesla Lease Trust filed a motion for rehearing on the additional grounds that the Commission lacked the legislative authorization to issue an investigative subpoena (as opposed to an adjudicative subpoena) and that it lacked jurisdiction to hear a motion to compel, which must instead be heard by the district court.

27.

On July 12, 2021, the Commission held a hearing, at which it rejected Tesla Lease Trust's arguments and denied rehearing. *See* Exhibit 2.

## GROUNDS FOR REVERSAL

### 28.

The June 10, 2021 Judgment of the Commission against Tesla Lease Trust should be reversed in its entirety or remanded for further proceedings pursuant to La. Rev. Stat. §49:964(G), as substantial rights of Tesla Lease Trust have been prejudiced because:

A. The Commission has no statutory authority to issue an investigative subpoena to Tesla Lease Trust but is instead authorized to issue subpoenas only in the context of a hearing on denial of a license, suspension or revocation of a license, or imposition of a civil penalty;

B. The Commission failed to follow the statutorily required procedure for compelling a response to its subpoena;

C. The Commission erred in issuing a subpoena to and otherwise attempting to exercise jurisdiction over Tesla Lease Trust without first determining that it has jurisdiction over Tesla Lease Trust and resolving Tesla Lease Trust's "fleet owner" objection;

D. The Commission deprived Tesla Lease Trust of due process by: (1) allowing biased Commissioners to decide the motion to compel; (2) denying Tesla Lease Trust's motion for a continuance of the hearing on the motion to compel; and (3) having the same individual act as both an adjudicator of Tesla Lease Trust's public records request and as prosecutor of the Commission's motion to compel.

### 29.

Each of these errors independently requires reversal of the Commission's decision.

## THE COMMISSION LACKED STATUTORY AUTHORITY
## TO ISSUE AN INVESTIGATIVE SUBPOENA

### 30.

The Court should reverse the Commission's order because the Commission exceeded its statutory authority in issuing an investigative subpoena to Tesla Lease Trust.

### 31.

The United States Supreme Court has recognized that even when an agency is granted subpoena power, that power may be cabined to the context of an adjudicatory proceeding and does not automatically extend to investigative subpoenas issued before any charge of a violation. *See E.E.O.C. v. Shell Oil Co.*, 466 U.S. 54, 64 (1984) (finding "the EEOC's investigative authority [to be] tied to charges filed with the Commission," therefore "unlike other federal agencies that possess plenary authority to demand to see records relevant to matters within their jurisdiction, the EEOC is entitled to access only to evidence relevant to the charge under investigation" (internal quotation marks omitted)).

32.

The rule is the same in Louisiana: "an administrative agency's power to issue <u>investigative</u> subpoenas depends upon the legislative authorization in a particular enabling statute." *Mary Moe, L.L.C. v. Louisiana Bd. of Ethics*, 875 So. 2d 22, 30 (La. 2004) (emphasis added). Although the Commission has promulgated regulations giving itself broad investigatory subpoena power, *see* Rule 303(B); La. Admin. Code Tit. 46, Part V, §§111, the Louisiana Legislature did not grant the Commission this authority.  Rather, the Commission can issue subpoenas only in the context of a "hearing on denial of a license, suspension or revocation of a license, or imposition of a civil penalty."  La. Rev. Stat. § 32:1258(D)(1).  The Commission has no statutory authority to issue subpoenas outside these specifically delineated contexts.

33.

That the Legislature limited the Commission's subpoena power is confirmed by the broader grant of authority extended to a similar agency, the Louisiana Used Motor Vehicle Commission. Unlike the Louisiana Motor Vehicle Commission, the Louisiana **Used** Motor Vehicle Commission is expressly authorized to "[i]ssu[e], serv[e], and enforc[e] a subpoena or subpoena duces tecum pursuant to any hearing *or lawful investigation*." *See* La. Rev. Stat. §32:783(F)(9) (emphasis added). The Legislature has expressly granted investigative, as opposed to adjudicative, subpoena power to other agencies as well. *See* La. Rev. Stat. §18:1511(C) (granting the Louisiana Board of Ethics the authority to "investigate any apparent or alleged violation" and, pursuant to that authority, "issue subpoenas . . . in furtherance of its investigation into potential violations" of the Campaign Finance Act); La. Rev. Stat. §37:831 (granting the Louisiana State Board of Embalmers and Funeral Directors the power to "investigat[e] as may be found necessary . . . with the right to subpoena").

34.

La. Rev. Stat. §32:1253(E), also relied on by the Commission, does not grant investigative subpoena authority.  This provision merely empowers the Commission to carry out the provisions and objects of its chapter. But this general grant of authority does not somehow confer authority to issue an investigative subpoena—particularly where a different statute specifically grants only limited power to issue an adjudicative subpoena. *See State in Interest of A.C.*, 643 So.2d 719, 730

(La.1994), *on reh'g*, 93-1125 (La. 10/17/94), 643 So. 2d 743 ("It is a well-settled proposition that "[i]n the interpretation of ... statutes, the specific controls the general."); *see also Richardson v. Say*, 31,989, p. 3 (La. App. 2 Cir. 7/22/99), 740 So. 2d 771, 773 ("In the instance where a statute specifically covers a particular subject, it takes precedence over a statute that governs general law.").

<div align="center">35.</div>

The Court should vacate the Commission's improper order because the Commission lacked authority to issue any investigative subpoena to Tesla Lease Trust. This independent error alone requires reversal of the Commission's decision.

<div align="center">

**THE COMMISSION LACKED JURISDICTION TO HEAR
A MOTION TO COMPEL**

</div>

<div align="center">36.</div>

The Court should also reverse the Commission's order compelling production of documents because the Commission had no authority to hear and rule on a motion to compel.

<div align="center">37.</div>

The statutory provisions governing the Commission set forth no specific procedure for enforcement of a subpoena. Where, as here, an agency's organic statute is silent, the Louisiana Administrative Procedures Act ("APA") governs agency procedure. *See Louisiana State Bd. of Embalmers & Funeral Directors v. Caskets Direct, Inc.*, 30,861, p. 7 (La. App. 2 Cir. 8/19/98), 716 So. 2d 943, 947 ("Where agency laws are silent, it is the function of the APA to fill in gaps and to provide rules for procedure."); *see also Louisiana State Bd. of Embalmers and Funeral Directors v. Caskets Direct, Inc.*, 30,861 (La. App. 2 Cir. 8/19/98), 716 So. 2d 943, 947 ("These provisions govern when an agency subpoena goes unanswered, and the Board in this case should have utilized these procedures, rather than filing a 'free-floating' motion to compel the production of documents in the First Judicial District Court.").

<div align="center">38.</div>

The APA requires the Commission to seek enforcement of its subpoena via a motion for contempt filed in the district court for the district within which the person so summoned resides or is found. La. Rev. Stat. §49:956(5)(c). *See also Louisiana State Bd. of Embalmers*, 716 So. 2d 943

<div align="center">10</div>

at 947 (holding that the Louisiana State Board of Embalmers and Funeral Directors was required

to follow this provision of the APA to compel production of documents); *Francis v. Accardo*, 602

So. 2d 1066, 1068 (La. App. 1st Cir. 1992) (noting that enforcement of a subpoena issued by the

Louisiana Department of Employment and Training "is by application for an order by the State

court having jurisdiction with in the geographical area of inquiry" under the employment statute

creating the agency).

<div align="center">39.</div>

The Commission's order compelling production has no legal effect because the

Commission lacks statutory authority to hear and decide a motion to compel brought by the

Commission. *See Realty Mart v. Louisiana Bd. of Tax Appeals*, 336 So. 2d 52, 55 (La. App. 1 Cir.

1976) (finding that where agency did not possess the express or implied power to compel

discovery, "its order directing the plaintiff to answer the interrogatories propounded to it by the

[agency] exceeded the authority delegated ... by the Legislature and was, therefore, without

effect").

<div align="center">40.</div>

None of the provisions cited by the Commission grants it authority to compel compliance

with its subpoena.  La. Rev. Stat. §32:1253(E), relied on by the Commission, merely grants the

Commission "the powers and duties necessary and proper to enable it to fully and effectively carry

out" the statute's provisions.  It does not specifically and expressly grant the Commission the

power to entertain and then rule on its own motion to compel.

<div align="center">41.</div>

The Commission's reliance on Rule 303(B) is also misplaced.  The Commission cannot

create new powers by regulation that are not authorized by statute.  *See Realty Mart*, 336 So. 2d at

55. Therefore, regardless of what this rule purports to allow, the Commission has no authority to

enforce a subpoena itself in light of the APA's requirement that it must enforce its subpoenas via

a contempt proceeding in court. Further, Rule 303(B)'s language does not authorize the

Commission to entertain and decide a motion to compel. Rather, it simply provides "[t]he

subpoena may be to compel the attendance of any person to appear for the purposes of giving

sworn testimony or to compel the production of books, records, papers, or other objects."

42.

The Commission failed to bring its motion to compel before the district court where Tesla Lease Trust resides as required under the APA and instead improperly ruled on its own motion to compel and ordered a response to the subpoena issued by the Commission itself.[1]  The Court should vacate the Commission's improper order compelling production because the Commission lacks authority to issue such an order.  Here again, this threshold error alone invalidates the Commission's decision.

## THE COMMISSION HAS NO AUTHORITY TO INVESTIGATE TESLA LEASE TRUST BECAUSE THE COMMISSION HAS NOT DETERMINED THAT TESLA LEASE TRUST IS WITHIN THE COMMISSION'S JURISDICTION

43.

The order compelling production is also improper because the Commission failed to establish its jurisdiction over Tesla Lease Trust.  Thus, even if the Court concludes the Commission has authority to issue an investigative subpoena (it does not), the Court should remand this matter to the Commission to determine whether Tesla Lease Trust qualifies as a fleet owner exempt from the Commission's jurisdiction and subpoena requests.

44.

In *Mary Moe, L.L.C.*, the Louisiana Supreme Court held that the evidence sought by a subpoena "must be reasonably relevant and material to the investigation's lawfully authorized purpose." 875 So. 2d at 30. An agency is thus ordinarily required to establish lawful authority to regulate the recipient's conduct before serving and compelling compliance with a subpoena.

45.

Reinforcing that general obligation, the Legislature has mandated that the Commission "has *no authority* over a fleet owner." *See* La. Rev. Stat. §32:1261(A)(1)(t)(v) (emphasis added). Accordingly, unless and until the Commission properly determines that Tesla Lease Trust is not a fleet owner, it has "no authority" to investigate Tesla Lease Trust or to require it to produce documents pursuant to a subpoena.

46.

---

[1] Tesla Lease Trust resides in Orleans Parish. Thus, the proper district court to hear a motion to compel by the Commission is Civil District Court.

Although Tesla Lease Trust objected to the subpoena on the ground that it qualifies as a fleet owner that is exempt from regulation by the Commission, the Commission granted its own motion to compel without first determining whether Tesla Lease Trust is a fleet owner and thus without ever establishing its own jurisdiction. The Commission's failure to even consider the question of its jurisdiction renders the Commission's purported investigation into Tesla Lease Trust without a lawful or valid investigatory purpose.

47.

Even setting aside Tesla Lease Trust's objection that the Commission lacks authority to issue investigative subpoenas at all, the order compelling production is invalid because the Commission has never determined whether it has any authority over Tesla Lease Trust. Thus, even if the Court overrules Tesla Lease Trust's threshold objections, discussed above, this matter should be remanded to the Commission to determine whether Tesla Lease Trust meets the definition of "fleet owner" and is therefore beyond the Commission's jurisdiction.

**THE COMMISSION DEPRIVED TESLA LEASE TRUST OF DUE PROCESS**

48.

The current order is also unenforceable against Tesla Lease Trust because the proceedings below violated Tesla Lease Trust's due process rights in three respects: first, the Commission is inherently biased and therefore was unfit to decide the motion to compel because it is made up in substantial part of Tesla's direct competitors, who wish to put Tesla out of business in Louisiana; second, the Commission violated Tesla Lease Trust's due process rights by denying its motion to delay the hearing until after the Commission responded to Tesla and Tesla Lease Trust's public records requests; and third, the Commission improperly comingled its prosecutorial and adjudicatory functions in its dealings with Tesla and Tesla Lease Trust.

49.

First, the Commission is inherently biased because it is dominated by Tesla's direct competitors, who have an interest in putting Tesla Lease Trust out of business in Louisiana. Half of the Commission's Commissioners are members of the Louisiana Auto Dealers Association. Commissioner Eric Lane was a member of the Association's board as recently as 2018. Even the Chairman of the Commission has acknowledged that the Association "is made up of many motor

dealers who compete with Tesla."  Exhibit 3 at Ex. J at LMVC_000052.  Given this inherent

conflict of interest, no proceeding before the Commission can afford Tesla Lease Trust with due

process.

<center>50.</center>

Both federal and state courts in Louisiana have recognized in similar contexts that a party's

"due process rights would be violated irreparably if the plaintiff is required to litigate before the

[C]omission and it is later determined that the [C]omission is biased." *Nissan Motor Corp. in*

*U.S.A. v. Royal Nissan, Inc.*, 757 F. Supp. 736, 740 (E.D.L.A. 1991); *see also Butler v. Dep't of*

*Pub. Safety & Corr.*, 609 So. 2d 790, 793 (La. 1992) ("An impartial decisionmaker is essential to

an administrative adjudication that comports with due process."); *Kelley Blue Book Co., Inc. v.*

*Louisiana Motor Vehicle Comm'n*, 16-281, p. 16 (La. App. 5 Cir. 12/7/16), 204 So. 3d 1139, 1152

(observing that for "the guarantee of due process to be preserved," the adjudicator cannot present

"a risk of actual and substantial bias or prejudgment"). The proceedings before the Commission

cannot be accepted until the question of bias has been resolved. To do otherwise violates Tesla

Lease Trust's due process rights.

<center>51.</center>

Second, at a minimum, the influence and control exercised over the Commission by

members of the Louisiana Automotive Dealers Association raises a serious question about whether

the Commission is in fact biased and pre-disposed to rule against Tesla Lease Trust.  But Tesla

Lease Trust has been prevented from further probing the Commission's bias because the

Commission has refused to respond fully to its outstanding public records requests.  Tesla Lease

Trust moved to continue the hearing on the Commission's motion to compel until the Commission

had produced responsive public records.  The Commission denied that continuance motion, and

ruled on the motion to compel even though Tesla and Tesla Lease Trust's public records requests

remained pending.

<center>52.</center>

Due process required the Commission to continue the hearing on its motion to compel until

it could produce a complete and independent response to Tesla Lease Trust's public records request

and hold a recusal hearing to determine (with the benefit of a complete record) the bias of the

<center>14</center>

Commissioners. *See Louisiana State Bd. of Med. Examiners v. Golden*, 94-0922, p.3 (La. App. 4

Cir. 9/29/94), 645 So. 2d 690, 691 (finding that when a party states the grounds for possible recusal

"with particularity in writing (in affidavit form under LSA-R.S. 49:960, . . .) . . . a recusal hearing

is warranted"). Tesla Lease Trust is entitled to fully investigate the bias of this purported regulator

(comprised of its competitors who wish to shut Tesla out of the state) whose impartiality has

rightly been called into doubt. By failing to delay the hearing, respond to the records request, and

then hold a recusal hearing addressing the Commission's bias, the Commission violated Tesla

Lease Trust's right to due process.

<div align="center">53.</div>

Third, the Commission also violated Tesla Lease Trust's due process rights because the

Commission's prosecutor on the motion to compel is participating in this matter as an investigator,

prosecutor, and reviewer of the Commission's response to Tesla Lease Trust's public records

requests. The Louisiana Attorney General has advised that where "records and facts involving

licensees are disputed" and the same individual "serves as prosecutor and custodian of records, a

potential conflict may arise." *See* La. Atty. Gen. Op. No. 09-0241 (2009). The independence of

the Commission's prosecutor is in question, and no independent evaluation of Tesla Lease Trust's

public records request has been made.

<div align="center">54.</div>

The few public records that Tesla Lease Trust has received in response to its requests reveal

that the Commission's prosecutor, who is deciding which records can be released to Tesla Lease

Trust, has long been personally involved in investigating possible charges of violations against

Tesla Lease Trust. *See* Exhibit 3 at Exs. M & N. Mr. LaPeyronnie's role as both a decider of Tesla

Lease Trust's claims and a prosecutor against Tesla Lease Trust are contrary to La. Rev. Stat.

§49:960(A), which provides that except in limited circumstances, "members or employees of an

agency assigned to render a decision or to make findings of fact and conclusions of law in a case

of adjudication noticed and docketed for hearing shall not communicate, directly or indirectly, in

connection with any issue of fact or law, with any party or his representative, or with any officer,

employee, or agent engaged in the performance of investigative, prosecuting, or advocating

functions." This improper mixing of the prosecutorial and adjudicatory roles further violates Tesla

<div align="center">15</div>

Lease Trust's due process rights. *See Value Import, Inc. v. Louisiana Used Motor Vehicle Comm'n*, 2012-1592 (La. App. 1 Cir. 8/9/13), 2013 WL 4039947 (ruling that when the prosecutor's "contact with the decision maker is not limited or inconsequential," due process may be violated); *In re Georgia Gulf Corp.*, 95-1694 (La. App. 1 Cir. 6/28/96), 676 So. 2d 1187, 1191 ("Mr. Sexton's combination of prosecutorial and adjudicatory roles, that was exhibited throughout the subject hearing and administrative determination, presented an unacceptable threat to the accuseds' right to a fair hearing.").

55.

For all of these reasons, the Commission's decision on the motion to compel should be vacated and the case remanded to the Commission for a new hearing that comports with the requirements of due process.

## DISCOVERY

56.

Good cause exists for Tesla Lease Trust to conduct discovery as to the bias of the Commission under La. Rev. Stat. §49:964(E) because Tesla Lease Trust's public records request remains outstanding, and the Commission denied Tesla Lease Trust the opportunity to complete its investigation into the bias of the Commission, which is material to establish bias.

## WRITTEN BRIEFING AND ORAL ARGUMENT

57.

Pursuant to La. Rev. Stat. §49:964(F), Tesla Lease Trust requests that this Court receive written briefing and hear oral argument on the issues presented herein. The full extent of the Commission's errors Tesla Lease Trust's grounds for relief will be set forth in Tesla Lease Trust's Brief in Support.

**WHEREFORE**, Petitioner Tesla Lease Trust prays that this Court reverse the Judgment of the Louisiana Motor Vehicle Commission against Tesla Lease Trust rendered on May 17, 2021 signed on June 10, 2021, and received on July 6, 2021, which Judgment was also subject of a Motion for Rehearing, which the Commission denied and provided notice of the denial to Petitioner on July 28, 2021, that after due proceedings, including the opportunity for Petitioner to brief the legal issues and present oral argument, that this Honorable Court vacate the Commission's

Judgment, find that the Commission erred and prejudiced Petitioner's substantial rights in ordering production of documents relating to matters beyond the Commission's statutory authority, or alternatively, remand this matter to the Commission to determine whether Tesla Least Trust qualifies as fleet owner beyond the jurisdiction of the Commission and whether the Commission is biased, for reasonable litigation expenses against the Commission, and for all other general and equitable relief to which Tesla Lease Trust is entitled.

Respectfully Submitted,

ADAMS AND REESE LLP

Mark R. Beebe (#19478)
Diana Cole Surprenant (#33399)
Jennifer C. Bergeron (#37584)
701 Poydras Street, Suite 4500
New Orleans, LA 70139
Telephone: (504) 581-3234
Facsimile: (504) 566-0210
*Counsel for Tesla Lease Trust*

Please serve
The Louisiana Motor Vehicle Commission
Through its Executive Director, Lessie A. House
3017 Kingman Street
Metairie, LA 70006

*Rec at Counter*
~~FILED FOR RECORD~~ 08/27/2021 10:48:03
Mandy Plaisance, DY CLERK
JEFFERSON PARISH, LA
*572*



# State of Louisiana
## LOUISIANA MOTOR VEHICLE COMMISSION

John Bel Edwards
Governor

Lessie A. House
Executive Director

IN RE:
**TESLA**
**2801 TCHOUPITOULAS STREET**
**NEW ORLEANS, LOUISIANA 70115**

Filed by: **FAX**
Date: _8/26/21_
Time: _4.13pm_
Deputy Clerk: _m plaisance_
(SEE ATTACHED LOG)

## ORDER

CAME for hearing before the Commissioners of the Louisiana Motor Vehicle Commission on May 17, 2021 was a "*Motion to Compel Production of Information Sought by Subpoena and Subpoena Duces Tecum*" filed on behalf of the Executive Director of the Louisiana Motor Vehicle Commission.

APPEARANCES:

| | | |
|---|---|---|
| Adrian F. LaPeyronnie, III | – | Attorney representing mover-in-rule, Executive Director Lessie A. House, Louisiana Motor Vehicle Commission |
| | | and |
| Mark R. Beebe | – | Attorney representing respondent-in-rule, Tesla Lease Trust |
| Eric LaFleur | – | Attorney representing respondent-in-rule Tesla Lease Trust |

UPON review of the record, the argument of counsel, and in accordance with the law:

**IT IS HEREBY ORDERED** that Tesla Lease Trust's objection to the LMVC Motion to Compel be and is hereby overruled.

**IT IS FURTHER ORDERED** that Tesla Lease Trust produce to the Louisiana Motor Vehicle Commission within thirty (30) days of the signing of this order all information sought by the "*Motion to Compel Production of Information Sought by Subpoena and Subpoena Duces Tecum*", namely:

1)   All documents or electronically stored information, including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations, stored in any medium from which information can be obtained either directly or, if necessary, after translation into a reasonably usable form – **identifying and or referencing warranty service and/or warranty repair performed on any and all motor vehicles at 2801 Tchoupitoulas Street, New Orleans, Louisiana from June 1, 2019 to present**.

2)   All documents or electronically stored information, including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations, stored in any medium from which information can be obtained either directly or, if necessary, after translation into a reasonably usable form – **identifying and/or referencing all motor vehicles leased in Louisiana and all motor vehicles leased into Louisiana by TESLA LEASE TRUST from June 1, 2019 to present.**

**IT IS FURTHER ORDER** that implementation of this order be and is hereby stayed pending appeal by Tesla Lease Trust within thirty (30) days of the signing of this order.

THIS _10th_ DAY OF _June_, 2021 AT METAIRIE, LOUISIANA.

Bill Westbrook, Acting Chairman
Louisiana Motor Vehicle Commission

Certified to be a true and
correct copy of the original.

La. Motor Vehicle Commission

**DEFENDANT'S**
**EXHIBIT**
**1**



*Rec at counter*
~~FILED~~ FOR RECORD 08/27/2021 10:48:04
Mandy Paisance, DY CLERK
JEFFERSON PARISH, LA
512

# State of Louisiana
### LOUISIANA MOTOR VEHICLE COMMISSION

John Bel Edwards
Governor

Lessie A. House
Executive Director

IN RE:
TESLA
2801 TCHOUPITOULAS STREET
NEW ORLEANS, LOUISIANA 70115

Filed by: FAX
Date: 8/26/21
Time: 4:13pm
Deputy Clerk: M Paisance
(SEE ATTACHED LOG)

## ORDER

CAME for hearing before the Commissioners of the Louisiana Motor Vehicle Commission on July 12, 2021 was Tesla Lease Trust's Motion for Rehearing on the Louisiana Motor Vehicle Commission's May 17, 2021 ORDER. Tesla Lease Trust's Motion for Rehearing was filed on June 1, 2021, by Mark R. Beebe, an Attorney for Tesla Lease Trust.

APPEARANCES:

| Mark R. Beebe | - | Attorney representing mover-in-rule, Tesla Lease Trust |
| Diana Surprenant | - | Attorney representing mover-in-rule Tesla Lease Trust |
| | | and |
| Adrian F. LaPeyronnie, III | - | Attorney representing respondent-in-rule, Executive Director Lessie A. House, Louisiana Motor Vehicle Commission |

UPON review of the record and the evidence in this matter, the argument of counsel, the Commission having found that its authority was sufficient to issue the *Subpoena* to Tesla Lease Trust in the investigation, and in accordance with the law:

IT IS HEREBY ORDERED that Tesla Lease Trust's Motion for Rehearing be and is hereby DENIED.

IT IS FURTHER ORDERED that implementation of this order be and is hereby stayed pending appeal by Tesla Lease Trust within thirty (30) days of the signing of this order.

THIS 27th DAY OF July, 2021 AT METAIRIE, LOUISIANA.

Alan J. Krake, Chairman
Louisiana Motor Vehicle Commission

Certified to be a true and
correct copy of the original.

La. Motor Vehicle Commission

DEFENDANT'S
EXHIBIT
2

3017 KINGMAN STREET, METAIRIE, LOUISIANA 70006 • (504) 838-5207 • FAX (504) 838-5416
www.lmvc.la.gov

Filed by: FAX

Date:  8/26/21

Time:  4.13pm

Deputy Clerk: M Plaisance
          (SEE ATTACHED LOG)

Rec at counter

FILED FOR RECORD 08/27/2021 10:48:05
Mandy Plaisance, DY CLERK
JEFFERSON PARISH, LA

512

## STATE OF LOUISIANA
## DIVISION OF ADMINISTRATIVE LAW

**DEPARTMENT OF LOUISIANA**
**MOTOR VEHICLE COMMISSION**

**IN THE MATTER OF TESLA SERVICE**
**& DELIVERY**

### AFFIDAVIT OF MARK R. BEEBE

**STATE OF LOUISIANA**

**PARISH OF ORLEANS**

   **BEFORE ME**, the undersigned authority, personally came and appeared:

### MARK R. BEEBE

who, after being first duly sworn by me, did depose and state the following:

   1. I am over the age of majority and a resident of Jefferson Parish, Louisiana, and this affidavit is based upon by personal knowledge

   2. I am an attorney representing Tesla Lease Trust ("Tesla") in the above-captioned matter.

   3. I submit this affidavit in connection with the Formal Opposition to May 17, 2021 Hearing Before Louisiana Motor Vehicle Commission and pursuant to La. R.S. §49:960(B) under Louisiana Administrative Procedures Act, La. R.S. 49:950, *et seq.*), which provides that a "party may request the disqualification of a subordinate deciding officer or agency member, on the ground of his inability to give a fair and impartial hearing, by filing an affidavit, promptly upon discovery of the alleged disqualification, stating with particularity the grounds upon which it is claimed that a fair and impartial hearing cannot be accorded."

   4. This affidavit is being filed to preserve the rights of Tesla to maintain its objection and to receive a complete and proper response to the outstanding public records requests issued to

DEFENDANT'S
EXHIBIT
3

the Louisiana Motor Vehicle Commission (the "Commission"), as detailed below.

5.      On April 20, 2021, on behalf of Tesla, I sent a Public Records Request to the Commission for "any and all records that contain any reference to 'Tesla,' 'Tesla Lease Motors', 'TSLA,' 'Tesla Inc.,' 'Tesla Trust Lease,' or any other name, moniker, or abbreviation used by the Commission to refer to Tesla within the time frame of January 1, 2019 to April 20, 2021.[1]

6.      On April 26, through April 28, 2021, the LMVC, through its counsel in this proceeding, Mr. LaPeyronnie, produced nine (9) batches of records pursuant to the Public Records Request. However, these submissions included significant redactions. Neither the Commission nor Mr. LaPeyronnie provided an explanation for withholding portions of these records, although required to do so under Louisiana Public Records Act, La. R.S. 44:1, *et seq* specifically La. R.S. 44:32(D), which provides:

> "In any case in which a record is requested and a question is raised by the custodian of the record as to whether it is a public record, such custodian shall within three days, exclusive of Saturdays, Sundays, and legal public holidays, of the receipt of the request, in writing for such record, notify in writing the person making such request of his determination and the reasons therefor. Such written notification shall contain a reference to the basis under law which the custodian has determined exempts a record, or any part thereof, from inspection, copying, or reproduction."

7.      On May 4, 2021, I submitted a follow-up letter to Mr. LaPeyronnie, indicating that several documents were "substantially redacted."[2] I further requested a "privilege log of those documents that have been redacted and of any documents withheld on the basis of some privilege or immunity claimed by the Commission."[3] Finally, as a result of receiving an inordinately small number of records that were received or generated by individual Commissioners in response to the Public Records Request, I requested confirmation that each Commissioner was provided a copy of

---

[1] *See* April 20, 2021 correspondence from M. Beebe to the Louisiana Motor Vehicle Commission, Custodian of Records, attached as Exhibit A.
[2] *See* May 4, 2021 correspondence from M. Beebe to A. LaPeyronnie, attached as Exhibit B.
[3] *Id.*

the request and had properly searched for the requested public records.[4]

8.    On May 6, 2021, Mr. LaPeyronnie responded, asserting that he was not aware of any requirement by the Louisiana *Public Records Law* (*"PRL"*) for the preparation of a privilege log or requiring the Commission to identify the information you request, despite the Commission failing to fulfill its obligations under La. R.S. 44:32(D).[5] Mr. LaPeyronnie further confirmed that he had not provided the Public Records Request to individual members of the Commission.[6]

9.    On May 7, 2021, I responded to Mr. LaPeyronnie, confirming that the Commission bears the burden of proving public records are not subject to production.[7] I further provided specific Louisiana case law to Mr. LaPeyronnie confirming the individual Commissioners' obligations to search for and produce public records in their possession. *See*, *Mercato Elisio, L.L.C. v. City of New Orleans*, 2018-0081 (La. App. 4 Cir. 11/21/18), 259 So.3d 1235 (any documents or communications created by an individual member of a public board is considered a public record if prepared, used, and possessed in accordance with that member's work with the public board). Finally, on behalf of Tesla I sought the Commission's immediate compliance with its obligations under Louisiana law to provide a full and complete response to the Public Records Request, or otherwise "provide a justification for its unwillingness to do so."[8]

10.    Mr. LaPeyronnie, did not respond to the May 7, 2021 request.[9]

11.    In reviewing the public records produced by the Commission, including redacted communications of the Commission and its employees, several records produced raise serious

---

[4] *See* Exhibit B.
[5] *See* May 6, 2021 correspondence from A. LaPeyronnie to M. Beebe, attached as Exhibit C.
[6] *Id.*
[7] *See* May 7, 2021 correspondence from M. Beebe to A. LaPeyronnie, attached as Exhibit D.
[8] *Id.*
[9] Ms. House sent a brief response on May 14, 2021, addressing only the example correspondence outlined in Exhibit D, and claiming "attorney-client privilege" over the same. Once again, it is the public body who bears the burden of establishing withheld public records are exempt from production.

questions and concerns regarding both the Commission's adjudicative and prosecutorial independence, including potential bias and prejudgment of the merits, abrogating the guarantees of due process rights under both the Louisiana and United States Constitutions, as well as possible violations of the Sherman Antitrust Act, 15 U.S.C. §1, *et seq.,* by the Commission and its constituent Commissioners.

12.     For example, on July 11, 2018, in an e-mail exchange attaching the a newspaper article captioned, "Tesla plans a N.O. service center" between Ms. Lessie House, the Executive Director of the Commission, and Ray Brandt, the then Chairman of the Commission and Board member of the Louisiana Auto Dealers Association (the "LADA"), Ms. House writes to Mr. Brandt "FYI. And to let you know I am on it."[10]

13.     In a July 17, 2018 email exchange with the subject line: "Tesla is opening a service center in New Orleans," Mat Baer of Bohn Bros – also a member of the LADA –asks Ms. House "Is Tesla's direct sale approach legal in Louisiana? If so how?" Ms. House writes in response "We [the LMVC] are on top of this."[11]

14.     Also on July 17, 2018, in an email chain with the subject, "Is this happening?" Ms. House apparently provided the Commission's legal position to Will Green, the President and Administrator of LADA, who confirms that he "spoke to Lessie at the LMVC and she re-stated her position that she feels the law is clear that [Tesla] cannot get a license" to operate a service center in New Orleans.[12]

15.     In this same email chain, Paul Strodred of Courtesy Automotive Group, writes to Don Hagroder, Joseph Westbrook, and Bill Cenlary, all of Courtesy Automotive, "please open up the link below and read will green response this is not good for the future of our business if the

---

[10] *See* July 11, 2018 e-mail correspondence from L. House to R. Brandt, attached as Exhibit E.
[11] *See* July 17, 2018 e-mail correspondence between L. House and M. Baer, attached as Exhibit F.
[12] *See* July 17, 2018 e-mail correspondence from W. Green, attached as Exhibit G, at LMVC_000384.

state lets this happen."[13] Ms. House responds that the Commission is "On top of it."[14]

16.     As recently as March 3, 2020, LADA, through its counsel, recognizing the breadth of the fleet exception under the current version of §1261(A)(1)(t)(i), requested that the Commission promulgate "[r]egulations clarifying the intent of the fleet exemption."[15] LADA's legal counsel went so far as to advise the Commission that "[d]isplacement of competition is clearly a logical result of the regulatory directive and authority given the LMVC by the legislature" and LADA's proposed clarification was requested to foreclose Tesla from operating as a fleet owner and to preclude Tesla from providing warranty service.[16] The issue of the fleet exemption is a key legal issue in the Commission's pending Motion to Compel.

17.     It was also discovered that on June 4, 2020 Representative Philip Devillier requested an attorney general opinion on issues that directly affect Tesla which are implicated in the Commission's pending motion to compel.[17] Chairman of the Commission, Allen Krake, responded on July 30, 2020 on behalf of the LMVC, and acknowledged that Rep. Devillier's Opinion Request was made "on behalf of others."[18] Tesla is entitled to know on whose behalf the Representative sought the Opinion. Moreover, Mr. Krake acknowledged potential serious antitrust concerns and years-long discussions between LADA and the Commission on the Tesla related issues to be decided by the Commission:

> Both questions raised by Rep. Devillier's Opinion Request involve a longtime issue existing among Tesla and franchise dealers.... The LMVC board is made up of many motor dealers who compete with Tesla. The motor vehicle dealers on the LMVC Board are all franchised dealers.... The questions (or variations thereof) contained in the Opinion Request letter have been discussed at length between the LMVC and LADA well over five years, the parties having met numerous times in

---

[13] *Id.* at LMVC_000383.
[14] *Id.*
[15] *See* March 2, 2020 correspondence from C. Reynaud to A. Krake, attached as Exhibit H.
[16] *Id.* at LMVC_000032.
[17] *See* June 4, 2020 correspondence from P. Devillier to Attorney General Jeff Landry, attached as Exhibit I.
[18] *See* July 30, 2020 correspondence from A. Krake to Attorney General Jeff Landry, attached as Exhibit J, at LMVC_000047.

attempts for LADA to convince LMVC to revise it interpretations."[19]

18.     The close relationship and interlocking of Board members of both LADA and Commission is well established, as each of the current Commissioners who are motor vehicle dealers are also members of LADA, and Commissioner, Eric Lane, has served as a LADA Board in 2018, when the Commission began investigating the Tesla's service center.  This intertwined relationship between the Commission and LADA, and LADA's clear intent to foreclose Tesla from operating its service center under the fleet exemption raises enough of a concern that Tesla should be able to further investigate the potential bias, lack of independence, and pre-judgment of the Commission and await a complete and proper response to the outstanding Public Records Requests.

19.     As a result, I made an additional public records request to the Commission, seeking communications between the LADA and the Commission related to these issues.[20]

20.     In addition, on August 24, 2018, Mr. LaPeyronnie provided his opinion to Ms. House, on a Tesla Lease Agreement.[21]  He was also involved in discussions with Ms. House and other Commission counsel, Mr. Reggie, regarding a "licensing issue" related to "Tesla Lease Trust" as early as November 27, 2019.[22]  In fact, Mr. LaPeyronnie provides Ms. House and Mr. Reggie a "draft opinion" on the matter he is now tasked with prosecuting, and Mr. Reggie is believed to be advising the Commissioners who are to deliberate on the merits.[23]  Almost a year later, Mr. LaPeyronnie sends to Ms. House and Mr. Reggie, a "brief summary" of the ongoing investigation and licensing issues at Tesla's Tchoupitoulas Street location.[24]

---

[19] *Id.* at LMVC_000052.
[20] *See* May 12, 2021 correspondence from M. Beebe to A. LaPeyronnie, attached as Exhibit K.
[21] *See* August 24, 2018 correspondence from A. LaPeyronnie to L. House, attached as Exhibit L.
[22] *See* November 27, 2019 correspondence from A. LaPeyronnie to L. House and G. Reggie, attached as Exhibit M.
[23] *Id.*
[24] *See* September 25, 2020 correspondence from A. LaPeyronnie to L. House and G. Reggie, attached as Exhibit N.

21.     These communications, the majority of which are redacted without any stated without justification as required under La. R.S. 44:32(D), reveal two major concerns. First, the nature, scope, purpose and dissemination of Mr. LaPeyronnie, Ms. House, and Mr. Reggie's ex parte communications with the Commissioners, should be disclosed, especially given the Commission has made no attempt to justify its redactions of records its admits are public records. Second, clearly LADA has "prejudged" Tesla, and the scope and extent to which the Commissioners have been influenced or possibly prejudged this matter themselves deserves further elucidation and investigation to which Tesla maintains it is entitled under due process and through a complete and proper public records response to its current outstanding request.

22.     Mr. LaPeyronnie has not responded to my requests for supplementation of my first records request, nor to my recent request for additional Commission communications. This non-response again raises concerns of adjudicative and prosecutorial bias, impartiality, and prejudgment in these proceedings.

23.     In light of Tesla's outstanding Public Records Requests to the Commission and the risk of adjudicative and prosecutorial bias, impartiality, and prejudgment, Tesla maintains a continuance of this hearing in order to review additional public records requested from the Commission is essential to guarantee due process and fundamental fairness.


Mark R. Beebe

Sworn to and subscribed before me this _____ day of May, 2021.

_____
Notary Public

JEFFREY M. SURPRENANT
Notary ID# 163438
Parish of Orleans
My Commission is for Life.

Page 7 of 7

# ADAMS AND REESE LLP

**Attorneys at Law**
Alabama
Florida
Georgia
Louisiana
Mississippi
South Carolina
Tennessee
Texas
Washington, DC

**Mark R. Beebe**
Also admitted in Texas
Direct: 504.585.0436
E-Fax: 504.584.9555
mark.beebe@arlaw.com

April 20, 2021

*Via Email*
Custodian of Records
Louisiana Motor Vehicle Commission
3017 Kingman Street
Metairie, LA 70006
LMVC.PublicRecordsRequest@lmvc.la.gov

Re:   **Public Records Request**
      **Our ref:  30254-2**

To Whom It May Concern,

Our firm was retained by Tesla Motors and Tesla Inc. ("**Tesla**") to assist in a records request under Louisiana Public Records Law that are in the custody or under the control of the Louisiana Motor Vehicle Commission (**LMVC**).

As used herein, the term "record" means paper or electronically stored records, including but not limited to writings, communications, emails, letters, recordings, documents, reports, spreadsheets, presentations, slides, images, photographs, data compilations, papers, formal or informal notes, text messages, instant messages, saved voicemail, and memoranda regardless of physical form or characteristics.

In particular, we request copies of any and all records that contain any reference to "Tesla," "Tesla Motors," "TSLA," "Tesla Inc.," "Tesla Trust Lease," or any other name, moniker, or abbreviation used by LMVC to refer to Tesla and that were created or amended between January 1, 2019, and the date of this request for the following topics:

1. All records, between the **LMVC staff**, on the one hand, and **any LMVC Commissioner** on the other hand.
2. All records, between any **LMVC staff and/or any LMVC Commissioner**, on the one-hand, and **any third-party** on the other hand.
3. All internal correspondence and records at LMVC.
4. All other correspondence and records.

We would appreciate your assistance with this matter on as expeditious a basis as possible and would request that the LMVC provide the responsive documents no later than the three (3) day time period

**EXHIBIT**

**A**

Louisiana Motor Vehicle Commission
April 20, 2021
Page 2 of 2

prescribed under Louisiana Revised Statute 44:32.D.  Once the records are ready, please communicate with me directly by email (to mark.beebe@arlaw.com) concerning this request, including in request of any requirement to pay fees for services related to our request.

Sincerely,

ADAMS AND REESE LLP

Mark R. Beebe

MRB/ngp

# ADAMS AND REESE LLP

Attorneys at Law
Alabama
Florida
Georgia
Louisiana
Mississippi
South Carolina
Tennessee
Texas
Washington, DC

May 4, 2021

Mark R. Beebe
Also admitted in Texas
Direct: 504.585.0436
E-Fax: 504.584.9555
mark.beebe@arlaw.com

**Via E-mail: alapeyronnie@glnolalaw.com**
**And U.S. Mail**
Adrian F. LaPeyronnie, III
Greenberg & LaPeyronnie, L.L.C.
The Energy Centre
1100 Poydras St., Ste. 2900
New Orleans, LA 70163

Re:   *Follow-up on April 20, 2021 Public Records Request to*
*the LMVC on the behalf of Tesla Motors & Tesla, Inc.*

Dear Mr. LaPeyronnie:

We write as a follow-up to my telephone call to you on Friday, April 30, 2021. After speaking with Mr. Greg Reggie, he suggested that we contact you directly regarding any questions relating to Tesla's April 20th Public Records Request to the Louisiana Motor Vehicle Commission ("Commission" or "LMVC").

In the Commission's response to the public records request, we found several documents that have been substantially redacted. We therefore request a privilege log of those documents that have been redacted and of any documents withheld on the basis of some privilege or immunity claimed by the Commission. By way of example, *see* November 27, 2019 email from "A. LePeyronnie to Lessie House, greggie@reggielaw.com, Ing-Ya Cattle, Amber Jones, Subject: "Tesla Least [sic] Trust- Licensing Issue." In the privilege log, please identify (i) date, (ii) type of document, (iii) author(s), (iv) recipient(s), (v) general subject-matter of the document, and (vi) the privilege being claimed (*e.g.* attorney-client).

Second, in our review of the LMVC's response to date, we found inordinately few records produced from the individual Commissioners. Additionally, there were no text communications produced from any person. Please confirm that each Commissioner was contacted, was provided a copy of Telsa's Public Records Request, and each Commissioner confirmed it had no responsive public records. In addition, please confirm that each person at the LMVC covered by the Tesla Public Records Request was provided a copy of the Public Records Request, has reviewed their individual texts messages, and has confirmed they do not have any responsive public records.

**EXHIBIT**
**B**

One Shell Square | 701 Poydras Street, Suite 4500 | New Orleans, Louisiana 70139 | 504.581.3234 | Fax 504.56
www.adamsandreese.com

**Adrian F. LaPeyronnie, III**
Greenberg & LaPeyronnie, L.L.C.
May 4, 2021
Page 2 of 2

Additionally, we maintain that the public records request as written encompassed all records that reference "Tesla," "Tesla Motors," "TSLA," "Tesla Inc.," "Tesla Trust Lease" and any other abbreviation or moniker used by the LMVC to refer Tesla, including without limitation:

(i)   Communications and/or records reflecting communications (*e.g.* notes or emails) between and among Commissioners individually;

(ii)  Communications and/or records reflecting communications (*e.g.* notes or emails) between LMVC personnel, on the one hand, and any Commissioner or Commissioners, on the other hand; and

(iii) Communications and/or records reflecting communications (*e.g.* notes or emails) between Commissioners and third-parties, such as (a) the Louisiana Automotive Dealers' Association ("LADA"), members of LADA on the one hand, and any Commissioner or Commissioners on the other hand; (b) other third-parties such as State Representative Phillip Devillier, on the one hand, and any Commissioner or Commissioners on the other hand.

We respectfully respect a prompt response to our further inquiry regarding the Tesla's Public Records Request. We have also copied Ms. Ingya Cattle, who has previously provided written correspondence in response to Tesla's Public Records Request, Thus, Tesla considers this communication to be a direct request to the LMVC's custodian of records for an undated response.

We remain,

Sincerely,

ADAMS AND REESE LLP

Mark R. Beebe

MRB/ngp
cc: Greg Reggie
    Lessie House
    Ingya Cattle



# GREENBERG & LAPEYRONNIE LLC
## ATTORNEYS AT LAW

DAVID GREENBERG                                                NATHAN GREENBERG (1924-2002)
ADRIAN F. LaPEYRONNIE, III*
*Also admitted in Texas

May 6, 2021

**Via Email and U.S. Mail**

Mark R. Beebe (markbeebe@arlaw.com)
Adams & Reese, LLP
One Shell Square
701 Poydras Street
Suite 4500
New Orleans, Louisiana 70139

                    Re:    Tesla Public Records Request
                           Louisiana Motor Vehicle Commission

Dear Mark,

        It was a pleasure speaking with you on May 4, 2021 concerning your letter of the same date.  Your information is correct that I am the appropriate attorney to contact regarding questions concerning your public records request by letter dated April 20, 2021 and the Louisiana Motor Vehicle Commission's ("LMVC") responsive production of records contained in nine (9) e-mail messages from 4/6/2021 through 4/7/2021.

        The LMVC's  response strived to provide you with all public records in its custody or control to which you are entitled under La. R.S. 44:1 et seq.  I believe that the LMVC's response has done this.  If you have any information for which you are of the opinion LMVC is required to amend or supplement its response,  please provide me with this information so that I may have the opportunity revisit the LMVC's response, and supplement accordingly.

        The second paragraph of your May 4, 2021 letter states that you found several documents to be substantially redacted.  For those documents that were substantially redacted,  you request the LMVC to prepare a privilege log.  I am not aware of any requirement by the Louisiana *Public Records Law* ("*PRL*") for the preparation of a privilege log or requiring LMVC to identify the information you request.   However, the LMVC is willing to provide you with information to assist you in further identifying the nature of the redacted information.

**EXHIBIT**

**C**

---

alapeyronnie@GLNolaLaw.com

| Gretna | www.GLNolaLaw.com | New Orl |
| 848 Second Street | (504) 366-8118 | The Energy Centre |
| Suite 200 | facsimile: (504) 368-9711 | 1100 Poydras Street, Suite 2900 |
| Gretna, Louisiana 70053 | | New Orleans, Louisiana 70163 |

Mark R. Beebe
May 6, 2021
Page 2 of 2

You identified one redacted document for which you seek additional information. That document was a "November 27, 2019 email from 'A. LePeyronnie to Lessie House, greggie@reggielaw.com, Ing-Ya Cattle, Amber Jones, Subject: Tesla Least [sic] Trust-Licensing Issue." I ask that you identify each redacted document that you wish the LMVC to address with a supplemental response.  For each redacted document, I also ask that you identify in which of the above referenced nine (9) e-mail transmissions that document is located. This would greatly reduce the amount of time required for the LMVC to produce the additional request by you.

In the third paragraph of your May 4, 2021 letter, you expressed concern that "we found inordinately few records produced from the individuals Commissioners."   It is my understanding that the *PRL* applies to "public records" which are held by a "public body." The *PRL* does not define that each of the Commissioners are a "public body."  If you are aware of any statute or jurisprudence that requires production of information by the LMVC that is not in the possession of the LMVC, but that is the type of information you reference in subparagraphs (i), (ii), and (iii) on page 2 of your May 4, 2021 letter, please let me know, and I will then revisit your request.

As soon as you provide me with the information requested herein, I will begin my review of LMVC's response to your April 20, 2021 public records request in light of your May 4, 2021 letter.

I await the requested information, and I remain,

Sincerely,

Adrian F. LaPeyronnie, III

AFL III/anj

cc:   Lessie A. House
      Executive Director
      Louisiana Motor Vehicle Commission

alapeyronnie@GLNolaLaw.com

| Gretna | www.GLNolaLaw.com | New Orleans (Satellite Location) |
|---|---|---|
| 848 Second Street | (504) 366-8118 | The Energy Centre |
| Suite 200 | facsimile: (504) 368-9711 | 1100 Poydras Street, Suite 2900 |
| Gretna, Louisiana 70053 | | New Orleans, Louisiana 70163 |

# ADAMS AND REESE LLP
®

**Attorneys at Law**
Alabama
Florida
Georgia
Louisiana
Mississippi
South Carolina
Tennessee
Texas
Washington, DC

**Mark R. Beebe**
Also admitted in Texas
Direct: 504.585.0436
E-Fax: 504.584.9555
mark.beebe@arlaw.com

May 7, 2021

**Via E-mail: alapeyronnie@glnolalaw.com**
**And U.S. Mail**
**Adrian F. LaPeyronnie, III**
Greenberg & LaPeyronnie, L.L.C.
The Energy Centre
1100 Poydras St., Ste. 2900
New Orleans, LA 70163

Re:   *Follow-up on April 20, 2021 Public Records Request to the LMVC on the*
*behalf of Tesla Motors & Tesla, Inc. and May 4, 2021 Supplemental Request*

Dear Adrian:

We are in receipt of your letter responding on behalf of the Louisiana Motor Vehicle Commission ("Commission" or "LMVC") and express both our surprise and disappointment in your letter.

First, we strongly disagree with your contention that "[t]he LMVC's response strived to provide you with all public records in its custody or control to which you are entitled under La. R.S. 44:1 et seq. I believe that the LMVC's response has done this."

As counsel for the Commission and as the Commission's self-acknowledged records custodian, you are well apprised of the Commission's responsibility and duty to provide access to its public records. *La. R.S. 44:31A.* The legislature, by enacting the "Public Records Law," *La. R.S. 44:1 et seq.*, sought to guarantee, in the most expansive and unrestricted way possible, the right of the public to inspect and reproduce those records which the laws deem to be public. There was no intent on the part of the legislature to qualify, in any way, the right of access. *See Landis v. Moreau*, 00–1157 (La.2/21/01), 779 So.2d 691, 694–95. Moreover, "no person shall be denied the right to … examine public documents, except in cases established by law." *LSA–Const. Art. XII, Sec. 3.* The Louisiana legislature intended these laws to be construed so liberally in favor of unrestricted access that, whenever doubt exists as to whether the public can access records, that doubt must be resolved in favor of the public's right to inspect. *In re Matter Under Investigation*, 07-1853 (La. 7/1/09), 15 So.3d 972, 989.

Second, we all agree that the Commission is required to provide *all* public records in response to the April 20th Request. Yet, the Commission has simply failed to make a complete production. You concede that the redacted records are public records. However, in disregard of the

**EXHIBIT**

**D**

Adrian F. LaPeyronnie, III
Greenberg & LaPeyronnie, L.L.C.
May 7, 2021
Page 2 of 2

Commission's legal obligation, you ask "that [I] identify each redacted document that [I] wish the LMVC to address with a supplemental response." Louisiana's law is unequivocal on this point. If the Commission withholds any documents, the Commission bears the substantial burden to justify its decision to withhold any properly requested public record. *La R.S. 44:31(B)(3)*. Neither the Commission's production nor your letter provide any legal justification for why the Commission redacted and/or is withholding any requested public records. Thus, we make demand for the immediate production of all redacted and withheld documents as the Commission has provided no grounds for withholding them and has failed to meet is burden under *La R.S. 44:31(B)(3)* ("The burden of proving that a public record is not subject to inspection, copying, or reproduction shall rest with the custodian.")

In addition, you acknowledge that the Commission made no effort to forward the public records request to the Commissioners. The Commission's decision not to seek public records held by the Commissioners is a violation of the Commission's duties and responsibilities under the Public Records Law. You write "[i]t is my understanding that the PRL applies to 'public records' which are held by a 'public body.'" You do not cite any law to justify your interpretation, and in fact the public records law, as enacted, applies to *all* public records regardless of its location. In *Mercato Elisio, L.L.C. v. City of New Orleans*, 2018-0081 (La. App. 4 Cir. 11/21/18), 259 So. 3d 1235, 1242, the Fourth Circuit held that an email prepared by the Commissioner of the Historic District Landmarks Commission relating to a future statement to the HDLC about his opposition to a proposed apartment development, exchanged with his partner, and maintained on his private computer was a public record. In other words, the Commissioner's private computer was searched for public records and even if the document was a draft it was considered a "public record." This case establishes that the public records need not be "held" by a public body to be produced.

Consequently, we re-urge our April 20, 2021 Public Records Request and May 4, 2021 Supplemental Request, including gathering documents held by the Commissioners. We ask that the Commission immediately comply or otherwise provide a justification for its unwillingness to do so.

Sincerely,

ADAMS AND REESE LLP

Mark R. Beebe

MRB/ngp
cc: Greg Reggie
    Lessie House
    Ingya Cattle

**Ingya Cattle**

| | |
|---|---|
| **From:** | Lessie House |
| **Sent:** | Thursday, April 22, 2021 11:47 AM |
| **To:** | Ingya Cattle |
| **Subject:** | FW: Tesla |
| **Attachments:** | 7-11-2018 Metro Newspaper - Tesla plans N.O. service delivery center.pdf |

**From:** Lessie House
**Sent:** Wednesday, July 11, 2018 3:39 PM
**To:** raybrandt@bellsouth.net
**Subject:** Tesla

Ray

FYI. And to let you know I am on it.

_____

*Lessie A. House*

**Executive Director**
**Louisiana Motor Vehicle Commission**
**3519 12th Street**
**Metairie, Louisiana 70002**
**(504) 838-5207**
**lahouse@lmvc.la.gov**

1

**EXHIBIT**

**E**

LMVC000381

# metro

**1B**

WEDNESDAY
JULY 11, 2018

THENEWORLEANSADVOCATE.COM

**JEFFERSON • NEW ORLEANS • PLAQUEMINES • RIVER PARISHES • ST. BERNARD • ST. TAMMANY**

# Tesla plans N.O. service, delivery center

BY RICHARD THOMPSON
rthompson@theadvocate.com

In May, David Urquhart was ecstatic when it finally came time to take delivery of his new Model 3, advertised as Tesla's first mass-market electric car.

Although nearly three years had passed since he paid his initial $1,000 deposit, Urquhart was undeterred. "It was the simplest car purchase I ever made in my life," the New Orleans engineer said recently. "Everything was done online."

The only hang-up: Urquhart had to pick it up in Houston.

But that aspect of the car-buying process may soon get easier too. Tesla Motors has filed plans to build a service and delivery center in New Orleans, possibly by this summer.

The center, which could be the first of its kind in the Gulf Coast, will come as welcome news to local enthusiasts of the electric-car maker.

Plans for the center have not been formally unveiled, although a demolition permit for the building's interior was issued in April and work is underway at the site at 2801 Tchoupitoulas St.

The center will include a nearly 16,000-square-foot repair garage and office, and an adjacent 30,000-square-foot warehouse, with space for about 70 vehicles, according to plans filed with the city.

It's unclear how much Tesla is spending on the project, or how many employees will work there. The company did not return a message seeking comment.

Patrick Schindler, president

of Felicity Property Co., the property's landlord, also did not return a message.

Rumors that the carmaker was planning to open a New Orleans facility have long circulated in [online] forums among Tesla owners. The company also has hinted at its interest, including the city on a list of destinations that were marked as "coming soon" on its website.

Tesla has enjoyed modest sales in the state, with nearly

➤ See TESLA, page 2B

## TESLA

Continued from page 1B

450 Tesla vehicles registered in Louisiana, according to state Department of Motor Vehicle data. That total includes Tesla's Model S luxury sedan and its SUV, the Model X, both of which sell for more than $75,000.

Tesla views its more affordable Model 3, which is supposed to start at $35,000, as the key to its transition from a niche electric carmaker to a profitable mass-market manufacturer.

But so far, the baseline $35,000 Model 3 hasn't started production. Instead, the least expensive version that's available for ordering carries a basic price tag of about $49,000, which can rise to $70,000.

For much of the year, the Silicon Valley-based company struggled to hit its self-proclaimed target of producing 5,000 cars per week, although it reportedly did so in the last week of June. Tesla said it expects to hit 6,000 per week by late August, but some analysts have questioned whether that rate is sustainable for long.

Across the country, Tesla has worked to build up a network of hundreds of "supercharger" stations in cities or along highways, including a half-dozen in Louisiana, with the closest to New Orleans being in Slidell.

Last year, as it prepared to launch the Model 3, Tesla said it would add nearly 100



ASSOCIATED PRESS FILE PHOTO BY PAUL SAKUMA
Tesla Motors, the electric carmaker, has filed plans to build a service and delivery center in New Orleans, possibly by this summer. The center would be the first of its kind in the Gulf Coast region.

retail, delivery and service centers globally.

Without a dedicated service center, Tesla has relied on mobile repair services for car owners who need modest repairs, with technicians making service calls at an owner's home or workplace.

Tesla said it determined that the majority of vehicle repairs can be made without a car lift.

Also, it said, its vehicles need less maintenance than gasoline-powered cars because there's no internal combustion engine, exhaust system or fuel tanks to tend to, and no oil that requires changing. However, the service center would presumably offer a local option for wheel alignments and more intensive maintenance and repairs.

David Wolf, a New Orleans attorney who has driven his Tesla S since 2013, said the local center will "definitely improve the delivery experience."

"It means that they're committed to expanding the brand and expanding their presence here, and I think they recognize that if they're going to be a real mass-market automobile manufacturer, which is what they are trying to do with the new Model 3, that they've got to make the ownership experience easier for people who are used to the dealer model," he said.

*Follow Richard Thompson on Twitter, @rthompsonMSY.*

LMVC000382

**Ingya Cattle**

| | |
|---|---|
| **From:** | Lessie House |
| **Sent:** | Thursday, April 22, 2021 11:49 AM |
| **To:** | Ingya Cattle |
| **Subject:** | FW: Tesla is opening a service center in New Orleans |

**From:** Lessie House
**Sent:** Tuesday, July 17, 2018 5:13 PM
**To:** Baer, Mat
**Subject:** Re: Tesla is opening a service center in New Orleans

We are on top of this.

Sent from my iPhone

On Jul 17, 2018, at 4:55 PM, Baer, Mat <mbaer@bohnbros.com> wrote:

> Lessie- Just saw article linked below where Tesla is opening a service center in New
> Orleans.  The service center will also have space for new vehicle deliveries.
>
> Is Tesla's direct sale approach legal in Louisiana?  If so, how?
>
> Appreciate your time.
>
>
>
> *Mat*
>
> **From:** bigbaerno@yahoo.com [mailto:bigbaerno@yahoo.com]
> **Sent:** Tuesday, July 17, 2018 4:31 PM
> **To:** Baer, Mat
> **Subject:** Tesla is opening a service center in New Orleans
>
> sent:
>
>
> -----
>
> Read more...
>
> Tesla is opening a service center in New Orleans
> There are roughly 440 Tesla vehicles registered in Louisiana.

1



LMVC000386

To unsubscribe click here.

This message has been scanned and found to be free of known security risks. Any unauthorized reading, distribution, copying, or other use of this message or its attachments is strictly prohibited.

LMVC000387

**Ingya Cattle**

| | |
|---|---|
| **From:** | Lessie House |
| **Sent:** | Thursday, April 22, 2021 11:50 AM |
| **To:** | Ingya Cattle |
| **Subject:** | FW: Is this happening? |

**From:** Lessie House
**Sent:** Wednesday, July 18, 2018 8:26 AM
**To:** Joseph Westbrook
**Subject:** Re: Is this happening?

On top of it

Sent from my iPhone

On Jul 17, 2018, at 6:50 PM, Joseph Westbrook <bill_cenlarv@yahoo.com> wrote:

     Sent from my iPhone

     Begin forwarded message:

          **From:** pstroderd@courtesyautomotive.com
          **Date:** July 17, 2018 at 3:55:06 PM CDT
          **To:** "Don Hagroder" <dhargroder2001@yahoo.com>, "Joseph Westbrook"
          <bill_cenlarv@yahoo.com>
          **Subject: FW: Fwd: Is this happening?**

          please open up the link below and read will green response
          this is not good for the future of our business if the state lets
          this happen

          -----Original Message-----
          From: "Court Williams" <cwill76@gmail.com>
          Sent: Tuesday, July 17, 2018 3:48pm
          To: "Paul Stroderd" <pstroderd@courtesyautomotive.com>
          Subject: Fwd: Is this happening?

          Court Williams

          Begin forwarded message:

1

EXHIBIT

G

tabbies'

LMVC000383

**From:** Will Green <wgreen@lada.org>
**Date:** July 17, 2018 at 3:13:45 PM CDT
**To:** Court Williams <cwill76@gmail.com>
**Subject: Re: Is this happening?**

They had plans to open before we passed our bill in 2017, but according to their lobbyist, they still think they can open a service center.  That said, I don't think Tesla intended for this to get out and are that ready to move forward.

We spoke to Lessie at the LMVC and she re-stated her position that she feels the law is clear that they cannot get a license.

Still, they have done this in other states, been denied a license and sued.  Usually the law suit results in high legal costs and bad press for the dealers and the LMVC and they are forced to settle.

I am not saying that will happen here, but I've been warned by many of my counterparts in other states.

*Will H. Green, JD*
President and Administrator
_____
**LOUISIANA AUTOMOBILE DEALERS ASSOCIATION**
**LOUISIANA AUTOMOBILE DEALERS SELF-INSURERS' TRUST FUND**
7526 Picardy Avenue
Baton Rouge, LA 70808
p: 225.769.5500 | f: 225.769.2085


**From:** Court Williams <cwill76@gmail.com>
**Date:** Tuesday, July 17, 2018 at 2:30 PM
**To:** Will Green <wgreen@lada.org>
**Subject: Is this happening?**

http://canalstreetbeat.com/tesla-opening-new-service-center-in-new-orleans/

2

LMVC000384



**Court Williams**
General Manager
Courtesy Buick GMC

337.769.4500

3

LMVC000385

 **BREAZEALE, SACHSE & WILSON, L.L.P.** | ATTORNEYS AT LAW

CLAUDE F. REYNAUD, JR.
Partner
chr@bswlp.com

March 2, 2020

DIRECT DIAL: 225-381-8012
CORPORATE PHONE: 225-387-4000
FAX: 225-381-8029
One American Place, 23rd Floor
Post Office Box 3197
Baton Rouge, Louisiana 70821-3197

www.bswlp.com

*VIA E-MAIL ONLY:*

Allen O. Krake, Chairman
LOUISIANA MOTOR VEHICLE COMMISSION
400 East Howze Beach Rd.
Slidell, Louisiana, Louisiana 70461

**LMVC**

**MAR 0 9 2020**

RE: *Distribution Channels*
BS&W File: 6456-50948

Dear Allen:

You have asked for a letter requesting information and suggestions related to what LADA believes are important regulations we would like the Commission to enact, of course, with the appropriate legislative oversight, pursuant to La. R.S. 32:1253E. Here are our suggestions:

I.   **Modifications to the rules that require licensing of salesmen.**

La. R.S. 32:1254A(16) and C(4) and (6) require that salesmen must be licensed at the geographic location (rooftop) where he or she works. So, for example, if a salesman is licensed in one of your stores, in order to actually work at another store also owned by your group legally, he or she would need another license and pay another fee. We believe, when these rules were enacted, there were no All Stars or Ray Brandt mega groups with 10 or more rooftops with common ownership.

As an efficient alternative, we recommend that there be but one license for commonly owned stores with a designation in the license which the commonly owned rooftops the salesman is authorized to work. This will eliminate inefficiency and delay in transferring salesmen within the same commonly owned group and avoid unnecessary fines when the inevitable mistakes are made. It is perfectly acceptable that the multi-rooftop license fee should be increased by a reasonable amount if there is any concern there may be a reduction in revenue to the Commission by the proposed amendment.

II.   **Clarifications of legislation and rules related to distribution channels.**

La. R.S. 32:1251 says, in part, that the purpose of the Commission is to "prevent disruption of the system of distribution of motor vehicles and recreational products to the public..." To that end, we believe a clarification as to prohibitions against manufacturers selling directly to the public should also include directly leasing to the public, meaning the ultimate consumer. This clarification does not change the intent of the law or the aforementioned purpose

B A T O N   R O U G E   •   N E W   O R L E A N S   •   M O N R O E

**EXHIBIT**

**H**

Allen O. Krake
March 3, 2020
Page 2

of the public policy that is the core of what the Commission does. As you know, there is no definition of "lessee," "lessor," or "lease" in our law.[1] The law was written at a time when leases were not as prevalent as they are now. The absence of any language addressing "lease" creates the context for our argument that the phrase "otherwise disposed of" must include "lease" or any other means of barter, exchange, etc. Thus, we would propose that a regulation explain that, under La. R.S. 32:1261A(1)(k), manufacturers may not lease a new or unused motor vehicle directly to a consumer, except upon the conditions delineated therein. Moreover, La. R.S. 32:1252(50) wherein it defines, fairly broadly, "retail sale," a regulation should be enacted including within the phrase "otherwise disposing the motor vehicle" "leases," and explaining that the phrase "ultimate purchaser" is actually meaning the ultimate "consumer" for use as a consumer. Lastly, La. R.S. 32:1252(57), wherein the phrase "ultimate purchaser" is defined, should be clarified, as is clearly the intent of the language, to include "ultimate lessees," because they, like a purchaser, is someone who is leasing, in good faith, for purposes other than re-sale or re-lease.

## II.    Regulations clarifying the intent of a fleet exemption.

The beginning of La. R.S. 32:1261A(1)(t)(i) says that a manufacturer or distributor is prohibited "to operate a satellite warranty and repair center." There is an exception for "fleet" owners, which was clearly intended to be Entergy, ExxonMobil, etc. La. R.S. 32:1261A(1)(s) makes it clear, however, that a manufacturer cannot do, through a subsidiary, what it cannot do directly. Accordingly, the prohibition follows through to the subsidiary in any fashion or form. Although we sincerely believe that no clarification regulation is necessary, if it is the Commission's position that there is some ambiguity, then we believe a clarifying regulation simply stating that a manufacturer who is prohibited from operating a satellite warranty center (fleet or not) cannot use a subsidiary to circumvent that prohibition is appropriate. This, indeed, is the simplest of all the regulations we propose.

## III.    Current licensing requirements.

At a minimum, any manufacturer that authorizes a satellite repair center in Louisiana must have a manufacturer's license. Also, the offer of contractual warranty rights to a lessee, which is a contract between the manufacturer and the purchaser/lessee, should be regulated by the LMVC. If you believe this to be the correct position, then there is no reason for the LMVC to delay demanding that any manufacturer authorizing others to do warranty work apply for a manufacturer's license.

Any manufacturer should also have a motor vehicle lessor/franchisor license. The licensing requirements for a motor vehicle lessor include the filing of a franchise or contract in effect between a motor vehicle lessor and a motor vehicle lessor/franchisor, such as Honda and Honda Trust. Clearly, our statutory scheme presumes that a motor vehicle lessor operating in Louisiana would be in contractual privity with a franchisor, and that franchise or contract would be on file at the LMVC.

---

[1] The only definition is "lease facilitator."

1843932.v1

Allen O. Krake
March 3, 2020
Page 3

These two licensing steps may be undertaken now without any regulatory amendment.

## CONCLUSION

Dealer protection laws have been widely upheld as being necessary to protect dealers from the abuses of manufacturers, and the implementation of them has been seen as being in furtherance of the stated public policy to preserve the integrity of the distribution of motor vehicles and the protection of the public welfare. Again, La. R.S. 32:1251 expresses Louisiana's declaration of public policy to prevent the disruption of the system of the distribution of motor vehicles to the public. Displacement of competition is clearly a logical result of the regulatory directive and authority given the LMVC by the legislature. The LMVC may rely on this authority to promulgate whatever rules it deems necessary to make it clear that manufacturers cannot sell or lease directly to the public.

LADA welcomes continued communications with the Commission to ensure that the rights of Louisiana's dealers and the clearly articulated public policy of the State regarding the orderly distribution of motor vehicles are not threatened or harmed by the actions of manufacturers that seek to circumvent our laws with contorted interpretations and manufactured loopholes.

With best personal regards, I am

Very truly yours,

BREAZEALE, SACHSE & WILSON, L.L.P.

Claude F. Reynaud, Jr.

CFRjr:sec

cc:     Will H. Green
        Jeanne C. Comeaux

1843932.v1

LMVC000032

125б259

## LOUISIANA HOUSE OF REPRESENTATIVES

P.O. Box 986
Eunice, LA 70535
Email: devillierp@legis.la.gov
Office: 337.457.0194
Fax: 337.457.5649



COMMITTEES:

Civil Law and Procedure
Natural Resources and Environment

### PHILLIP DEVILLIER
### State Representative ~ District 41

**#OR 20-0059**
**ALDERMAN**
**6/29/20**

June 4, 2020

*VIA E-MAIL: (OpinionRequest@ag.louisiana.gov)*

Honorable Jeff Landry, Attorney General
Louisiana Department of Justice
**Attn: Civil Division**
Post Office Box 94005
Baton Rouge, Louisiana 70804

RE:   **REQUEST FOR OPINION:**
       *An interpretation of La. R.S. 32:1252(50); La. R.S. 32:1261A(1)(s) & (t); La.*
       *R.S. 32:1261A1(k) and related statutes in the Motor Vehicle Franchise Act* .

Dear Attorney General Landry:

The undersigned herein respectfully requests an Attorney General Opinion regarding the ability of a manufacturer or distributor of motor vehicles to legally lease motor vehicles directly to consumers and to perform repair services for vehicles under warranty directly without use of a dealer. Specifically, the issues presented are as follows:

A.   Is it a violation of La. R.S. 32:1261A(1)(k)(i) and (ii) for a manufacturer or distributor to lease new vehicles directly to consumers?

B.   May a manufacturer or distributor (or any subsidiary thereof) perform warranty services directly without using a dealer? La. R.S. 32:1261A(1)(s) and (t)

I.   **Background of Louisiana Franchise Law:**

Title 32 of the Louisiana Revised Statutes is entitled, "Motor Vehicles and Traffic Regulation." La. R.S. 32:1251 begins, "The General Provisions Applicable to Motor Vehicles and Recreational Products" (Franchise Law) Specifically, La. R.S. 32:1251 is a declaration of public policy, wherein that particular statute provides:

**EXHIBIT**

**I**

LMVC000060

June 4, 2020
Page 2

The legislature finds and declares that the distribution and sale of motor vehicles and recreational products in the state of Louisiana vitally affects the general economy of the state, the public interest, and the public welfare, and that in order to promote the public interest, and the public welfare, and in the exercise of its police power, it is necessary to regulate business in Louisiana, in order to prevent frauds, impositions, and other abuses upon its citizens, <u>and avoid undue control of the independent motor vehicle dealer and recreational products by their motor vehicle manufacturing and distributive organizations and foster and keep alive vigorous and healthy competition, by prohibiting unfair practices by which fair and honest competition is destroyed or prevented</u>, and to protect the public against the creation or perpetuation of monopolies and practices detrimental to the public welfare, to prevent the practice of requiring the buying, leasing, or renting of special features, appliances, and equipment not desired or requested by the purchaser . . . <u>and prevent disruption of the system of distribution of motor vehicles</u> and recreational products to the public and prevent deterioration of facilities for servicing motor vehicles and keeping same safe and properly functioning . . . (emphasis added)

Simply put, La. R.S. 32:1251, *et seq.*, our Franchise Law has three principal purposes: (1) to protect the public in connection with the distribution and sale of motor vehicles; (2) to protect the dealers from unfair practices by their manufacturers and/or distributors of vehicles; and (3) prevent disruption of the system of distribution of motor vehicles.

La. R.S. 32:1253 provides for the establishment of the Louisiana Motor Vehicle Commission ("LMVC" or "Commission"). This Commission exists under the Executive Branch, and all the Commission members are appointed by the governor, including a chairman of the Commission, who is specifically appointed by the governor. La. R.S. 32:1253E provides:

The commission is hereby vested with the powers and duties necessary and proper to enable it to fully and effectively carry out the provisions and objects of this Chapter, and is hereby authorized and empowered to make and enforce all reasonable rules and regulations and to adopt and prescribe all forms necessary to accomplish said purpose, and the enumeration of any power or authority herein shall not be construed to deny, impair, disparage, or limit any others necessary to the attainment thereof, provided no rule or regulation of the commission, including but not limited to Chapter 7 (Advertising) of Subpart 1 of Part V of Title 46, comprised of LAC 46:V:701 through 741, of the Louisiana Administrative Code, shall prohibit a dealer from making a monetary donation or contribution that does not directly involve the sale or lease of a motor vehicle in connection with an advertising campaign. A copy of all rules

LMVC000061

June 4, 2020
Page 3

and regulations adopted by the commission shall be published in the Louisiana Administrative Code, as they may be amended, modified, or repealed from time to time.

In furtherance of 32:1253E, the LMVC has enacted regulations, including a definitional section. La. Admin. Code Part V entitled, "Automotive Industry."[1]  The purpose of this letter is to ask your office to provide guidance for the Commission in enacting certain regulations which will clarify the intent of specific sections of La. R.S. 32:1251, *et. seq.*

Historically, the Franchise Law in Louisiana has been interpreted to mean that manufacturers and distributors (such as General Motors or Gulf States Toyota, respectively) could not sell or lease vehicles directly to the public.  Instead, they had to distribute their products through franchised dealers.  The franchise system has been developed throughout the United States, and each state has its own set of regulations regarding the relationship between dealers, on the one hand, and a manufacturers and distributors, on the other.  Historically, all states have prohibited manufacturers or distributors from selling or leasing vehicles directly to the public.  The purpose, as articulated in 32:1251, is to balance the playing field between very large manufacturers and local dealers.  Since the manufacturers are the sole source of product, parts, etc., they have disproportionate bargaining power over the dealers.  The statutes enacted and, in particular, La. R.S. 32:1261, and its many subparts, are designed to protect the dealers from unfair practices from the manufacturers or distributors.

The LMVC is tasked, in part, with maintaining that balance between dealers and their franchisors.  The Motor Vehicle Commission has jurisdiction to rule on alleged violations of the Franchise Law, and regularly does so.  A three-member panel composed of non-dealers, who are also Commissioners, makes evidentiary legal and factual determinations in these disputes.  Findings of the three-member panel and the Commission may be appealed to the Jefferson Parish District Court (24th JDC).  On other occasions, when a potential violation by a manufacturer is brought to the attention of the Commission, the Commission Staff will issue orders on its own prohibiting the illegal activity.  The Commission has attorneys on retainer and regularly consults with these attorneys regarding interpretation of the statutes.

---

[1] Definitions are found in Section §101.

LMVC000062

June 4, 2020
Page 4

II.    **Analysis of the Issues:**

A.    **Is it a violation of La. R.S. 32:1261A(1)(k)(i) and (ii) for a manufacturer or distributor to lease new vehicles directly to consumers?**

Perhaps as important as what the current Franchise Law provides is what the current Franchise Law does not say. La. R.S. 32:1252 contains 74 definitions to be used in the Franchise Law. Many of these definitions have subparts. One definition is missing. It is the definition of "lease." Although it is hard to theorize a negative, it is safely assumed that the reason "lease" is not contained is that, when most of the definitions were drafted, leasing of vehicles was not a prevalent practice as it is today. "Motor Vehicle Lessor"(36) is defined, as is "Motor Vehicle Lessor Franchisor" (38), but those definitions describe an entity without defining a lease.[2]

In addition, the Commission has enacted its own regulations, which are cited at Louisiana Administrative Code in Title 46. They also include a definitional section in §101. That definitional section, presumably a supplement to La. R.S. 32:1252, does not contain a definition of "lease" either.

Historically, the prohibitions against manufacturers and distributors contained in La. R.S. 32:1261, and its many subparts, apply to both sale and lease transactions, without them necessarily saying so. Indeed, under Louisiana's version of the Uniform Commercial Code (UCC), if a lease contains an option on the part of the lessee of the vehicle to purchase at the end of the lease, it is considered a disguised sale, meaning that the lease payments are simply another equivalent of note payments secured by a lien on the vehicle in a purchase transaction. La. R.S. 10:1-203. Delivery to a Louisiana consumer of a leased vehicle is also a taxable event subject to La. R.S. 47:302, if there is a "sale, use, lease or rental of tangible personal property" in the State. A tax is added to the monthly payment of every leased vehicle.

La. R.S. 32:1252, however, does have a definition of "retail sale." La. R.S. 32:1252(50) provides:

> "Retail sale" or "sale at retail" means the act or attempted act of selling, bartering, exchanging, or otherwise disposing of a motor vehicle, recreational product, or specialty vehicle to an ultimate purchaser for use as a consumer. (emphasis added)

La. R.S. 32:1252(57) defines "ultimate purchaser" and describes of one who purchases a vehicle for something other than resale. There is no definition of "ultimate lessee," who would lease a vehicle for something other than "lease." The point is that the word "lease" has just been absent from the regulations, but nevertheless, the regulations have been applied uniformly to lease

---

[2] "Lease facilitator" is defined in Definition No. 21, but it assumes what is a lease without defining it.

LMVC000063

June 4, 2020
Page 5

transactions, as well as purchase transactions.  For decades, it was considered by the industry and the Commission that "otherwise disposing of" would apply to leases.

This issue came to a head in 2019 when the Commission Staff advised the Louisiana Automobile Dealers Association ("LADA") that it had issued a license to Tesla Trust, a subsidiary of the manufacturer Tesla, to be an out-of-state leasing company to lease vehicles directly to consumers in Louisiana.  There was no hearing where anyone could oppose the proposed license.  In conversations with the Commission Staff, the Tesla Trust license was analogized to the Honda Trust license.  The important difference, however, is that Honda Trust, in all cases, leases vehicles through the Honda dealer network.

The prohibition against direct sales has historically been in La. R.S. 32:1261, where many other specific prohibitions against manufacturers and distributors are found.  ~~The previous~~ La. R.S. 32:1261A(1)(k)(i) provides:

It shall be a violation of this Chapter:

(1) for a manufacturer, a distributor, a wholesaler, distributor branch, factory branch, convertor or officer, agent or other representative thereof:

\* \* \*

**(k)(i) To sell or offer to sell a new or unused motor vehicle directly to a consumer except when any one of the following conditions is met:**

**(emphasis added)**

The conditions are inapplicable.[3]

It should be noted that the aforementioned subsection was amended by the Louisiana Legislature at the request of LADA in 2017 as a means to strengthen the prohibition on a manufacturer to sell direct.  Despite numerous conversations with the Commission during the process where LADA provided them language for comment, at no time during the course of the process of amending Subpart (k) did the Commission ever suggest that leases would not continue to be included in this prohibition.  This is the issue presently presented for review.

---
[3]

The conditions are:
(aa) Operating an existing, licensed, and franchised motor vehicle dealership for a reasonable period, not to exceed two years.
(bb) Operating an existing, licensed, and franchised motor vehicle dealership which is for sale to any qualified independent person at a fair and reasonable price, not to exceed two years.
(cc) Operating in a bona fide relationship in which a person independent of a manufacturer has made a significant investment subject to loss in the dealership, and can reasonably expect to acquire full ownership of such dealership on reasonable terms and conditions.

LMVC000064

June 4, 2020
Page 6

If one was to read the definition of "retail sale" found in 1252(50) together with the updated (k)(1) prohibition, it would read as follows:

(k)(i) To sell, barter, exchange, or otherwise dispose of a new or unused motor vehicle, or to offer to sell, barter, exchange, or otherwise dispose of a new or unused motor vehicle, directly to a consumer...

As you can see, when read together as one would, the prohibition against a manufacturer or related entity like Tesla circumventing the dealer network is very broad, with only very few narrow exceptions cited in the same subpart (which again are inapplicable to this discussion).

The intent of La. R.S. 32:1261A(1)(k) was and is to prevent manufacturers and distributors from circumventing the dealer network by distributing vehicles directly to the consumer. We herein respectfully request an opinion of the Attorney General to assist the Commission in applying the applicable definition of "retail sale," which includes (as quoted *supra*) the phrase "or otherwise disposing of a motor vehicle."

**B.    May a manufacturer or distributor (or any subsidiary thereof) perform warranty services directly without using a dealer? La. R.S. 32:1261A(1)(s) and (t)**

At the same time that the LMVC advised certain dealers and the LADA that it had allowed Tesla Trust to be licensed as an out-of-state entity, it also said that it would allow Tesla Trust to open a warranty repair center in New Orleans. This decision runs afoul of several other prohibitions contained in La. R.S. 32:1261A(1). The LMVC has labeled the warranty repair center a "satellite fleet repair center" under La. R.S. 32:1261A(1)(t). As such, it says the warranty repair center is not under the jurisdiction of the LMVC by citing La. R.S. 32:1261A(1)(t)(v) and (vi). Because it is within the "fleet" exception, the unregulated facility is only "allowed" to work on the lease "fleet," which are vehicles leased in the State by Tesla Trust. The subparts of (t) relied on by the Commission are as follows:

(v) The commission has no authority over a fleet owner or an emergency services company or emergency services related company with respect to the requirements of this Subparagraph.

(vi) A repair facility of a fleet owner authorized pursuant to this Subparagraph to perform warranty repairs shall not be deemed a satellite warranty and repair center as defined in R.S. 32:1252 and shall not be required to be licensed by the commission pursuant to R.S. 32:1254.

This law was substantially revised in 2015 at the request of major fleet owners, such as Entergy, Turner Industries, and ExxonMobil. There was also support for changing the law from large trucking companies based in the state. A third group was short term rental car companies,

LMVC000065

June 4, 2020
Page 7
_____

such as Hertz and Enterprise. These entities with considerable numbers of vehicles wanted to maintain the warranty on their vehicles but did not want to have to take so many vehicles to an established dealer for warranty repairs. An exception to the general prohibition contained in the first line of Subpart (t)(i) was established for these entities. These entities, such as Entergy, Hertz or ExxonMobil, are not, however, "manufacturers or distributors" of new vehicles. Tesla is.

Accordingly, there are several key elements to Subpart (t), as supplemented by Subpart (s), which is found just above Subpart (t), in 32:1261. Reading Subpart (t) with Subpart (s), it makes it clear that a manufacturer and any subsidiary are in a special class of companies forbidden from operating a warranty repair center. The main prohibition in Subpart (t) is in its first sentence. It provides:

§1261. Unauthorized acts

A.    It shall be a violation of this Chapter:

(1)    For a manufacturer, a distributor, a wholesaler, distributor branch, factory branch, converter or officer, agent, or other representative thereof:

\*    \*    \*

**(t)(i) To operate a satellite warranty and repair center, to authorize a person to perform warranty repairs, including emergency repairs, who is not a motor vehicle dealer, . . .**

**(emphasis** added)

A reading of this in the whole means that entities such as Entergy and ExxonMobil, that are not dealers, may perform repairs on their vehicles and maintain the warranty on those vehicles. That said, the prohibition against manufacturers performing warranty work is clear. Tesla Trust, however, is a subsidiary of Tesla. It, too, is prohibited from performing warranty work directly. A manufacturer or distributor cannot simply label itself or a subsidiary a fleet warranty center to avoid this prohibition. Subpart (s) of 32:1261A(1) provides:

§1261. Unauthorized acts

A.    It shall be a violation of this Chapter:

(1)    For a manufacturer, a distributor, a wholesaler, distributor branch, factory branch, converter or officer, agent, or other representative thereof:

_____

LMVC000066

June 4, 2020
Page 8

\* \* \*

> (s) To use any subsidiary, affiliate, or any other controlled person or
> entity, or to employ the services of a third party, to accomplish what
> would otherwise be illegal conduct under this Chapter on the part of the
> manufacturer or distributor.

Perhaps ExxonMobil can perform warranty repair services beyond the authority of the
Commission, but a manufacturer or a distributor may not directly create a subsidiary to do the
warranty work. To believe otherwise would simply read out the first line of Subpart (t) and the
entirety of Subpart (s) from our law.

III.  **Conclusion:**

A. A manufacturer or distributor or related entity may not circumvent the Louisiana
Franchise Law by leasing motor vehicles directly to consumers within the State of
Louisiana. A lease is one way to dispose of a vehicle other than by selling. The
definition of "retail sale" and the prohibition of La. R.S. 32:1261A(1)(k) applies
to leasing activities.

B. Manufacturers, distributors or similar entities are specifically prohibited from
operating a satellite warranty repair center. This function is reserved to franchised
dealers. True "fleet" entities envisioned by the exceptions to R.S.
32:1261A(1)(t), such as ExxonMobil, Entergy, Hertz or Enterprise, are not
manufacturers or distributors. The mere fact that a manufacturer elects to us a
wholly-owned subsidiary to operate a satellite warranty center does not insulate
that manufacturer or its subsidiary from the prohibition of La. R.S.
32:1261A(1)(s) and (t).

We would respectfully request an opinion from the Attorney General consistent with the
foregoing.

Sincerely,

Phillip R. DeVillier

LMVC000067



John Bell Edwards
Governor

Lessie A. House
Executive Director

### 𝕾tate of 𝕷ouisiana
LOUISIANA MOTOR VEHICLE COMMISSION

July 30, 2020

*VIA EMAIL & U.S. MAIL*

Honorable Jeff Landry, Attorney General
Louisiana Department of Justice
Attention: Civil Division (opinionrequest@ag.louisiana.gov)
Post Office Box 94005
Baton Rouge, Louisiana 70804

RE:   **Louisiana Motor Vehicle Commission information regarding an opinion requested by Representative Phillip Devillier regarding La. R.S. 32:1252(50); La. R.S. 32:1261(A)(1)(s) & (t); La. R.S. 32:1261(A)(1)(k) and related statutes in the Motor Vehicle Franchise Act**

Dear Attorney General Landry:

This letter is respectfully furnished in response to a request from your office for information or legal memorandum regarding an opinion your office is preparing at the request of State Representative Phillip Devillier regarding portions of La. R.S. 32 (Title 32) which are administered by this agency, the Louisiana Motor Vehicle Commission (LMVC). Specifically, your office was asked to answer Questions A and B, below:

A.   *"Is it a violation of La. R.S. 32:1261(A)(1)(k)(i) and (ii) for a manufacturer or distributor to lease new vehicles directly to consumers?"*

B.   *"May a manufacturer or distributor (or any subsidiary thereof) perform warranty services directly without using a dealer? La. R.S. 32:1261(A)(1)(s) and (t)*

We address these two questions in order, below.

#### QUESTION A

**Question:** *"Is it a violation of La. R.S. 32:1261(A)(1)(k)(i) and (ii) for a manufacturer or distributor to lease new vehicles directly to consumers?"*

**Answer:** It is **not** a violation of law for a manufacturer or distributor to *lease* new vehicles directly to consumers.

3017 KINGMAN STREET, METAIRIE, LA 70006  |  PHONE: (504) 838-5207  |  FAX: (504) 838-5411

**EXHIBIT**

Dubbler⁺ **J**

LMVC000046

Honorable Jeff Landry, Attorney General
Louisiana Department of Justice
Attention: Civil Division (opinionrequest@ag.louisiana.gov)
Baton Rouge, Louisiana 70804
July 30, 2020
Page 2

### Law and Argument Regarding Question A

Despite arguments seeking to bootstrap the statute which clearly prohibits direct *sales* by manufacturers/distributors to consumers into also prohibiting direct *leasing* to consumers by analogy, no such prohibition against direct *leasing* exists. Using mere analogy instead of a statute to answer the question would result in an improper, activist expansion of the law beyond the language passed by the legislature. The LMVC's refusal to unilaterally "legislate" that expansion in applying the law is what has given rise to this Opinion Request.

If the legislature wants to prohibit direct *leasing* it can easily pass a law to accomplish that, but thus far it has not. Absent such action by the legislature, the LMVC must issue a license to any qualified *motor vehicle lessor* applicant defined in La. R.S. 32:1252(36)(a) and allow such licensee to conduct its business according to law, including direct *leasing* by manufacturers/distributors to consumers.

The legislature is not opposed to amending the law to address changes in the automotive industry, including this law specifically. In 2017 the legislature amended this law to provide that not only manufacturers/distributors who have a dealer network are prohibited from *selling* directly to consumers, but also now even manufacturers/distributors who have no dealer network (Tesla?) are prohibited from *selling* directly to consumers in Louisiana. Without expressing an opinion here on the constitutionality of that change, one can only surmise the likelihood, expense and outcome of a legal challenge if that prohibition is extended to direct *leasing* (by Tesla?) as well, when no mention of prohibiting direct *leasing* is contained in the statute. Importantly, the legislature chose not to address direct *leasing* when it modified the law on direct *selling* in that 2017 amendment.

For many years the LMVC has regularly issued Lessor licenses to entities that are not franchised motor vehicle dealers who lease new and unused motor vehicles directly to consumers. It has also issued Lessor licenses to motor vehicle manufacturers or distributors or their subsidiaries who sell directly to consumers. In addition to Tesla Lease Trust who is licensed as a Lessor, Ferrari is a manufacturer who has held a Lessor license from the LMVC since 2015 and is authorized to lease directly to consumers.

Respectfully, Representative Devillier's Opinion Request (on behalf of others) represents the attempt of others to inject a desired legal interpretation into the space left by a non-existing law, through mere analogy to an actually existing law, using unsupported speculation, and unsubstantiated and often inaccurate statements of how the industry has operated in the past. See examples from Representative Devillier's letter below.

EXAMPLE 1

*"Although it is hard to theorize a negative, it is safely assumed that the reason "lease" is not contained is that, when most definitions were drafted, leasing of vehicles was not a prevalent practice as it is today."*

LMVC000047

Honorable Jeff Landry, Attorney General
Louisiana Department of Justice
Attention: Civil Division (opinionrequest@ag.louisiana.gov)
Baton Rouge, Louisiana 70804
July 30, 2020
Page 3

**Our Response:** Leasing of motor vehicles has widely occurred in Louisiana for many decades. Surely, if the legislature wished to amend the law regarding any prohibition in relation to direct leasing it has had adequate time to do so, and could have easily done so when it amended provisions of the prohibition against direct *sales* in 2017, but it did not. Therefore, the reasons hypothesized for the legislature's inaction regarding direct *leases* cannot be "safely assumed."

EXAMPLE 2

> *"Historically, the prohibitions against manufacturers and distributors contained in La. R.S. 32:1261, and its many subparts, apply to both sale and lease transactions, without them necessarily saying so."*

**Our Response:** To the extent that "*prohibitions against manufacturers and distributors contained in La. R.S. 32:1261, and its many subparts, apply to both sale and lease transactions,*" it is true only when such prohibitions are explicitly provided in law, and never "*without them necessarily saying so.*" It should be noted that no examples of such alleged unenumerated prohibitions are provided.

Further, jurisprudence does not support an assertion that a statute may prohibit a regulated activity without identifying that activity. In Ellis v. Louisiana Bd. Of Ethics, 2014-0112 (La. App. 1 Cir. 12/30/14), 168 so.3d 714, 724, writ denied, 2015-0208 (La. 4/17/15), 168 So. 3d 400, the court stated:

> "The rule of lenity posits that the courts should not construe penal statutes as extending powers not authorized by the letter of the law even if such powers are arguably within its spirit. The rule of lenity, moreover, applies not only to the substantive ambit of criminal laws and civil penal statutes, but also to the penalties imposed by those laws. Additionally, the rule of lenity requires that where there is any doubt as to the interpretation of a statute upon which a prosecution is based, doubt must be resolved in favor of the accused. This principle applies to both criminal laws and civil statutes of a penal nature. And the rule of lenity has been applied in the area of administrative law." (Emphasis added)

EXAMPLE 3

> *"Indeed, under Louisiana's version of the Uniform Commercial Code (UCC), if a lease contains an option on the part of the lessee of the vehicle to purchase at the end of the lease, it is considered a disguised sale, meaning that the lease payments are simply another equivalent of note payments secured by a lien in a purchase transaction. La. R.S. 10:1-203. Delivery to a Louisiana consumer of a leased vehicle is also a taxable event subject to La. R.S. 47:302, if there is a 'sale, use, lease, or rental of tangible personal property' in the State. A tax is added to the monthly payment of every leased vehicle."*

**Our Response:** While these statements may apply to certain provisions of some leases and for some tax treatments, there are many types of leases of motor vehicles. And options to purchase motor vehicles are only *options* to purchase, not actual purchases. Also, this argument does not have direct bearing on the issue

Honorable Jeff Landry, Attorney General
Louisiana Department of Justice
Attention: Civil Division (opinionrequest@ag.louisiana.gov)
Baton Rouge, Louisiana 70804
July 30, 2020
Page 4

at hand except as an argument to conflate the definitions of *sale* and *lease*, which will be dealt with later in this document. Nonetheless, please note that many leases contain *no* option to purchase and the lessee must return the motor vehicle to the lessor at the end of the lease. The Tesla Lease Trust lease which is presumably the basis of this Opinion Request is a lease that does *not* contain an option to purchase.

Also, this example does not describe the difference regarding the tax treatment of a motor vehicle that is sold versus a motor vehicle that is leased. The tax on the sale of an automobile is due in its entirety at the time of the sale on the entire sales price (less trade-in). The tax due on the lease of a motor vehicle is calculated only upon the amount of the monthly lease payment, and the tax is paid monthly, and not paid on the entire value of the leased automobile. Sales and leases are treated differently for tax purposes because they are different under law.

EXAMPLE 4

Another proffered argument to support the erroneous proposition that the prohibition against direct *sales* from manufacturers and distributors to consumers should also include a prohibition against direct *leases*, is that La. R.S. 32:1252(50) defines a "*retail sale*" as any "...*act of selling, bartering, exchanging, or otherwise disposing of a motor vehicle*..." This argument incorrectly claims that the language "*disposing*" includes *leasing*, thereby making the prohibition extend to the direct *lease* of a motor vehicle.

It is also further argued without legal basis or factual accuracy that, "*For decades, it was considered by the industry and the Commission that "otherwise disposing of" would apply to leases.*"

**Our Response:** The LMVC categorically states that it has not and does not subscribe to that view and has never enforced the law in that way. Indeed, that interpretation would be contrary to long-settled, still applicable case law. The Louisiana Supreme Court long ago clearly set out the difference in a "sale" and a "lease" and described why a "lease" is not a means by which one may "dispose" of a motor vehicle. In Logan v. State Gravel Co., 158 La. 105 (1926); 103 So. 526, the Louisiana Supreme Court provides:

> "The essential difference between *a sale* and *a lease* is this: That in a sale the property, or ownership, of the thing sold passes at once out of the vendor and to the purchaser, his heirs and assigns, *forever*; whilst in a lease the property, or ownership, of the thing leased remains in the lessor (landlord) and the lessee (tenant) acquires *only the use or enjoyment* of the thing leased, and must restore it at the end of the term." (Emphasis in text)

Given this controlling jurisprudence, the phrase "*otherwise disposing of a motor vehicle*" does not include the *lease* of a motor vehicle. Therefore, to lease a motor vehicle is not to "*dispose*" of that motor vehicle, and the prohibition against direct *sale* does not extend to direct *lease*.

LMVC000049

Honorable Jeff Landry, Attorney General
Louisiana Department of Justice
Attention: Civil Division (opinionrequest@ag.louisiana.gov)
Baton Rouge, Louisiana 70804
July 30, 2020
Page 5

Further, the chronology of legislative history establishes that the legislature did not consider "lease" as a means of "otherwise disposing of a motor vehicle." Between 1961 and 1966, the Louisiana legislature enacted the definition of "retail sale" to include "otherwise disposing of a motor vehicle."[1] Yet, the LMVC did not begin regulating motor vehicle lessors and the motor vehicle leasing business until 1984 with the passage of Acts 1983, No. 539. As the legislature did not delegate the task of administration and regulation of the motor vehicle leasing business to the LMVC until 1984, logic would have it that the legislature did not contemplate in 1966 that the "otherwise disposing of a motor vehicle" was a reference to the activity of leasing motor vehicles. Legislative history evidences that the "otherwise disposing" of a motor vehicle in the La. R.S. 32:1252(50) definition of "retail sale" did not, and does not, contemplate a "lease."

EXAMPLE 5

In yet another unpersuasive argument that claims a "sale" and a "lease" should be viewed the same under law, the definition of "ultimate purchaser" provided in La. R.S.32:1252(57) is cited. This argument theorizes that since the law contains no definition of an "ultimate lessor" this must somehow mean that the definition of "ultimate purchaser" includes *lessors*, and therefore presumably, that the prohibition of direct "*sales*" to consumers also somehow prohibits direct "*leases*" to consumers.

**Our Response:**  This tortured explanation to compensate for the absence of actual statutory language—an absence presumably intentional by the legislature—is unpersuasive and incorrect. It is fundamental Louisiana law that a sale and a lease are separate and distinct acts, defined by law and caselaw. Civil Code article 2439 (Code Title 7. Sale) and Civil Code article 2668 (Code Title 9. Lease) clearly set out the distinction. Years of Louisiana caselaw, transactions, tax planning and regulatory enforcement have acknowledged and relied upon that distinction. To opine otherwise would be contrary to well-settled law and practice and would open all Louisiana businesses and transactions to untold legal, commercial and regulatory tumult, confusion and complication.

The Louisiana legislature delegated La. R.S. 32:1261 to the Louisiana Motor Vehicle Commission ("LMVC") for its administration and enforcement. The statutory law is clear that the legislature prohibited a manufacturer/distributor from selling or offering to sell new motor vehicles directly to a consumer. Likewise, it is equally clear that the words "lease," "leasing," and "offer to lease," were not included by the legislature in La. R.S. 32:1261(A)(1)(k)(i).

In Mallard Bay Drilling, Inc. v. Kennedy, 2004-1089 (La. 6/29/05), 914 So. 2d 533, 546, the Louisiana Supreme Court stated: "*It is presumed that every word and provision in a statute was intended to serve some useful purpose, that some effect is to be given to each provision, and that no words or provisions were used unnecessarily.*" (Emphasis added)

LMVC000050

Honorable Jeff Landry, Attorney General
Louisiana Department of Justice
Attention: Civil Division (opinionrequest@ag.louisiana.gov)
Baton Rouge, Louisiana 70804
July 30, 2020
Page 6

As such it is clear that when the legislature prohibited manufacturers/distributors from "selling" or "offering to sell" new automobiles directly to the public, the legislature's intent was to prohibit the act of "selling" or "offering to sell." The legislature did not express an intent to prohibit the "lease" or "offering to lease" new vehicles directly to the public by manufacturers/distributors. If the legislature wanted to prohibit the "lease" or "offer to lease" new vehicles directly to the public by manufacturers/distributors, it would have included the words "lease" or "offering to lease" in La. R.S. 32:1261(A)(1)(k).

**Conclusion:** It is **not** a violation of law for a manufacturer or distributor to lease new vehicles directly to consumers.

<div align="center">

**QUESTION B**

</div>

**Question**: "*May a manufacturer or distributor (or any subsidiary thereof) perform warranty services directly without using a dealer? La. R.S. 32:1261(A)(1)(s) and (t)*

**Answer**: <u>Yes, a manufacturer or distributor (or any subsidiary thereof) may perform warranty services directly without using a dealer, as specifically provided in La. R.S. 32:1261(t)(i), (ii), (iii) and (iv), when the manufacturer or distributor or subsidiary is a fleet owner and performs warranty work on its own fleet.</u>

<div align="center">

**Law and Argument Regarding Question B**

</div>

La. R.S.32:1261(s), which prohibits a manufacturer or distributor from "use[ing] any subsidiary...to accomplish what would *otherwise be illegal conduct under this Chapter*" does not apply because performing such warranty work on such entities' own fleets is specifically *authorized* in "this Chapter" by La. R.S. 32:1261(t)(i), (ii), (iii) and (iv).

Any prohibition contained in La. R.S. 32:1261(A)(1)(s) by its own language has no applicability to conduct that is specifically authorized in "this Chapter," i.e. La. R.S. 32:1251, et seq. In La. R.S. 32:1261A(1)(t)(i), the legislature specifically allows a "fleet owner" to operate a warranty and repair center for work on its own fleet. The legislature defined a "fleet owner" to include a person who is, "...approved and authorized by a manufacturer to perform warranty repairs and owns or leases vehicles for its own use or a renting or leasing company that rents, maintains, or leases vehicle to a third party." This definition applies to Tesla Lease Trust.

LMVC000051

Honorable Jeff Landry, Attorney General
Louisiana Department of Justice
Attention: Civil Division (opinionrequest@ag.louisiana.gov)
Baton Rouge, Louisiana 70804
July 30, 2020
Page 7

In La. R.S. 32:1261A(1)(t)(v), the legislature withheld from the Louisiana Motor Vehicle Commission all authority over warranty repairs by such fleet owners. In La. R.S. 32:1261A(1)(t)(vi) the legislature further made clear that a repair facility of a fleet owner is not a satellite warranty and repair center, and that the LMVC has no licensing authority over fleet owner repair facilities. Therefore, the LMVC has no authority to prohibit a manufacturer or distributor or subsidiary (Tesla Lease Trust) from performing warranty repairs on its own fleet, and has no authority to license that operation. Tesla Lease Trust's repair facility as a fleet owner is limited to performing warranty work on its own fleet. It cannot legally perform warranty work on vehicles not owned by Tesla Lease Trust. If Tesla Lease Trust were to perform warranty repairs on vehicles it did not own, that would subject Tesla Lease Trust to LMVC regulation and enforcement actions. As can any repair shop, Tesla Lease Trust can perform <u>non-warranty</u> repair work on vehicles of any make or model of its choosing without subjecting itself to LMVC regulation and enforcement actions.

The LMVC's regulatory actions are consistent with <u>Benson & Gold Chevrolet</u>, *supra*, in applying La. R.S. 32:1261(A)(1)(s), La. R.S. 32:1261A(1)(t)(i), La. R.S. 32:1261A(1)(t)(v), and La. R.S. 32:1261A(1)(t)(vi) in determining that: 1) the legislature defines the LMVC's administrative overview of the operation of satellite warranty and repair centers, 2) the legislature allows an owner of lease fleet vehicles to perform warranty repairs; 3) the legislature defines "fleet owner," 4) the legislature removes "fleet owners" from the LMVC's administrative authority, and 5) the legislature declares that a repair facility of a fleet owner is <u>not</u> a satellite warranty and repair center and is not subject to licensing or regulation by the LMVC.

**Conclusion**: A manufacturer or distributor (or any subsidiary thereof) may perform warranty services directly without using a dealer, as specifically provided in La. R.S. 32:1261(t)(i), (ii), (iii) and (iv), when the manufacturer or distributor or subsidiary is a fleet owner and performs warranty work on its own fleet.

## AN OVER-ARCHING ADDITIONAL CONSIDERATION

### The Danger of Legal Liability for LMVC and Its Commissioners

Both questions asked in Representative Devillier's Opinion Request involve a longtime issue existing among Tesla and franchised dealers. The letter directly references the LADA and Tesla Lease Trust. The LMVC board is made up of many motor dealers who compete with Tesla. The motor vehicle dealers on the LMVC commission are all franchised dealers. Tesla is not represented on the LMVC board and does not have franchised dealers.

The questions (or variations thereof) contained in the Opinion Request letter have been discussed at length between the LMVC and LADA for well over five years, the parties having met numerous times in attempts for LADA to convince LMVC to revise its interpretations. The LMVC has always openly held (and directly stated to LADA) that it would issue a license to Tesla if Tesla met the statutory guidelines. The LMVC has no authority to act outside the statutes and has always advised the LADA that the way to have the LMVC change its regulatory actions is to have the law changed. Year after year LADA took no action on these issues in the legislature until 2017.

LMVC000052

Honorable Jeff Landry, Attorney General
Louisiana Department of Justice
Attention: Civil Division (opinionrequest@ag.louisiana.gov)
Baton Rouge, Louisiana 70804
July 30, 2020
Page 8

In 2017 LADA successfully worked to have the statute amended to provide that a manufacturer or distributor or subsidiary, *even one without a dealer network*, is prohibited from *selling* new and unused motor vehicles directly to consumers. La. R.S.32:1261A(1)(k)(i). This amendment would seem to require the LMVC to deny a manufacturer or distributor license to Tesla or a subsidiary if it intends to use its non-franchise dealer business model to sell new and unused motor vehicles directly to consumers.

The 2017 amendment did *not* address direct *leasing* by a manufacturer or distributor or subsidiary. In 2019, the LMVC approved the motor vehicle lessor license application of Tesla Lease Trust and issued the license. In 2019 Tesla Lease Trust also opened a fleet owner repair facility in New Orleans to provide warranty repairs for the motor vehicles Tesla Lease Trust leased, which did not require approval by the commission. These 2019 events seem to have given rise to the current Opinion Request.

Tesla's non-franchise business model has been a contentious issue with franchise dealers around the country and has resulted in much litigation. The Opinion Request in this case requests that your office issue an opinion that supports the contentions of the LADA, a trade association comprised of franchise dealers.

As a commission including many franchised dealers, any actions by the LMVC which are determined to be anti-competitive or a restraint on trade designed to protect the franchised dealers serving on the LMVC board, could subject the commission and its commissioners to civil and even criminal liability. Reading or analogizing additional language that the legislature clearly did not pass into statutes that it did pass, which results in competitive advantages for LMVC commission members, represents a clear risk of this liability.

Should the LMVC act outside of the clearly articulated directives of the legislature expressed in La. R.S. 32:1261(A)(1)(s), La. R.S. 32:1261A(1)(t)(i), La. R.S. 32:1261A(1)(t)(v), and La. R.S. 32:1261A(1)(t)(vi), the LMVC (*i.e.*, the state of Louisiana) places at risk its immunity from liability imposed by the federal anti-trust law. This immunity was limited in 2015 by the United States Supreme Court decision in N. Carolina State Bd. of Dental Examiners v. F.T.C., 574 U.S. 494, 494, 135 S. Ct. 1101, 1104, 191 L. Ed. 2d 35 (2015). As a result of this decision, a state agency is not automatically entitled to this immunity, but the action must be taken pursuant to a clearly stated state policy. That is, for the LMVC to be immune from federal anti-trust law: 1) the restraint on trade imposed by the board by means of its regulation/rule must be one clearly articulated and affirmatively expressed in state policy, and 2) there must be active supervision of the promulgation of the regulation/rule by the state agency.

Certainly, La.R.S.32:1261A(k)(i) does not provide for any prohibition for a manufacturer or distributor or subsidiary to *lease* directly to a consumer. And La. R.S. 32:1261(A)(1)(s), La. R.S. 32:1261A(1)(t)(i), La. R.S. 32:1261A(1)(t)(v), and La. R.S. 32:1261A(1)(t)(vi) do not clearly prohibit owners of fleets from performing warranty repairs. Those statutes explicitly provide for it. To "interpret" otherwise is to place the LMVC and its commissioners at risk of the loss of immunity, and therefore, at risk of personal liability.

LMVC000053

Honorable Jeff Landry, Attorney General
Louisiana Department of Justice
Attention: Civil Division (opinionrequest@ag.louisiana.gov)
Baton Rouge, Louisiana 70804
July 30, 2020
Page 9

### IN CONCLUSION

The LMVC and LADA have a longstanding, very good working relationship. While the entities are completely independent of each other and have different missions, communication and mutual respect for the role of each other has resulted in both succeeding in their respective missions. It would be surprising if LADA were involved in seeking an attorney general opinion to oppose the LMVC's implementation of its duties under the law, which has required the LMVC to write this letter to respond to the Opinion Request under consideration. We appreciate the opportunity to furnish this information and analysis.

The LMVC respectfully requests that your office issue its opinion consistent with the following:

A. It is **not** a violation of law for a manufacturer or distributor to *lease* new vehicles directly to consumers; and

B. A manufacturer or distributor (or any subsidiary thereof) may perform warranty services directly without using a dealer as specifically provided in La. R.S. 32:1261(t)(i), (ii), (iii) and (iv) if the manufacturer or distributor or subsidiary is a fleet owner and performs warranty work on its own fleet.

Sincerely,

Allen Krake
Chairman of the Louisiana Motor Vehicle Commission

LMVC000054

# ADAMS AND REESE LLP

**Attorneys at Law**
Alabama
Florida
Georgia
Louisiana
Mississippi
South Carolina
Tennessee
Texas
Washington, DC

Mark R. Beebe
Also admitted in Texas
Direct: 504.585.0436
E-Fax: 504.584.9555
mark.beebe@arlaw.com

May 12, 2021

*Via E-mail Correspondence*
Ms. Ingya Cattle
Louisiana Motor Vehicle Commission
3017 Kingman Street
Metairie, LA 70006

*Via E-mail Correspondence*
Adrian L. LaPeyronnie, III
Greenberg & LaPeyronnie, L.L.C.
The Energy Centre
1100 Poydras Street, Ste. 2900
New Orleans, LA 70163

Re:   Second Public Records Request to LMVC
       Our ref: 30254-2

Dear Ms. Cattle and Mr. LaPeyronnie:

On behalf of Tesla Motors and Tesla, Inc. ("Tesla"), we write to submit a second public records request (the "Second Request") for records in the custody or under the control of the Louisiana Motor Vehicle Commission ("LMVC"), pursuant to the Louisiana Public Record Act, La. Rev. Stat. Ann. § 44:1, *et seq.*

As you may be aware, Tesla originally submitted a public records request to the LMVC on April 20, 2021 (the "Original Request"), to which the LMVC has admittedly failed to properly respond.[1] In the Original Request, Tesla requested:

"All records that reference "Tesla," "Tesla Motors," "TSLA," "Tesla Inc.," "Tesla Trust Lease" and any other abbreviation or moniker used by the LMVC to refer Tesla, including without limitation:

...

(iii)   Communications and/or records reflecting communications (e.g. notes or emails) between Commissioners and third-parties, such as (a) the Louisiana Automotive Dealers' Association ("LADA"), members of LADA on the one hand, and any Commissioner or Commissioners on the other hand; (b) other third-parties such as State Representative Phillip Devillier, on the one hand, and any Commissioner or Commissioners on the other hand."

---

[1] *See* correspondence from M. Beebe to A. LaPeyronnie, III dated May 7, 2021.

**EXHIBIT**

**K**

Without prejudice to Tesla's rights to receive the records requested under the Original Request, Tesla now makes an additional request for records maintained by the LMVC and its Commissioners. Specifically, in a July 30, 2020 letter from Mr. Allen Krake, Chairman of the LMVC, Mr. Krake states that "the LMVC and LADA" have been discussing two issues for "well over five years."[2] These issues concern the LMVC's interpretation of La. R.S. § 32:1261, as outlined in LMVC's correspondence.

In light of these admitted discussions, Tesla now requests:

(1) Copies of any and all communications related to the LMVC's interpretation of La. R.S. § 32:1251, et seq., including La. R.S. §32:1261, without limitation, between any LMVC Commissioner[3] and any executive committee member, board member, or regular member of the Louisiana Automotive Dealers' Association ("LADA") occurring from January 1, 2015 to the present.

For purposes of this request, the definition of "communication" includes but is not limited to written correspondence, emails, letters, text messages, instant messages, saved voicemails, and any other documents, records, or memoranda transferred between any Commissioner of the LMVC and any member of the LADA. As you know, records that are in the possession of individual Commissioners are considered public records. *See Mercato Elisio, L.L.C. v. City of New Orleans*, 2018-0081 (La. App. 4 Cir. 11/21/18), 259 So.3d 1235 (any documents or communications created by an individual member of a public board is considered a public record if prepared, used, and possessed in accordance with that member's work with the public board). Accordingly, we request written confirmation that this Second Request is shared with the individual Commissioners of the LMVC in furtherance of its duties to gather and produce public records as a public body.

We respectfully remind the LMVC of its obligation to provide prompt access to the requested public records. In the event the LMVC determines that any of the requested records are not public, we demand that the LMVC respond in writing, within three days of this request, with an explanation for this determination and the reasons therefor.[4] This response should include "a reference to the basis under law which the [LMVC] had determined exempts [the] record, or any part thereof" from production.[5]

Once the records are ready, please communicate with me directly by email (to mark.beebe@arlaw.com) concerning this request, including any request or requirement to

---

[2] *See* correspondence from A. Krake to Attorney General Jeff Landry, dated July 30, 2020, which was produced to Tesla in response to the Original Request.
[3] Including specifically Allen O. Krake, Stephen L. Guidry, Jr., Wesley Randal Scoggin, Gregory Lala, Joseph W. Westbrook, V. Price LeBlanc, Jr., Scott A. Courville, Eric R. Lane, Donna C. Corley, Kenneth Smith, Terryl J. Fontenot, Keith P. Hightower, Maurice C. Guidry, Raney Redmond, Keith M. Marcotte.
[4] *See* La. R.S. § 32(D).
[5] *Id.*

2

pay fees for services or copies of the requested documents.

Sincerely,

**ADAMS AND REESE LLP**

Mark R. Beebe

MRB/ngp

Cc:    Greg Reggie
         Lessie House

3



# GREENBERG & LAPEYRONNIE
## ATTORNEYS AT LAW

DAVID GREENBERG
ADRIAN F. LaPEYRONNIE, III*

*Also admitted in Texas

NATHAN GREENBERG (1921-2002)

August 24, 2018



**Via E-mail and U.S. Mail**

Lessie House, Executive Director - **(lessiehouse@lmvc.la.gov)**
Louisiana Motor Vehicle Commission
3519 12th Street
Metairie, LA 70002

**RE: Tesla Lease Agreement**

Dear Ms. House,

I reviewed a copy of a form Tesla Lease Agreement. For the following reasons, it is my opinion ████████████████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
███████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
█████

alapeyronnie@GLNolaLaw.com

**Gretna**
848 Second Street
Suite 200
Gretna, Louisiana 70053

**www.GLNolaLaw.com**
(504) 366-8118
facsimile: (504) 368-9711

**New Orleans (Sat**
Th
1100 Poydras S
New Orleans, Louisiana 70163

**EXHIBIT**

**L**

*Lessie House*
*August 24, 2018*
*Page 2 of 2*



If you wish to discuss further, please call me at your convenience.  I remain,

Sincerely,

Adrian F. LaPeyronnie, III

LMVC
AUG 2 7 2018

AFL, III/db
Attachment
cc: Gregory Reggie

alapeyronnie@GLNolaLaw.com

| Gretna | www.GLNolaLaw.com | New Orleans (Satellite Location) |
|---|---|---|
| 848 Second Street | 504-366-8118 | The Energy Centre |
| Suite 200 | facsimile:  504-368-9711 | 1100 Poydras Street, Suite 2900 |
| Gretna, Louisiana 70053 | | New Orleans, Louisiana 70163 |

LMVC000613

# TESLA
## LEASE AGREEMENT

| Lessee / Co-Lessee ("You") Name and Address | Garaging Address (if Different) | Lessor ("We", "Us", "Our") |
|---|---|---|
| | | Tesla Motors Inc<br>45500 Fremont Blvd<br>Fremont CA 94538 |

### 1. Description of Leased Vehicle (Vehicle) and Trade-In (if applicable)

| | | Year | Make | Model | Vehicle Identification Number | Odometer |
|---|---|---|---|---|---|---|
| A. Leased Vehicle | New | 2018 | Tesla | Model X | 5YJXCBE47GF214082 | 000050 |
| | | Year | Make | Model | Agreed Upon Value | Payoff Amount | Net Value (Item 7A or 12G) |
| B. Trade-in | | | | | 0.00 | 0.00 | 0.00 |

**THERE IS NO COOLING OFF PERIOD**
California law does not provide for a "cooling off" or other cancellation period for vehicle leases. Therefore, you cannot later cancel this lease simply because you change your mind, decided the vehicle costs too much, or wish you had acquired a different vehicle. You may cancel this lease only with the agreement of the lessor or for legal causes, such as fraud.

### Federal Consumer Leasing Act Disclosures

| 2. Amount Due at Lease Signing or Delivery (Itemized below)* $9,386.20 | 3. Monthly Payments<br>Your first monthly payment of $2,269.80 is due on 08/01/2018 followed by 23 payments of $2,269.80 due on the 1 of each month. The total of your monthly payments is $54,470.40 | 4. Other Charges (not part of your monthly payment)<br>Disposition fee $395.00<br>Total $395.00 | 5. Total of Payments (the amount you will have paid by the end of the lease)<br>$61,982.00 |
|---|---|---|---|

### Itemization of Amount Due at Lease Signing or Delivery

| 6. Amount Due at Lease Signing or Delivery | | 7. How the Amount Due at Lease Signing or Delivery Will be Paid | |
|---|---|---|---|
| A. Capitalized cost reduction | $ 5,000.00 | A. Net trade-in allowance | 0.00 |
| B. First monthly payment | $ 2,269.80 | B. Rebates and noncash credits | 0.00 |
| C. Title fees | $ 0.00 | C. Amount applied from deposit | 2,500.00 |
| D. Registration fees | $ 81.00 | D. Amount to be paid in cash | 6,886.20 |
| E. License fees | $ 878.00 | | |
| F. Sales/use tax | $ 55.60 | | |
| G. Sales tax on capitalized cost reduction | $ 400.00 | | |
| H. Acquisition fee | $ 695.00 | | |
| I. California tire fee | $ 7.00 | | |
| J. Other | $ 0.00 | | |
| Total | $ 9,386.20 | Total | $ 9,386.20 |

### 8. Your Monthly Payment is Determined as Shown Below

A. **Gross Capitalized Cost.** The agreed upon value of the vehicle ($ 135,150.00) and any items you pay for over the lease term (such as taxes, fees, service contracts, insurance, and any outstanding prior credit or lease balance) (see item 12 for an itemization of this amount) ... $ 135,150.00

B. **Capitalized Cost Reduction.** The amount of any net trade-in allowance, rebate, noncash credit, or cash you pay that reduces the gross capitalized cost ... − $ 5,000.00

C. **Adjusted Capitalized Cost.** The amount used in calculating your base monthly payment. ... = $ 130,150.00

D. **Residual Value.** The value of the vehicle at the end of the lease used in calculating your base monthly payment. ... − $ 89,190.00

E. **Depreciation and Any Amortized Amounts.** The amount charged for the vehicle's decline in value through normal use and for other items paid over the lease term ... = $ 40,960.00

F. **Rent Charge.** The amount charged in addition to the depreciation and any amortized amounts. ... + $ 9,475.44

G. **Total of Base Monthly Payments.** The depreciation and any amortized amounts plus the rent charge ... = $ 50,435.44

H. **Lease Payments.** The number of payments in your lease ... ÷ 24

I. **Base Monthly Payment.** ... = $ 2,101.48

J. **Monthly Sales/use Tax.** ... + $ 168.12

Total Monthly Payment. ... = $ 2,269.80

> **Early Termination.** You may have to pay a substantial charge if you end the lease early. **The charge may be up to several thousand dollars.** The actual charge will depend on when the lease is terminated. The earlier you end the lease, the greater this charge is likely to be.

9. **Excessive Wear and Use.** You may be charged for excessive wear based on our standards for normal use and for mileage in excess of total miles over the scheduled lease term of 30,000 miles at the rate of 25 cents per mile.

10. **Purchase Option at End of Lease Term.** You will have an option to purchase the vehicle at the scheduled end of the lease for $89,190.00 plus official fees and taxes.

11. **Other Important Terms.** See your lease documents for additional information on early termination, purchase options and maintenance responsibilities, warranties, late and default charges, and insurance.

### 12. Itemization of Gross Capitalized Cost

| A. Agreed upon value of vehicle as equipped | $ 135,150.00 | F. Maintenance agreement | $ 0.00 |
|---|---|---|---|
| B. Title fees | $ 0.00 | G. Net trade-in balance | $ 0.00 |
| C. Registration fees | $ 0.00 | H. Sales tax on capitalized cost reduction | $ 0.00 |
| D. License fees | $ 0.00 | I. Other | $ 0.00 |
| E. Sales/use tax | $ 0.00 | Total (A to I) | $ 135,150.00 |

© 2014 Tesla Finance LLC

CA14290


LMVC
AUG 2 7 2018

Page 1 of 3


EXHIBIT
A

| 13 Estimated Official Fees and Taxes You Must Pay During the Lease | | |
|---|---|---|
| $6,530.48 is our estimate of the total of official fees and taxes you will have to pay over the lease term. The actual amount may be higher or lower, depending on the tax rates in effect or the value of the vehicle at the time a fee or tax is assessed. (See item 23 for a description of your responsibility for official fees and taxes.) | | |
| 14 Lease Date | 15 Scheduled End of Lease Term | 16 Lease Term (Number of Months) |
| 8/31/2016 | 9/1/2018 | 24 |

**17. Agreement.** You agree to everything in this lease, including items 2-11, and are not buying a vehicle. We intend to assign this lease to Tesla Lease Trust. Tesla Finance LLC helped arrange this lease and will service it.

**18. Payments and Late Charge.** You will pay us any amounts under this lease when they become due, which may be after the lease ends. A late fee of 5% of any amount we do not receive by 10 days after the due date will be charged.

**19. Insurance.** You must insure the vehicle through policies and insurers acceptable to us from the delivery of the vehicle to you until you return it to us, and show us proof if we ask. The liability insurance must cover at least $50,000, $300,000 and $500,000 for property damage, for bodily injuries to any one person, and for any one accident, respectively. The physical damage insurance must cover the vehicle's full value and no deductible under it may exceed $2,500. The policies must cover the driving of the vehicle by you or anyone likely to do so and must show as additional insureds us and anyone else we designate. We will be entitled to any insurance proceeds for damage, theft or destruction of the vehicle.

**20. Delivery.** By signing below, you acknowledge the delivery to, and acceptance by, you of the vehicle, and you assume the risks of loss or damage.

**21. Warranty.** The only warranties on the vehicle are the Tesla Motors New Vehicle Limited Warranty provided to you (which is separate from this lease and states any coverage limits) and a warranty that the vehicle conforms to the description in this lease.

**22. Maintenance and Use.** You will keep the vehicle in good working order and repair and follow any maintenance schedules or recall advisories we or our affiliate may notify you of. You are responsible for all operating costs. You will not use the vehicle or allow it to be used illegally, outside of your insurance coverage, or for transport or rental for payment. You will notify us if the vehicle is out of the state where it is first titled for more than 30 days. You will keep the vehicle free from liens or claims of, or confiscation by, others.

**23. Fees, Fines and Taxes.** You will pay all fees, fines and taxes mandated by the government, and road tolls, related to the vehicle or its use (except our net income taxes), including those accruing from your failure to pay when due. We will charge you for any such amounts that we pay on your behalf.

**24. Return at Scheduled Lease End.** You will return the vehicle at the scheduled lease term end to the place we designate, unless you purchase it (see item 26). You will pay us (i) any excess mileage charge (see item 9), (ii) any excess wear charge (see item 25), and (iii) any amounts due under item 30. For each month you keep the vehicle beyond the scheduled lease term end, you will be in default and will also pay us the monthly payment amount.

**25. Excess Wear.** The charge for excess wear will be our estimated or actual cost of repairing wear beyond that reasonably expected with ordinary, everyday use and maintenance according to this lease. It includes: (i) parts, accessories and vehicle specifications present in or on the vehicle or provided at delivery being incomplete, modified or replaced with items of inferior quality or design; (ii) any tire with less than 1/8 inch of tread or not part of a matching set of four; (iii) dents, scratches, gouges or cracks in the vehicle's external parts or glass; (iv) torn or burned interior parts or upholstery; (v) inoperative mechanical or electrical components; and (vi) any damage or neglect resulting from your failure to follow any maintenance schedules or recall advisories we or our affiliate may notify you of.

**26. Option to Purchase.** You may buy the vehicle "AS IS," either at the scheduled lease term end by paying the amount in item 10 or during the lease term by paying the adjusted lease balance (see item 28) plus, in each case, any amounts due under item 30. If you buy the vehicle, you will re-title and re-register it in your name as soon as possible.

**27. Terminating the Lease Early.** This lease may be ended before its scheduled term end by you for any reason, or by us if: (i) you default on this lease (see item 32), or (ii) the vehicle is a total loss, or (iii) you die with no surviving lessee. You will have to pay any early end liability (see items 28 and 29).

**28. Early End Liability.** If the lease ends early and you do not purchase the vehicle under item 26, you will pay the amount of any excess of the "adjusted lease balance" over the "realized value" (see below). However, if such excess is greater than the sum of the following, you will pay such sum instead: (i) all monthly lease payments not yet due plus (ii) any excess mileage charge (see item 9) plus (iii) any excess wear charge (see item 25). Either way, you will also owe us any amounts due under item 30.

- **Adjusted Lease Balance:** The adjusted lease balance on any date is the adjusted capitalized cost (see item 8.C) less all depreciation/amortization through that date. We calculate the split between (i) depreciation/amortization and (ii) rent in each monthly payment using the "constant yield method," a written explanation of which will be provided to you upon request. Our calculations assume that rent charges for each month are earned in advance, that your lease payments are received on their due dates and that the lease ends on the scheduled end date.
- **Realized Value:** If: (i) we keep the vehicle, the vehicle's wholesale fair market value, or (ii) we dispose of the vehicle, the price we receive (including any insurance settlement we receive where "gap protection" under item 29 does not apply). Appraisal Right: However, you may pay for an independent third party agreeable to us to conduct a professional appraisal of the wholesale value of the vehicle that could be realized at sale, in which case the "realized value" will instead be such appraised value.

**29. Gap Protection.** If your vehicle is a total loss and we get a settlement under your insurance policy that complies with this lease, you will not owe an early end liability under item 28. Instead, if such settlement is less than the adjusted lease balance (see item 28), you will owe the difference (up to your insurance deductible) plus any amounts due under item 30. We will credit you for any excess of the insurance settlement over the adjusted lease balance.

**30. Other Amounts Due at Lease End.** You will owe us the following when this lease ends: (i) any monthly payments already due and unpaid at such time; (ii) any official fees and taxes for the lease and (and vehicle purchase, if applicable); and (iii) any other amounts due and unpaid under this lease.

**31. Odometer Disclosure.** Federal law requires you to tell us the vehicle's mileage in connection with a transfer of vehicle ownership. You may be fined and/or imprisoned if you do not complete the disclosure or you make a false statement.

**32. Default and Remedies.** You will be in default if you breach any agreement in this lease, provide false or misleading information in your credit application, or do anything else the law says is a default. If you are in default, we may, after any legally required notice or waiting period: (i) end this lease and charge an early end liability (see items 28 and 29); (ii) do anything to protect our interest in the vehicle, including repossessing the vehicle using legally permitted means; (iii) locate the vehicle electronically using our remote dynamic vehicle connection described in our Privacy Policy; (iv) use the vehicle's license plates to move it; (v) sue you for damages or to get the vehicle back; and/or (vi) charge you for amounts we spend taking these actions.

**33. Indemnification.** You agree to indemnify us and hold us and our designees, agents, and insurers harmless from and against any and all liabilities, damages, claims and expenses, including reasonable attorneys' fees to the extent permitted by law, arising out of the condition, maintenance, use and operation of the vehicle, including claims under a strict liability doctrine.

© 2014 Tesla Finance LLC CA14290 

LMVC
AUG 2 7 2018

LMVC000615

о

## A LaPeyronnie

| | |
|---|---|
| **From:** | A LaPeyronnie |
| **Sent:** | Wednesday, November 27, 2019 11:10 AM |
| **To:** | Lessie House; 'greggie@reggielaw.com' |
| **Cc:** | Ing-Ya Cattle (icattle@lmvc.la.gov); Amber Jones |
| **Subject:** | Tesla Least Trust - Licensing Issue - ████████████ |
| **Attachments:** | ████████████ |

Lessie and Greg,

████████████████████████████████████

Contact me with any questions or to discuss further.

Thank you.

Adrian F. LaPeyronnie, III

**Greenberg & LaPeyronnie, L.L.C.**
Attorneys at Law
848 Second St., Suite 200
Gretna, LA 70053
(504) 366-8118- telephone
(504) 368-9711- facsimile

**e-mail:** alapeyronnie@GLNolaLaw.com
**website:** www.GLNolaLaw.com

**Downtown Office:**
The Energy Centre
1100 Poydras St., Ste. 2900
New Orleans, LA 70163

1



EXHIBIT
tabbies
**M**

LMVC000020



LMVC000021



LMVC000022

## A LaPeyronnie

| | |
|---|---|
| **From:** | A LaPeyronnie |
| **Sent:** | Wednesday, November 27, 2019 5:31 PM |
| **To:** | Gregory F. Reggie |
| **Cc:** | Lessie House; Ing-Ya Cattle (icattle@lmvc.la.gov); Amber Jones |
| **Subject:** | RE: Tesla Least Trust -- Licensing Issue - |



LMVC000023



Adrian F. LaPeyronnie, III

**Greenberg & LaPeyronnie, L.L.C.**
Attorneys at Law
848 Second St., Suite 200
Gretna, LA 70053
(504) 366-8118- telephone
(504) 368-9711- facsimile

**e-mail:** alapeyronnie@GLNolaLaw.com
**website:** www.GLNolaLaw.com

**Downtown Office:**
The Energy Centre
1100 Poydras St., Ste. 2900
New Orleans, LA 70163

**From:** Gregory F. Reggie <greggie@reggielaw.com>
**Sent:** Wednesday, November 27, 2019 2:34 PM
**To:** A LaPeyronnie <alapeyronnie@glnolalaw.com>
**Cc:** Lessie House <LAHouse@lmvc.la.gov>; Ing-Ya Cattle (icattle@lmvc.la.gov) <icattle@lmvc.la.gov>; Amber Jones <ajones@glnolalaw.com>
**Subject:** Re: Tesla Least Trust - Licensing Issue -



On Nov 27, 2019, at 11:10 AM, A LaPeyronnie <alapeyronnie@glnolalaw.com> wrote:

2

LMVC000024



Contact me with any questions or to discuss further.

Thank you.

Adrian F. LaPeyronnie, III
**Greenberg & LaPeyronnie, L.L.C.**
Attorneys at Law
848 Second St., Suite 200
Gretna, LA 70053
(504) 366-8118- telephone
(504) 368-9711- facsimile

**e-mail:** alapeyronnie@GLNolaLaw.com
**website:** www.GLNolaLaw.com

**Downtown Office:**
The Energy Centre
1100 Poydras St., Ste. 2900
New Orleans, LA 70163



LMVC000025

Filed by: **FAX**

Date: 8/26/21

Time: 4:13pm

Deputy Clerk: _____
(SEE ATTACHED LOG)

FILED FOR RECORD 08/27/2021 10:48:06
Mandy Paisance, DY CLERK
JEFFERSON PARISH, LA

**State of Louisiana**
LOUISIANA MOTOR VEHICLE COMMISSION

John Bel Edwards
Governor

Lessie A. House
Executive Director

## SUBPOENA AND SUBPOENA DUCES TECUM

**TO:**   TESLA
2801 TCHOUPITOULAS STREET
NEW ORLEANS, LOUISIANA 70115

Pursuant to the authority vested in the Louisiana Motor Vehicle Commission by La. R.S. 32:1251 et seq.,La. R.S. 32:1253(E), TESLA is hereby commanded in the name of the State of Louisiana, Louisiana Motor Vehicle Commission, to produce at the offices of the Louisiana Motor Vehicle Commission, 3017 Kingman Street, Metairie, Louisiana 70006, on the **23rd day of February, 2021, at 10:00 o'clock a.m.**, the following to wit:

1.   All documents or electronically stored information, including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations, stored in any medium from which information can be obtained either directly or, if necessary, after translation into a reasonably usable form — **identifying and/or referencing warranty service and/or warranty repair performed on any and all motor vehicles at 2801 Tchoupitoulas Street, New Orleans, Louisiana from June 1, 2019 to present.**

2.   All documents or electronically stored information, including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations, stored in any medium from which information can be obtained either directly or, if necessary, after translation into a reasonably usable form — **identifying and/or referencing all motor vehicles leased in Louisiana and all motor vehicles leased into Louisiana by TESLA LEASE TRUST from June 1, 2019 to present.**

*Please note, that if the requested documents are received before February 23, 2021 at the office of the Louisiana Motor Vehicle Commission, there will be no need to appear on that day.*

**BY ORDER OF THE LOUISIANA MOTOR VEHICLE COMMISSION**
**(Pursuant to the authority granted by LSA-R.S. 32:1253)**

**FAIL NOT UNDER PENALTY OF LAW**

L. A. House
Executive Director

LAH/al

*Service of this Subpoena and Subpoena Duces Tecum is made upon Tesla on February 3, 2021 via hand delivery at 2801 Tchoupitoulas Street, New Orleans, Louisiana.*

**Hand-Delivered:**

**Received by:** _____

**Date & Time:** 2/3/2021   9:24am

cc:   Commission Counsel
Eric LaFleur, Via E-Mail

*Delivered by: Antoine DeRouen*

EXHIBIT 1

**DEFENDANT'S EXHIBIT 4**

3017 KINGMAN STREET, METAIRIE, LOUISIANA 70006 • (504) 838-5207 • FAX (504) 838-5416
www.lmvc.la.gov