UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| TESLA, INC., *et al.* | CIVIL ACTION NO. 2:22-cv-02982 |
| Plaintiffs, | |
| v. | JUDGE SARAH S. VANCE |
| LOUISIANA AUTOMOBILE DEALERS ASSOCIATION, *et al.* | |
| Defendants. | MAG. JUDGE DONNA PHILLIPS CURRAULT |

---

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT LOUISIANA AUTOMOBILE DEALERS ASSOCIATION INC.'S**
**MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)**

---

## INTRODUCTION

Settled precedent squarely forecloses Tesla's[1] claims. Tesla alleges that Defendant Louisiana Automobile Dealers Association, Inc. (the "Association") successfully lobbied the Louisiana Legislature to adopt a favorable statutory amendment and then successfully lobbied a state agency to interpret a related law to similar effect, which led the agency to issue several subpoenas to Tesla. This constitutionally protected petitioning activity is categorically immune from antitrust and unfair-competition liability. *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657 (1965).

Tesla's constitutional claims fare no better. Its Commerce Clause claim is equally foreclosed by precedent. The Fifth Circuit has twice held that state laws prohibiting automobile manufacturers from selling directly to consumers do not discriminate against interstate commerce—and that remains true even if "all or most affected businesses are located out-of-state."

---

[1] "Tesla" refers to all three Plaintiffs: Tesla, Inc., Tesla Lease Trust, and Tesla Finance, LLC.

*Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 726 (5th Cir. 2004); *see also Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498–502 (5th Cir. 2001). Tesla's claim is foreclosed by the same precedent when repackaged as an equal protection claim. As for the remaining claim—that the composition of the Louisiana Motor Vehicle Commission (the "Commission") violates due process by denying Tesla "a neutral arbiter," Am. Compl. ¶270[2]—that claim is, if anything, even less valid than the rest. Absent the rarest of allegations, wholly absent here, the Due Process Clause does not authorize federal courts to superintend the design of state governments. And all Tesla alleges to support its claim of bias is that the Commission issued a subpoena that Tesla here explicitly *does not challenge*. *See id.* ¶283 n.29. That is a far cry from a due process violation.

Tesla has strong opinions on what the law "should" be. In Tesla's view, businesses should not be able to lobby the government; states should not be able to regulate how vehicles are sold or serviced; and federal courts should enjoin state agencies from regulating anyone anytime they are staffed by people with an interest in the laws they enforce. But Tesla's view has no legal grounding, and runs headlong into decades of caselaw. Private parties are free to lobby the government to amend the law in ways that benefit them and undercut competitors; states are free to regulate how products are sold and serviced; and federal courts have no business telling state governments how to structure themselves. If Tesla wants to change the law, it can make its case to state lawmakers— but not in federal court. The Court should dismiss the Amended Complaint.

## BACKGROUND[3]

Louisiana has long prohibited manufacturers from selling their cars directly to consumers; it also generally prohibits them from leasing directly to consumers and from providing warranty

---

[2] "Amended Complaint" and "Am. Compl." refers to Tesla's First Amended Complaint, ECF No. 151.

[3] Because this case is at the pleadings stage, this motion relies on the allegations in the Amended Complaint. The Association does not concede that any of these allegations are, in fact, true.

service or repairs for vehicles it does not own. *See* La. Stat. §32:1261(A)(1)(k)(i), (t). These laws reflect dealers' contributions to local communities and the dynamics of a manufacturer-dealer relationship. Dealers are asked to make multimillion-dollar investments in facilities that play a prominent role in local communities, but they are uniquely dependent on manufacturers—who have a monopoly on their products and could exercise "undue control" over "independent … dealer[s]" to the detriment of consumers. *See* §32:1251. Numerous states recognize these dynamics and accordingly protect consumers and communities via franchise laws like Louisiana's.[4]

In 2017, the Association "successfully lobbied" Louisiana to amend its laws to clarify that it is still unlawful for "a manufacturer" "[t]o sell or offer to sell a new or unused motor vehicle directly to a consumer," subject to narrow exceptions.[5] *See* Am. Compl. ¶¶148–53.

The Commission (which has 18 members, 15 of whom must be active market participants) is tasked with enforcing these laws. One of its core purposes is to "prevent disruption of the system of distribution of motor vehicles and recreational products to the public." *See* §32:1251. To ensure that it complies with that command, the Commission is supervised by the Occupational Licensing Review Commission and the Legislature's Commerce Committee, and its decisions are subject to state judicial review. *See* Am. Compl. ¶¶232–34, 259. Although the Commission initially took a contrary position, in August 2020 both it and the Louisiana Attorney General concluded that Tesla could not lease its vehicles or service vehicles it did not own in Louisiana. *Id.* ¶¶192–204. The Commission then issued several subpoenas investigating Tesla's service-and-repair activities. *Id.* ¶¶204–07. Those subpoenas are currently being reviewed by a state court. *Id.* ¶¶232–34.

In August 2022, Tesla filed this suit against the Association and nearly 30 other defendants

---

[4] *See* James Cobb & Norman Mayersohn, *Why Do We Keep Buying Vehicles at Dealerships?*, Car & Driver (Oct. 1, 2015), https://bit.ly/3CATWq6 (explaining the virtues of the franchise system and how it promotes competition).

[5] Tesla has *never* sold cars directly to Louisianans; nothing changed for it, sales-wise, after the 2017 amendment.

(primarily local Louisiana dealers). *See* Compl., ECF No. 1. Tesla asserted both competition-law and constitutional claims. *Id.* The Association moved to dismiss that complaint (as did the other Defendants). ECF No. 107-5. Rather than respond to those motions, however, Tesla filed the Amended Complaint, raising previously implied legal theories (which the motions to dismiss had already addressed) and removing factual allegations that undercut Tesla's antitrust claims.

The Association now moves to dismiss the Amended Complaint.

## LEGAL STANDARD

"[A] complaint must contain sufficient factual matter which, when taken as true, states a claim to relief that is plausible on its face." *E.g.*, *Cicalese v. Univ. of Tex. Med. Br.*, 924 F.3d 762, 765 (5th Cir. 2019).[6] This requires "plead[ing] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The allegations must be more than "speculative." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). While a court must "accept all well-pleaded facts as true and view them in the light most favorable to the non-movant," *BRFHH Shreveport, LLC v. Willis-Knighton Med. Ctr.*, 49 F.4th 520, 523 (5th Cir. 2022), "legal conclusions masquerading as factual conclusions will not suffice." *Beavers v. Metro. Life Ins. Co.*, 566 F.3d 436, 439 (5th Cir. 2009).

## ARGUMENT

**I.     *Noerr-Pennington* Defeats Tesla's Antitrust Claims (Counts I, V, and VI).**

**A.     Tesla's Allegations Fall Within the Heartland of *Noerr-Pennington* Immunity.[7]**

It has been settled law for more than 60 years that "efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition." *Pennington*, 381

---

[6] Unless otherwise noted, internal quotation marks, alterations, and citations have been omitted.

[7] *Noerr-Pennington* applies equally to Tesla's federal and state competition claims. *E.g.*, *Ehlinger & Assocs. v. La. Architects Ass'n*, 989 F.Supp. 775, 786 (E.D. La.) (Vance, J.), *aff'd* 167 F.3d 537 (5th Cir. 1998).

U.S. at 670. This "*Noerr-Pennington*" immunity is fundamental to our constitutional system; "the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives." *Noerr*, 365 U.S. at 137. "[T]he antitrust laws, 'tailored as they are for the business world, are not at all appropriate for application in the political arena.'" *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991) (quoting *Noerr*, 365 U.S. at 141).

*Noerr-Pennington* covers all petitioning, to all government entities, regardless of intent. *Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 859 (5th Cir. 2000); *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972). Petitioning a legislature to pass an anticompetitive law is immune, *Noerr*, 365 U.S. at 139–40, as is lobbying an agency to promulgate a rule or issue subpoenas for anticompetitive reasons, *e.g.*, *Pennington*, 381 U.S. at 660–61; *Veritext Corp. v. Bonin*, 417 F.Supp.3d 778, 788 (E.D. La. 2019). "[T]here is no exception to *Noerr* immunity even if plaintiffs claim that private parties conspired with public officials to produce anticompetitive action," *Ehlinger*, 989 F.Supp. at 785, even if "the sole purpose of the activity is to drive competitors out of business," *Lamar Cnty. Elec. Coop. Ass'n v. Rayburn Country Elec. Coop., Inc.*, 330 F.Supp.2d 763, 765 (E.D. La. 2002), or even if the petitioning is "unethical," "reprehensible," *Noerr*, 365 U.S. at 141, 145, "or even unlawful," *see City of Columbia*, 499 U.S. at 381.

*Noerr-Pennington* bars Tesla's claims against the Association. Everything Tesla complains about is core petitioning activity. Tesla claims the Association: "successfully lobbied the Louisiana Legislature to prohibit Tesla from directly selling its vehicles to customers in Louisiana,"[8] Am. Compl. ¶148; tried "to convince [the Commission] to revise its interpretations" of state law, *id.* ¶200; "requested the enactment of regulations" from the Commission, *id.* ¶189; "[sought] to

---

[8] Despite repeatedly invoking Tesla's lobbying of the Legislature in the Amended Complaint, Tesla insists that it is not relying on this conduct as a basis for antitrust liability, just to show anticompetitive intent. Even so, the conduct is irrelevant; as explained, *Noerr-Pennington* applies "regardless of … intent." *Bayou Fleet*, 234 F.3d at 859.

influence and apply [the Association's supposedly] incorrect interpretation of the law," *id.* ¶191; and (maybe) convinced a Louisiana State Representative to request an opinion letter from the Attorney General,[9] *id.* ¶¶191–93. Tesla further complains that these efforts were successful, convincing the Attorney General and the Commission to adopt the Association's "interpretation of state law," which then resulted in certain subpoenas being issued to Tesla. *Id.* ¶¶201, 208, 244.

"Influence," "convince," "lobbied"—this is precisely what *Noerr-Pennington* protects. Sending "communications" to government officials to persuade them to change the law, *id.* ¶¶179–90, and encouraging the government to investigate a competitor, are fully protected. *E.g.*, *Semke v. Enid Auto. Dealers Ass'n*, 456 F.2d 1361, 1364–67 (10th Cir. 1972) (holding that efforts "to persuade" the Oklahoma Motor Vehicle Commission to take an adverse action against a competitor was immune). When it comes to encouraging a government investigation, one person's conspirator is another person's whistleblower, and the First Amendment protects the activity either way.

Tesla tries to plead around *Noerr-Pennington* with grand claims of conspiracy. But there is no conspiracy exception to *Noerr-Pennington*.[10] *City of Columbia*, 499 U.S. at 383. Few "effort[s] to influence legislative action could succeed unless one or more members of the legislative body became 'co-conspirators' in *some* sense with the private party urging such action."[11] *Id.* And a close look at Tesla's allegations confirms that the only challenged *conduct* is core petitioning activity. Tesla alleges: the Association "conspired to block Tesla from operating in Louisiana *by … lobbying for an amendment*," Am. Compl. ¶35; Defendants "have agreed to drive Tesla from the relevant market *by adopting an incorrect interpretation of Louisiana law*," *id.* ¶20; "dealers

---

[9] Tesla implies, but never actually alleges, that the Association was involved in soliciting the letter.

[10] Tesla's allegations also belie any claim of a conspiracy. The Commission refused *for two years* to adopt the Association's preferred interpretation of state law, and even issued an opinion letter adopting *Tesla's* view. *See* Am. Compl. ¶¶181–200. That is hardly the conduct of entities in cahoots.

[11] A "conspiracy" exception would also make no sense. A "conspiracy" is an unlawful agreement. *Conspiracy*, Black's Law Dictionary (11th ed. 2019). But an agreement to influence the government is not unlawful.

have tried to block Tesla from local markets altogether *by promoting protectionist legislation and by coopting state regulatory authority*," *id.* ¶6 (emphases added). This fails to state a claim.

### B.   No Exception to *Noerr-Pennington* Immunity Saves Tesla's Claims.

Tesla's efforts to evade *Noerr-Pennington* fail. Tesla first claims that the Association's "lobbying of the Commission … has been a sham" because (it says) "any reasonable private citizen would be aware" "that the subpoenas were improper" under state law. Am. Compl. ¶262. This argument fundamentally misunderstands *Noerr-Pennington*'s "sham" exception.[12] The sham exception is limited to cases where defendants use government "*process*—as opposed to the *outcome* of that process—as an anticompetitive weapon," in other words, where a defendant's petitioning is "not genuinely aimed at procuring favorable government action at all." *City of Columbia*, 499 U.S. at 380. That is the opposite of what Tesla complains of here. Tesla's entire theory is that the Association *successfully* convinced the state legislature to amend the law and state officials to then interpret that law favorably. "[A] successful effort to influence governmental action certainly cannot be characterized as a sham." *PREI v. Columbia Pictures Inc.*, 508 U.S. 49, 58 (1993).

And contrary to Tesla's claim, *Noerr-Pennington* immunity does not turn on whether the sought action was authorized under state law. *Greenwood Utils. Comm'n v. Miss. Power Co.*, 751 F.2d 1484, 1500 (5th Cir. 1985). Indeed, a contrary rule would pose both grave chilling problems, *id.* at 1499, and federalism issues, requiring a federal court to first decide whether a state agency's action is valid under state law before reaching the antitrust question, *see* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶206c (2022 4th ed.) ("Areeda").

---

[12] It also depends on a demonstrably false premise. Tesla's claim depends on the allegation that no reasonable person could agree with the Association's interpretation of state law. But as Tesla itself admits, no less an authority on state law than the Louisiana Attorney General shares that interpretation. *See* Am. Compl. ¶201.

Tesla next complains that the Association's members "comprise[] a controlling majority" of the Commission, Am. Compl. ¶14, and they "control" the Commission, *id.* ¶181. This Court rejected identical arguments in *Ehlinger*, 989 F.Supp. 775, *aff'd* 167 F.3d 537 (5th Cir. 1998). The plaintiffs there alleged that a trade association "controlled" a Louisiana agency, that most of the agency's members were members of the trade association, and, in practice, that the trade association controlled selection of new members.[13] 989 F.Supp. at 784. But as this Court held (and the Fifth Circuit affirmed), all that meant was that the association "sought to influence the [agency] and succeeded"—claims squarely barred under *Noerr-Pennington*. *Id.* at 784–85. So too here.

Tesla further alleges that the Association cannot rely on *Noerr-Pennington* for petitioning directed at the Commission, because (it says) the Commission is not sufficiently "sovereign" to avail itself of state-action immunity under *Parker v. Brown*, 317 U.S. 341 (1943). Am. Compl. ¶¶260–61. Not so. "*Noerr* immunity for a private party's petition to the government in no way depends upon a finding of *Parker* immunity for the subsequent government action." Areeda ¶229.[14] Requiring private parties to accurately predict (on pain of treble damages) whether a court will extend state-action immunity to the government action they sought would chill protected conduct. *In re Airport Car*, 521 F.Supp. at 584–85. And despite Tesla's suggestion (Am. Compl. ¶261), the Supreme Court's decision in *North Carolina State Board of Dental Examiners v. FTC*, 574 U.S. 494 (2015), which said exactly nothing about *Noerr-Pennington*, is not to the contrary.

Conceptually, *Noerr-Pennington* and *Parker* are "mutually independent." *Ind. Taxicab Drivers' Emps. v. Greater Houston Transp. Co.*, 760 F.2d 607, 613 n.10 (5th Cir. 1985). *Noerr-Pennington* is driven by concerns for facilitating representative government. *Parker* is driven by

---

[13] Appellants' Br., No. 98-30119, 1998 WL 34177260, at *4 (5th Cir. June 16, 1998) (detailing allegations).

[14] *Accord, e.g.*, *In re Airport Car Rental Antitrust Litig.*, 521 F.Supp. 568, 584–85 (N.D. Cal. 1981), *aff'd* 693 F.2d 84 (9th Cir. 1982); *Bright v. Ogden City*, 635 F.Supp. 31, 33 (D. Utah 1985), *aff'd sub nom.* 824 F.2d 819 (10th Cir. 1987); *see also Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 107 F.3d 1026, 1037 n.11 (3d Cir. 1997).

federalism concerns. *See N.C. State Bd.*, 574 U.S. at 503. These diverging rationales explain why a petitioner is entitled to *Noerr-Pennington* immunity even if the petitioned entity does not qualify for *Parker* immunity. As the Supreme Court has made clear, to vindicate petitioning rights, *Noerr-Pennington* must "extend[] to *all* departments of the Government." *Cal. Motor Transp.*, 404 U.S. at 510 (emphasis added). In contrast, because *Parker* is only implicated by the deference extended to *sovereigns*, state-action immunity does *not* automatically apply to all governmental entities. *City of Lafayette v. La. Power & Light Co.*, 435 U.S. 389, 411–12 (1978); *see* Areeda ¶229.

Finally, to the extent Tesla argues that the supposedly "*per se*" nature of the alleged violation allows it to evade *Noerr-Pennington*, *see* Am. Compl. ¶¶254, 352, it is wrong. *A.D. Bedell Wholesale Co. v. Philip Morris Inc.*, 263 F.3d 239, 249 (3d Cir. 2001). Indeed, the conduct in *Pennington* would itself have been a *per se* violation. *See id.*

In sum, *Noerr-Pennington* bars Tesla's antitrust and unfair-competition claims as a matter of law, and they must be dismissed with prejudice. *See, e.g.*, *Lamar Cnty.*, 330 F.Supp.2d at 767 (dismissing claims under *Noerr-Pennington*).

## II.     *Noerr*-Pennington Aside, Tesla's Antitrust Claims Fail on Their Own Terms.[15]

### A.     Tesla Does Not and Cannot Allege Antitrust Injury.

An antitrust plaintiff must establish that it suffered an injury "of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977); *accord Pulse Network, LLC v. Visa, Inc.*, 30 F.4th 480, 488 (5th Cir. 2022). It must also "establish that it was the defendant's conduct that actually caused [its] injury." *BRFHH Shreveport*, 49 F.4th at 532.[16]

---

[15] This analysis applies equally to Tesla's state-law claim (Count V). *See Clean Water Opportunities, Inc. v. Willamette Valley Co.*, 759 F.App'x 244, 248–49 (5th Cir. 2019) ("[A] Louisiana antitrust claim hinges on the success of the federal claims, because the Louisiana statute substantially mirrors the Sherman Act.").

[16] Tesla cannot meet this bar in part because Tesla complains only of inherently *lawful* petitioning conduct. *See supra*.

Although the introduction to Tesla's Amended Complaint promises a wide-ranging conspiracy, Tesla's few factual allegations of injury are far more modest. Tesla complains that it cannot sell cars directly to Louisianans because of a 2017 statutory amendment, Am. Compl. ¶¶8–9, but it *explicitly disclaims reliance* on this amendment for its antitrust claims, *see id.* ¶148 n.20 ("Plaintiffs do *not* challenge the enactment of this law as part of their antitrust or unfair trade practice claims[.]"). So, even if the 2017 amendment hurt Tesla's bottom line and consumers' ability to buy their car of choice—and even if those are cognizable antitrust injuries—*those injuries are entirely irrelevant* to Tesla's antitrust claims against the Association. In all events, Tesla cannot rely on the 2017 amendment because, even before the amendment, Tesla *did not* sell directly to Louisiana consumers and direct sales were already prohibited by then-existing state law.

Tesla also complains that the Association lobbied the Commission to interpret state law to prohibit Tesla from "leasing Tesla vehicles and providing warranty repair and services for Tesla vehicles in Louisiana." *Id.* ¶13. But Tesla *still leases Tesla vehicles in Louisiana* and *still provides warranty repair and services in Louisiana*. So, despite Tesla's complaining about efforts to prevent Tesla from opening a "planned service center in New Orleans," *id.* ¶246, Tesla's own allegations confirm that this has not happened. *See Anago, Inc. v. Tecnol Med. Prods.*, 976 F.2d 248, 249 (5th Cir. 1992) (holding that "the threat of decreased competition" is not an "antitrust injury").

This leaves only the subpoenas Tesla received from the Commission. *See* Am. Compl. ¶342. But these fail twice over. First, receiving subpoenas, if it can be characterized as an *injury* at all, is not an *antitrust* injury. *See Anago*, 976 F.2d at 249 (explaining that the Fifth Circuit "has narrowly interpreted the meaning of antitrust injury" and that "[t]ypical anticompetitive effects include increased prices and decreased output"); *see also Atl. Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 338 (1990) ("[A]ntitrust laws were enacted for the protection of *competition*,

not *competitors*."). Second, Tesla has not plausibly alleged that *the Association* is responsible for

the subpoena (and of course it is not).[17] Tesla's failure to establish antitrust injury or causation also

warrants dismissal of its antitrust and competition claims. *See BRFHH Shreveport*, 49 F.4th at 532.

**B.      Tesla Does Not and Cannot Allege a Viable Antitrust Market.**

Tesla also fails to plead a viable antitrust market. "To state an antitrust claim," the

"complaint must plausibly define the relevant product and geographic markets." *PSKS, Inc. v.

Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 417 (5th Cir. 2010). The relevant product

market includes all products that are "reasonably interchangeable by consumers for the same

purposes." *Id.* The relevant geographic market includes the area in which buyers can turn for

alternative sources of supply. *Wampler v. Sw. Bell Tel. Co.*, 597 F.3d 741, 744 (5th Cir. 2010). "[A]

plaintiff's failure to allege a relevant market properly is grounds for dismissal." *In re Pool Prods.

Distrib. Mkt. Antitrust Litig.*, 940 F.Supp.2d 367, 377 (E.D. La. 2013) (Vance, J.).

Tesla may try to argue that it need not establish a relevant market because it now alleges

that the Association's petitioning conduct is a "*per se*" antitrust violation, *see* Am. Compl. ¶¶254,

352, and *per se* violations typically do not require a relevant market, *see In re Cox Enters., Inc.*,

871 F.3d 1093, 1097 (10th Cir. 2017). But Tesla has not come remotely close to showing a *per se*

violation. That category is narrowly limited to conduct like price fixing or bid rigging that "would

be invalidated in all or almost all instances." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,

551 U.S. 877, 886–87 (2007). So, at most, this is a rule-of-reason case, which requires a properly

defined market. *E.g.*, *PSKS, Inc.*, 615 F.3d at 417.

Here, Tesla alleges that the "relevant product market is the market for new motor vehicle

sales, leasing, and warranty service," thus including both electric and gas-powered vehicles but

---

[17] This gets back to part of the reason that petitioning conduct is immune; "the government itself becomes the 'cause' of the restraint." Areeda ¶201a.

11

excluding all used cars.[18] Am. Compl. ¶241. It claims that the "relevant geographic market is Louisiana." *Id.* ¶242. But Tesla fails to offer any *factual* allegations to support these definitions.

Instead, Tesla relies primarily on speculation or unsupported generalizations, like "[m]ost consumers purchase or lease new motor vehicles through a local vendor" and "[m]ost consumers are not willing to travel more than 50 miles to find a vendor." *Id.* ¶242a–b.[19] Tesla also includes a formulaic recitation of the so-called hypothetical-monopolist test (which seemingly neither the Supreme Court nor the Fifth Circuit has ever endorsed). *See id.* ¶¶241h, 242h. But "conclusory allegations" that "merely restate a commonly used test for market definition without providing any factual basis for the claim" are not enough. *Apple, Inc. v. Psystar Corp.*, 586 F.Supp.2d 1190, 1198 (N.D. Cal. 2008) (dismissing antitrust claim).[20] "[C]ourts are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555.

By contrast, Tesla's *factual* allegations undermine its market definition. Although its product market includes both electric and gas-powered vehicles, the Amended Complaint claims that Tesla's cars are so different from gas-powered cars that Tesla must teach purchasers about:

> (a) how electric cars work; (b) what it means that Tesla cars are 'dual motor' and have regenerative braking; (c) how the car can be charged at home …; (d) how Tesla's network of charging stations, called 'Superchargers,' facilitate long-distance travel; (e) maintenance costs (because electric cars have no oil to change or engine to tune); (f) the difference in fuel costs; and (g) tax incentives for electric vehicle owners.

Am. Compl. ¶135. Indeed, Tesla claims that, unlike gas-powered-vehicle manufacturers, it cannot use the dealership and must use "a unique model." *Id.* ¶120; *see id.* ¶2. Similarly, although Tesla

---

[18] The idea that low-mileage used cars are not reasonably interchangeable with new cars or that the two categories do not compete with one another defies common sense. *See also Nationwide R.A.C. Sales, Inc. v. Ford Motor Co., Inc.*, 1997 WL 88399, at *7 (N.D. Cal. Feb. 20, 1997), *aff'd* 145 F.3d 1339 (9th Cir. 1998).

[19] The second allegation does not actually support Tesla's geographic market: Louisiana's three largest cities are less than 50 miles from the border.

[20] *See Dixon v. Nat'l Hot Rod Ass'n*, 450 F.Supp. 3d 831, 853 (S.D. Ind. 2020); *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 4955377, at *12 (N.D. Cal. Oct. 2, 2014).

tries to limit the geographic market to Louisiana, it admits that, when Tesla vehicles became unavailable in Louisiana, residents went "to a neighboring State like Tennessee or Mississippi … to buy a Tesla vehicle." *See id.* ¶156 (emphasis omitted).[21] This confirms Tesla's market is too narrow.

The defects above are enough to reject Tesla's proposed market definition. But if this Court needs more, it should consider several key factual admissions made in Tesla's original complaint, (but which Tesla scrubbed from its Amended Complaint). Although superseded admissions typically lose their binding force, they remain relevant as evidentiary admissions. *White v. ARCO/Polymers, Inc.*, 720 F.2d 1391, 1396 n.5 (5th Cir. 1983). For example, in *Sanders*, the Fifth Circuit held that the district court "had every right to consider" superseded factual allegations in dismissing an amended complaint. *Sanders v. Univ of Tex. Pan Am.*, 776 F. App'x 835, 837–38 (5th Cir. 2019); *see Aubrey v. Est. of Tobolowsky*, 2021 WL 4445304, at *4 (N.D. Tex. Sept. 7, 2021) (relying on admissions in prior complaint to dismiss amended complaint).[22] Specifically, the Court should consider Tesla's original allegation that "Tesla customers pay the same price whether they purchase through Tesla's website, at a local store, or in a different State," Compl. ¶127, which rebuts Tesla's geographic market. It should also consider Tesla's original admissions that "[s]elling and leasing a Tesla car is very different from selling/leasing a traditional, gas-powered car" and that "[e]lectric vehicle ownership is simply far different than owning and operating a traditional, gas-powered car," Compl. ¶126, which undermine Tesla's product market.

---

[21] Tesla's emphasis of "buy" apparently indicates that Tesla is trying to draw a distinction between new-car *sales* and new-car *leasing and servicing*. But this is at odds with its market definition, which lumps sales, leasing, and servicing together. It is also at odds with Tesla's allegation that "market participants compete with one another at the point of sale/lease to provide warranty service." Am. Compl. ¶241i.

[22] *See also United States v. Avanir Pharms., Inc.*, 2020 WL 4339339, at *3–4 (N.D. Ohio July 28, 2020) (holding that an "unabashed attempt to delete arguably damaging allegations … that were pointed out by [Defendant] in its motion to dismiss" is a "bad faith" "maneuver" and only allowing the amended complaint because the original allegations would "be treated as an admission").

All in all, the antitrust claims fail for three independent reasons and must be dismissed.

III.    **Tesla's Commerce Clause Claim Is Squarely Foreclosed by Precedent.**

A.      **Under Settled Precedent, Louisiana's Prohibition against Auto Manufacturer Direct-to-Consumer Sales Is Constitutional.**

Tesla's claim that "Louisiana's direct sales ban" (*i.e.*, La. Stat. §32:1261(A)(1)(k)) "violates the Commerce Clause," Am. Compl. ¶318, is squarely foreclosed by Circuit precedent.

Louisiana's prohibition against auto manufacturers selling directly to consumers in the state does not discriminate against interstate commerce. A state law that "discriminates against interstate commerce … 'is virtually *per se* invalid.'" *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 499 (5th Cir. 2001) (quoting *Or. Waste Sys., Inc. v. Dep't of Envtl. Qual.*, 511 U.S. 93, 99 (1994)). But as the Fifth Circuit has long and consistently held, a state law is not discriminatory just because it has negative effects on some out-of-state interests. *Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 725 (5th Cir. 2004) ("[D]iscrimination does not include all instances in which a state law burdens some out-of-state interest while benefitting some in-state interest."). A state law is discriminatory, and subject to virtually per se invalidation, only if it treats "*similarly situated* in-state and out-of-state interests" differently. *Ford*, 264 F.3d at 500 (emphasis added).

Applying this basic principle, the Fifth Circuit in *Ford* upheld a Texas law materially indistinguishable from the Louisiana "direct sales ban" at issue here. It is illegal to sell cars to consumers in Texas except through a licensed dealer, and Texas prohibits "manufacturer[s]" from "directly or indirectly: (1) own[ing] an interest in a dealer or dealership; (2) operat[ing] or control[ling] a dealer or dealership; or (3) acting in the capacity of a dealer." *Ford*, 264 F.3d at 498 (quoting Tex. Rev. Civ. Stat. §5.02C(c)). Ford alleged that Texas's direct sales ban "violates the dormant Commerce Clause." *Id.* The district court disagreed, and the Fifth Circuit affirmed. *Id.*

That conclusion applies here down the line because there is no daylight between the law

held to be nondiscriminatory in *Ford* and the law challenged here. Just like under the law in *Ford*, it is illegal in Louisiana to sell cars to consumers in the state except through a licensed dealer, and the state prohibits manufacturers from being dealers. La. Stat. §32:1261(A)(1)(k); Am. Compl. ¶¶9–10, 148–53. Also like in *Ford*, Louisiana's law makes no distinction between in-state and out-of-state manufacturers; *no manufacturer* can be a dealer or sell its cars directly to consumers in the state. La. Stat. §32:1261(A)(1)(k). Thus, just like the law in *Ford*, Louisiana's law distinguishes only between business forms (manufacturers vs. non-manufacturers), not on the basis of contacts with the state. And as the Fifth Circuit recently reiterated, "[a] state can discriminate based on business form" without implicating, let alone violating, the dormant Commerce Clause. *NextEra Energy Cap Holdings, Inc. v. Lake*, 48 F.4th 306, 322 n.7 (5th Cir. 2022). "The only form of discrimination that implicates the dormant Commerce Clause is discrimination between 'substantially similar entities,'" and a manufacturer is not substantially similar to a dealer that does not produce the goods it sells. *Hignell-Stark v. City of New Orleans*, 46 F.4th 317, 326 (5th Cir. 2022); *see also Tex. Manufactured Hous. Ass'n v. City of Nederland*, 101 F.3d 1095, 1102 (5th Cir. 1996) ("[T]he mere fact that a statute has the effect of benefitting a local industry while burdening a separate interstate industry does not in itself establish that the statute is discriminatory."). That manufacturers generally or Tesla specifically may be burdened is therefore of no moment.

Tesla tries to plead around this inconvenient reality by artfully alleging that the direct sales ban here means that "*out-of-State* vehicle manufacturers … must go through local, in-State dealers" "to sell their vehicles to customers in Louisiana." Am. Compl. ¶322 (emphasis added). But Tesla neglects to mention that the same is true of *in-state* manufacturers. Indeed, the Louisiana statute that contains the direct sales ban specifically defines "Manufacturer" to mean "any person, *resident or nonresident*, who fabricates, manufactures, or assembles motor vehicles." La. Stat.

§32:1252(24) (emphasis added). Thus, just as with the Texas law upheld in *Ford*, Louisiana's law "does not protect dealers from out-of-state competition[;] it protects dealers from competition from manufacturers"—and that is not unconstitutional discrimination. *Ford*, 264 F.3d at 502.[23]

Here as in *Ford*, "[o]ut-of-state corporations … have the same opportunity as in-state corporations to obtain a license and operate a dealership in [Louisiana]," provided they are not manufacturers. *Id.* The Commerce Clause demands no more. *See CTS Corp. v. Dynamics Corp. of Am.*, 481 U.S. 69, 87 (1987) (upholding state statute that had "the same effects … whether or not the [entity] is a domiciliary or resident of [the state]'"). Put simply, "because the challenged provision [does] not discriminate on the basis of a company's business contacts with the state, but rather on the basis of its status as an automobile manufacturer, the statute [does] not offend the dormant Commerce Clause." *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 162 (5th Cir. 2007).

Tesla's backup allegation fares no better than its discrimination claim. Tesla alleges that "[t]he direct sales ban … imposes a burden on interstate commerce that 'is clearly excessive in relation to the putative local benefits.'" Am. Compl. ¶324 (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)). Ford tried this same maneuver. It failed there, and it fails here too.

In trying to make out its *Pike* claim, "Ford extol[ed] the benefits of [Ford's online, direct-to-consumer sales platform] to consumers, Texas automobile dealers, and Ford itself." *Ford*, 264 F.3d at 503. Tesla does the same thing here. *See* Am. Compl. ¶¶131–37. But as the Fifth Circuit made clear in *Ford*, "eliminat[ing]" "these alleged benefits" is not a cognizable "burden on commerce." 264 F.3d at 503. "It may be true," as Tesla alleges, "that the consuming public will be injured" from the direct-sales ban—but "that argument relates to the wisdom of the statute, not its

---

[23] Nor would it make a difference even if all manufacturers were out-of-state entities (something Tesla does not allege in all events). "That all or most affected businesses are located out-of-state does not tend to prove that a statute is discriminatory." *Int'l Truck*, 372 F.3d at 726. That is particularly true as to a law common across many states, including some with in-state manufacturers. *See, e.g.*, Mich. Laws §445.1574(1)(h).

burden on commerce." *Exxon Corp. v. Maryland*, 437 U.S. 117, 128 (1978). And though Tesla levels conclusory allegations that the direct sales ban "imped[es] the flow of out-of-state-manufactured vehicles into Louisiana," Am. Compl. ¶321, it has no factual allegations to support that bare assertion, other than *its own decision not to work with dealers*. That is not enough. "Purchasers … will simply turn to new [automobiles] manufactured by [Tesla's] competitors." *Int'l Truck*, 372 F.3d at 727. As in *Ford*, Louisiana's law "merely requires that automobiles be retailed through independent dealerships, rather than manufacturer-operated dealerships." *Ford*, 264 F.3d at 503. And while Tesla's decision not to work with dealers may mean that, unlike in *Ford*, "[t]he number of out-of-state vehicles retailed in [Louisiana]" will be lower than if Louisiana allowed direct-to-consumer sales, "the Commerce Clause does not protect 'the particular structure or methods of operation in a retail market,'" and certainly not the idiosyncratic practices of a single firm. *Id.* (quoting *Exxon*, 427 U.S. at 127); *see also Int'l Truck*, 372 F.2d at 727–28.

As a last-ditch effort to salvage its *Pike* claim against §32:1261(A)(1)(k), Tesla alleges that "the only 'benefit' of the direct sales ban is economic protection for local dealers, which is not a legitimate purpose under the Commerce Clause." Am. Compl. ¶324. Ford tried the same gambit. *See Ford*, 264 F.3d at 503 ("Ford initially posits that there are no legitimate state interests to protect, so any burden is clearly excessive."). Here as there, the "argument is without merit." *Id.*

For one, "prevent[ing] vertically integrated companies from taking advantage of their incongruous market position" is plainly a "legitimate state interest[]" under Fifth Circuit precedent. *Id.* That interest motivated the enactment of the law in *Ford*. *See id.* at 500 (Texas "perceived" that "vertical integration of the automobile market" would redound to the "detriment [of] the public"). And the same is true here. *See generally* La. Stat. §32:1251. "[W]e may not now revisit *Ford*'s conclusion that the Legislature did not act irrationally in banning manufacturer control of dealers."

*Int'l Truck*, 372 F.3d at 728. "Like [in] *Ford*, the Legislature in this case sought to prevent firms with superior market position [auto manufacturers] from entering a downstream market [retail auto sales] upon the belief that such entry would be harmful to consumers. The dormant Commerce Clause is no obstacle to such regulation." *Allstate*, 495 F.3d at 162.

**B.      Under Settled Precedent, Louisiana's Prohibition against Non-Fleet Owners Providing Warranty Repairs and Servicing in the State Is Constitutional.**

As with its challenge to the direct-sales ban, Tesla's claim that Louisiana's "warranty servicing ban for non-fleet owners" (*i.e.*, La. Stat. §32:1261(A)(1)(t)) "violates the Commerce Clause," Am. Compl. ¶¶325–27, is squarely foreclosed by on-point Fifth Circuit precedent.

In 2003, Texas enacted a law that "generally prohibits an insurer from owning or acquiring an interest in an auto repair facility." *Allstate*, 495 F.3d at 157. The Fifth Circuit upheld the law. The statute "simply" reflected "a legislative desire to treat differently two [distinct] business forms—independent auto body shops on the one hand and insurance-company-owned auto body shops on the other." *Id.* at 161. Because that "distinction [is] based not on domicile but on business form," the statute did not discriminate in violation of the Commerce Clause. *Id.* at 161–62.

So too here. Louisiana prohibits "manufacturer[s]" from "operat[ing] a satellite warranty and repair center" or "authoriz[ing] a person to perform warranty repairs, including emergency repairs, who is not a motor vehicle dealer, fleet owner, or an emergency services company or emergency services related company," but allows manufacturers to "authorize a fleet owner," *i.e.*, an entity that owns a fleet of cars and "leases [the] vehicles to … third part[ies]," "to perform warranty repairs." *Id.* §32:1261(A)(1)(t)(i)–(ii). (Tesla Lease Trust is Tesla's "fleet owner.") That statute, which is part of a long line of state laws aimed at protecting consumers through the regulation of warranties and servicing, *see Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. Abrams*, 899 F.2d 1315, 1319 (2d Cir. 1990) ("[C]onsumer protection through warranty law is an area of

traditional state regulation."), makes no distinctions between similarly situated in-state and out-of-state entities. As in *Allstate* (and *Ford*), "similarly situated in-state and out-of-state companies are treated identically": "Neither in-state nor out-of-state [manufacturers or non-fleet owners] may [operate a satellite warranty and repair center]" in Louisiana. *Allstate*, 495 F.3d at 163.

Likewise, "the statute raises no barriers whatsoever to out-of-state [entities] entering the [Louisiana] market" and setting up a warranty and repair center, "so long as they are not [manufacturers or non-fleet owners]." *Id.* All the non-fleet-owner prohibition does is treat one business form (firms that own vehicles leased out to consumers) differently from another business form. And, as noted above, "state[s] can discriminate based on business form." *NextEra*, 48 F.4th at 322 n.7; *see also Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 945 F.3d 206, 220 (5th Cir. 2019) (upholding a Texas law banning all public corporations from operating or owning a package store, even though the statute was driven by a desire to prevent Wal-Mart specifically from selling liquor in Texas, because it "treats in-state and out-of-state public corporations the same," which means that it "does not have a discriminatory effect on interstate commerce," despite the fact that it "undoubtedly blocks some economic actors from entering the Texas liquor retail market"). In short, Louisiana's "warranty servicing ban for non-fleet owners," Am. Compl. ¶326, does not discriminate against interstate commerce within the meaning of the Commerce Clause.

Tesla's *Pike* claim, *see id.* ¶327, fails for similar reasons. A law that "raises no barriers whatsoever to out-of-state [entities] entering the [state] market," *Allstate*, 495 F.3d at 163, can impose no more than a *de minimis* burden on interstate commerce. Indeed, Tesla currently can and currently does provide warranty servicing in Louisiana on Tesla cars in its fleet. Tesla's own allegations thus confirm that the law Tesla is challenging has no appreciable effect on "the flow of goods interstate." *Id.* ("A statute imposes a burden when it inhibits the flow of goods interstate.").

Furthermore, even if the prohibition on non-fleet owners undermines Tesla's ability to expand in the warranty servicing market, *see id.* at 164 (assuming arguendo that an out-of-state firm's "inability to expand" could be "characterized … as a burden on interstate commerce"), "that burden would not be clearly excessive as compared to [the law's] putative local benefits," *id.* Here as in *Allstate*, reasonable legislators could believe that the non-fleet-owner prohibition "would further legitimate interests in protecting consumers." *Id.* No more is required. Tesla's dormant Commerce Clause challenge to the non-fleet-owner prohibition fails as a matter of law.

## IV.   Tesla's Fourteenth Amendment Claims Are Squarely Foreclosed by Precedent.

### A.   Tesla's Equal Protection Claim Fails.

Tesla's claim that Louisiana's direct sales ban violates equal protection likewise runs into binding precedent. Tesla alleges that "the State's distinction between manufacturer-owned dealerships (like Tesla) and franchised dealerships that are not owned by manufacturers[] lacks a legitimate justification." Am. Compl. ¶304. Ford made the same argument in challenging Texas's analogous law, and the Fifth Circuit had no trouble rejecting it. "For the reasons discussed in the dormant Commerce Clause analysis, we 'have no hesitancy in concluding that [Texas's direct sales ban] bears a reasonable relationship to the State's legitimate purpose in controlling the automobile retail market.'" *Ford*, 264 F.3d at 510 (quoting *Exxon*, 437 U.S. at 125). So too here. As in *Ford*, Louisiana's decision to prevent manufacturer-owned dealerships from selling cars in-state is plainly rational. The Legislature has reasonably determined not only that "the distribution and sale of motor vehicles … in the state … vitally affects the general economy of the state," but that "the public interest" is "promote[d]" by laws that help "avoid undue control of the independent motor vehicle dealer" by "manufactur[ers]." La. Stat. §32:1251. Those are determinations the Legislature is plainly entitled to make, and the direct sales ban unquestionably supports that avowed goal. *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) ("[A] legislative choice is not subject to

courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data."). Tesla's claim fails as a matter of law.

Tesla's challenge to "the warranty servicing ban for non-fleet owners," Am. Compl. ¶306, fails for the same reasons. As noted, economic legislation that distinguishes between similarly situated groups is fully consistent with the equal-protection guarantee as long as the distinction is rationally related to a legitimate government aim. *Beach Commc'ns*, 508 U.S. at 313. "[I]n the local economic sphere, it is only the invidious discrimination, the wholly arbitrary act, which cannot stand consistently with the Fourteenth Amendment." *New Orleans v. Dukes*, 427 U.S. 297, 303–04 (1976). "'[E]ven foolish and misdirected provisions' will be upheld under this test." *Kittery Motorcycle, Inc. v. Rowe*, 320 F.3d 42, 47 (1st Cir. 2003) (quoting *Craigmiles v. Giles*, 312 F.3d 220, 223–24 (6th Cir. 2002)); *see, e.g.*, *Fireside Nissan, Inc. v. Fanning*, 30 F.3d 206, 219–20 (1st Cir. 1994) (upholding, under rational-basis review, a state law that permitted in-state dealers to participate in "new dealership hearings," but "exclu[ded]" "similarly situated out-of-state dealers": "We find it reasonable for Rhode Island to believe, rightly or wrongly, that members of its own community are best qualified to represent community interests to regulators, including interests concerning the effect of a manufacturer's efforts to establish a new dealership on existing dealers and consumers."). Economic regulations pass muster, in other words, if a court can "think of any" "potentially rational bases" for them. *Hines v. Quillivan*, 982 F.3d 266, 274 (5th Cir. 2020).

The non-fleet-owner provision easily clears that low bar. The law serves to ensure that all servicers in Louisiana satisfy "the same basic level of requirements for special tools, technician certification, and training." La. Stat. §32:1261(A)(1)(t)(ii). It also promotes the state's interest in ensuring that manufacturers cannot use their market power to create a monopoly on servicing their products. This case is thus far afield from the cases Tesla invokes in which the Court is asked to

"accept nonsensical explanations for regulation." *St. Joseph Abbey v. Castille*, 712 F.3d 215, 226 (5th Cir. 2013). And while there might be other ways to accomplish the Legislature's goals, "[a] classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality." *Big Tyme Invs., LLC v. Edwards*, 985 F.3d 456, 470 (5th Cir. 2021) (quoting *Veritext Corp. v. Bonin*, 901 F.3d 287, 291 (5th Cir. 2018)).

Finally, Tesla claims that "the State's classifications are based on particular animus against Tesla." Am. Compl. ¶310; *see id.* ¶303 (a law "fails rational basis review" if it "is based on animus"). But the fact that "the State amended its direct sales ban specifically to respond to Tesla's entrance into the market in Louisiana," *id.* ¶311, does not show "animus."[24] Tesla is treated no differently from other manufacturers. Nor does "animus" vitiate rational laws. Animus cases are those in which a plaintiff "has been intentionally treated differently from others similarly situated," and "*there is no rational basis for the difference in treatment*." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (emphasis added). The challenged statutes here are more than rational, for the reasons explained above. Tesla's Equal Protection Clause challenge fails as a matter of law.

### B.    Tesla's Due Process Claim Fails.

Tesla claims that the "composition of the Commission violates Tesla's right to a neutral arbiter, and accordingly violates the Due Process Clause." Am. Compl. ¶270. That is a bold charge. Tesla's claim is *not* that it has received insufficient process in a particular proceeding or that the Commission has taken (or is poised to take) a particular bias-infected action against it. What Tesla wants is "a declaration that the Commission is unconstitutionally constituted and cannot exercise regulatory authority over Tesla's leasing and servicing activities." *Id.* ¶294. But States have broad

---

[24] That Louisiana has prohibited car manufactures from selling directly to consumers since before Tesla sold its first car similarly undermines Tesla's animus claims. *Compare* 2005 La. Sess. Law Act No. 500, *with* Am. Compl. ¶123 ("[Tesla's first offering was the Tesla Roadster, released in 2008[.]").

discretion in structuring their government entities, and absent the narrowest of circumstances, the Due Process Clause does not dictate the design of state government. Moreover, when, as here, the state entity's actions are subject to judicial review in a state court before they take substantive effect, the due-process claim is a non-starter. But even beyond these more fundamental obstacles, the Amended Complaint's allegations of a due-process violation are unavailing.

As evidence of the Commission's supposed unconstitutional "bias," Tesla first cites "the subpoena" "issued to Tesla Lease Trust regarding" its leasing activities in the State. *Id.* ¶¶279–81 & n.28. The subpoena seeks to determine whether Tesla Lease Trust is performing warranty work on vehicles it does not own (and so are not within its "fleet"), which would violate Louisiana law. *See id.* ¶286. Trying to determine whether a regulated entity is out of compliance with duly enacted law is plainly a valid government objective. The only way the subpoena could be evidence of bias, therefore, is if the construction of state law underlying its issuance was objectively baseless. But Tesla explicitly disclaims any challenge to the "construction of state law" underlying the subpoena. *Id.* ¶283 n.29. The Court is thus left with the allegation that a legally proper subpoena is evidence of illicit bias so severe that it violates the Due Process Clause. That is not a valid claim.

Tesla next alleges that "the Commission's efforts will not end at issuing subpoenas." *Id.* ¶285. But as the use of future tense there makes clear, no such "efforts" have yet transpired. Nor does Tesla point to any in the works, or even say what those "efforts" would be designed to do. Perhaps that is because, based on the allegations in the Amended Complaint, the only reasonable inference is that any such "efforts" would be aimed at ensuring compliance with Louisiana law and/or amending the law—neither of which is a problem, let alone a due process violation.

"The suggestion of possible temptation here is not only overdrawn, but also ignores the fact that [nine] of the [eighteen] members of the Commission *are not dealers*." *Chrysler Corp. v.*

*Tex. Motor Vehicle Comm'n*, 755 F.2d 1192, 1199 (5th Cir. 1985) (emphasis added). That "fact" is obviously "relevant to the possible bias of the full decisionmaker—the Commission," *id.*, which Tesla has not sued in this case. Indeed, Tesla has not even pleaded facts sufficient to show that "the personal financial circumstances of each *dealer member* … will invariably cause them to unite against the manufacturers [or Tesla] on all issues." *All. of Auto. Mfrs. v. Gwadosky*, 353 F.Supp.2d 97, 108 (D. Me.) (emphasis added), *aff'd*, 430 F.3d 30 (1st Cir. 2005). Yet that is Tesla's burden, given its sweeping claim that the "composition of the Commission" *facially* "violates the Due Process Clause," and its equally broad request for "a declaration that the Commission" not only "is unconstitutionally constituted," but "cannot exercise regulatory authority over Tesla's leasing and servicing activities" *at all*. *See* Am. Compl. ¶¶270, 294.

Tesla also omits that the Commission is not the ultimate decisionmaker for most (if not all) of the hypothetical actions it could take vis-à-vis Tesla. The Legislature is the source of the laws that Tesla challenges in this case. And even as to regulations and enforcement proceedings within the Commission's bailiwick, the buck does not stop with the Commission. Tesla's own state-court lawsuit confirms the point: State law affords Tesla more than constitutionally sufficient process if they believe that the Commission has taken some action that does not comport with law.[25]

## V.    Tesla's State-Law Claims Are Time-Barred.

As explained above, Tesla's state-law claims run headlong into *Noerr-Pennington*. They are also untimely. Louisiana antitrust and competition claims must be brought within one year of the act causing the alleged injury. *E.g.*, *Big River Indus., Inc. v. Headwaters Res., Inc.*, 971 F.Supp.

---

[25] Finally, despite explicitly disavowing any challenge to the Commission's interpretation of state law, Tesla at times suggests that its complaint is that the Commission is acting unlawfully. Even if that were so (and well-pleaded), "the fact that a government actor's actions might be illegal under state or local law does not mean that they are irrational." *Lindquist v. City of Pasadena*, 669 F.3d 225, 235 (5th Cir. 2012). It makes no difference to the due process analysis whether Tesla will ultimately be proven correct that the Commission has no jurisdiction over its leasing activities.

2d 609, 623–24 (M.D. La. 2013); La Stat. §51:1409(E). The last complained-of act relating to the Association is a March 2020 letter urging the Commission to issue regulations clarifying the scope of the direct-sales ban.[26] Am. Compl. ¶188. Although Tesla complains of other things, like the Commission issuing subpoenas and a Representative requesting and obtaining an opinion from the Attorney General, there are no factual allegations showing that the Association was involved.

Tesla's argument that the mere existence of Defendants' supposed agreement constitutes a "continuing violation" is of no avail. *Id.* ¶263. An antitrust plaintiff must show that the defendants took some *additional overt action* in furtherance of the challenged agreement. *United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*, 892 F.Supp. 890, 912 (W.D. Tex. 1995), *aff'd* 89 F.3d 233 (5th Cir. 1996). The Amended Complaint contains no such allegations. Running from the latest complained-of action, Tesla's state-law claims (brought in August 2022) come too late.

## CONCLUSION

This Court should dismiss the Amended Complaint with prejudice. Tesla's claims are incurably flawed; no amount of repleading will change that. *See Great Plains Tr. Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002). Indeed, Tesla already amended once "to respond to the motions to dismiss." ECF No. 147-2 at 3. Yet the same basic problems remain. If Tesla could fix them, it would have. That Tesla used its amendments to bury "bad" facts also weighs against further amendment; neither this Court nor Defendants should have to keep responding to a moving target. *See Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 865 (5th Cir. 2003).

---

[26] The Amended Complaint indicates that Tesla learned of these communications no later than April 2021. *See* Am. Compl. ¶212. In all events, the date Tesla learned of its claims is irrelevant as to its Unfair Trade Practices Act claim. *Zeigler v. Hous. Auth. of New Orleans*, 118 So.3d 442, 452 (La. App. 4th Cir. 2013).

February 1, 2023                             Respectfully submitted,

***/s/ Claude F. Reynaud, Jr.***

Claude F. Reynaud, Jr. (#11197)
**BREAZEALE, SACHSE & WILSON, L.L.P.**
(additional counsel listed below)

Jeanne C. Comeaux (#22999)
**BREAZEALE, SACHSE & WILSON, L.L.P.**
301 Main Street, 23rd Floor
Post Office Box 3197
Baton Rouge, LA 70821-3197
(225) 387-4000
claude.reynaud@bswllp.com
jeanne.comeaux@bswllp.com

Paul D. Clement (*pro hac vice*)
Nicholas M. Gallagher (*pro hac vice*)
**CLEMENT & MURPHY, PLLC**
708 Wolfe Street
Alexandria, VA 22314
(202) 742-8900
paul.clement@clementmurphy.com
nicholas.gallagher@clementmurphy.com

David A. Higbee (*pro hac vice*)
Jacob M. Coate (*pro hac vice*)
**SHEARMAN & STERLING, LLP**
401 9th Street, NW, Suite 800
Washington, D.C. 20004
(202) 508-8000
david.higbee@shearman.com
jacob.coate@shearman.com

*Attorneys for Louisiana Automobile Dealers
Association, Inc*