**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| Tesla, Inc., et al. | ) Civil Action No. 22-cv-02982 |
| | ) |
| Plaintiffs, | ) Section "R(1)" |
| | ) |
| v. | ) Judge Sarah S. Vance |
| | ) |
| Louisiana Automobile Dealers Association, et al., | ) Magistrate Judge |
| | ) Donna Phillips Currault |
| Defendants. | ) |

**PLAINTIFFS' COMBINED MEMORANDUM IN OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS THE FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

Table of Contents ........................................................................................................ ii

Table of Authorities .................................................................................................... v

Introduction ................................................................................................................. 1

Background .................................................................................................................. 3

    A. Tesla has disrupted the market for automobile sales, leasing, and warranty servicing .......................................................................................................... 3

    B. State law irrationally prohibits Plaintiffs from selling Tesla vehicles in Louisiana. .... 4

    C. Despite the direct-sales ban, Plaintiffs currently lease Tesla vehicles in Louisiana and perform warranty servicing in Plaintiffs' role as "fleet owner" under State law ... 5

    D. The Dealer Cartel has agreed to take anticompetitive actions against Plaintiffs. ......... 6

        1. A controlling bloc of Commissioners on the Louisiana Motor Vehicle Commission are members of the Dealer Cartel. ..................................................... 6

        2. The Dealer Cartel has agreed to take anticompetitive action against Plaintiffs' operations in Louisiana. ................................................................................. 9

            a. Through its control of the Commission, the Dealer Cartel has taken anticompetitive action by initiating an investigation into Plaintiffs. ............... 9

            b. The Cartel's conspiracy is carried out. .......................................................... 9

            c. Tesla Lease Trust has sought limited judicial review of the Commission's order—and in the course of that judicial review, the Commission argued that Plaintiffs are not a "fleet owner" under Louisiana law. ................................. 11

Standard of Review ................................................................................................... 11

Argument ................................................................................................................... 12

I.    Tesla has plausibly alleged that the Dealer Cartel violated antitrust law by conspiring to drive non-dealer rivals out of the Louisiana market for the sale, leasing, and warranty service and repair of new vehicles (Counts I and V). ....................................... 12

    A. Tesla has plausibly alleged an agreement to exclude rivals. ..................................... 13

    B. The Dealer Cartel's efforts to drive Tesla from the market are *per se* illegal and illegal under the "quick-look" mode of analysis ........................................................ 18

    C. Tesla has stated a claim under the rule of reason that the Dealer Cartel has violated and is violating the antitrust laws .............................................................................. 21

        1. Tesla has plausibly alleged a relevant product market for the sale, leasing, and warranty service and repair of new passenger vehicles. ....................................... 22

        2. Tesla has plausibly alleged that the relevant geographic market is Louisiana. .... 26

        3. Tesla has plausibly alleged that the Dealer Cartel has market power .................. 28

D.   The Dealer Cartel's efforts to run Tesla out of the Louisiana market are a quintessential form of antitrust injury. ......................................................... 29

E.   The Commission is not treated as a state agency for antitrust purposes. .................... 33

F.   *Noerr-Pennington* immunity does not protect the Dealer Cartel's efforts to drive Tesla out of the market. ............................................................................. 34

G.   The antitrust claims are timely. ................................................................................... 39

II.   Plaintiffs have adequately alleged a violation of the Due Process Clause (Count II). ..... 40

A.   Plaintiffs have adequately alleged that the Commission is unconstitutionally structured to adjudicate disputes regarding Plaintiffs—as confirmed by Supreme Court and the precedent of courts in this district. ...................................................... 40

B.   Defendants' arguments to the contrary are unavailing because they rely on drawing non-pertinent factual distinctions. ............................................................................... 43

III.   Plaintiffs have adequately alleged a violation of the Equal Protection Clause (Count III). ................................................................................................................................... 47

A.   The direct-sales ban and the warranty-servicing ban for non-fleet owners violate the Equal Protection Clause because they arbitrarily discriminate against Plaintiffs— and the direct-sales ban is doubly unlawful because it was enacted based on anti-Tesla bias. ................................................................................................................... 48

B.   The governmental interests asserted by the Dealers Association are belied by the facts and Louisiana's regulatory scheme—and rely on inapt precedent that does not control here. ................................................................................................................. 51

IV.   Plaintiffs have adequately alleged a violation of the Commerce Clause (Count IV). ....... 54

A.   Louisiana law regulates extraterritorially, discriminates in both effect and intent in favor of incumbent in-State dealers, and unduly interferes in interstate commerce in violation of the Commerce Clause. ............................................................................. 55

B.   Defendants' arguments to the contrary are unavailing. ............................................... 58

V.   Plaintiffs have adequately alleged violations of the Louisiana Unfair Trade Practices Act (Count VI). .................................................................................................................. 58

VI.   This Court should not abstain from deciding any of Plaintiffs' constitutional claims. .... 60

A.   Pullman abstention is not appropriate here because the Louisiana courts' resolution of issues of State law will not render this Court's decision unnecessary. .................. 60

B.   *Younger* and *Burford* abstention do not apply because Plaintiffs do not seek to enjoin State proceedings, nor would Plaintiffs' claims be disruptive of State public policy. 61

C.   There is no need to abstain from Plaintiffs' State-law claims because the Court has independent diversity jurisdiction over Plaintiffs' State-law claims and there is no reason to dismiss the federal-law claims in all events. ................................................ 62

VII.   This Court has discretion to permit Plaintiffs to maintain their Declaratory Judgment Act claims (Count VII). ..................................................................................................... 62

VIII.   Plaintiffs properly sued the Commissioners in their individual capacities under *Ex parte Young* and Eleventh Amendment Immunity does not apply. .......................................... 62

Conclusion ............................................................................................................................. 63

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.*,
  998 F.3d 190 (5th Cir. 2021) ..................................................................40

*All. of Auto. Mfrs. v. Gwadosky*,
  353 F. Supp. 2d 97 (D. Me. 2005) ...........................................................44

*Allied Tube & Conduit Corp v. Indian Head, Inc.*,
  486 U.S. 492 (1988)...............................................................13, 35, 36

*Allstate Ins. Co. v. Abbott*,
  495 F.3d 151 (5th Cir. 2007) ............................................................55, 58

*Am. Needle, Inc. v. NFL*,
  560 U.S. 183 (2010)..................................................................................30

*Anago, Inc. v. Tecnol Medical Products*,
  976 F.2d 248 (5th Cir. 1992) ............................................................31, 32

*Anderson Foreign Motors, Inc. v. New England Toyota Distrib., Inc.*,
  475 F. Supp. 973 (D. Mass. 1979) ..........................................................24

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.*,
  300 F.3d 620 (5th Cir. 2002) ...................................................................27

*Arnold Pontiac-GMC, Inc. v. Gen. Motors Corp.*,
  786 F.2d 564 (3d Cir. 1986)......................................................................27

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..................................................................................11

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..................................................................................14

*Blasingim v. Hill*,
  2008 WL 11320088 (N.D. Ga. Sept. 8, 2008) ........................................63

*Brown Shoe Co. v. United States*,
  370 U.S. 294 (1962)..................................................................................27

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977)...............................................................13, 29, 31

*Carbone v. Brown Univ.*,
  2022 WL 3357249 (N.D. Ill. Aug. 15, 2022) ........................................................17

*CheckPoint Fluidic Sys. Intern., Ltd. v. Guccione*,
  888 F. Supp. 2d 780 (E.D. La. 2012) ....................................................................60

*Chrysler Corp. v. Texas Motor Vehicle Commission*,
  755 F.2d 1192 (5th Cir. 1985) ........................................................................44, 45

*City of Columbia v. Omni Outdoor Advert., Inc.*,
  499 U.S. 365 (1991) ...........................................................................21, 38, 39

*City of New Rochelle v. Town of Mamaroneck*,
  111 F. Supp. 2d 353 (S.D.N.Y. 2000) ...................................................................58

*Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*,
  611 F.3d 495 (9th Cir. 2010) ..........................................................................36, 37

*Crump v. Sabine River Auth.*,
  737 So.2d 720 (La. 1999) .....................................................................................60

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*,
  123 F.3d 301 (5th Cir. 1997) ..........................................................................29, 31

*Edgar v. MITE Corp.*,
  457 U.S. 624 (1982) ............................................................................................55

*Ehlinger & Associates v. Louisiana Architects Ass'n*,
  989 F. Supp. 775 (E.D. La. 1998) ...................................................................37, 38

*Erie Cnty v. Morton Salt, Inc.*,
  702 F.3d 860 (6th Cir. 2012) ...............................................................................14

*Exxon Corp. v. Governor of Maryland*,
  437 U.S. 117 (1978) ............................................................................................55

*In re Flat Glass Antitrust Litig.*,
  385 F.3d 350 (3d Cir. 2004) .................................................................................16

*Ford Motor Co. v. Dep't of Transp.*,
  264 F.3d 493 (5th Cir. 2001) ..........................................................52, 53, 55, 58

*Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Nat. Res.*,
  504 U.S. 353 (1992) ............................................................................................56

*Free v. Abbott Lab'ys*,
  176 F.3d 298 (5th Cir. 1999) ...............................................................................12

*FTC v. CCC Holdings Inc.*,
  605 F. Supp. 2d 26 (D.D.C. 2009) ........................................................................25

*Garmon Corp. v. Vetnique Labs, LLC*,
  2020 WL 3414983 (N.D. Ill. June 22, 2020) ..........................................................34

*Gibson v. Berryhill*,
  411 U.S. 564 (1973) ..............................................................................40, 41, 44, 61

*Goldfarb v. Va. State Bar*,
  421 U.S. 773 (1975) ..............................................................................................35

*Grace Ranch, L.L.C. v. BP Am. Prod. Co.*,
  989 F.3d 301 (5th Cir. 2021) ................................................................................61

*Grappone, Inc. v. Subaru of New England, Inc.*,
  858 F.2d 792 (1st Cir. 1988) ................................................................................24

*H.P. Hood & Sons, Inc. v. Du Mond*,
  336 U.S. 525 (1949) ..............................................................................................56

*Healy v. Beer Inst., Inc.*,
  491 U.S. 324 (1989) ..............................................................................................55

*Henry v. N.C. Acupuncture Licensing Bd.*,
  2017 WL 401234 (M.D.N.C. Jan. 30, 2017) ..........................................................31

*Hibernia Nat'l Bank v. Carner*,
  997 F.2d 94 (5th Cir. 1993) ..................................................................................25

*Hines v. Quillivan*,
  982 F.3d 266 (5th Cir. 2020) ..................................................................47, 50, 51

*Hingel v. Exxon Corp.*,
  1999 WL 893574 (E.D. La. Oct. 15, 1999) ............................................................59

*State ex rel. Ieyoub v. Bordens, Inc.*,
  684 So.2d 1024 (La. App. 1996) ......................................................................39, 40

*Impax Lab'ys, Inc. v. FTC*,
  994 F.3d 484 (5th Cir. 2021) ................................................................................30

*Ind. Taxicab Drivers' Emps. v. Greater Hous. Transp. Co.*,
  760 F.2d 607 (5th Cir. 1985) ................................................................................38

*In re Ins. Brokerage Antitrust Litig.*,
  618 F.3d 300 (3d Cir. 2010) ..................................................................................19

*Int'l Truck & Engine Corp. v. Bray*,
   372 F.3d 717 (5th Cir. 2004) ........................................................................55

*Jebaco, Inc. v. Harrah's Operating Co., Inc.*,
   587 F.3d 314 (5th Cir. 2009) ........................................................................34

*Johnson v. Bredesen*,
   624 F.3d 742 (6th Cir. 2010) ........................................................................48

*K&F Rest. Holdings, Ltd. v. Rouse*,
   798 F. App'x 808 (5th Cir. 2020) .................................................................59

*La. Power & Light Co. v. United Gas Pipe Line Co.*,
   493 So.2d 1149 (La. 1986) ............................................................................12

*Lee-Moore Oil Co. v. Union Oil Co. of California*,
   599 F.2d 1299 (4th Cir. 1979) ......................................................................31

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007) .......................................................................................53

*Marucci Sports, LLC v. NCAA*,
   751 F.3d 368 (5th Cir. 2014) ........................................................................32

*McNeilus Truck & Mfg., Inc. v. Ohio ex rel. Montgomery*,
   226 F.3d 429 (6th Cir. 2000) ...................................................................56, 57

*Merit Motors, Inc. v. Chrysler Corp.*,
   417 F. Supp. 263 (D.D.C. 1976) .......................................................24, 44, 45

*Miller v. Conagra, Inc.*,
   991 So.2d 445 (La. 2008) ..............................................................................60

*Monsanto Co. v. Spray-Rite Service Corp.*,
   465 U.S. 752 (1984) .......................................................................................14

*Moore v. State Farm Fire & Cas. Co.*,
   556 F.3d 264 (5th Cir. 2009) ........................................................................60

*Morton v. Soc. Sec. Admin.*,
   2016 WL 5724810 (E.D. La. Sept. 15, 2016) ...............................................33

*N. Chi. Pro. Sports Ltd. v. Nat'l Basketball Ass'n*,
   961 F.2d 667 (7th Cir. 1992) ........................................................................20

*N. Tex. Specialty Physicians v. FTC*,
   528 F.3d 346 (5th Cir. 2008) ........................................................................19

*In re N.C. Bd. of Dental Exam'rs*,
  2011 WL 11798463 (FTC Dec. 2, 2011) ..............................................................................29

*N.C. State Bd. of Dental Exam'rs v. FTC*,
  574 U.S. 494 (2015) .......................................................................................... *passim*

*N.C. State Bd. Of Dental Exam'rs v. FTC*,
  717 F.3d 359 (4th Cir. 2013) ............................................................................. *passim*

*Nat'l Athletic Trainers' Ass'n, Inc. v. Am. Physical Therapy Ass'n*,
  2008 WL 4146022 (N.D. Tex. Sept. 9, 2008) .....................................................................27

*Nationwide R.A.C. Sales, Inc. v. Ford Motor Co.*,
  1997 WL 88399 (N.D. Cal. Feb. 20, 1997) .........................................................................25

*Nissan Motor Corp. in U.S.A. v. Royal Nissan, Inc.*,
  757 F. Supp. 736 (E.D. La. 1991) ....................................................................... *passim*

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
  472 U.S. 284 (1985) .............................................................................................................31

*Osborn v. Visa Inc.*,
  797 F.3d 1057 (D.C. Cir. 2015) ..........................................................................................16

*Parker v. Brown*,
  317 U.S. 341 (1943) .............................................................................................................33

*Pike v. Bruce Church*,
  397 U.S. 137 (1970) .............................................................................................................57

*PLS.Com, LLC v. Nat'l Ass'n of Realtors*,
  32 F.4th 824 (9th Cir. 2022) ...............................................................................................31

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*,
  940 F. Supp. 2d 367 (E.D. La. 2013) .................................................................. *passim*

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*,
  988 F. Supp. 2d 696 (E.D. La. 2013) .....................................................................15, 17, 18

*Quackenbush v. Allstate Ins. Co.*,
  517 U.S. 706 (1996) .............................................................................................................62

*Quadvest, L.P. v. San Jacinto River Auth.*,
  7 F.4th 337 (5th Cir. 2021) ..............................................................................................9, 33

*Quality Env't Processes, Inc. v. I.P. Petroleum Co., Inc.*,
  144 So. 3d 1011 (La. 2014) ............................................................................................59, 60

ix

*Ron Tonkin Gran Turismo, Inc. v. Fiat Distribs., Inc.*,
    637 F.2d 1376 (9th Cir. 1981) ...................................................................24

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
    801 F.3d 412 (4th Cir. 2015) ....................................................................14

*SmileDirectClub, LLC v. Tippins*,
    31 F.4th 1110 (9th Cir. 2022) ...................................................... *passim*

*Smitty's Supply, Inc. v. Hegna*,
    2019 WL 1099712 (E.D. La. Mar. 8, 2019) .............................................62

*Spectators' Commc'n Network Inc. v. Colonial Country Club*,
    253 F.3d 215 (5th Cir. 2001) ....................................................................12

*St. Joseph Abbey v. Castille*,
    712 F.3d 215 (5th Cir. 2013) ...................................................... *passim*

*Stacy v. Aetna Cas. & Sur. Co.*,
    484 F.2d 289 (5th Cir. 1973) ....................................................................25

*Starr v. Sony BMG Music Ent.*,
    592 F.3d 314 (2d Cir. 2010) .....................................................................14

*Stone v. La. Dep't of Revenue*,
    590 F. App'x 332 (5th Cir. 2014) .............................................................20

*Tampa Elec. Co. v. Nashville Coal Co.*,
    365 U.S. 320 (1961) ..................................................................................28

*Tex. All. for Retired Ams. v. Scott*,
    28 F.4th 669 (5th Cir. 2022) .....................................................................63

*Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*,
    959 F.2d 468 (3d Cir. 1992) .....................................................................24

*Tubos de Acero de Mexico, S.A. v. Am. Int'l. Inv. Corp., Inc.*,
    292 F.3d 471 (5th Cir. 2002) ....................................................................60

*Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.*,
    496 F.3d 403 (5th Cir. 2007) ....................................................................19

*Turner v. Purina Mills, Inc.*,
    989 F.2d 1419 (5th Cir. 1993) ..................................................................60

*United Mine Workers of America v. Pennington*,
    381 U.S. 657 (1965) ..................................................................................21

x

*United States v. Conn. Nat'l Bank*,
    418 U.S. 656 (1974) ................................................................................27, 28

*United States v. E.I. du Pont de Nemours & Co.*,
    353 U.S. 586 (1957) ...............................................................................22

*United States v. Eastman Kodak Co.*,
    63 F.3d 95 (2d Cir. 1995) .......................................................................28

*United States v. Gen. Motors Corp.*,
    384 U.S. 127 (1966) ..........................................................................19, 20

*United States v. Greater Buffalo Press, Inc.*,
    402 U.S. 549 (1971) ...............................................................................26

*United States v. Phila. Nat'l Bank*,
    374 U.S. 321 (1963) ..........................................................................26, 28

*United States v. Phillipsburg Nat'l Bank & Tr. Co.*,
    399 U.S. 350 (1970) ...............................................................................26

*Veritext Corp. v. Bonin*,
    417 F. Supp. 3d 778 (E.D. La. 2019) ....................................................38

*Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc.*,
    858 F.2d 1075 (5th Cir. 1988) ...............................................................39

*Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*,
    945 F.3d 206 (5th Cir. 2019) ............................................................55, 57

*White v. ARCO/Polymers, Inc.*,
    720 F.2d 1391 (5th Cir. 1983) ...............................................................25

*Wilton v. Seven Falls Co.*,
    515 U.S. 277 (1995) ...............................................................................62

**Statutes, Regulations, and Rules**

Fed. R. Civ. P. 10 ...............................................................................................9

La. Admin Code tit. 46, pt. V, § 90 .................................................................53

La. R.S. § 32:1251 ...........................................................................................52

La. R.S. § 32:1252 ........................................................................................7, 54

La. R.S. § 32:1253 ...............................................................................6, 7, 42, 63

La. R.S. § 32:1261 ...............................................................................5, 10, 54

La. R.S. § 32:1270 ..............................................................................................8

La. R.S. § 51:1405 ............................................................................................59

La. R.S. § 51:1409 ......................................................................................59, 60

**Legislative Materials**

2017 La. Sen. Bill No. 107, 43rd Regular Session ...........................................48

2017 La. Sess. Law Serv. Act 45 (S.B. 107) ...................................................48

J. of La. House of Rep., 43rd Regular Session No. 24 (May 18, 2017),
    https://bit.ly/3FFGeUp ...............................................................................49

La. House Floor (May 18, 2017), https://bit.ly/3P81uq4;...................................49

La. R.S. § 32:1261 Amendment Notes to 2017 Amendments ...........................4

**Other Authorities**

Commission Reply in Support of Motion to Dismiss, *Tesla Lease Tr. v. La. Motor
    Vehicle Comm'n*, No. 820-801 (La. D. Ct. May 10, 2022) ......................11

Daniel A. Crane, *Why Intra-Brand Dealer Competition Is Irrelevant to the Price
    Effects of Tesla's Vertical Integration*, 165 U. Pa. L. Rev. Online 179 (2017) ....................53

Jonathan M. Gitlin, *No More Dealer Markups: Ford Wants to Move to Online-
    Only Sales for EVs*, arstechnica (June 2, 2022), https://bit.ly/3G6HMIn ...............................4

La. Att'y Gen. Op. No. 20-0059, 2020 WL 5289959 (Aug. 10, 2020) .........................46

La. Auto. Dealers Ass'n, About Us, https://bit.ly/3OTQDyQ......................................8

## **INTRODUCTION**

This case arises out of an illegal agreement between competing Louisiana car dealers (the "Dealer Cartel") to wield the power several of them exercise as Commissioners of the Louisiana Motor Vehicle Commission ("Commission") to exclude Plaintiffs from the Louisiana market and otherwise frustrate Louisianans' abilities to purchase, lease, and receive warranty servicing on their Tesla vehicles. Their scheme here follows a common antitrust pattern. Car dealers have long enjoyed outsized profits while serving as middlemen between auto manufacturers and consumers. Unsurprisingly, though the law requires them to act as competitors, they work together to protect their privileged status.

Tesla Inc., Tesla Lease Trust, and Tesla Finance LLC ("Plaintiffs" or "Tesla") seek to change things by selling, leasing, and providing warranty servicing for Tesla's revolutionary vehicles directly to consumers in Louisiana. Tesla's direct-to-consumer business model poses an existential threat to dealers.

Against that backdrop, individual dealers could decide to compete on the merits by lowering their markups and improving the quality of their customers' experiences. But in Louisiana, the dealers have made a different choice. The Dealer Cartel has conspired to drive Tesla out of the State and discourage other new, innovative competitors from entering the market at all. If the Cartel is allowed to succeed, Louisiana residents will have reduced choice, higher costs, and inferior sales, leasing, and warranty-servicing experiences.

These efforts are anticompetitive and illegal under traditional antitrust principles. In a sprawling series of briefs, Defendants seek dismissal through arguments that have consistently been rejected by courts, including this one. These arguments should meet the same fate here. To begin, Plaintiffs have plausibly alleged an illegal horizontal agreement to exclude competition.

Such an agreement is illegal *per se* under Supreme Court precedent. Next, even if the agreement were evaluated under the rule of reason, the Amended Complaint plausibly alleges that the sale, lease, and provision of warranty service for new cars is a relevant market, that the Defendants clearly have power within that market, and that they have wielded that power in a manner likely to have anticompetitive effects. Defendants' suggestion that other, smaller antitrust markets may exist does not preclude the existence of a broader market, and their bald contention that they do not compete with Tesla is belied by their conduct and common sense.

Nor may Defendants skirt the consequences of their misconduct by hiding behind the fact that the *means* to effectuate their conspiracy is the Louisiana Motor Vehicle Commission. The Cartel controls the Commission, which operates without any meaningful oversight by the State. As a result, the Commission is viewed for antitrust purposes as a private entity. The challenged conspiracy is thus one agreed to by private actors for a clear private benefit. It is not "petitioning" activity in any sense of the term.

The ills in Louisiana are not limited to the Dealer Cartel's antitrust violations. The State has enacted a ban on manufacturers—including manufacturer-retailers like Tesla—from selling their vehicles directly to consumers. Furthermore, Louisiana has banned manufacturers from providing warranty leasing on their vehicles except in limited circumstances. And, to top it all, the State has entrusted the power to enforce those laws to the Commission, which is dominated by car dealers (members of the Louisiana Automobile Dealers Association ("Dealers Association") who compete with Tesla and whose business model Tesla threatens). Each of these features of Louisiana law violates the U.S. Constitution

Applying leading Supreme Court precedent, a court in this District has already held that the Commission's composition violates due process. *Nissan Motor Corp. in U.S.A. v. Royal Nissan,*

*Inc.*, 757 F. Supp. 736, 737 (E.D. La. 1991). In that case, the court concluded that "enough of an indirect and institutional financial interest exists to raise a question as to the impartiality of the Commissioners" to adjudicate issues involving manufacturers. *Id.* at 740. The same is true here.

The laws the Commission enforces are unconstitutional too. Both the direct-sales ban and the warranty-servicing ban violate the Equal Protection Clause because they irrationally discriminate against Tesla and other dealer-manufacturers. *St. Joseph Abbey v. Castille*, 712 F.3d 215, 218-23 (5th Cir. 2013). Similarly, both of those laws violate the Commerce Clause because they regulate extraterritorially, discriminate against out-of-state commerce in effect and intent, and impose an excessive burden on interstate commerce.

Accordingly, the Court should deny Defendants' motions to dismiss.

## BACKGROUND

**A. Tesla has disrupted the market for automobile sales, leasing, and warranty servicing.**

Through the dual innovations of its groundbreaking vehicles and its revolutionary sales model, Tesla has quickly become a dynamic competitor in the market for vehicle sales, leasing, and warranty servicing.[1] It has brought some—but not all—of those innovations to Louisiana.

Today, Tesla's Model 3, Model S, Model X, and Model Y are among the best-selling electric vehicles—indeed, some are among the best-selling vehicles *period*. ECF 151 at 19 ¶ 125-27.

Tesla sells, leases, and services Tesla vehicles directly; it does not use middle-men dealerships. *Id.* at 20 ¶¶ 130-32.

---

[1] Here, "Tesla" refers to the various entities that operate to lease and provide warranty repair and servicing for Tesla vehicles. ECF 151 at 6 ¶ 29. The precise combination of corporate entities may vary State to State, so when speaking generally about those operations, this Opposition uses "Tesla."

In Louisiana, those entities include Plaintiffs (1) Tesla, Inc., which designs, develops, and manufactures Tesla vehicles, *id.* at 5 ¶ 26; (2) Tesla Lease Trust, which holds the title to Tesla vehicles leased in Louisiana, *id.* at 6 ¶ 27; and (3) Tesla Finance LLC, which originates, services, administers, and makes collections on leases, *id.* at 6 ¶ 28.

3

Tesla's consumer-centric sales approach provides better experiences to its customers and is designed to educate consumers about Tesla's technology. *Id.* at 21-23 ¶¶ 136-43. In line with that goal, Tesla compensates its employees in a way that minimizes incentives for those employees to pressure customers into spending money unnecessarily. *Id.* at 21 ¶ 137. Primarily, Tesla's sales employees' compensation is not based on commission (to avoid pressuring buyers into quick, inflated purchases), and its service employees are compensated by the hour (to avoid unnecessary repairs). *Id.*

By contrast, franchise dealers—including members of the Dealer Cartel—operate businesses that succeed by subjecting as many customers as possible to high-pressure sales environments and markups. *Id.* at 22 ¶ 142. Empirical research confirms that customers have poor experiences with dealers and pay higher prices. *Id.* at 21-22 ¶¶ 139-40. In fact, other vehicle manufacturers have criticized their own franchise dealerships for those dealerships' sales tactics. *Id.* at 22 ¶ 141.

If Tesla and future direct sales, leasing, and servicing entrants continue to compete, and even expand, in Louisiana, consumers will choose Tesla vehicles and other direct-to-consumer automobile manufacturers. In turn, that will cause other vehicle manufacturers to reevaluate their dealer-centric business models to stay competitive. As Ford's CEO Jim Farley stated last year, "We've got to go to non-negotiated price" and to "100 percent online," because Ford's current distribution model adds around $2,000 in extra costs per car compared to a Tesla. Jonathan M. Gitlin, *No More Dealer Markups: Ford Wants to Move to Online-Only Sales for EVs*, arstechnica (June 2, 2022), https://bit.ly/3G6HMIn. Consumers will of course benefit from this transition through lower prices, improved service and quality, and additional choice.

**B.  State law irrationally prohibits Plaintiffs from selling Tesla vehicles in Louisiana.**

Before 2017, Louisiana prohibited manufacturers from competing with *their own* franchise dealers. *See* Amendment Notes to 2017 Amendments, La. R.S. § 32:1261. Thus, Plaintiffs would

have been free to directly sell vehicles if they did not franchise local, in-State dealers, which they do not. ECF 151 at 24 ¶ 152. Since 2017, however, Plaintiffs may not sell cars directly to consumers in Louisiana without using a local, in-State dealer. La. R.S. § 32:1261(A)(1)(k)(i). As a result of the direct-sales ban, Plaintiffs have not sought a license to sell vehicles in Louisiana.

### C. Despite the direct-sales ban, Plaintiffs currently lease Tesla vehicles in Louisiana and perform warranty servicing in Plaintiffs' role as "fleet owner" under State law.

Louisiana law also generally prohibits manufacturers (like Tesla, Inc.) from "operat[ing] a satellite warranty and repair center" that "authorize[s] a person to perform warranty repairs . . . who is not a motor vehicle dealer." La. R.S. § 32:1261(A)(1)(t)(i). This same law, however, contains an exception: a manufacturer may authorize a "fleet owner" to perform warranty repairs "if the manufacturer determines that the fleet owner has the same basic level of requirements . . . that are required of a franchise dealer." *Id.* § 32:1261(A)(1)(t)(ii). "Fleet owner" means "a person" who "owns or leases vehicles for its own use or a renting or leasing company that rents, maintains, or leases vehicles to a third party." *Id.* § 32:1261(A)(1)(t)(i). "The [Louisiana Motor Vehicle] commission has no authority over a fleet owner." *Id.* § 32:1261(A)(1)(t)(v).

Plaintiffs "lease[] vehicles" and thus are "fleet owners" under the statute, *id.* § 32:1261(A)(1)(t)(i)—as even some Defendants recognize as to the vehicles that Tesla leases. *E.g.*, ECF 156-2 at 2 ("'fleet owner' Tesla Lease Trust may repair and service leased vehicles"); ECF 159-1 at 7 ("Tesla Lease Trust qualifies as a 'fleet owner.'"); ECF 169-1 at 18 ("Tesla Lease Trust is Tesla's 'fleet owner'").

Tesla currently competes with the Dealer Cartel by offering leasing and warranty services (but not selling). ECF 151 at 23 ¶ 145-46. This allows Plaintiffs to compete, at least for now, in Louisiana because most consumers in the market for a new passenger vehicle are not willing to travel more than 50 miles to find a vendor. *Id.* at 41 ¶ 242(b). Were Tesla unable to offer leasing

and warranty services in Louisiana, it would be unable to compete with the Dealer Cartel in the relevant market. *Id.*

### D.  The Dealer Cartel has agreed to take anticompetitive actions against Plaintiffs.

Plaintiffs' success is perceived as a serious threat to Defendants' business model. To address that competitive threat, the Dealer Cartel agreed to exclude Plaintiffs from the market and extinguish competition from likely new entrants. *Id.* at 23-37 ¶¶ 144-230. Plaintiffs' public-record requests have unearthed communications detailing the Dealer Cartel's anticompetitive agreement. Discovery will only unearth more.[2]

### 1.  A controlling bloc of Commissioners on the Louisiana Motor Vehicle Commission are members of the Dealer Cartel.

*Defendant Commissioners, their dealerships, and the Commission.* By statutory design, members of the Dealer Cartel control the Louisiana Motor Vehicle Commission—which is empowered to enforce the Louisiana laws relevant in this case. ECF 151 at 8-14 ¶¶ 39-94. Currently, the Dealers Cartel has a controlling nine-member majority on the Commission (made up entirely of members of the Dealer Association). *Id.* at 7 ¶ 36.

The Louisiana Legislature created the Louisiana Motor Vehicle Commission to regulate and license the distribution and sale of motor vehicles and the dealers, manufacturers, and distributors of motor vehicles in Louisiana. *See generally* La. R.S. § 32:1253; ECF 151 at 8 ¶ 39. The Commission acts through its Commissioners, who are statutorily empowered with enforcement of

---

[2] Because of the Commission's and the Commissioners' ties to the Dealer Cartel and the traditional automotive industry in Louisiana, Tesla submitted public-records requests on April 20, 2021, and May 12, 2021. Between April 26, 2021, and April 28, 2021, the Commission produced only limited documents in response to Tesla's April 20, 2021, request. The Commission has produced only a few responsive documents in response to Tesla's second, May 12, 2021, request. Many of the sparse documents the Commission has produced have contained substantial redactions. The Commission has admitted that it has not completed its responses, has failed to explain the basis for the redactions, and has declined to produce a privilege log. *See* ECF 151 at 34 ¶¶ 212-16; *id.* at 35 ¶ 220.

the direct-sales ban and the other provisions at issue in this lawsuit like the warranty-servicing ban for entities that do not, for example, qualify as a fleet owner. La. R.S. § 32:1253(E) ("vested with the powers and duties necessary and proper to enable it to fully and effectively carry out the provisions and objects of this Chapter"); ECF 151 at 8 ¶ 41.[3]

Members of the Dealer Cartel control the Commission by design, as the Legislature requires the Commission to be constituted with such franchised dealers. ECF 151 at 8 ¶ 42. Specifically, Louisiana law requires 15 of the 18 total Commissioners to be appointed "licensees" of the Commission and retain their licenses while they serve as Commissioners. La. R.S. § 32:1253(A)(2) (requiring those Commissioners to be "an actively engaged licensee of the commission . . . for not less than five consecutive years prior to such appointment, and be a holder of such a license at all times while a member of the commission"); ECF 151 at 8 ¶ 45. A licensee is "any person who is required to be licensed by the commission," and includes "motor vehicle dealers" that "hold[] a bona fide franchise in effect with a manufacturer or distributor of new motor vehicles"—who are "the sole and only persons entitled to sell, publicly solicit, and advertise the sale of new motor vehicles as such." La. R.S. § 32:1252(22), (35)(a); ECF 151 at 9 ¶ 46. These 15 licensee members exercise the aspects of the Commission's authority most relevant here.

Nine controlling members of the Commission are Dealer Cartel members that directly compete with Tesla in the market for automobile sales, leasing, and servicing. ECF 151 at 9 ¶ 47. As required by Louisiana law, the other six Commissioners are in different parts of the motor-vehicle industry (like "motorcycle" or "marine product" sales), but those other Commissioners may be

---

[3] The statute requires the Commissioners to "appoint a qualified person to serve as executive director thereof, to serve at the pleasure of the commission and shall fix his salary and shall define and prescribe his duties." La. R.S. § 32:1253(D). Thus, the Executive Director is a functionary of the Commission.

affiliated with dealers that directly compete with Tesla. *See* ECF 151 at 14-15 ¶¶ 95-106. Moreover, they may also be franchise dealers themselves. *E.g.*, La. R.S. § 32:1270(E) (contemplating marine-dealership franchises); *id.* § 32:1270.10(B) (contemplating motorcycle-dealership franchises); *id.* § 32:1270.21 (indemnity for franchise-recreational-vehicle dealerships).[4]

*Defendant Dealers Association.* The dealers comprising the Dealer Cartel—which includes both Commissioners and non-Commissioners—are members of the Dealers Association, a Louisiana-resident trade association that "represent[s] nearly 350 new motor vehicle car and heavy truck dealers in Louisiana." La. Auto. Dealers Ass'n, About Us, https://bit.ly/3OTQDyQ; ECF 151 at 6-8 ¶ 30-38. The Association is controlled by, and founded to support, auto dealers in Louisiana who use the protectionist franchise-dealer sales model. ECF 151 at 7 ¶ 32. The Dealers Association's members have publicly and privately opposed Tesla doing business in Louisiana because they view Tesla as a competitive threat. ECF 151 at 7 ¶¶ 33-34.

There is a revolving door between leadership in the Dealers Association and the Commission. For instance, Defendant Commissioner Eric Lane served on the Board of the Dealers Association in 2018 when the Commission began investigating Tesla for warranty repairs of Tesla vehicles. *Id.* at 7 ¶ 37.

This close and intermingled relationship between the Dealers Association and the Commission is so plain that Defendant Allen Krake—a current Commissioner and former Chairman of the Commission—openly acknowledged that the Commission "board is made up of many motor

---

[4] The remaining three members of the Commission constitute the "consumer board" and exercise some of the Commission's authority. ECF 151 at 15-16 ¶¶ 107-09. Plaintiffs remain in conversation with counsel for the 3-member consumer board about dismissing them from the case. But these Defendants have not yet agreed to be bound by this Court's eventual merits order as a condition of dismissal.

dealers who compete with Tesla" and that for "five years" the Commission and the Dealers Association had "met numerous times" to discuss excluding Tesla from the market. ECF 1-1 at 7; ECF 151 at 7-8 ¶ 38.[5]

### 2. The Dealer Cartel has agreed to take anticompetitive action against Plaintiffs' operations in Louisiana.

### a. Through its control of the Commission, the Dealer Cartel has taken anticompetitive action by initiating an investigation into Plaintiffs.

The Dealer Cartel has taken aim at Plaintiffs' warranty servicing because it knows that consumers' inability to receive warranty servicing on a Tesla vehicle will discourage consumers from leasing a Tesla vehicle in Louisiana. *See* ECF 151 at 28-30 ¶¶ 178-90.

Following Tesla's announcement that it planned to open a service center in New Orleans in 2018, on July 11, 2018, Ray Brandt—the former Chairman of the Commission and a member of the Dealers Association—forwarded an article to the Commission's Executive Director, Lessie House, entitled "Tesla plan N.O. service, delivery center." ECF 1-3. In response, the Executive Director responded, "I am on it." *Id.* at 1. On July 17, 2018, Mat Baer of Bohn Brothers Investments, another member of the Dealer Cartel, brought the New Orleans service center to House's attention. ECF 1-4. House again responded: "We are on top of this." *Id.* at 1. The Dealer Cartel went so far as to disclose the anticompetitive purpose of the conspiracy, remarking that "[d]isplacement of competition is clearly a logical result of the regulatory directive and authority given the [Commission] by the legislature." ECF 1-5 at 3.

### b. The Cartel's conspiracy is carried out.

On August 5, 2020, the Commission issued a subpoena to Tesla Lease Trust for records

---

[5] "When, as here, the complaint attaches written exhibits, the exhibits are considered 'a part of the pleading for all purposes.'" *Quadvest, L.P. v. San Jacinto River Auth.*, 7 F.4th 337, 345 (5th Cir. 2021) (quoting Fed. R. Civ. P. 10(c)).

regarding Tesla Lease Trust's activities in Louisiana. ECF 151 at 32-33 ¶ 204. Tesla Lease Trust responded to that subpoena. *Id.* at 33 ¶ 205.

On February 12, 2021, the Commission issued another subpoena for any records identifying vehicles leased in Louisiana by Tesla Lease Trust and "identifying and/or referencing warranty service and/or warranty repair performed on any and all motor vehicles" in Louisiana from June 1, 2019, to the present. *See* ECF 1-7. This subpoena expressly targeted Tesla Lease Trust over Tesla's performance of warranty repairs in alleged violation of La. R.S. § 32:1261(A)(l)(t)(i), under a strained interpretation of "fleet owner" by the Commission. ECF 151 at 33 ¶ 207.

Tesla Lease Trust responded on March 1, 2021, and objected to the February 12, 2021, subpoena because Tesla Lease Trust is a "fleet owner" under La. R.S. § 32:1261(A)(l)(t)(i), and therefore statutorily exempt from the Commission's authority and the restrictions imposed by La. R.S. § 32:1261(A)(l)(t)(i). *See* ECF 151 at 33-34 ¶ 209.

In subsequent motion-to-compel proceedings initiated by the Commission's Executive Director before the Commission in May 2021, the Dealer Cartel's controlling majority paid off— ensuring that the Commission could continue targeting Plaintiffs. The Commission rejected multiple requests by Tesla Lease Trust to continue the hearing, and rejected Tesla Lease Trust's request for a determination on whether Tesla Lease Trust qualified as a fleet owner—even though that threshold question determined whether the Commission had authority to issue the subpoena in the first place. Instead, the Commission simply ordered Tesla Lease Trust to respond to the subpoena. *Id.* at 36 ¶ 222. An overwhelming majority of the Commissioners who adjudicated the motion to compel were Tesla's direct competitors and members of the Dealer Cartel. *Id.* at 36 ¶ 227.

On June 1, 2021, Tesla Lease Trust filed a motion for rehearing on the additional grounds that

the Commission lacked the legislative authorization to issue an investigative subpoena (as opposed to an adjudicative subpoena) and that it lacked jurisdiction to hear a motion to compel, which must instead be heard by the district court. *Id.* at 37 ¶ 225. Unsurprisingly, on July 12, 2021, the Commission held a hearing, at which it rejected Tesla Lease Trust's arguments and denied rehearing. *Id.* at 36 ¶ 226; *see id.* at 36 ¶ 228 (detailing votes to compel response to the subpoena); *id.* at 37 ¶ 229 (detailing votes in support of Commission's purported authority to issue the subpoena); *id.* at 37 ¶ 230 (detailing votes to deny rehearing).

   c.   **Tesla Lease Trust has sought limited judicial review of the Commission's order— and in the course of that judicial review, the Commission argued that Plaintiffs are not a "fleet owner" under Louisiana law.**

On August 26, 2021, Tesla filed a petition for judicial review in Louisiana State court, requesting that the court reverse the Commission's judgment to enforce the subpoena or, in the alternative, to remand for the Commission to affirmatively determine whether it has jurisdiction over fleet owner Tesla Lease Trust. *Id.* at 37 ¶ 232. There, the Commission revealed that it has agreed that Plaintiffs are *not* a "fleet owner" under Louisiana law—and thus cannot lawfully service Tesla vehicles in the State. Commission Reply in Support of Motion to Dismiss at 5, *Tesla Lease Tr. v. La. Motor Vehicle Comm'n*, No. 820-801 (La. D. Ct. May 10, 2022).

## STANDARD OF REVIEW

"To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead 'enough facts to State a claim to relief that is plausible on its face.' A claim is facially plausible when the plaintiff pleads facts that allow the court to 'draw the reasonable inference that the defendant is liable for the misconduct alleged.' A court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff." *In re Pool Prods. Distrib. Mkt. Antitrust Litig.* ("*In re Pool Prods. I*"), 940 F. Supp. 2d 367, 375 (E.D. La. 2013) (Vance, J.) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## ARGUMENT

**I.  Tesla has plausibly alleged that the Dealer Cartel violated antitrust law by conspiring to drive non-dealer rivals out of the Louisiana market for the sale, leasing, and warranty service and repair of new vehicles (Counts I and V).**

Section 1 of the Sherman Act prohibits "anticompetitive self-regulation by active market participants." *N.C. State Bd. of Dental Exam'rs v. FTC* ("*Dental Examiners II*"), 574 U.S. 494, 505 (2015). To establish a violation of section 1 of the Sherman Act and its Louisiana counterpart a plaintiff must plausibly allege concerted action among the defendants and that this action amounted to an "unreasonable restraint of trade." *Spectators' Commc'n Network Inc. v. Colonial Country Club*, 253 F.3d 215, 222 (5th Cir. 2001). There are three forms of analysis for determining if conduct violates § 1: per se; quick-look; and rule of reason. *N.C. State Bd. Of Dental Exam'rs v. FTC* ("*Dental Examiners I*"), 717 F.3d 359, 373 (4th Cir. 2013), *aff'd*, 574 U.S. 494 (2015).[6]

The Dealer Cartel's actions are illegal under any of the three analytical frameworks. *First*, Tesla has plausibly alleged an agreement among the members of the Dealer Cartel, a prerequisite for all section 1 claims. Tesla's entrance into the Louisiana market alarmed local automobile dealers, who feared that their antiquated business model would soon be replaced. *E.g.¸* ECF 151 at 29 ¶ 181-87. Dealers, including members of the Dealers Association, conspired to exercise their control over the Commission to drive up Tesla's costs and ultimately exclude Tesla from the Louisiana market, which would not only limit competition from Tesla but also discourage other new entrants that would utilize a business model that threatens the Dealer Cartel's outsized profits. *Id.* at 29-30 ¶¶ 181-96. And the Dealer Commissioners have begun to carry out that agreement. *Id.* at 32-37 ¶¶ 204-36. *Second*, Tesla has plausibly alleged that this agreement is illegal under the *per*

---

[6] The Louisiana Supreme Court and lower state courts have "considered federal antitrust standards a starting point for interpreting" the Louisiana provision. *Free v. Abbott Lab'ys*, 176 F.3d 298, 299 (5th Cir. 1999) (citing *La. Power & Light Co. v. United Gas Pipe Line Co.*, 493 So.2d 1149, 1158 (La. 1986)).

*se* and quick-look modes of analysis because it is a horizontal agreement to exclude competition, and such agreements are usually afforded *per se* treatment. *Id.* at 44-45 ¶¶ 252-54. *Third*, and in the alternative, Tesla has alleged that this conduct violates the rule of reason. *Id.* at 45 ¶ 255. There is a relevant market for the sale, leasing, and warranty service and repair of new passenger vehicles in Louisiana. *Id.* at 38-42 ¶¶ 241-42. And the Dealer Cartel enjoys—and abuses—market power in that relevant market. *Id.* at 45 ¶ 255.

In response, the Dealer Cartel raises arguments frequently rejected by courts. The Cartel's members argue that there is no direct evidence of their illegal agreement, but Tesla does point to direct evidence of an agreement, and, in any event, indirect evidence has long been held to suffice at the motion-to-dismiss stage. *See, e.g.*, *Dental Examiners I*, 717 F.3d at 373; *In re Pool Prods. I*, 940 F. Supp. 2d at 394. They disagree with the alleged market definition, but that is a question of fact unsuitable for resolution on a Rule 12(b)(6) motion. *See In re Pool Prods. I*, 940 F. Supp. 2d at 378. They attempt to hide behind *Noerr-Pennington* immunity, but that protection is available only to those lobbying the government, not to market participants entering into a private agreement with fellow competitors to restrict competition. *Allied Tube & Conduit Corp v. Indian Head, Inc.*, 486 U.S. 492 (1988). And they assert that Tesla has not suffered antitrust injury because they have not yet succeeded in driving Tesla out of the market, but antitrust law has never required that a cartel succeed before its targets can receive redress. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 n.14 (1977). The Court should deny the motions to dismiss the antitrust claims.

### A.  Tesla has plausibly alleged an agreement to exclude rivals.

The Dealer Cartel, a group of horizontal competitors, agreed to exclude a rival from the relevant market and to discourage future competition from other new entrants. In addition, the Commissioner members of the Cartel have agreed—through their votes on the Commission—to issue subpoenas to Tesla, which is a separately actionable agreement to restrain trade. An

agreement is defined under antitrust law as "a conscious commitment to a common scheme." *In re Pool Prods. I*, 940 F. Supp. 2d at 394 (internal quotation marks omitted). To allege an agreement, a plaintiff may rely on "direct *or circumstantial* evidence." *Id.* (emphasis added). And, at the motion-to-dismiss stage, a plaintiff need only "allege 'enough factual matter (taken as true) to suggest that an agreement was made.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). "Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.*

Defendants rely on *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752 (1984), a case about the *directed-verdict* standard, to suggest that a plaintiff's allegations at the *motion-to-dismiss* stage must also "tend[] to exclude the possibility of independent action." ECF 170-1 at 8; *see also* ECF 167-1 at 10. Not so. Although a plaintiff must put forward that kind of evidence to succeed at trial or summary judgment, "Rule 12(b)(6) does not require this heightened showing." *SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1118 (9th Cir. 2022); *accord SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 424-25 (4th Cir. 2015); *Erie Cnty v. Morton Salt, Inc.*, 702 F.3d 860, 869 (6th Cir. 2012) ("[I]n order to state a Section One claim, a plaintiff need not allege a fact pattern that 'tends to exclude the possibility' of lawful, independent conduct."); *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 325 (2d Cir. 2010) ("Defendants first argue that a plaintiff seeking damages under Section 1 of the Sherman act must allege facts that tend to exclude independent self-interested conduct as an explanation for defendants' parallel behavior. This is incorrect." (cleaned up)). Regardless, the Amended Complaint meets even the *Monsanto* standard.

Tesla plausibly alleges that members of the Dealer Cartel, including the Dealers Association and the Dealer Commissioners, agreed to force Tesla out of the Louisiana market.

*First*, the allegations establish that the members of the Dealer Cartel had "a *motive* to conspire." *In re Pool Prods. Distrib. Mkt. Antitrust Litig.* ("*In re Pool Prods. II*"), 988 F. Supp. 2d 696, 711 (E.D. La. 2013) (Vance, J.) (emphasis added). Tesla's direct-to-consumer model benefits consumers by eliminating the mark-ups and questionable sales tactics associated with the dealership model. ECF 151 at 22 ¶¶ 140-42. "Of course, it is precisely those consumer harms that make the franchise-dealer model profitable for dealers." *Id.* at 23 ¶ 143. So, dealers were understandably alarmed when Tesla announced its entrance into the Louisiana market, recognizing that this could spell the end of the dealership model; as one dealer observed, it was "not good for the future of [their] business." *Id.* at 29 ¶ 186. Dealers—including the Dealer Cartel and its members on the Commission—therefore had a motive "to prohibit Tesla from operating in Louisiana and to discourage entry from other direct to consumer automobile manufacturers." *Id.* at 28 ¶ 178.

*Second*, the allegations establish that the members of the Dealer Cartel had "an *opportunity* to conspire." *In re Pool Prods. II*, 988 F. Supp. 2d at 711 (emphasis added). Defendant Allen Krake, a member of the Dealers Association, a Dealer Commissioner, and the Chairman of the Commission in 2020, has admitted that the Dealer Cartel "met numerous times" to discuss limiting Tesla's ability to lease or service in Louisiana. ECF 151 at 7 ¶ 38; *see, e.g.*, *id.* at 29-30 ¶¶ 188-90 (the Dealers Association's March 2020 letter to Krake discussing its wish to "[d]isplace [] competition").

The connections between the Dealers Association and the Dealer Commissioners go further still. All Dealer Commissioners are members of the Dealers Association, and some within the relevant period have served on the Association's board. *Id.* at 11-14 ¶¶ 60, 65, 69, 73, 77, 81, 85, 89, 93. For example, Defendant Krake is a current Association board member. *Id.* at 11 ¶ 61.

Defendant Kenneth Smith, another Dealer Commissioner, served on the Association board between 2021 and 2022. *Id.* at 12 ¶ 73. And Defendant Eric Lane, yet another Dealer Commissioner, served on the board in 2018. *Id.* at 12 ¶ 69.

Indeed, the Commission's documents produced as part of the paltry and incomplete response to Tesla's public-information request *confirm* the existence of an agreement to keep Tesla out of Louisiana. In response to concerns from dealers (including members of the Dealers Association) about Tesla's entry into the Louisiana market, the Commission's Executive Director responded, "*We* are on top of this." ECF 151 at 29 ¶ 185 (emphasis added); *see id.* at 29 ¶¶ 183, 187 (similar). It is a reasonable inference that "[w]e" refers to the Commissioners, including the Dealer Commissioners. Particularly in light of the Commission's reluctance to respond to Tesla's public-records request, *see id.* at 34 ¶¶ 214-16, there can be little doubt "that discovery will reveal evidence of [an] illegal agreement," *In re Pool Prods. I*, 940 F. Supp. 2d at 394; *see In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 361 (3d Cir. 2004) (explaining that a "customary indication[] of traditional conspiracy" includes "proof that the defendants got together and exchanged assurances of common action . . . even though no meetings, conversations, or exchanged documents are shown"); *Osborn v. Visa Inc.*, 797 F.3d 1057, 1067 (D.C. Cir. 2015) (plaintiffs stated claim of illegal agreement where complaint alleged defendants used their governance role to force association to take anticompetitive actions that served their economic interests).

That leaves the actual execution of the agreement, *Dental Examiners I*, 717 F.3d at 373 (relying on evidence of the execution of the unlawful agreement to infer the existence of the agreement itself): the Dealer Cartel's subpoenas to Tesla, the first step to preventing Tesla from operating in Louisiana. ECF 151 at 32-33 ¶ 204. The Dealer Commissioners' control of the Commission "is sufficient, when coupled with the congruence between the [Commission's] actions and the [Dealer

Commissioners'] own self-interest, to allow a plausible inference of active participation" in the decision to issue the three subpoenas. *SmileDirectClub*, 31 F.4th at 1119.

The Dealer Commissioners' subsequent votes against Tesla support this inference and are themselves illegal agreements for which there is ample direct evidence of their occurrence. *E.g.*, ECF 151 at 37 ¶ 229 (Dealer Commissioners Krake, LeBlanc, Lane, Smith, Hightower, Marcotte, Fontenot, and Guidry vote that the Commission had the power to issue the third subpoena); *id.* at 37 ¶ 230 (Dealer Commissioners LeBlanc, Lane, Smith, Hightower, Fontenot, and Guidry vote to deny Tesla's motion for a rehearing); *id.* at 36 ¶ 228 (all four Dealer Commissioners participating in an eight-member panel—LeBlanc, Lane, Guidry, and Corley—vote to compel Tesla to respond to the third subpoena). Taken together, these allegations establish that the Dealer Commissioners used their control of the Commission to carry out the Dealer Cartel's unlawful agreement. *See Dental Examiners I*, 717 F.3d at 373 (finding direct evidence of illegal agreement when a regulatory board controlled by dentists "discussed teeth whitening services provided by non-dentists and then voted to take action to restrict these services").

The Dealer Cartel's grounds for dismissal are a hodgepodge of losing arguments levied against antitrust complaints. The principal objection is that Tesla does not supply evidence *directly* connecting each of the Dealer Commissioners to the illegal agreement. *See* ECF 159-1 at 18-19; ECF 164-1 at 11; ECF 167-1 at 11-12; ECF 170-1 at 9 (asserting that the complaint should be dismissed because Tesla "never identified which Defendants were involved in the alleged agreement, [or] where the agreement was confected"). As just explained, this is wrong. In any event, an antitrust plaintiff is "not required to mention a specific time, place, or person involved in each conspiracy allegation." *In re Pool Prods. II*, 988 F. Supp. 2d at 715. Nor must a plaintiff "cite evidence specific to each defendant in [the] complaint." *Carbone v. Brown Univ.*, No. 22 C 125,

2022 WL 3357249, at *6 (N.D. Ill. Aug. 15, 2022). *Contra, e.g.*, ECF 170-1 at 9 (urging dismissal based on the incorrect assertion that "the only specific 'communications' referenced in the Amended Complaint were among individuals not even named in this lawsuit" (emphasis omitted)). It is sufficient that this complaint sets out "[t]he general contours of the alleged agreement," and, through circumstantial evidence (or in this case, direct evidence), "support[s] those allegations with a context that tends to make said agreement plausible." *In re Pool Prods. II*, 988 F. Supp. 2d at 715-16 (internal quotation marks omitted).

Some of the Dealer Commissioners also object on the basis that not *all* their actions were consistently anti-Tesla. In other words, they ask the Court to infer from certain acts that they did not participate in the conspiracy. *See, e.g.*, ECF 156-2 at 12; ECF 170-1 at 13. But at this stage of the case, all inferences must be drawn in Plaintiffs' favor. *In re Pool Prods. I*, 940 F. Supp. 2d at 375. In any event, the Amended Complaint alleges that the Dealer Commissioners' initial statements of pro-Tesla views were cover for their illegal agreement. *See, e.g.*, ECF 151 at 32-33 ¶ 204. At this stage, those factual allegations must be credited. *See In re Pool Prods. II*, 988 F. Supp. 2d at 715 ("That defendants' interpretation of the document may also be plausible does not foreclose plaintiffs' interpretation at this stage.").[7]

## B.  The Dealer Cartel's efforts to drive Tesla from the market are *per se* illegal and illegal under the "quick-look" mode of analysis.

"[W]hen a practice facially appears to be one that would always or almost always tend to restrict competition and decrease output, rather than one designed to increase economic efficiency and render markets more, rather than less, competitive, it is considered *per se* illegal and may be

---

[7] At least one member of the Dealer Cartel complains that some of the allegations are made "on information and belief." *E.g.*, ECF 170-1 at 11. But that is a permissible practice, particularly where the heightened pleading standards of Rule 9 are not implicated, *see In re Pool Prods. II*, 988 F. Supp. 2d at 726, and where the Commission has admittedly not completed its disclosures pursuant to Tesla's public-records requests, as addressed above at p.6 n.2.

condemned without further analysis." *In re Pool Prods. I*, 940 F. Supp. 2d at 392 (internal quotation marks omitted). As the Dealer Cartel concedes, *see* ECF 169-1 at 11, "[u]nder the per se standard, plaintiffs are relieved of the obligation to define a market and prove market power," *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 316 (3d Cir. 2010).

A horizontal agreement—that is, an agreement among competitors—to force out a market disruptor has long been held to be *per se* illegal, including by the Supreme Court in a case involving auto dealers. *See, e.g.*, *United States v. Gen. Motors Corp.*, 384 U.S. 127, 145 (1966) (condemning as *per se* illegal automobile dealers' attempts to drive discounters from the market); *Tunica Web Advert. v. Tunica Casino Operators Ass'n, Inc.*, 496 F.3d 403, 413 (5th Cir. 2007) ("[P]er se unlawful boycotts generally involved joint efforts to disadvantage competitors . . . .").

Tesla has pleaded precisely that kind of agreement. It has alleged that the Dealer Cartel conspired to have its members on the Commission use the Commission's regulatory power to force from the market the Cartel's non-dealer rivals—by conspiring to drive up Tesla's costs and ultimately ban Tesla from leasing or performing warranty servicing. ECF 151 at 32-33, 43-44 ¶¶ 204, 248-49. It has explained that the unavoidable effect of this will be to restrict competition and decrease output by forcing Tesla out of the Louisiana market, leaving consumers with the higher prices, reduced choice, and worse service associated with the dealership model, all while deterring other would-be entrants from challenging that model. *Id.* at 42, 44-45 ¶¶ 245, 250, 252-53. And it has alleged that there is no pro-competitive justification for this conduct. *Id.* at 46 ¶ 256.

Tesla's allegations also suffice to establish defendants' liability under the so-called "quick-look" analysis, which applies when defendants offer procompetitive justifications but "the likelihood of anticompetitive effects is obvious." *N. Tex. Specialty Physicians v. FTC*, 528 F.3d 346, 362 (5th Cir. 2008) (cleaned up); *see Dental Examiners I*, 717 F.3d at 374 (agreeing that state

regulatory board's efforts to discourage competition with members of the board were illegal under "a quick-look analysis"); *N. Chi. Pro. Sports Ltd. v. Nat'l Basketball Ass'n*, 961 F.2d 667, 674 (7th Cir. 1992) (explaining that a court need not consider market power where there are no "sound justifications" for the defendants' conduct).

The Dealer Cartel makes no real effort to justify its conduct under either standard. It baldly asserts that "Tesla has not come remotely close to showing a *per se* violation," ECF 169-1 at 11, but does little to explain why.[8] It does not (because it cannot) dispute that its "horizontal agreement among competitors" to exclude a disruptive new entrant from the market is the kind of agreement that "would always or almost always tend to restrict competition and decrease output." *In re Pool Prods. I*, 940 F. Supp. 2d at 392; *see Gen. Motors*, 384 U.S. at 145 ("Elimination, by joint collaborative action, of discounters from access to the market is a per se violation of the [Sherman Act.").[9] And Defendants do not deign to offer a pro-competitive justification that could excuse their actions under the quick-look approach.

Instead, the Dealer Cartel advances two arguments in support of the legality of the conspiracy, but neither has merit. Start with the novel argument that Tesla was required to sue the Commission. ECF 170-1 at 13. That is not the law. *See, e.g.*, *SmileDirectClub*, 31 F.4th at 1118 (permitting an antitrust suit to proceed against "various Board members and employees" even though "[t]he

---

[8] Of course, at the motion-to-dismiss stage, Tesla need only plead a plausible factual basis, not make an evidentiary showing. *Stone v. La. Dep't of Revenue*, 590 F. App'x 332, 339 (5th Cir. 2014) (per curiam).

[9] Defendants Kenneth Smith and P.K. Smith Motors Inc. attempt to distinguish *General Motors* on the ground that, unlike the targeted discounters in that case, Tesla has not yet been "entirely excluded from the market." ECF 164-1 at 12. This is a distinction without a difference. That Tesla chose to sue before it had been forced to abandon Louisiana altogether says nothing about whether the Dealer Cartel's agreement "would always or almost always tend to restrict competition and decrease output." *In re Pool Prods. I*, 940 F. Supp. 2d at 392. And Tesla is not required to wait until it has been entirely excluded from the market before it may sue. *See infra* p.31.

Complaint d[id] not . . . name the Board as a defendant"). *United Mine Workers of America v. Pennington*, 381 U.S. 657 (1965), the Dealer Cartel's sole citation for its point, stands only for the proposition that a plaintiff must name a party as a defendant if the plaintiff wishes to recover from that party, *see* ECF 170-1 at 13 (explaining that, in *Pennington*, plaintiffs "could not recover for any injuries caused by the Secretary of Labor's actions because the Secretary of Labor had not been made a party to the litigation"). Tesla has done just that by naming the Dealer Cartel—including its members on the Commission—as defendants.[10]

The Dealer Cartel also asserts that its actions cannot have been unlawful because they were permitted by state law. *E.g.*, ECF 164-1 at 11. That is wrong. "[A]greements are not always lawful simply because they are 'consistent with' the purpose of a regulatory Board dominated by market participants." *SmileDirectClub*, 31 F.4th at 1118; *see City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 379 (1991) ("[W]e in no way qualify the well-established principle that a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." (internal quotation marks omitted)).

### C. Tesla has stated a claim under the rule of reason that the Dealer Cartel has violated and is violating the antitrust laws.

To state a claim under the rule of reason for a violation of section 1 of the Sherman Act (and Louisiana law), a plaintiff must plausibly allege (1) an anticompetitive agreement among defendants and (2) "that defendants have sufficient market power to restrain competition substantially in a relevant market." *In re Pool Prods. I*, 940 F. Supp. 2d at 394, 397. "A relevant market has both product and geographic dimensions." *Id.* at 376. That is, a plaintiff must plausibly define "a relevant product [market] and [a relevant] geographic market." *Id.* at 397.

---

[10] To the extent the argument is a variant of the *Noerr-Pennington* argument made elsewhere in the Dealer Cartel's briefs, it is also incorrect for the reasons given below. *See infra* pp.34-39.

The complaint satisfies both requirements. Tesla has plausibly alleged an anticompetitive agreement among the Dealer Cartel. *See supra* pp.13-18. And it has plausibly alleged a relevant market for "the sale, leasing, and warranty service and repair of new passenger vehicles in Louisiana." ECF 151 at 38 ¶ 239. The Dealer Cartel disputes the market definition, but its objections are little more than disagreements with the facts alleged in the complaint, which must be taken as true at this stage. And only one member of the Dealer Cartel disputes (wrongly) that the Cartel has "sufficient market power to restrain competition substantially" in the market that Tesla has pleaded. *In re Pool Prods. I*, 940 F. Supp. 2d at 397; *see* ECF 151 at 45 ¶ 255.

> **1.  Tesla has plausibly alleged a relevant product market for the sale, leasing, and warranty service and repair of new passenger vehicles.**

"The relevant product market . . . include[s] all products, the use of which is reasonably interchangeable." *In re Pool Prods. I*, 940 F. Supp. 2d at 377. "Products that consumers view as substitutes for other products can be said to be in competition with each other" and reasonably interchangeable. *Id.* "Whether one product is reasonably interchangeable for another [also] depends . . . on the cross-elasticity of suppliers' production facilities." *Id.*

Defendants' arguments regarding the relevant product market can be readily dispensed with. Defendants privately (and publicly) concede that they compete with Tesla, and their actions reveal that they view Tesla's business model as an existential threat. *E.g.*, ECF 151 at 26, 29 ¶¶ 168, 181-87. Because market definition exists to measure "the area of effective competition," *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 593 (1957), this is alone more than sufficient at the pleading stage.

Moreover, "because market definition is a fact-intensive inquiry," dismissal of an antitrust case on relevant market grounds is appropriate only where a plaintiff (1) unsuccessfully "attempts to limit a product market to a single brand, franchise, institution, or comparable entity that competes

22

with potential substitutes"; "or (2) fail[s] even to attempt a plausible explanation as to why a market should be limited in a particular way." *In re Pool Prods. I*, 940 F. Supp. 2d at 378.

Neither criterion applies here. First, Plaintiffs have not limited the relevant product market to a single entity. *Defendants* have attempted to narrow the product market artificially to Tesla vehicles or electric vehicles. *E.g.*, ECF 169-1 at 12-13.

Second, the complaint explains in detail why the market for the sale, leasing, and warranty service and repair of new passenger vehicles is the relevant product market. [11]

- "[P]rospective purchasers of new Tesla automobiles compare price, quality (including the quality of warranty service and repair), and features with other automobile brands." ECF 151 at 38 ¶ 241(a).

- "Tesla's ability to win new customers depends on its comparative prices and features with new passenger vehicles from other automobile brands." *Id.* at 39 ¶ 241(b).

- "Tesla's website compares the price and features of its autos with familiar benchmarks from other automobile companies and the media perceives Tesla as competing with all other automobile brands." *Id.* at 39 ¶ 241(c).

- "Tesla itself recognizes in its 10-K that competing products typically include internal combustion vehicles from more established automobile manufacturers." *Id.* at 39 ¶ 241(d) (cleaned up).

- "Other manufacturers of passenger vehicles are able to—and do—produce products that compete with Tesla." *Id.* at 40 ¶ 241(g).

---

[11] Defendants do not take issue with the inclusion of leasing or warranty servicing in the relevant product market. Because they have forfeited any objection to the pleading of those aspects of the market definition, Tesla does not address them. To be clear, however, although the relevant market includes both the sale *and* leasing of new passenger vehicles, Tesla does not challenge, in its antitrust claims, the 2017 sales ban.

The Dealer Cartel has nothing to say about these allegations, each of which—individually or taken together—suffices to plausibly establish that all passenger vehicles are reasonably interchangeable. Indeed, these same allegations have led numerous courts to conclude that a relevant antitrust market exists for *all* passenger vehicles, not some subset of those vehicles. *E.g.*, *Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp.*, 959 F.2d 468, 480 (3d Cir. 1992) (en banc) ("[T]he district court was correct to define, as a matter of law, the [relevant] product market to include all new automobiles . . . ."); *Grappone, Inc. v. Subaru of New England, Inc.*, 858 F.2d 792, 797 (1st Cir. 1988) (Breyer, J.) (opining that "sales of all autos" was a "reasonable way" to define the market); *Ron Tonkin Gran Turismo, Inc. v. Fiat Distribs., Inc.*, 637 F.2d 1376, 1387 (9th Cir. 1981) (agreeing that "the relevant product market was cars in general"); *Merit Motors, Inc. v. Chrysler Corp.*, 417 F. Supp. 263, 269 (D.D.C. 1976), *aff'd*, 569 F.2d 666 (D.C. Cir. 1977) ("[I]t is clear that the relevant market . . . must include the fleet market for all brands of automobiles."); *Anderson Foreign Motors, Inc. v. New England Toyota Distrib., Inc.*, 475 F. Supp. 973, 986 (D. Mass. 1979) (relevant market was "the market for new automobiles foreign and domestic").

The Dealer Cartel raises two objections to the relevant product market, but neither has merit. The Cartel first asserts that "low-mileage used cars" should be part of the relevant market. ECF 169-1 at 12 & n.18. But Tesla has alleged that "[u]sed cars are not reasonable substitutes for new cars" because "[n]ew cars typically are offered with new factory warranties, subsidized financing from manufacturers, and interest rates that are lower than normal for those who borrow money." ECF 151 at 39 ¶ 241(e). The Dealer Cartel's apparent disagreement with that explanation is nothing more than a factual dispute not appropriate for resolution on a motion to dismiss. *See In*

*re Pool Prods. I*, 940 F. Supp. 2d at 375-76.[12]

Second, the Dealer Cartel argues that the market for electric vehicles (or perhaps for Tesla vehicles alone) constitutes the relevant market because the complaint mentions differences between electric vehicles and gas-powered vehicles. But differentiated products within a relevant market are not at all unusual and certainly do not defeat the alleged relevant market here. *See, e.g.*, *FTC v. CCC Holdings Inc.*, 605 F. Supp. 2d 26, 42-43 & n.19 (D.D.C. 2009) (explaining differentiated product markets); *In re Pool Prods. I*, 940 F. Supp. 2d at 378-79 (at the motion-to-dismiss stage, treating highly differentiated products as part of the same relevant market).

The Dealer Cartel also focuses on the distinctive features of Tesla vehicles as compared to other vehicles, *see* ECF 169-1 at 12-13, but that too is a red herring.[13] As this Court has explained, what matters for market definition purposes is whether consumers view the products as substitutes, not whether they share similar features. *In re Pool Prods. I*, 940 F. Supp. 2d at 377. Tesla has alleged that purchasers looking to buy a new passenger vehicle treat Tesla vehicles, other electric vehicles, and gas-powered vehicles as competitive with one another, comparing the price, quality, and features of each. ECF 151 at 38-39 ¶ 241.

---

[12] As if to prove this point, the Dealer Cartel relies on *Nationwide R.A.C. Sales, Inc. v. Ford Motor Co.*, a case decided at *summary judgment* where it was "[d]efendant's *evidence*" that suggested that some "low-mileage used cars" competed in "defendant's closed auctions." 1997 WL 88399, at *7 (N.D. Cal. Feb. 20, 1997) (emphasis added); *see* ECF 169-1 at 12 n.18.

[13] The Dealer Cartel asks the Court to consider allegations in the *original* complaint that have been superseded by the amended complaint, *see* ECF 169-1 at 13, in effect rehashing arguments that the Court has already rejected about the propriety of Tesla's amendment, *see* ECF 150 at 7.

Under Fifth Circuit law, any "judicial confession" in the original complaint has been "amended away." *Hibernia Nat'l Bank v. Carner*, 997 F.2d 94, 101 (5th Cir. 1993); *see White v. ARCO/Polymers, Inc.*, 720 F.2d 1391, 1396 n.5 (5th Cir. 1983) ("Admissions made in superseded pleadings are as a general rule considered to lose their binding force[.]"). Superseded allegations cannot be considered "unless [they are] properly introduced into evidence as a party admission," *Stacy v. Aetna Cas. & Sur. Co.*, 484 F.2d 289, 294 (5th Cir. 1973), which has not happened here. And even considering the allegations in the original complaint in addition to the allegations in the operative complaint, Tesla has pleaded a plausible market for the reasons given in the body text.

Perhaps it is Defendants' view that electric vehicles are a sub-market of the broader market for all passenger vehicles. But the existence of sub-markets says nothing about the plausibility of the broader market. *United States v. Phillipsburg Nat'l Bank & Tr. Co.*, 399 U.S. 350, 360 (1970) ("[S]ubmarkets are not a basis for the disregard of a broader line of commerce that has economic significance."); *accord United States v. Greater Buffalo Press, Inc.*, 402 U.S. 549, 553 (1971).

### 2. Tesla has plausibly alleged that the relevant geographic market is Louisiana.

"The relevant geographic market is the 'area of effective competition in which the seller operate[s], and to which the purchaser can practically turn for supplies.'" *In re Pool Prods. I*, 940 F. Supp. 2d at 377 (alteration adopted) (quoting *United States v. Phila. Nat'l Bank*, 374 U.S. 321, 359 (1963)). Again, the inquiry is a "fact-intensive" one, ordinarily not suited for resolution at the motion-to-dismiss stage. *Id.* at 378.

Tesla has plausibly established that the relevant geographic market is Louisiana. For example:

- Most consumers looking to purchase or lease a new motor vehicle (or obtain warranty repair and service work) shop locally and do not travel more than 50 miles to find a vendor. ECF 151 at 41 ¶ 242(a)-(c).

- "It is more convenient to buy or lease a car in the state one lives in because there will be an established process and requirement list for title and registration. In particular, out of state leases are challenging to execute." *Id.* at 41 ¶ 242(d).

- "Tesla's competitors for the sale and lease of new vehicles to consumers also consider the relevant market to be local. Many franchises have been granted geographic exclusivity for the sale and lease of new vehicles that is no larger than state-wide and is often far smaller." *Id.* at 41 ¶ 242(e).

- The Dealer Cartel's documented concerns about Tesla entering Louisiana—and its efforts to

prevent that entry—also indicate that market participants view the market as state-wide. *Id.* at 41 ¶ 242(g).

- The sale and warranty servicing of new vehicles is subject to statewide regulation. *Id.* at 24-25, 28, 41 ¶¶ 153, 174, 242(g).

These allegations, taken as true, establish that consumers tend to stay within Louisiana when looking to purchase, lease, or have serviced a motor vehicle, and that market participants recognize this "commercial realit[y] of the industry." *In re Pool Prods. I*, 940 F. Supp. 2d at 377 (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962)); *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 626 (5th Cir. 2002) (explaining that the existence of "regulatory constraints" "that affect the behavior of market participants" is suggestive of the scope of the relevant geographic market); *cf. Arnold Pontiac-GMC, Inc. v. Gen. Motors Corp.*, 786 F.2d 564, 573 (3d Cir. 1986) (recognizing an antitrust conspiracy among "Pittsburgh-area" car dealers).

Unable to attack the substance of the above allegations, the Dealer Cartel either ignores them or asserts without authority that they are "speculat[ive]" or "unsupported," as if geographic-market allegations must meet some heightened pleading standard. ECF 169-1 at 12. They do not. *Nat'l Athletic Trainers' Ass'n, Inc. v. Am. Physical Therapy Ass'n*, No. 3:08-CV-0158-G, 2008 WL 4146022, at *13 (N.D. Tex. Sept. 9, 2008) ("[T]here are no heightened pleading requirements in an antitrust case, and this court will not look behind the [plaintiff]'s allegations at the pleading stage of this case to explore facts concerning the complaint's market definition.").

The Dealer Cartel also makes much of Tesla's allegation that some Louisiana residents have been forced to travel to neighboring States to acquire a Tesla, *see* ECF 169-1 at 13, but this allegation does not alter the plausibility of the geographic-market definition. Relevant geographic "markets need not—indeed cannot—be defined with scientific precision." *United States v. Conn.*

*Nat'l Bank*, 418 U.S. 656, 669 (1974); *see Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 331 (1961) ("[T]he relevant competitive market is not ordinarily susceptible to a 'metes and bounds' definition."). "[S]o far as [consumers] located near the perimeter [of the relevant geographic market] are concerned," there will always be "some artificiality in deeming" that perimeter the edge of the relevant market. *Phila. Nat'l Bank*, 374 U.S. at 360 n.37. "But such fuzziness" is "inherent in any attempt to delineate the relevant geographical market," and is not fatal to an antitrust claim. *Phila. Nat'l Bank*, 374 U.S. at 360 n.37. A "rough approximation" of the market suffices. *Conn. Nat'l Bank*, 418 U.S. at 669. The existence of some consumers who cross state lines is therefore to be expected and of no moment.

What is more, the need for consumers to travel out of state to obtain their preferred vehicle is a sign of market failure within the Louisiana market, not an indication that the market is defined too narrowly. When competition is distorted by firms exercising market power, consumers will often purchase items outside the relevant market. *See United States v. Eastman Kodak Co.*, 63 F.3d 95, 105 (2d Cir. 1995) ("At a high enough price, even poor substitutes look good to the consumer."). But this decision to go outside the relevant market is a product of the market distortion "rather than a belief on the part of consumers that the products are good substitutes for one another." *Id.*

### 3. Tesla has plausibly alleged that the Dealer Cartel has market power.

"Under the rule of reason, plaintiffs must plausibly allege that defendants have sufficient market power to restrain competition substantially in a relevant market." *In re Pool Prods. I*, 940 F. Supp. 2d at 397. Two sets of allegations permit a reasonable inference of market power. First, the Dealer Cartel has market power because it controls the Commission, which purports to have the power to prohibit Tesla from leasing or performing warranty services and repairs in Louisiana. ECF 151 at 28, 32, 45 ¶¶ 178, 203, 255. The Cartel therefore "has market power based on the

[Commission's] power to exclude competition." *In re N.C. Bd. of Dental Exam'rs*, 2011 WL 11798463, at *31 (FTC Dec. 2, 2011), *pet. for review denied*, *Dental Examiners I*, 717 F.3d 359. Second, the Dealers Association represents—and has entered into the Dealer Cartel on behalf of— "nearly 350 new motor vehicle car and heavy truck dealers in Louisiana," which, along with the other Defendants, makes up "the majority of market participants in the relevant market." ECF 151 at 6, 45 ¶¶ 30, 255. This is more than enough for an inference of market power. *In re Pool Prods. I*, 940 F. Supp. 2d at 397-98 (finding market power from a 33 percent share of the market); *cf. id.* at 382 ("A nonconclusory allegation that a defendant holds a predominant share of the relevant market will usually [establish] monopoly power[.]"). *Contra* ECF 164-1 at 13 (asserting that there are insufficient allegations of market power because "defendants in this case represent a fraction of the hundreds of automobile dealerships in the state of Louisiana").[14]

### D. The Dealer Cartel's efforts to run Tesla out of the Louisiana market are a quintessential form of antitrust injury.

Another element of an antitrust claim is antitrust injury. That is, a plaintiff must allege facts plausibly suggesting that it has suffered or will "suffer injuries caused by the violation 'of the type that the antitrust laws were intended to prevent.'" *In re Pool Prods. I*, 940 F. Supp. 2d at 399 (quoting *Brunswick Corp.*, 429 U.S. at 489). This requirement "ensures that the plaintiff's demand for relief ultimately serves the purposes of antitrust law to increase consumer choice, lower prices and assist competition, not competitors." *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 306 (5th Cir. 1997). So, a plaintiff fails to allege antitrust injury primarily when the complained-of harm comes from "increased, not decreased, competition." *Id.* at 305 n.7.

The antitrust injury element is easily met here. The likely elimination of an actual or competitor

---

[14] Of the Defendants, only P.K. Motors, Inc., and its owner have preserved an argument relating to the Dealer Cartel's market power.

from the market "is, by definition, anticompetitive." *Impax Lab'ys, Inc. v. FTC*, 994 F.3d 484, 493

(5th Cir. 2021); *see Am. Needle, Inc. v. NFL*, 560 U.S. 183, 195 (2010) ("The central evil addressed

by Sherman Act § 1 is the elimination of competition that would otherwise exist." (cleaned up)).

"[I]ncreased prices, decreased output, [and] lower quality"—"effects . . . that harm consumers"—

are other familiar kinds of antitrust injury. *Impax*, 994 F.3d at 493. And one way these injuries can

be inflicted is through "a scheme by which [defendants'] rivals' costs [are] raised," "forc[ing]

some rivals out of business" and limiting the ability of "remaining rivals" to "serv[e] as a check to

[defendants'] ability to raise prices." *In re Pool Prods. I*, 940 F. Supp. 2d at 400.

Allegations of these kinds of antitrust injury run through Tesla's complaint. *First*, the Dealer

Cartel has agreed to force Tesla out of the market by banning Tesla from leasing directly to

consumers and from providing warranty repairs and services directly to consumers. ECF 151 at

29, 42-45 ¶¶ 181, 244, 246-47, 249, 252-53. Either kind of ban would force Tesla to choose

between exiting the market or working through dealers; either way, prices would rise and the

consumer experience would suffer. *Id.* at 44-45 ¶¶ 252-53. And the Dealer Cartel's actions are

intended to deter other direct-to-consumer manufacturers from entering the market. *Id.* at 43-44

¶ 248. The forcing-out of a competitor and the deterring of new entrants, all leading to market-

wide increased prices and lower quality—these are precisely the types of injury the antitrust laws

were intended to prevent. *Impax*, 994 F.3d at 493; *In re Pool Prods. I*, 940 F. Supp. 2d at 400.

*Second*, Tesla has alleged that the Dealer Cartel has conspired to force Tesla to respond to

unlawful subpoenas targeting Tesla's lawful business activities. ECF 151 at 32-34, 36-37, 46

¶¶ 204-11, 224-30, 257. This investigation has been "costly" to Tesla, *id.* at 43 ¶ 247, forcing it to

incur expenses and creating uncertainty about its continued ability to operate in Louisiana, thereby

placing it at a "competitive disadvantage[]" to the Dealer Cartel, which does not have to bear the

same costs, and deterring new entrants who would otherwise adopt Tesla's business model, *Doctor's Hosp. of Jefferson*, 123 F.3d at 305; *see* ECF 151 at 43-44, 47 ¶¶ 248, 250-51, 262-63. The Dealer Cartel's scheme to limit Tesla's ability to "serv[e] as a check to [the Cartel's] ability to raise prices" and offer an improved consumer experience therefore imposes a classic antitrust injury on Tesla. *In re Pool Prods. I*, 940 F. Supp. 2d at 400.

The Dealer Cartel's counterarguments come in three forms. All are flawed.

*First*, the Cartel argues that there is no antitrust injury because Tesla remains active today. *E.g.*, 159-1 at 19-20; 164-1 at 13; ECF 169-1 at 10. But it is well-established that competitors need not wait until "they actually are driven from the market" before bringing an antitrust claim. *Brunswick*, 429 U.S. at 489 n.14; *accord PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 840-41 (9th Cir. 2022), *cert. denied sub nom. Nat'l Ass'n of Realtors v. The PLS.com, LLC*, 143 S. Ct. 567 (2023); *Lee-Moore Oil Co. v. Union Oil Co. of California*, 599 F.2d 1299, 1304 (4th Cir. 1979); *see, e.g.*, *Henry v. N.C. Acupuncture Licensing Bd.*, No. 1:15CV831, 2017 WL 401234, at *12 (M.D.N.C. Jan. 30, 2017) (rejecting defendants' argument that dry needling practitioners had failed to plead injury because practitioners "continue to perform and receive dry needling"). Tesla has alleged that the Dealer Cartel began to put its plan into action and that it is only a matter of time until the Dealer Commissioners ban Tesla from leasing or providing warranty services, or both. ECF 151 at 32, 42, 44 ¶¶ 204, 245, 249. Where, as here, competitors engaged in "joint efforts . . . to disadvantage [other] competitors, . . . the likelihood of anticompetitive effects is clear." *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985).[15]

---

[15] *Anago, Inc. v. Tecnol Medical Products*, 976 F.2d 248, (5th Cir. 1992), is not to the contrary, *see* ECF 164-1 at 13; ECF 169-1 at 10. The case stands for the proposition "that the loss of independent decision making [due to a merger] is [not] the type of injury meant to be prevented by the antitrust laws," *Anago*, 976 F.2d at 250-51—a holding that is irrelevant here. Instead, *Anago* reaffirms that a plaintiff may establish antitrust injury and obtain an injunction by showing that it

In any event, Tesla has pleaded that it has already suffered antitrust injury because the Dealer Cartel has conspired to make Tesla less competitive by forcing it to incur costs responding to the baseless subpoenas. ECF 151 at 43-44 ¶¶ 247-50. This also creates uncertainty for Tesla with regard to both its current and future investment in operations in Louisiana. *See id.* at 44 ¶¶ 250, 52.

*Second*, the Dealer Cartel next asserts (without authority) that this form of injury is not antitrust injury. ECF 164-1 at 13; 169-1 at 10. The Cartel is wrong. Raising rivals' costs is a well-recognized form of antitrust injury, *e.g.*, *In re Pool Prods. I*, 940 F. Supp. 2d at 400, as is the use of threatened enforcement action, through subpoenas or other means, in order to deter competition, *e.g.*, *Dental Examiners I*, 717 F.3d at 365, 374 (upholding finding that state regulatory board's efforts to discourage competition with members of the board—through investigations, stern letters, and cease-and-desist letters—were "likely to cause significant anticompetitive harms"); *SmileDirectClub*, 31 F.4th at 1121-22 (similar).

*Third*, the Dealer Cartel speculates that, even if Tesla is forced out of the market, sufficient competition will remain "to ensure that competitive prices, quality, and service persist." ECF 164-1 at 13 (quoting *Marucci Sports, LLC v. NCAA*, 751 F.3d 368, 377 (5th Cir. 2014)). If that were true, the Cartel would not have invested the years and effort to exclude Tesla in the first place. Moreover, the Cartel is not entitled to have that inference drawn in its favor. *In re Pool Prods.*, 940 F. Supp. 2d at 375. Tesla is the Cartel's principal competitor supplying customer choice and an improved customer experience by eliminating the use of dealers (with their attendant price mark-ups and poor customer service). ECF 151 at 21, 43 ¶¶ 136-38, 248(c). So, Tesla's

---

will be injured by a defendant's actions and that the same actions "will cause" "anticompetitive effects, such as higher prices and decreased competition." *Id.* at 251.

elimination from the market will guarantee harm to consumers because there will no longer be any meaningful pressure on the dealership model, and other direct-to-consumer manufacturers will be deterred from entering the market. *See id.* at 43-44, 45 ¶¶ 248(b)-(d), 253.

**E.  The Commission is not treated as a state agency for antitrust purposes.**

The state-action exemption, also known as the *Parker* doctrine (after *Parker v. Brown*, 317 U.S. 341 (1943)), protects "the States when acting in their sovereign capacity" from antitrust liability. *Dental Examiners II*, 574 U.S. at 503. The Dealer Commissioners offer a footnoted assertion that "they are likely entitled to *Parker* immunity," ECF 170-1 at 15 n.2, but do not explain why, *but see Morton v. Soc. Sec. Admin.*, 2016 WL 5724810, at *4 (E.D. La. Sept. 15, 2016), *report and recommendation adopted*, 2016 WL 5678548 (E.D. La. Oct. 3, 2016) (explaining that underdeveloped arguments are forfeited). They are wrong.

State agencies like the Commission "in which a decisive coalition (usually a majority) is made up of participants in the regulated market" are treated as "private actors," subject to antitrust scrutiny." *Dental Examiners I*, 717 F.3d at 368. Here, because the Dealer Cartel dominates the Commission, the Commission and its members are private actors in the eyes of the antitrust laws. ECF 151 at 8-9 ¶¶ 44, 47 (alleging that "[a] controlling majority of nine Commissioners are Dealer Cartel members—motor vehicle dealers that directly compete with Tesla in the market for automobile sales, leasing and servicing"). And because "active market participants cannot be allowed to regulate their own markets free from antitrust liability," *Dental Examiners II*, 574 U.S. at 505, private actors (like the Dealer Commissioners) who assert *Parker* immunity must establish that they are "subject to 'active supervision' by the state." *Quadvest*, 7 F.4th at 346 (quoting *Dental Examiners II*, 574 U.S. at 507). As Tesla has alleged, no such supervision keeps the Dealer Commissioners in check, ECF 151 at 46 ¶¶ 258-59, and Defendants do not argue to the contrary.

**F.  *Noerr-Pennington* immunity does not protect the Dealer Cartel's efforts to drive Tesla out of the market.**

The antitrust-related allegations in the Amended Complaint relate to "private actors violat[ing] the Sherman Act through an illegal horizontal restraint," not an attempt to "lobby" government officials, and as a result *Noerr-Pennington* immunity does not apply. *Jebaco, Inc. v. Harrah's Operating Co., Inc.*, 587 F.3d 314, 318 n.9 (5th Cir. 2009). The Cartel's arguments otherwise transparently challenge allegations not made and theories not advanced.[16] They should be rejected.

The Dealer Cartel's *Noerr-Pennington* defense hangs on the fact that some of its members—the Dealer Commissioners—exercise a measure of delegated governmental power. In the Cartel's view, this turns their illegal agreement into a lawful lobbying effort. *E.g.*, ECF 169-1 at 5-6. Not so. Tesla's antitrust claim does not challenge lobbying, such as the direct sales ban (which is challenged instead on constitutional grounds). ECF 151 at 23 n.20. The challenged restraint here stems from the Dealer Cartel's private agreement to use its control of the Commission to exclude Tesla, not arms-length lobbying between a private actor and the government. *See Garmon Corp. v. Vetnique Labs, LLC*, No. 19 C 8251, 2020 WL 3414983, at *3 (N.D. Ill. June 22, 2020) (explaining that *Noerr-Pennington* immunity does not apply "where a restraint on trade 'has resulted from private action'" (quoting *Allied Tube*, 486 U.S. at 499)).

Because the Dealer Commissioners are treated as private actors for antitrust purposes, *see supra* p.33 (explaining that, under the Sherman Act, entities controlled by market participants are private actors), the fact that they have been afforded some limited government authority "does not

_____

[16] *See, e.g.*, ECF 167-1 at 15-16 (asserting that *Noerr* protects the lobbying that led to the 2017 sales ban, even though that ban is not the subject of the antitrust claims); ECF 170-1 at 12 n.1 (similar); ECF 169-1 at 6 (asserting that Tesla relies on a now-discredited "conspiracy" exception to *Noerr*, even though as explained below, *see infra* pp.38-39, Tesla does no such thing); *id.* at 7 (asserting that Tesla's antitrust claims "turn on whether the sought action was authorized under state law," even though as already explained, *see supra* p.21, the Dealer Cartel's agreement is illegal regardless of whether it was sanctioned by state law).

create an antitrust shield that allows [them] to foster anticompetitive practices for the benefit of" the Dealer Cartel. *Goldfarb v. Va. State Bar*, 421 U.S. 773, 791 (1975). The Dealer Commissioners are no more than private actors participating in an illegal agreement and as a result the other members of the Dealer Cartel cannot claim that their communications with the Dealer Commissioners to effectuate the agreement are acts of lobbying protected by *Noerr* immunity.

Consider *Allied Tube & Conduit Corp v. Indian Head, Inc.*, where the Supreme Court refused to extend *Noerr-Pennington* immunity to the defendants' efforts to take over a private association and alter product-safety standards that were "widely adopted into law by state and local governments." 486 U.S. at 495. The Court's reasoning applies with equal force here:

- The Court explained that members of standard-setting associations "often have economic incentives to restrain competition and that the product standards set by such associations have a serious potential for anticompetitive harm." *Id.* at 500. Indeed, "the decisionmaking body of the Association [was] composed, at least in part, of persons with economic incentives to restrain trade." *Id.* The same is true of the Commission, which is controlled by dealers, who have an economic incentive to protect their business model against competition. *See* ECF 151 at 8-9 ¶¶ 44, 47; *id.* at 49 ¶ 274.

- "Unlike the publicity campaign in *Noerr*, the activity at issue [in *Allied Tube*] did not take place in the open political arena." *Allied Tube*, 486 U.S. at 506. Nor did the defendants "confine [themselves] to efforts to persuade an independent decisionmaker; rather, [they] organized and orchestrated the actual exercise of the Association's decisionmaking authority in setting a standard." *Id.* at 507 (citations omitted). Similarly, the Dealer Cartel has engaged in secret communications with, among others, its own members on the Commission in order to exercise the Dealer Commissioners' decisionmaking authority instead of attempting to persuade an

independent decisionmaker. *See* ECF 151 at 28-29 ¶¶ 179-89.

- Finally, the standard-setting process could not "be characterized as merely an exercise of the power of persuasion, for it in part involve[d] the exercise of market power." *Allied Tube*, 486 U.S. at 507. That is, because the Association "included consumers, distributors, and manufacturers of electrical conduit, . . . any agreement to exclude [a product] from the Code is in part an implicit agreement not to trade in that type of electrical conduit." *Id.* Here, because the Commission is controlled by Tesla's competitors, its actions to drive Tesla out of the market are part of "what is essentially a private anticompetitive activity for the benefit of its [dealer] members." *Dental Examiners II*, 574 U.S. at 510 (internal quotation marks omitted).

In all, the Supreme Court concluded that "the context and nature of [defendants'] activity ma[de] it the type of commercial activity that has traditionally had its validity determined by the antitrust laws themselves." *Allied Tube*, 486 U.S. at 505. So too here. *Noerr-Pennington* does not shield the Dealer Cartel from liability for its anticompetitive actions.

In reply, the Dealer Cartel will no doubt attempt to distinguish *Allied Tube*, but any distinctions are immaterial. For example, it is true that, in *Allied Tube*, the Court gave some weight to the fact that the Association was a private organization and not a part of any state or local government. *See id.* at 500. But, as already explained, for antitrust purposes, the same is true of the Commission. Again, "agencies controlled by market participants are more similar to private trade associations vested by States with regulatory authority than to [independent] agencies," and those similarities "are not eliminated simply because [the market participants] are given a formal designation by the State, vested with a measure of government power, and required to follow some procedural rules." *Dental Examiners II*, 574 U.S. at 511.

*Coalition for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495 (9th Cir. 2010),

illustrates this point well. In that case, the Ninth Circuit reversed the district court's grant of *Noerr-Pennington* immunity to VeriSign, a website domain-name registry operator, for its attempts to coerce ICANN, an entity that "administer[s] the domain name system on the Department [of Commerce's] behalf." *Id.* at 500, 506-07. Although ICANN exercised government power, the court of appeals explained that *Noerr-Pennington* did not immunize VeriSign's interactions with the entity because ICANN was alleged to be "a private body with no public accountability." *Id.* at 507.

The same is true here. The Commission might be vested with some regulatory authority, but the entity and the Dealer Commissioners are "private, nonsovereign actor[s]" for antitrust purposes. ECF 151 at 47 ¶ 261 (internal quotation marks omitted); *id.* at 4 ¶ 17. *Noerr* does not protect the Dealer Cartel's interactions with its members on the Commission.

The Commission's status as a private actor further distinguishes this case from *Ehlinger & Associates v. Louisiana Architects Ass'n*, 989 F. Supp. 775 (E.D. La. 1998), on which Defendants rely. *See* ECF 164-1 at 15; ECF 169-1 at 8. There, the Court concluded that, for antitrust purposes, the challenged regulatory body was "clearly an agency of the state." *Ehlinger*, 989 F. Supp. at 783. And, unlike here, plaintiffs challenged clear petitioning activity. *See id.* at 784-85 (describing the defendants' public lobbying campaign). For that reason, plaintiffs "concede[d] that if" the entity's conduct was "state action," "defendants' conduct would be protected by *Noerr* immunity." *Id.* at 785. So, the Court held plaintiffs to their word and concluded that *Noerr* applied. *Id.* Needless to say, Tesla makes no such concession.

Far from undermining Tesla's case, *Ehlinger* reveals the flaw in the Dealer Cartel's efforts to convince the Court to apply *Noerr*. As Defendants would have it, the *Noerr-Pennington* and *Parker* doctrines have no relationship to one another, such that the availability of one has no

bearing on the application of the other. *E.g.*, ECF 169-1 at 8 & n.14 (relying on *outdated* caselaw to assert that, "[c]onceptually, *Noerr-Pennington* and *Parker* are 'mutually independent'" (quoting *Ind. Taxicab Drivers' Emps. v. Greater Hous. Transp. Co.*, 760 F.2d 607, 613 n.10 (5th Cir. 1985))). But, as *Ehlinger* illustrates—and as the Supreme Court has now made clear—"*Parker* and *Noerr* are complementary expressions of the principle" and "generally present two faces of the same coin." *City of Columbia*, 499 U.S. at 383; *see id.* (explaining that the rationale about the scope of *Parker* applied equally to *Noerr-Pennington* immunity). That is, once the *Ehlinger* Court determined that the regulatory body at issue was a state agency "protected by state action immunity," it had little trouble concluding that *Noerr* immunity similarly applied to defendants' interactions with that body. 989 F. Supp. at 784-85.

The inverse is true here. Because Defendants make no meaningful effort to invoke *Parker*, the Court should treat the Dealer Commissioners as private actors. And because, as *Allied Tube* teaches (and *Coalition for ICANN Transparency* confirms), an agreement among private actors to harm competition is subject to the antitrust laws, *Noerr* has no place in this litigation.[17]

Similarly, *City of Columbia v. Omni Outdoor Advertising* does not help the Dealer Cartel. *See, e.g.*, ECF 164-1 at 15; ECF 169-1 at 5-6. The entity in *City of Columbia* "was an electorally accountable municipality with general regulatory powers and no private price-fixing agenda." *Dental Examiners II*, 574 U.S. at 511. "In that and other respects the municipality was more like

---

[17] To be sure, when it comes to their application, the two doctrines do not always run hand-in-hand. *See Veritext Corp. v. Bonin*, 417 F. Supp. 3d 778, 786 n.10 (E.D. La. 2019) (noting that *Noerr* and *Parker* are "not coterminous" in every circumstance). Thus, a plaintiff cannot assert that *Noerr* is inapplicable merely because *Parker* is inapplicable. *See id.* (rejecting precisely that argument). Instead, a court considering a *Noerr* defense should apply the *Allied Tube* considerations to determine whether *Noerr* applies. Where, as here, members of an entity treated as a private organization for antitrust purposes secretly agree with other market participants to exclude a competitor, the entity's members cannot hide behind *Parker* and the market participants cannot hide behind *Noerr-Pennington*.

prototypical state agencies, not specialized boards dominated by active market participants." *Id.* For that reason, the Supreme Court concluded that *Parker*'s state-action doctrine shielded the entity, and *Noerr* protected efforts to lobby the entity. *See City of Columbia*, 499 U.S. at 379 (discussing *Parker* and observing that there is no conspiracy exception to either immunity). But this decision applies only to "the actions of state sovereigns," and does not apply to "*private* action," *id.* at 379, such as action by "agencies controlled by market participants," *Dental Examiners II*, 574 U.S. at 511.

Put simply, for *Noerr* to apply, there must be "governmental participants" to the lobbying activity or conspiracy. *City of Columbia*, 499 U.S. at 383. Market participants who control a state agency, like the Dealer Commissioners, are not government participants. *Dental Examiners II*, 574 U.S. at 511-12; *Dental Examiners I*, 717 F.3d at 368. Nor is any other member of the Dealer Cartel.

Finally, even if the Dealer Commissioners are correct that they should be treated as government officials for antitrust purposes, they cannot claim *Noerr-Pennington* immunity for their involvement in the Dealer Cartel and their illegal agreements to issue the subpoenas. That immunity "does not apply to the government . . . since it is impossible for the government to petition itself within the meaning of the first amendment." *Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc.*, 858 F.2d 1075, 1086 (5th Cir. 1988).

### G. The antitrust claims are timely.

"An antitrust action must be brought within four years from the date on which it accrues." *In re Pool Prods. I*, 940 F. Supp. 2d at 400. "An antitrust cause of action generally accrues, and the statute of limitations begins to run when a defendant commits an act that injures a plaintiff's business." *Id.* (internal quotation marks omitted). Put slightly differently, "[t]he statute of limitations bars claims for [damages] outside of the four-year period" "before filing suit." *Id.*

As for the state law antitrust claim, there is a one-year prescriptive period. *State ex rel. Ieyoub*

*v. Bordens, Inc.*, 684 So.2d 1024, 1026 (La. App. 1996). But "[t]he commencement of prescription is delayed when a . . . continuing tort[] is involved." *Id.* at 1027. That is, [p]rescription does not begin to run until the continuing tort ceases." *Id.*

Tesla's antitrust claims are timely. The Dealer Cartel first unlawfully injured Tesla on August 5, 2020, when the Commission issued its first baseless subpoena. ECF 151 at 32 ¶ 204. Tesla sued on August 26, 2022, well within the four-year period for a claim under the Sherman Act. *See Acad. of Allergy & Asthma in Primary Care v. Quest Diagnostics, Inc.*, 998 F.3d 190, 197 (5th Cir. 2021) ("[E]ach time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and . . . the statute of limitations runs from the commission of the act." (internal quotation marks omitted)). As for the state-law claim, the Dealer Cartel continues to take action against Tesla as part of the ongoing conspiracy, including by prolonging the state-court proceedings. *E.g.*, ECF 151 at 37 ¶ 233 (Commission's January 10, 2022, filing in state court). Again, when Tesla filed its original complaint in August 2022, the prescriptive period had not expired.

## II.  Plaintiffs have adequately alleged a violation of the Due Process Clause (Count II).

A court in this district has *already held* that the Commission's structure violates due process, and thus this Court should reject Defendants' requests to dismiss this claim. *See* ECF 169-1 at 22-24; ECF 170-1 at 16-17.

### A.  Plaintiffs have adequately alleged that the Commission is unconstitutionally structured to adjudicate disputes regarding Plaintiffs—as confirmed by Supreme Court and the precedent of courts in this district.

The Supreme Court has held that where an administrative board is comprised of a litigant's competitors and a particular outcome in the proceeding could even "*possibly* redound to the personal benefit of members of the Board," that board is "constitutionally disqualified from hearing" disputes involving that litigant. *Gibson v. Berryhill*, 411 U.S. 564, 578-79 (1973)

(emphasis added). In *Gibson*, optometrists sued members of the State board in charge of regulating optometrists and sought an injunction against the "Board"—made up of incumbent, rival optometrists—"to hear the pending charges against the individual plaintiffs." *Id.* at 569-70. And the Court agreed with the plaintiffs, holding that the board's "personal interest" and "pecuniary interest" in the case was enough to disqualify them. *Id.* at 578-79.

Federal courts have applied *Gibson*'s core insight to myriad factual circumstances. Most pertinently, a court in this district has *already held*, in a similar as-applied challenge, that the Louisiana Motor Vehicle Commission's structure violates due process. In *Nissan*, dealers filed a complaint against Nissan (the manufacturer) before the Commission, and Nissan sought an injunction in federal court. *Nissan*, 757 F. Supp. at 737. Nissan argued that "the Commissioners"— franchise dealers—"would be biased in favor of the dealers if the Commission were to hear the dispute between the dealers and Nissan." *Id.* The court agreed and concluded that "enough of an indirect and institutional financial interest exists to raise a question as to the impartiality of the Commissioners." *Id.* at 740. "The dealers' interest lays in preventing the manufacturer from creating another dealership that cuts into the existing dealers' market area." *Id.* The Commissioners could not be trusted to be impartial in deciding issues that could affect even franchise dealers that sold Nissans. Thus, the court enjoined the Commission from taking action against the manufacturer:

> [T]he [manufacturer] plaintiff will be forced to litigate before a potentially biased Commission. Nissan will have to expend time and effort defending itself and perhaps appealing the Commission's decision. This expenditure of resources, and the expenditure caused by a decision against it by the Commission, would cause great harm to the plaintiff. Furthermore, the plaintiff's due process rights would be violated irreparably if the plaintiff is required to litigate before the Commission and it is later determined that the Commission is biased.

*Id.*

This Court should do the same here: the Commission is unconstitutionally structured to

adjudicate any issues related to Plaintiffs because the Commissioners have an "indirect and institutional financial" and pecuniary interest—in favor of their business and franchise-dealer model, and thus against Plaintiffs. *Id.* Plaintiffs' place in the Louisiana market cannot exist at the whim of the Commissioners, who are their hostile competitors. If anything, the bias that Plaintiffs have alleged here is stronger than the bias alleged in *Nissan*, because Tesla represents a threat to the entire dealer model, a model employed by virtually all members of the Commission—and not merely the interests of a subset of franchise dealers (in *Nissan*, Nissan dealers). ECF 151 at 49 ¶ 274.

Plaintiffs have more than adequately pleaded the Commissioners' improper interest and their ability to take action against Plaintiffs. The franchise-dealer Commissioners control the Commission, *see supra* pp.6-9, and directly compete with Plaintiffs in the market for vehicle sales, leasing, and servicing. ECF 151 at 51 ¶¶ 289-90. And more generally, Commissioners have an interest in the survival of the franchised dealership model. *Id.* at 51 ¶¶ 291-92.

Defendants have admitted as much. Defendant Krake—when he was Chairman of the Commission, no less—recognized that the Commission is full of Tesla's competitors and excludes Tesla itself:

> The LMVC [Commission] board is made up of many motor dealers who compete with Tesla. The motor vehicle dealers on the LMVC commission are all franchised dealers. Tesla is not represented on the LMVC board and does not have franchised dealers.

ECF 1-1 at 7; *see* ECF 151 at 49 ¶ 274.[18] And the State's largest dealer has stated that Tesla's entry

---

[18] Some Defendants argue that Plaintiffs could seek representation on the Commission, as Tesla Lease Trust is a licensee and thus eligible. ECF 156-2 at 20. Assuming for the sake of argument that Tesla Lease Trust meets the criteria to be "*appointed*" as a Commissioner, La. R.S. § 32:1253(a) (emphasis added), there are still three problems. First, Tesla could be, at best, one vote among 15—where other franchise dealers would still have a controlling bloc. Second, to be appointed, Tesla Lease Trust would need to rely on the political good graces of the Governor. Third, the Commission is actively taking action against Plaintiffs, and could, in any event, impair

into Louisiana is "not good for the future of our business." ECF 1-2 at 1; *see* ECF 151 at 51 ¶ 292.

Although unnecessary to create due-process problems, the Commission has already taken self-interested *action* against Plaintiffs as well. As described *supra* pp.9-11, it issued subpoenas to investigate Tesla Lease Trust's operations in Louisiana, and it has now taken the official position in state court that Plaintiffs may not lawfully service vehicles in Louisiana, contrary to the terms of the "fleet owner" provisions.

### B. Defendants' arguments to the contrary are unavailing because they rely on drawing non-pertinent factual distinctions.

In arguing for dismissal of Plaintiffs' due process claim, Defendants do not seriously grapple with *Gibson* or *Nissan*. Instead, they raise a series of unavailing arguments seeking to undermine Plaintiffs' fundamental due process rights.

*First*, the Dealers Association argues that "the due process claim is a non-starter" where "the state entity's actions are subject to judicial review in a state court before they take substantive effect" or where the Legislature is ultimately responsible for the laws at issue. ECF 169-1 at 22, 24. Tellingly, the Dealers Association cites *nothing* for these arguments, as they are at odds with *Gibson* and *Nissan*—cases that focus on the bias of the Commissioners themselves. Regardless of the judiciary or the Legislature, the Commission is improperly structured to enforce even valid laws against Plaintiffs. As was true in *Nissan*, the issue is not whether the law requires some limited anticompetitive outcomes, but whether the Commission is sufficiently unbiased to effectuate those laws as applied to Plaintiffs in the first place.

*Second*, the Dealers Association argues that Plaintiffs have not adequately alleged that "the personal financial circumstances of each dealer member . . . will invariably cause them to unite

---

Tesla Lease Trust's licensee status. Tesla also would be outnumbered by the Cartel's strong majority.

against the manufacturers [or Tesla] on all issues." ECF 169-1 at 24 (alterations in original) (quoting *All. of Auto. Mfrs. v. Gwadosky*, 353 F. Supp. 2d 97, 108 (D. Me. 2005)). But under *Gibson* (and *Nissan*), the issue is whether adjudicating claims could "*possibly*"—not invariably— "redound to the personal benefit of members of the" Commission. *Gibson*, 411 U.S. at 578-79. And as described above at p.15, Plaintiffs have satisfactorily alleged that all franchise-dealer Commissioners benefit from less competition.

Moreover, *Alliance of Automobile Manufacturers*—a case from the District of Maine—is inapposite and incompatible with *Nissan* regardless. In that case, a trade association representing multiple manufacturers brought a facial challenge seeking "a wholesale declaration that the Board in Maine"—predominately made up of dealers—"is *fatally flawed for all purposes*." *All. of Auto. Mfrs.*, 353 F. Supp. 2d at 108 (emphasis added). In that context, the court concluded that the plaintiffs failed to demonstrate "the personal financial circumstances of each dealer member on the Board will invariably cause them to unite [1] against the manufacturers [2] on all issues." *Id.* In the context of that *facial challenge*, allegations of bias were "speculation." *Id.* at 109. Here, Plaintiffs have *not* brought a facial challenge, nor are their allegations of bias "speculation." *Id.*

*Third*, the Dealers Association cites *Chrysler Corp. v. Texas Motor Vehicle Commission*, 755 F.2d 1192, 1199 (5th Cir. 1985), to argue that the "suggestion of possible temptation here is not only overdrawn, but also ignores the fact that [nine] of the [eighteen] members of the Commission are not dealers." ECF 169-1 at 23 (alteration in original). *Nissan* correctly distinguished *Chrysler*, though. 757 F. Supp. at 740. In *Chrysler*, the Fifth Circuit held that where indicia of bias runs in conflicting directions, a *Gibson* claim may fail. There, a manufacturer argued that the dealer-dominated commission was too biased to adjudicate *warranty* disputes that involve both manufacturers and dealers. *Id.* at 1198. Such disputes may arise from problems caused either by

44

manufacturing defects covered by Texas's lemon law *or* by negligent dealer repair. *Id.* Thus, the Fifth Circuit concluded that the commission had as much incentive to take the sides of dealers against manufacturers as they were to side *with* a manufacturer against a rival dealer. *Id.* at 1199. Given that possibility of dealer bias "in opposite directions," the *Chrysler* court observed that it was "relevant" that "four of the nine members of the Commission" were not even dealers at all. *Id.*

Here, however, as in *Nissan*, "the indicia of bias do not point in opposite directions." 757 F. Supp. at 740. Plaintiffs' operations are a competitive threat to *all* franchise dealers and the franchise-dealer model, and thus it is in the entire Commission's interest to take adverse action against Plaintiffs. There is "no interest that the dealers would have in allowing [Plaintiffs] to . . . create new competition." *Id.* It therefore is not "relevant" that 6 of the 15 voting members do not directly compete with Tesla. Those 6 voting members have an interest in the continued vitality of the dealership model. ECF 151 at 9 ¶ 48. And even if it were otherwise, Louisiana law effectively ensures that 9 of the 15 voting members will be automobile dealers in direct competition with Tesla. That biased, controlling bloc of 9 Commissioners will always be able to outvote any non-biased Commissioners—to the extent they exist.

The remaining six Commissioners are proper Defendants. As reflected in Plaintiffs' First Amended Complaint, even the non-automobile-dealer Commissioners have acceded to their dealer co-Commissioners and have taken adverse action against Plaintiffs. *See supra* pp.10-11.

*Fourth*, Defendant Commissioners point to the Commission's carefully worded statements purportedly disclaiming any anti-Tesla bias. ECF 170-1 at 17. True, in 2020, the Commission issued an opinion letter stating that Plaintiffs' Louisiana operations could be lawful under certain circumstances. ECF 1-1 at 1, 6. Specially, the Commission concluded that: (1) "It is not a violation

of law for a manufacturer or distributor to lease new vehicles directly to consumers"; and (2) "a manufacturer or distributor (or any subsidiary thereof) may perform warranty services directly without using a dealer . . . when the manufacturer or distributor or subsidiary is a fleet owner and performs warranty work on its own fleet." ECF 1-1 at 1, 6. But that years-old letter cannot overcome the structural due process problems at issue here. The Commission is dominated by Tesla's competitors who have "enough of an *indirect and institutional financial interest* . . . to *raise a question* as to the impartiality of the Commissioners." *Nissan*, 757 F. Supp. at 740 (emphases added).

In any event, the 2020 letter was heavily caveated, and the Commission is not bound by it. Indeed, the Commission's position has changed recently—as the Dealer Cartel's conspiracy has borne fruit and the Commission has taken more aggressive action. But room for that about-face was in the July 2020 letter itself.[19] Specifically, the opinion letter was careful to expressly condition Tesla's continued activities in the State upon the Commission's—and thus the dealer Commissioners'—determination of whether it is a fleet owner and performs warranty work on its own fleet. ECF 1-1 at 9 (premising conclusion on "*if the manufacturer or distributor or subsidiary is a fleet owner* and performs warranty work on its own fleet" (emphasis added)). Thus, even the Commission's seemingly positive conclusions (in 2020, no less) provide little help to Plaintiffs. *Id.* at 1, 6; ECF 151 at 30-31 ¶ 197.

Furthermore, in that same letter the Commission recognized the Dealers Association's inappropriate attempts to pursue anticompetitive, self-interested activities including by eliminating

---

[19] In a formal opinion letter, the Louisiana Attorney General has also sided against Tesla and concluded: "manufacturers, distributors, or their subsidiaries, [1] may *not* lease directly to consumers in Louisiana without the use of a dealer [under the State's direct-sales ban], [2] nor may they perform warranty services directly without using a dealer." La. Att'y Gen. Op. No. 20-0059, 2020 WL 5289959, at *1 (Aug. 10, 2020).

Tesla from the Louisiana market and the grave liability risks for the Commission and the Commissioners. In a section titled "The Danger of Legal Liability for LMVC [the Commission] and Its Commissioners," the Commission outlined potential violations:

> The LMVC board is made up of many motor dealers who compete with Tesla. The motor vehicle dealers on the LMVC commission are all franchised dealers. Tesla is not represented on the LMVC board and does not have franchised dealers.
> . . .
> As a commission including many franchised dealers, any actions by the LMVC which are determined to be anti-competitive or a restraint on trade designed to protect the franchised dealers serving on the LMVC board, could subject the commission and its commissioners to civil and even criminal liability. Reading or analogizing additional language that the legislature clearly did not pass into statutes that it did pass, which results in competitive advantages for LMVC commission members, represents a clear risk of this liability.

ECF 1-1 at 7-8.

*Finally*, the Defendant Commissioners make contradictory arguments concerning who Plaintiffs should have sued. They argue that Plaintiffs were wrong to sue all 18 Commissioners because the *Nissan* plaintiffs "only sued the nine (9) individual Commissioners who were associated with automobile dealers." ECF 170-1 at 16. As explained above at pp.7-8, though, every non-voting member of the Commission—even those who do not directly compete with Tesla— have an interest in the continued vitality of the dealership model. The Commissioners and Dealers Association also assert that Plaintiffs should have sued the governmental-agency Commission, rather than suing the Commissioners under *Ex parte Young*. ECF 169-1 at 24; ECF 170-1 at 2, 5, 13, 16. That argument is meritless and addressed below at p.63.

### III. Plaintiffs have adequately alleged a violation of the Equal Protection Clause (Count III).

The Louisiana Legislature's arbitrary (or else, biased) discrimination against manufacturer-retailers generally—and Plaintiffs specifically—violates the Equal Protection Clause because it "treat[s]" "similarly situated individuals . . . differently." *Hines v. Quillivan*, 982 F.3d 266, 272 (5th Cir. 2020) (quotation omitted). Both the direct-sales ban and the warranty-servicing ban are

irrational, *St. Joseph Abbey*, 712 F.3d at 218-23, and the direct-sales ban was enacted specifically based on anti-Tesla animus. Defendants' arguments to the contrary rely upon inapt precedent and mischaracterize how the Louisiana Legislature enacted the direct-sales ban.

**A.  The direct-sales ban and the warranty-servicing ban for non-fleet owners violate the Equal Protection Clause because they arbitrarily discriminate against Plaintiffs—and the direct-sales ban is doubly unlawful because it was enacted based on anti-Tesla bias.**

A State violates the Equal Protection Clause where it treats similarly situated persons differently without a rational basis, *St. Joseph Abbey*, 712 F.3d at 218-23, or where "the challenged government action was motivated by animus or ill-will," *Johnson v. Bredesen*, 624 F.3d 742, 747 (6th Cir. 2010) (internal quotation marks omitted). Louisiana law here implicates both of those prohibitions.

**1.** As an initial matter, the direct-sales ban is doubly unconstitutional because it was enacted with anti-Tesla animus: "A plaintiff may demonstrate that the government action lacks a rational basis . . . by demonstrating that the challenged government action was motivated by animus or ill-will." *Id.* (internal quotation marks omitted).

The direct-sales ban was enacted because the Dealer Cartel and their legislative allies wanted to act against Tesla entering the market. In a July 17, 2018, email, the Dealers Association's President Will Green referred to this law as "our bill in 2017," acknowledging the Dealers Association's involvement in the 2017 amendment. ECF 1-2 at 2.

The legislative history reveals that the Legislature passed the direct-sales ban because of the Dealer Cartel's involvement. ECF 151 at 26 ¶¶ 163-69. State Senator Mack Bodi White, Jr. introduced the pieces of legislation that would become the direct-sales ban. *See* 2017 La. Sess. Law Serv. Act 45 (S.B. 107). This initial version did not include the direct-sales ban and was instead focused on vehicles for law enforcement. *See* 2017 La. Sen. Bill No. 107, 43rd Regular

Session. When the bill was introduced to the Louisiana House, however, State Representative Tanner Magee presented an amendment revising the bill and incorporating the direct-sales ban targeted at automobile manufacturers that did not have a dealer-network. He stated that the bill contained amendments "on behalf of the Auto Dealers Association." La. House Floor at 3:46:10 (May 18, 2017), https://bit.ly/3P81uq4; *see also* J. of La. House of Rep., 43rd Regular Session No. 24 (May 18, 2017), https://bit.ly/3FFGeUp. The direct-sales ban was just one part of the Dealer Cartel's anti-Tesla campaign. Thus there is compelling evidence that the direct-sales ban was enacted to specifically harm Tesla and similar manufacturer-retailers.

The Dealers Association argues that there is no animus, because Plaintiffs are treated no differently than any other manufacturer and "Louisiana has prohibited car manufactures from selling directly to consumers since before Tesla sold its first car." ECF 169-1 at 22 & n.24. But it is precisely *because* Plaintiffs are unlike other manufacturers, as they do not use a dealer network, that the Dealer Cartel took action. Although Louisiana law long prohibited traditional manufacturers from competing against their own franchise dealers, the Legislature amended the law in 2017 to specifically prohibit manufacturer-retailers like Plaintiffs from selling new vehicles directly to consumers.

**2.** Both the direct-sales ban and the warranty-servicing ban violate equal protection because they are irrational and arbitrary. Binding precedent—based on an analogous State law—demands that the "taking of wealth and handing it to others when it comes not as economic protectionism in service of the public good but as 'economic' protection of the rulemakers' pocket" is unlawful. *St. Joseph Abbey*, 712 F.3d at 226-27. Those principles apply here.

**a.** The Fifth Circuit has already rejected another piece of irrational, protectionist Louisiana legislation. In *St. Joseph Abbey*, the Fifth Circuit resoundingly concluded that a state policy of

"granting funeral homes an exclusive right to sell caskets . . . den[ied] equal protection." 712 F.3d at 217. In that case, a group of monks attempted to sell to the public "simple wooden caskets"—at prices "significantly lower than those offered by funeral homes." *Id.* They did not, however, "offer[] . . . funeral services" as define by State law. *Id.* But the Louisiana State Board of Embalmers and Funeral Directors used their regulatory power to decree that "intrastate sales of caskets to the public may be made only by a state-licensed funeral director and only at a state-licensed funeral home." *Id.* at 218.

The *St. Joseph Abbey* district court found that backdrop to raise triable issues of fact. *Id.* at 220. That alone is sufficient to defeat Defendants' motions to dismiss Plaintiffs' claims here, challenging similar industry preferences enacted against similar legislative histories. *E.g.*, *Hines*, 982 F.3d at 278 (Elrod, J., concurring in part and dissenting in part) ("[W]here the State provides only a theoretically plausible rationale and the plaintiff is successful in affirmatively undermining the logic that makes that basis rational, then the claim can proceed to an evidentiary stage.").

After ultimately holding a bench trial, the district court in *St. Joseph Abbey* found the scheme unlawful, and the Fifth Circuit affirmed. 712 F.3d at 221-27. As the Fifth Circuit explained, "mere economic protection of a particular industry" is not a "legitimate governmental purpose," and "naked economic preferences are impermissible to the extent that they harm consumers." *Id.* at 222-23 (cleaned up). The Fifth Circuit further reasoned that courts should not engage in "judicial blindness to the history of a challenged rule or the context of its adoption" and should not "accept nonsensical explanations for regulation." *Id.* at 226.

The Fifth Circuit thus rejected the State's asserted interests. *First*, the court concluded the State's asserted interest in consumer protection "obscure[d] the actual structure of the challenged law." *Id.* at 223. Beyond the irrational requirement "creat[ing] funeral industry control over

intrastate casket sales," Louisiana imposed no real requirements on the sale of caskets. *Id.* at 223-25. On its own, the "grant of an exclusive right of sale add[ed] nothing to protect consumers and put[] them at a greater risk of abuse including exploitative prices." *Id.* at 226. *Second*, the court concluded "that no rational relationship exists between public health and safety and restricting intrastate casket sales to funeral directors." *Id.* This interest too "elide[d] the realities of Louisiana's regulation of caskets and burials" because other portions of Louisiana law did not impose health-and-safety requirements on casket sales by funeral directors—indeed "Louisiana does not even require a casket for burial." *Id.*

**b.** The Fifth Circuit's decision in *St. Joseph Abbey* entitles Plaintiffs to discovery, at a very minimum. Here, the only purpose of the direct-sales ban and the warranty-servicing ban is to benefit incumbent dealers at the expense of disruptive new manufacturer-retailers. Like the monks and funeral directors in *St. Joseph Abbey*, Plaintiffs (and manufacturer-retailers more generally) are "similarly situated," *Hines*, 982 F.3d at 272, in all core respects that matter for the claimed purpose of the law: they are capable of selling goods consistent with all requirements of State law, excluding the protectionist, challenged requirements.

Also like in *St. Joseph Abby*, the "history" of the direct-sales and warranty-servicing bans and the "the context of [their] adoption" demonstrate that Louisiana's objective is "pure economic protection of a discrete industry." 712 F.3d at 221, 226. The Legislature passed the direct-sales ban solely to protect the franchise dealers and target Tesla despite existing protections for dealers with manufacturers before the direct-sales ban was passed. *See supra* p.48-49.

**B. The governmental interests asserted by the Dealers Association are belied by the facts and Louisiana's regulatory scheme—and rely on inapt precedent that does not control here.**

As in *St. Joseph Abbey*, the Dealers Association's asserted interests here cannot carry the

State's burden. 712 F.3d at 223.[20] Additional discovery will further undermine these manufactured interests.

As an initial matter, the Dealers Association argues that Tesla is not "similarly situated" with incumbent, franchise dealers. ECF 169-1 at 14. But neither the State nor Defendants get to define Plaintiffs' business for them: Tesla *is* a retailer of vehicles capable of complying with regulations Louisiana places on such retailers. No State may define what makes businesses differently situated by relying on the very discriminatory law that distinguishes them. Here, the main difference between Tesla and local dealers is that franchise dealers have a franchise to sell vehicles from manufacturers—which is what Louisiana's (discriminatory) law requires.

Consequently, Plaintiffs will address the asserted interests independently.

*Direct-sales ban.* The Commission asserts that the direct-sales ban is not irrational because "the public interest is promoted by laws that help avoid undue *control of the independent motor vehicle dealer by manufacturers*." ECF 169-1 at 20 (emphasis added; cleaned up, quoting La. R.S. § 32:1251). This echoes the Fifth Circuit's decision in *Ford Motor Co. v. Department of Transportation*, 264 F.3d 493 (5th Cir. 2001), which considered whether Texas could permissibly prohibit manufacturers from competing with their own franchise dealers, but is not relevant here. *See* ECF 169-1 at 20.

As an initial matter, *Ford* says nothing about whether dismissal is warranted here, where Louisiana's law is textually distinct, has different legislative history (and different evidence of discriminatory intent), and was enacted a decade later against a different interstate market.

*Ford* is also inapposite because it concerned a traditional vehicle manufacturer (Ford) seeking

---

[20] Defendant Commissioners in their official capacities do not defend this provision on the merits, and instead argue for abstention. *See infra* pp.60-62.

to compete against its own franchise dealers. 264 F.3d at 499. Texas's law in *Ford* resembles the pre-2017 version of Louisiana's direct sales ban—not the current version of Louisiana law targeted at manufacturer-retailers like Tesla without a dealer. *See supra* pp.48-49. Thus, *Ford* did not consider whether a state may permissibly discriminate against manufacturer-retailers like Tesla to the benefit of dealers. *Ford*, 264 F.3d at 498-99.

Here applying the direct-sales ban to Plaintiffs does not further the State's interest in preventing "undue control of the independent motor vehicle dealer by manufacturers" because Tesla does not use franchise dealers and thus Plaintiffs do not seek to compete with franchise Tesla dealerships. So—whatever interest the State has in preventing intra-brand competition—it cannot use that interest to interfere with inter-brand (and inter-retailer) competition. *E.g.*, *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 890 (2007) (recognizing difference between intra-brand and inter-brand competition); *see also generally* Daniel A. Crane, *Why Intra-Brand Dealer Competition Is Irrelevant to the Price Effects of Tesla's Vertical Integration*, 165 U. Pa. L. Rev. Online 179 (2017).

Though Defendants Krake and Ford of Slidell do not address the equal protection claim, they assert that the direct-sales ban is rational because "dealers maintain showrooms, service centers, and other in-person conveniences for consumers." ECF 156-2 at 2 (citing La. Admin Code tit. 46, pt. V, § 901(A)). This contention underlines the hollowness of the State's protectionist laws. For example, the State could simply make requirements around showrooms, service centers, and other in-person requirements applicable to manufacturer-retailers like Plaintiffs—rather than locking them out of the market entirely. *Id.* at 2 n.2 (quoting La. Admin Code tit. 46, pt. V, § 901(A)).

*Warranty-servicing ban.* The Dealers Commission—and, again, not the Commissioners—present two hypothetical governmental interests.

*First*, Defendants assert that the law works to ensure that all servicers in Louisiana satisfy "the same basic level of requirements for special tools, technician certification, and training." ECF 169-1 at 21 (quoting La. R.S. § 32:1261(A)(1)(t)(ii)). But, there is no rational relationship between that asserted objective and the warranty-servicing ban; the State could just impose that "basic level of requirements" on manufacturer-retailers like Plaintiffs and bar any that do not meet the requirements from performing warranty-servicing.

*Second*, Defendants assert that the law "promotes the State's interest in ensuring that manufacturers cannot use their market power to create a monopoly on servicing their products." ECF 169-1 at 21. But this argument (1) conflates servicing with warranty servicing, which is what is at issue here; and (2) is wholly irrational regardless.

The warranty-servicing ban does nothing to abrogate the manufacturer's so-called "market power" over the warranty servicing of the vehicles they manufacture. Rather, the law ensures only that local *franchise* dealers—which receive franchises from manufacturers to sell vehicles and perform warranty servicing—get to extract profits from warranty servicing. After all, a "franchise" is a "written contract or selling agreement between a motor vehicle . . . dealer . . . by which the motor vehicle . . . dealer . . . is authorized to engage in the business of selling or leasing the specific makes, models, or classifications of new motor vehicles[.]" La. R.S. § 32:1252(20). Thus, traditional manufacturers can exert control over their franchise dealers.

## IV. Plaintiffs have adequately alleged a violation of the Commerce Clause (Count IV).

Plaintiffs have adequately alleged that the direct-sales ban and the warranty-servicing ban violate the Commerce Clause. ECF 151 at 55-57 ¶¶ 317-32. The laws are discriminatory both in effect and intent. Defendants' arguments to the contrary rely on a mischaracterization of the nature of the laws and factually distinct precedent that has since been undermined by doctrinal and market developments. As even the Dealers Association's cited cases recognize, this Court should allow

Plaintiffs an opportunity at discovery to further substantiate Louisiana laws' evident discriminatory intent and its clearly excessive effect on interstate commerce. *E.g.*, *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 155 (5th Cir. 2007) (evaluating Commerce Clause claim after bench trial); *Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 726 (5th Cir. 2004) (decided at summary judgment); *Ford*, 264 F.3d at 498 (same).[21]

### A. Louisiana law regulates extraterritorially, discriminates in both effect and intent in favor of incumbent in-State dealers, and unduly interferes in interstate commerce in violation of the Commerce Clause.

"A statute violates the dormant Commerce Clause where it discriminates against interstate commerce either facially, by purpose, or by effect." *Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n*, 945 F.3d 206, 213 (5th Cir. 2019) (internal quotation marks omitted). Here, the direct-sales ban and the warranty-servicing ban discriminate against out-of-State commerce in both effect and in intent.

*First*, Louisiana law, in effect, regulates extraterritorially. To sell vehicles in Louisiana—and perhaps to provide warranty servicing—Plaintiffs would need to change their entire (out-of-State) business models to accommodate the State's requirement to use franchise dealers. Complying with Louisiana's law would require Plaintiffs to revamp myriad activities, like out-of-state manufacturing, out-of-state decisions about how to price vehicles at retail, and out-of-State allocation of warranty-servicing decisions. Thus, in "practical effect," Louisiana unconstitutionally regulates "commerce that takes place wholly outside of the State's borders"— and thus is *per se* invalid. *Healy v. Beer Inst., Inc.*, 491 U.S. 324, 336 (1989) (quoting *Edgar v.*

---

[21] Defendants' briefs and the authorities they cite rely heavily on *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117 (1978), which is squarely implicated in *National Pork Producers Council v. Ross*, U.S. No. 21-468, currently pending before the Supreme Court. That case concerns other important questions about the Commerce Clause's application to laws that putatively apply to in-State commerce but have the effect of directly regulating out-of-State commercial actors. Thus, at minimum, the Court should defer resolution of Defendants' motions until that case is decided.

*MITE Corp.*, 457 U.S. 624, 642-43 (1982) (plurality op.)).

*Second*, the bans have discriminatory effect because they ensure only incumbent in-State dealerships may sell automobiles and may perform warranty servicing on automobiles. The necessary result of this regime is that out-of-State vehicle manufacturer-retailers like Tesla cannot do business in Louisiana and fewer of their vehicles will enter the Louisiana market. Compounding that effect, Louisianans' inability to secure warranty servicing will further discourage them from buying or leasing Tesla vehicles. Thus, Louisiana law discourages its residents from going to other States—entering into interstate commerce—to purchase Tesla vehicles in those States. The Commerce Clause prohibits States from "advanc[ing] their own commercial interests by curtailing the movement of articles of commerce, *either into* or out of the state." *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 535 (1949) (emphasis added); *accord Fort Gratiot Sanitary Landfill, Inc. v. Michigan Dep't of Nat. Res.*, 504 U.S. 353, 359 (1992) (same). Moreover, because all manufacturers are located outside of Louisiana, the plain and unmistakable effect of both the direct-sales ban and the warranty-servicing ban (individually and in concert) is to penalize out-of-State firms.[22]

*Third*, the direct-sales ban and the warranty-servicing ban also result from discriminatory intent. A "neutrally-worded" law that is "lobbied for by in-State . . . interests" may violate the Commerce Clause—even where it only "indirectly burden[s] out-of-state" businesses. *McNeilus Truck & Mfg., Inc. v. Ohio ex rel. Montgomery*, 226 F.3d 429, 443 (6th Cir. 2000) (citation omitted). In other words, where there is evidence that "local [businesses] sought the legislation"—

---

[22] Defendant Commissioners contend this argument is foreclosed by *Ford* and *Allstate*. Plaintiffs disagree that *Ford*'s and *Allstate*'s evaluations of Texas law resolves anything relevant to Louisiana's laws. But assuming Defendants are correct, *Ford* and *Allstate* themselves relied on *Exxon*—which the Supreme Court is considering in *National Pork Producers*. In all events, Plaintiffs reserve the argument that *Ford* and *Allstate* were wrongly decided.

demonstrated with as little as "several letters by in-State dealers," *id.*—that can be sufficient to establish that the Legislature sought to discriminate against out-of-State manufacturers and retailers.

Courts "consider the following non-exhaustive factors when determining whether a State legislature's actions amount to purposeful discrimination against interstate commerce: (1) whether the effect of the state action creates a clear pattern of discrimination; (2) the historical background of the action, which may include any history of discrimination by the decisionmakers; (3) the specific sequence of events leading up to the challenged state action, including (4) any departures from normal procedures; and (5) the legislative or administrative history of the state action, including contemporary statements by decisionmakers." *Wal-Mart*, 945 F.3d at 214 (cleaned up).

As in *Wal-Mart* and *McNeilus*, here the allegations of the Dealers Association's involvement in the direct-sales ban is plain evidence of discriminatory intent. Both the Legislature itself and the Dealers Association have acknowledged that the direct-sales ban was the result of the Dealers Association, which call the direct-sales ban "our bill." ECF 151 at 24 ¶ 149; *see also* ECF 1-2 at 2. This is much like the law in *Wal-Mart*, which was "drafted" by a "lawyer and lobbyist who worked on behalf of the TPSA"—a similar trade organization dedicated to barring out-of-State competition. *Wal-Mart*, 945 F.3d at 215. And the warranty-servicing ban is part of the same discriminatory regime and thus shares in that regime's discriminatory intent.

*Finally*, at a minimum, "the burden imposed on [interstate] commerce" by Louisiana's laws "is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church*, 397 U.S. 137, 142 (1970). Louisiana law impedes the flow of automobiles into the State—both directly through the direct-sales ban and indirectly through the warranty-servicing ban. That burden upon commerce has no offsetting local benefits, except those benefits that accrue to in-State dealerships.

These allegations are certainly sufficient to justify discovery that would inform the *Pike* balancing analysis. *E.g.*, *City of New Rochelle v. Town of Mamaroneck*, 111 F. Supp. 2d 353, 363 (S.D.N.Y. 2000) (concluding it "premature" to resolve *Pike* analysis "prior to discovery").

### B.  Defendants' arguments to the contrary are unavailing.

Defendants rely heavily on the Fifth Circuit's decisions in *Ford* and *Allstate* about *Texas's* law, but one of those cases was decided on summary judgment and the other following a bench trial. *Ford*, 264 F.3d at 498; *Allstate*, 495 F.3d at 155. And in any event, these arguments fail for similar reasons as Defendants' Equal Protection Clause arguments. *See supra* pp.52-53.

Generally, contrary to the Dealers Association's argument (ECF 169-1 at 14), Plaintiffs are similarly situated with in-State, incumbent, franchise dealers. *See supra* pp.51-52.

Thus, *Ford* does not control here, and is inapposite because it did not consider the effects on interstate commerce that arise when a State discriminates against out-of-State manufacturer-retailers like Tesla. *Ford*, 264 F.3d at 498-99; *see also* ECF 169-1 at 15 ("Louisiana's law distinguishes only between business forms (manufacturers vs. non-manufacturers)").

Defendants' reliance on *Allstate* (ECF 169-1 at 16, 18-20) is similarly unavailing, because that case concerned a challenge to an entirely different part of the industry—raising different questions about effects on interstate commerce and purported justifications for burdens on that interstate commerce. Specifically, *Allstate* considered an insurance company's challenge to a Texas law that prevented insurance companies from having an interest in auto-body shops. *Allstate*, 495 F.3d at 156. Thus, *Allstate* did not consider the effects on the interstate automobile market posed by a direct-sales ban or a *warranty*-servicing ban.

### V.  Plaintiffs have adequately alleged violations of the Louisiana Unfair Trade Practices Act (Count VI).

The private Defendants' anticompetitive agreement separately violates Louisiana's Unfair

58

Trade Practices Act. La. R.S. §§ 51:1405(A), 1409(A); *see* ECF 151 at 68-70 ¶¶ 367-83.[23] In applying that "broad" statute, "Louisiana courts have used a two-prong test, finding a practice unfair when (1) it offends established public policy, or (2) it is unethical, oppressive, unscrupulous, or substantially injurious." *Hingel v. Exxon Corp.*, 1999 WL 893574, at *4 (E.D. La. Oct. 15, 1999). Plaintiffs have adequately alleged that private Defendants' actions violate both prongs for generally the same reasons those actions violate the antitrust law, causing an ascertainable loss for costs related to the subpoenas and the records requests as well as the loss of investment backed expectations, *see supra* pp.6 n.2, 9-11.[24]

In brief, private Defendants' use of their control over the Commission to take anticompetitive actions against Plaintiffs violates public policy because it violates public trust placed in Commissioners, and it is "unethical, oppressive, unscrupulous, or substantially injurious" to use governmental authority in service of private goals. *Hingel*, 1999 WL 893574, at *4. It is core Louisiana policy to "preserv[e] and promot[e] effective and fair competition, and curb[] business practices that lead to a monopoly and unfair restraint of trade within a certain industry." *Quality Env't Processes, Inc. v. I.P. Petroleum Co., Inc.*, 144 So. 3d 1011, 1025 (La. 2014).

The Smith Defendants' reliance on *K&F Rest. Holdings, Ltd. v. Rouse*, 798 F. App'x 808, 811 (5th Cir. 2020), is misplaced because the allegations here go far beyond the "singling out" of one business. And in any event, that unpublished decision cannot displace the Louisiana Supreme Court's previous (published) recognition that it is core Louisiana policy to "preserv[e] and

---

[23] Plaintiffs have only brought these claims against the *private* Defendants, *i.e.*, the dealers in their *personal capacities* and their dealerships (where applicable). *See* ECF 151 at 68, 71. They do not seek any damages or injunctive relief from the Commissioners in their official capacities, contrary to the Commissioners' concerns. ECF 170-1 at 23-24.

[24] And for the same reasons explained above at pp.34-39, the *Noerr-Pennington* doctrine does not apply here. *Cf.* ECF 164-1 at 21.

promot[e] effective and fair competition, and curb[] business practices that lead to a monopoly and unfair restraint of trade within a certain industry." *Quality Env't Processes*, 144 So. 3d at 1025. Thus, contrary to Defendants' assertions (ECF 164-1 at 20), these allegations are far more than allegations of mere "pursu[it of] profit, even at the expense of competitors." *Turner v. Purina Mills, Inc.*, 989 F.2d 1419, 1422 (5th Cir. 1993).

Defendants are also wrong to contend that Louisiana's one-year prescriptive period (La. R.S. § 51:1409(E)) bars Plaintiffs' claims, because binding Fifth Circuit precedent provides "the continuing violation doctrine applies to the LUTPA peremptive period." *Tubos de Acero de Mexico, S.A. v. Am. Int'l. Inv. Corp., Inc.*, 292 F.3d 471, 482 (5th Cir. 2002); *CheckPoint Fluidic Sys. Intern., Ltd. v. Guccione*, 888 F. Supp. 2d 780, 792 (E.D. La. 2012) (Vance, J.) ("[T]he Louisiana Supreme Court has not ruled squarely on the issue," so "[t]his Court is therefore bound by the Fifth Circuit's holding that La. R.S. 51:1409(E) . . . does not begin to run until a continuing violation ceases."). As described above at p.40, Plaintiffs here have adequately alleged a continuing violation here, and that "the operating cause of injury is a continuous one and gives rise to successive damages." *Miller v. Conagra, Inc.*, 991 So.2d 445, 456 (La. 2008) (quoting *Crump v. Sabine River Auth.*, 737 So.2d 720, 726 (La. 1999)).

## VI. This Court should not abstain from deciding any of Plaintiffs' constitutional claims.

### A. Pullman abstention is not appropriate here because the Louisiana courts' resolution of issues of State law will not render this Court's decision unnecessary.

Defendant Commissioners' argument for *Pullman* abstention (ECF 170-1 at 17-19) is meritless because *Pullman* abstention only "applies when [1] an interpretation of an unclear State law [2] will preclude the need to decide a federal constitutional issue." *Moore v. State Farm Fire & Cas. Co.*, 556 F.3d 264, 273 (5th Cir. 2009); *accord* ECF 170-1 at 17. Here, state-court resolution of what it means to be a "fleet owner" under state law will not resolve Plaintiffs':

(1) Due Process claim (Count I), which goes to the composition of the Commission and its structural anti-Tesla bias, affecting Plaintiffs' *leasing* activities (at a minimum);[25] (2) Equal Protection claim (Count III), which concerns both the direct-sales ban *and* the warranty-servicing ban; or (3) Commerce Clause claim (Count IV), which likewise concerns both the direct-sales ban *and* the warranty servicing ban. Tesla's status as a fleet owner is, at most, relevant to some of the effects of the warranty-servicing ban—not the composition of the Commission, the direct-sales ban, and Plaintiffs' leasing operations.

Therefore, each of Plaintiffs' constitutional claims cannot be resolved by pending state-court proceedings and *Pullman* abstention does not apply.

### B. *Younger* and *Burford* abstention do not apply because Plaintiffs do not seek to enjoin State proceedings, nor would Plaintiffs' claims be disruptive of State public policy.

In a footnote, Defendant Commissioners contend they also "are likely entitled to both *Younger* and *Burford* abstention." ECF 170-1 at 19-20 n.4. But *Younger* abstention does not apply because Plaintiffs expressly do *not* seek to "*enjoin* a pending State criminal [or civil] proceeding." *Gibson*, 411 U.S. at 573-74 (emphasis added); *see* ECF 151 at 37 ¶ 235. *Burford* is inapplicable because the case would not require the Court to engage "in an open-ended 'fairness' inquiry into predominantly local matters," "second-guess the policy decisions of state regulators," or disrupt "a complex administrative process." *Grace Ranch, L.L.C. v. BP Am. Prod. Co.*, 989 F.3d 301, 316-18 (5th Cir. 2021). Rather, Plaintiffs challenge the constitutional validity of discrete state laws—like countless lawsuits filed in federal court every year.[26] In all events, *Burford* "only rarely favors

---

[25] Regardless of whether the Commission may exercise jurisdiction over Plaintiffs' fleet-owner operations, it regulates Plaintiffs' leasing operations.

[26] *Nissan* rejected a *Burford* argument. *Nissan*, 757 F. Supp. at 739-40. That decision highlighted some aspects of the *Nissan* plaintiffs' claims that are not true of Plaintiffs' claims here. But those considerations go to facts that only minimally weigh in favor of *Burford* abstention. *See id.*

abstention." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996). This is not that rare case.

**C. There is no need to abstain from Plaintiffs' State-law claims because the Court has independent diversity jurisdiction over Plaintiffs' State-law claims and there is no reason to dismiss the federal-law claims in all events.**

Defendants Krake and Ford of Slidell argue that this Court should abstain from resolving Plaintiffs' State-law claims after dismissing Plaintiffs' federal-law claims. ECF 156-2 at 16-17. This Court should not dismiss Plaintiffs' federal claims for all the reasons discussed above. But Defendants' argument fails on its own terms, as the precedent these Defendants rely on applies to federal courts exercising *supplemental* jurisdiction. ECF 156-2 at 16-17 & nn.101-04 (collecting cases). Here, by contrast, if this Court were to dismiss Plaintiffs' federal-law claims, diversity jurisdiction would be proper over the state-law claims because the amount in controversy exceeds $75,000 and the parties are citizens of different States. *See* ECF 151 at 16 ¶ 111. Abstention would therefore be improper.

**VII. This Court has discretion to permit Plaintiffs to maintain their Declaratory Judgment Act claims (Count VII).**

Multiple Defendants argue that this Court should dismiss Plaintiffs' claims for declaratory judgment because they assert Plaintiffs' declaratory-judgment claims are redundant of their substantive claims. *E.g.*, ECF 156-2 at 14-16; 159-1 at 24-25; 164-1 at 22; 170-1 at 22-23; 171-1 at 16-17. This Court has "wide discretion to grant or deny declaratory judgment." *Smitty's Supply, Inc. v. Hegna*, 2019 WL 1099712, at *2 (E.D. La. Mar. 8, 2019) (citing *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995)). Plaintiffs have properly pleaded their claims, so declining to dismiss Plaintiffs' Declaratory Judgment Act claims would not cause any prejudice to Defendants.

**VIII. Plaintiffs properly sued the Commissioners in their individual capacities under *Ex parte Young* and Eleventh Amendment Immunity does not apply.**

The Commissioners (ECF 170-1 at 2, 5, 13, 16) and Dealers Association (ECF 169-1 at 24) argue that Plaintiffs should have sued the Commission rather than suing the Commissioners in

their official capacities. But "*Ex parte Young* permits plaintiffs to sue a *State officer* in his official capacity for an injunction to stop ongoing violations of federal law." *Tex. All. for Retired Ams. v. Scott*, 28 F.4th 669, 671 (5th Cir. 2022) (emphasis added). As the state officials with authority to enforce the Louisiana laws challenged here, *see* La. R.S. § 32:1253, all of the Defendant Commissioners have "*some* connection with the enforcement of the challenged act." *Tex. All. for Retired Ams.*, 28 F.4th at 672 (cleaned up; citation omitted). That makes the Commissioners proper Defendants in this lawsuit to vindicate Plaintiffs' constitutional rights. And it is perfectly consistent with standard practice in federal constitutional litigation. *E.g.*, *St. Joseph Abbey*, 712 F.3d at 220.[27]

The Commissioners also argue that some of Plaintiffs' claims are barred by Eleventh Amendment sovereign immunity. ECF 170-1 at 23-24. Plaintiffs do not seek any money damages from the Commissioners in their official capacities, as Plaintiffs made clear in their requested relief: "Plaintiffs respectfully request that the Court . . . [a]ward Plaintiffs damages for the *private* Defendants' anticompetitive behavior in violation of federal and State antitrust laws and State unfair trade practices claims." ECF 151 at 70-71 (emphasis in original). And Plaintiffs only seek prospective injunctive relief requiring the Commissioners to comply with the *Constitution*.

## CONCLUSION

Plaintiffs respectfully request that this Court deny Defendants' motions to dismiss.

---

[27] Plaintiffs did not sue Lala and Stephen Guidry in their private capacities. *Cf.* ECF 171-1 at 17-20. As the caption of the Complaint (ECF 1 at 3) and the summons issued to those Defendants make clear, they have only been sued in the official capacities. ECF 39; ECF 64. Thus, Lala and Stephen Guidry do not need to be "dismissed" from this case. *See Blasingim v. Hill*, 2008 WL 11320088, at *2 (N.D. Ga. Sept. 8, 2008) ("Dismissal pursuant to 12(b)(6) is not available to a non-party."), *report and recommendation adopted*, 2008 WL 11320126 (N.D. Ga. Oct. 14, 2008).

Respectfully submitted,


Adams and Reese LLP

/s/ *Mark R. Beebe*
Mark R. Beebe T.A. (#19487)
Diana Cole Surprenant (#33399)
Jennifer C. Bergeron (#37854)
Jeffrey M. Surprenant (#38908)
701 Poydras Street, Suite 4500
New Orleans, LA 70139
Telephone: (504) 581-3234
Facsimile: (504) 566-0210
Mark.Beebe@arlaw.com
Diana.Surprenant@arlaw.com
Jennifer.Bergeron@arlaw.com
Jeff.Surprenant@arlaw.com

And

Lehotsky Keller LLP

Katherine C. Yarger*
700 Colorado Blvd., #407
Denver, CO 80206
Katie@lehotskykeller.com

And

Jeremy Evan Maltz*
200 Massachusetts Ave., NW
Washington, DC 20001
Jeremy@lehotskykeller.com

*Admitted Pro Hac Vice