UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

TESLA, INC., ET AL.                                    CIVIL ACTION

VERSUS                                                      NO. 22-2982

LOUISIANA AUTOMOBILE                          SECTION "R" (2)
DEALERS ASSOCIATION, ET AL.


**ORDER AND REASONS**


Before the Court are defendants' motions to dismiss plaintiffs' first

amended complaint.[1]   Plaintiffs oppose defendants' motions.[2]   For the

following reasons, the Court grants defendants' motions.


I.      **BACKGROUND**

This case arises from a dispute regarding Louisiana's laws regulating

new motor vehicle sales, leasing, and warranty repairs, and the way those

laws have been applied to plaintiffs.  Plaintiffs are Tesla, Inc., an American

manufacturer of electric vehicles; Tesla Finance LLC, a wholly owned

subsidiary of Tesla, Inc.; and Tesla Lease Trust, title holder to vehicles that

are leased under a leasing program managed by Tesla Finance LLC

---

[1]      R. Docs. 156, 159, 164, 167, 169, 170, & 171.
[2]      R. Doc. 176.

(collectively, "Tesla").[3]   Defendants are the Louisiana Automobile Dealers Association ("LADA"), a trade association that represents nearly 350 new motor vehicle and heavy truck dealers in Louisiana; eighteen commissioners of the Louisiana Motor Vehicle Commission (the "Commission") in their individual and official capacities; and ten car dealerships.[4]

Tesla contends that it is a "disruptive" member of the automobile market due to its "unique sales, leasing, distribution, and service model," by which it engages with customers directly rather than through franchised car dealerships.[5]   Tesla asserts that unlike franchised dealerships, which foster "high-pressure, commissions-driven environment[s]," its retail locations are designed to educate consumers about electric vehicles and demonstrate Tesla's products and services.[6]   Tesla contends that it sells and leases its vehicles at uniform and transparent prices without any dealer markup or fees, which are omnipresent at franchised dealerships, and that it provides warranty repair and services for Tesla vehicles directly.[7]   It alleges that this model, which provides its customers with a low-pressure retail experience and high-quality repair service, has procompetitive advantages for

---

[3]   R. Doc. 151 ¶¶ 26-28.
[4]   *Id.* ¶¶ 30-109.
[5]   *Id.* ¶ 2.
[6]   *Id.* ¶ 135.
[7]   *Id.* ¶¶ 4-5, 136.

consumers,[8] whereas franchised dealerships serve the interests of entrenched franchised dealers at consumers' expense.

Tesla asserts that because its unique approach to selling, leasing, and servicing vehicles threatens the traditional franchised dealership model, Tesla's competitors across the country have "pursued every avenue to bar Tesla from the market," including "promoting protectionist legislation and coopting state regulatory authority."[9]  Tesla contends that its competitors in Louisiana have taken a similar approach by collectively engaging in two strategies to exclude Tesla from the motor vehicle market in Louisiana.[10]

## A.    The Direct Sales Ban

The first strategy Tesla's competitors allegedly employed was successfully lobbying the Louisiana Legislature in 2017 to amend Louisiana Revised Statute section 32:1261(A)(1)(k)(i) to prohibit manufacturers like Tesla from selling vehicles directly to consumers.[11]

The pre-2017 version of the law provided that no manufacturer may "sell or offer to sell a new or unused motor vehicle directly to a consumer

---

8    *Id.* ¶¶ 5, 137.
9    *Id.* ¶ 6.
10    *Id.*
11    *Id.* ¶ 148.

except as provided in this Chapter." La. Rev. Stat. Ann. § 32:1261(A)(1)(k)(i) (2016). Tesla contends that its competitors, including LADA, an entity allegedly controlled by and designed to support franchised dealers,[12] successfully lobbied the Louisiana Legislature to amend the law in 2017. The amended version of the law provides that no manufacturers may "sell or offer to sell a new or unused motor vehicle directly to a consumer" without using a franchised dealer. La. Rev. Stat. Ann. § 32:1261(A)(1)(k)(i) (2017).

Tesla notes that LADA's involvement in the change in the law is evidenced by a statement in which LADA's president, non-party Will Green, referred to the amendment as "our bill in 2017."[13] Tesla further asserts that State Representative Tanner Magee, who proposed the language that ultimately became the 2017 amendment, stated that the amendment was "on behalf of the Auto Dealers Association."[14] Tesla contends that it, along with other electric vehicle manufacturers, did not pursue a license to sell vehicles in Louisiana after 2017.[15]

### B.    Leasing and Warranty Repairs

---

[12]    *Id.* ¶ 32.
[13]    *Id.* ¶ 149.
[14]    *Id.* ¶ 168.
[15]    *Id.* ¶ 170. Notably, Tesla does not allege that it sold cars in Louisiana before the 2017 amendment was passed.

The second alleged strategy of Tesla's competitors was to abuse their control of state regulatory power to curb Tesla's other business operations in Louisiana.  In particular, Tesla contends that defendants formed a "cartel" that conspired to prevent Tesla from leasing its vehicles and providing warranty repairs and servicing in Louisiana.[16]

The Commission is an eighteen-member entity created by the Louisiana Legislature "within the office of the governor."  La. Rev. Stat. Ann. § 32:1253(A).  The commissioners are appointed by the governor.  *Id.*  The Commission also employs an Executive Director who is "in charge of the [C]ommission's office."  *Id.* § 32:1253(D).  The Commission is tasked with enforcing Louisiana's laws regulating the sale, leasing, and servicing of vehicles.  Of the eighteen commissioners, three are non-licensee members of the public.  *Id.* § 32:1253(A)(3)(a).  The three non-licensee commissioners have limited responsibilities:  Their "sole function" is hearing and deciding disputes between, among other entities, manufacturers and motor vehicle dealers.  *Id.*

The remaining fifteen commissioners must be licensees of the Commission.  *Id.* § 32:1253(A)(2).  Of the fifteen licensee commissioners, six must be primarily engaged in different parts of the industry than the sale of

---

[16]     *Id.* ¶ 13.

new cars. *Id.*[17] Accordingly, under Louisiana law, nine of the commissioners may be "primarily engaged in the business of" selling new cars. *See id.* Tesla alleges that these nine commissioners "directly compete with Tesla in the market for automobile sales, leasing, and servicing."[18] Tesla alleges that each of these nine commissioners, all of whom are LADA members,[19] own franchised dealership businesses and are thus "beholden to the dealership model" and "strive to protect it."[20] In other words, Tesla concludes that of the fifteen commissioners that wield meaningful regulatory power over the motor vehicle industry in Louisiana, a controlling majority of nine[21] are Tesla's direct competitors. Tesla further asserts that, although the remaining

---

[17] Specifically, one commissioner must be "primarily engaged in the business of lease or rental," one must be "primarily engaged in the business of heavy truck sales," three must be "primarily engaged in the business of recreational products," and one must be "primarily engaged in the business of sales finance." *Id.*

[18] R. Doc. 151 ¶ 47. These nine commissioners are defendants Allen Krake, V. Price LeBlanc, Eric Lane, Kenneth Smith, Keith Hightower, Keith Marcotte, Donna Corley, Terryl Fontenot, and Maurice Guidry.

[19] *Id.* ¶ 36.

[20] *Id.* ¶¶ 49-50.

[21] Although Tesla's nine direct competitors only account for half of the eighteen total commissioners, because the three non-licensee members of the Commission have limited responsibilities, Tesla asserts that its nine competitors effectively constitute a controlling majority of the Commission. *Id.* ¶ 36.

six do not directly compete with Tesla in the new car sales market, they "may also be affiliated with dealers that directly compete with Tesla."[22]

Tesla contends that although it may not lawfully sell its vehicles directly to consumers in Louisiana, it may still lease its cars in the state.[23] Further, while Louisiana law prohibits manufacturers from "operat[ing] a satellite warranty and repair center" that "authoriz[es] a person to perform warranty repairs . . . who is not a motor vehicle dealer," Tesla maintains that it falls under an exception to this law because it is a "fleet owner."  La. Rev. Stat. Ann. § 32:1261(A)(1)(t)(i)-(ii).  A "fleet owner" is a "person . . . who is approved and authorized by a manufacturer to perform warranty repairs and owns or leases vehicles for its own use or a renting or leasing company that rents, maintains, or leases vehicles to a third party."  *Id.* § 32:1261(A)(1)(t)(i). Fleet owners may perform warranty repairs "if the manufacturer determines that the fleet owner has the same basic level of requirements . . . that are required of a franchise dealer."  *Id.* § 32:1261(A)(1)(t)(ii).  The Commission "has no authority over a fleet owner."  *Id.* § 32:1261(A)(1)(t)(v).  Tesla

---

[22]  The six remaining licensee commissioners are defendants Gregory Lala, Stephen Guidry, Wesley Scoggin, Joseph Westerbrook, Scott Courville, and Raney Redmond.  *Id.* ¶¶ 95, 97, 99, 101, 103, 105.  Tesla contends these defendants are primarily in the business of sales finance, leasing and rentals, RV sales, motorcycle sales, and marine products sales.  *Id.*

[23]  *Id.* ¶ 173.

contends that it is a "fleet owner," so it may perform warranty repairs on its vehicles.[24]

Tesla asserts that its competitors have conspired to "reinterpret" state law in a manner that prevents Tesla from continuing to lease and provide warranty repairs to its vehicles.[25]  Tesla relies on several incidents, including a series of communications between LADA and the Commission in 2018 and the Commission's recent investigation of Tesla's operations in New Orleans, in support of its contention that its competitors entered into a conspiracy to exclude it from competing in the Louisiana motor vehicle market.

### 1. *2018 Communications between LADA and the Commission*

In 2018, Tesla announced plans to open a service center in New Orleans.[26]  Through public records requests, Tesla has discovered several communications related to the opening of its service center that it contends demonstrate an unlawful conspiracy.  The first is an email in which a non-party LADA member forwarded a news article related to Tesla's service center announcement to Lessie House, Executive Director of the

---

[24]     *Id.* ¶ 176.
[25]     *Id.* ¶ 178.
[26]     *Id.* ¶ 180.

Commission.[27]  House responded, "I am on it."[28]  A week later, another non-party LADA member contacted House about Tesla's plans to open a service center, in response to which House stated, "[w]e are on top of this."[29]  In a separate email, another non-party remarked of Tesla's plans, it "is not good for the future of our business if the state lets this happen," to which House responded, "[o]n top of it."[30]   Tesla contends that these 2018 communications demonstrate an agreement among LADA and the commissioners to block Tesla's operations in Louisiana.

## 2. *Competing Interpretations of Louisiana Law*

Tesla contends that the anti-Tesla conspiracy is also evidenced by LADA's efforts in 2020 to have Louisiana law interpreted in a way that disadvantages Tesla's leasing and servicing operations in Louisiana.  In March of 2020, an LADA member wrote to defendant Krake, who, at the time, was the Chairman of the Commission and a member of LADA.  The letter provided "suggestions related to what LADA believes are important regulations [that it] would like the Commission to enact."[31]  The proposed

---

[27]    *Id.* ¶ 181.  House is not a party to this lawsuit, either.
[28]    *Id.* ¶ 183.
[29]    *Id.* ¶¶ 184-85.
[30]    *Id.* ¶¶ 186-87.
[31]    *Id.* ¶ 188.

regulations would prohibit the leasing of motor vehicles by manufacturers and "clarify the intent of [the] fleet exemption."[32] The letter further observed that "displacement of competition is clearly a logical result of the regulatory directive and authority given the [Commission] by the legislature."[33]

Later that year, State Representative Phillip Devillier requested a formal opinion from the Louisiana Attorney General on two questions: whether, under Louisiana law, (1) manufacturers or distributors may lease new vehicles directly to consumers, and (2) a manufacturer or distributor may perform warranty repairs directly without using a dealer.[34] Representative Devillier indicated that he thought the answer to both questions was no.[35]

The Attorney General then requested the Commission's position on the questions. Defendant Krake responded on behalf of the Commission with an interpretation of the law that contradicted LADA's (and Representative Devillier's) view: He asserted that it "is not a violation of the law for a manufacturer or distributor to lease new vehicles directly to customers," and "a manufacturer or distributor (or any subsidiary thereof) may perform

---

[32]   *Id.* ¶ 189.
[33]   *Id.* ¶ 190.
[34]   *Id.* ¶ 192.
[35]   *Id.* ¶ 193.

warranty services directly without using a dealer" under Louisiana law, "when the manufacturer or distributor or subsidiary is a fleet owner and performs warranty work on its own fleet."[36]

Krake's letter also included a section entitled, "The Danger of Legal Liability for [the Commission] and Its Commissioners," which acknowledged that the Commission's board "is made up of many motor vehicle dealers who compete with Tesla," an entity that "is not represented on the [Commission's] board."[37]  The Commission's letter went on to state:

> The questions . . . contained in the Opinion Request letter have been discussed at length between the [Commission] and LADA for well over five years, the parties having met numerous times in attempts for LADA to convince [the Commission] to revise its interpretations.  The [Commission] has always openly held (and directly stated to LADA) that it would issue a license to Tesla if Tesla met the statutory guidelines.  The [Commission] has no authority to act outside the statutes and has always advised LADA that the way to have the [Commission] change its regulatory actions is to have the law changed.  Year after year LADA took no action on these issues in the legislature until 2017.
>
> . . .
>
> Tesla's non-franchise business model has been a contentious issue with franchise dealers around the country and has resulted in much litigation.  The Opinion Request in this case requests that your office issue an opinion that supports the contention of LADA, a trade association of franchise dealers.
>
> As a commission including many franchised dealers, any actions by the [Commission] which are determined to be anti-

---

[36]    *Id.* ¶ 197.
[37]    *Id.*

competitive or a restraint on trade designed to protect the franchised dealers serving on the [Commission's] board, could subject the Commission and its commissioners to civil and even criminal liability.  Reading or analogizing additional language that the legislature clearly did not pass into statutes that it did pass, which results in competitive advantages for [the Commission] members, represents a clear risk of this liability. . . . Should the [Commission] act outside of the clearly articulated directives of the legislature expressed in [state law], the [Commission] places at risk [the Commission's] immunity from liability imposed by the federal antitrust law.[38]

After the Commission stated its position, the Attorney General announced his own, which mirrored the position taken by LADA and Representative Devillier: that, under Louisiana law, manufacturers "may *not* lease directly to consumers in Louisiana without the use of a dealer," "nor may they perform warranty services directly without using a dealer."[39]  In particular, the Attorney General opined that although the law is silent as to leasing, Louisiana law defines retail sale to include "the act or attempted act of selling, bartering, exchanging, *or otherwise disposing of* a motor vehicle."[40]  He concludes that leasing is one method of disposing of a vehicle, so the direct sales ban covers leasing of new vehicles as well.[41]  As to warranty

---

[38]  *Id.* ¶ 200.

[39]  *Id.* ¶ 201 (citing La. Att'y Gen. Op. No. 20-0059, 2020 WL 5289959, at *1 (Aug. 10, 2020) (emphasis in original).

[40]  La. Att'y Gen. Op. No. 20-0059, 2020 WL 5289959, at *2 (emphasis in original).

[41]  *Id.*

servicing, the Attorney General opined that "[o]nly one who sells or leases motor vehicles to others fits the fleet owner definition, and a manufacturer may not sell or lease directly to Louisiana consumers."[42] Accordingly, "a manufacturer cannot satisfy the definition of fleet owner," so it cannot "fit within the exception to the general prohibition on such warranty and repair services by manufacturers."[43] The Attorney General acknowledged that the law is "perspicuous" on the question of whether a subsidiary of a manufacturer could be a "fleet owner," but cautioned that "[a] subsidiary may not be used to circumvent the prohibitions within the Act."[44]

### 3. *The Commission's Investigation*

Tesla asserts that although in its opinion letter, the Commission's interpretation of Louisiana law contradicted LADA's position, the Commission nevertheless agreed to target Tesla through an investigation of Tesla Lease Trust, the plaintiff entity that leases Tesla vehicles in Louisiana. Tesla contends that even before the Attorney General issued his opinion, the Commission issued a subpoena to Tesla Lease Trust for records regarding its

---

[42]    *Id.* at *3.
[43]    *Id.*
[44]    *Id.*

activities in Louisiana dating back to September of 2019.[45]   Tesla Lease Trust responded to the subpoena, and the Commission followed up with another subpoena, this time seeking records dating back to October of 2013.[46]   The second subpoena was subsequently withdrawn.[47]   The Commission then issued a third subpoena for records identifying vehicles leased in Louisiana by Tesla Lease Trust and "identifying and/or referencing warranty service and/or warranty repair performed on any and all motor vehicles" in Louisiana dating back to June 2019.[48]

Tesla contends that these subpoenas were issued to advance its competitors' unlawful agreement to exclude Tesla from the Louisiana market.[49]   It asserts that the subpoenas indicate that the Commission does not believe Tesla is a "fleet owner" entitled to perform warranty servicing. Tesla contends that this "sudden" and "unjustifiable" change in position is, in fact, a "pretext" and the product of Tesla's competitors' "illegal agreement to drive Tesla out of the relevant market."[50]   Tesla objected to the third subpoena on the grounds that because it is a "fleet owner," the Commission

---

[45]     R. Doc. 151 ¶ 204.

[46]     *Id.* ¶ 205.

[47]     *Id.*

[48]     *Id.* ¶ 206.

[49]     *Id.* ¶ 204.

[50]     *Id.* ¶¶ 208, 210.

has no authority over it pursuant to Louisiana Revised Statute section 32:1261(A)(1)(t)(v).[51]

The Commission's Executive Director then moved to compel a response to the third subpoena.[52]  Tesla asserts that Adrian LaPeyronnie, attorney for the Commission, prosecuted the motion to compel.[53]  Tesla Lease Trust moved to continue the Commission's hearing on the motion to compel, which the Commission denied.[54]  Tesla Lease Trust filed its opposition to the motion to compel and again moved to continue the hearing, which the Commission again denied.[55]  At the motion to compel hearing, counsel for Tesla allegedly requested a determination of fact as to whether Tesla Lease Trust constitutes a "fleet owner."  Tesla asserts that such a finding would mean that the Commission lacks the authority to investigate Tesla Lease Trust.[56]

---

[51]   *Id.* ¶ 209.

[52]   *Id.* ¶ 211.

[53]   Tesla contends that LaPeyronnie was also responsible for responding to Tesla's public records requests.  It asserts that LaPeyronnie's productions have been incomplete and contain substantial redactions. The Commission has allegedly refused to produce a privilege log explaining the basis for the redactions.  *Id.* ¶¶ 213-16.

[54]   *Id.* ¶ 218.

[55]   *Id.* ¶ 219.

[56]   *Id.* ¶ 221.

At the motion to compel hearing, the Commission ordered Tesla Lease Trust to comply with the third subpoena.[57]  Tesla then moved for rehearing on the grounds that the Commission lacked authority to issue an investigative subpoena and that it lacked jurisdiction to hear a motion to compel.[58]  The Commission allegedly rejected Tesla's arguments and denied rehearing.[59]  Tesla asserts that a majority of the commissioners involved in adjudicating the motion to compel were Tesla's direct competitors.[60]

Tesla filed a petition in state court on August 26, 2021, requesting the court to reverse the Commission's judgment to enforce the subpoena, or, in the alternative, to remand for the Commission to affirmatively determine whether it has jurisdiction over Tesla Lease Trust.[61]  The Commission stayed its order on the motion to compel while Tesla sought judicial review of the order.  The Commission moved to dismiss Tesla's petition for review, which the state court denied.[62]  That case remains pending.

## C.    Tesla's Complaint

---

[57]    *Id.* ¶ 222-23.
[58]    *Id.* ¶ 225.
[59]    *Id.* ¶ 226.
[60]    *Id.* ¶ 227.
[61]    *Id.* ¶ 232.
[62]    *Id.* ¶ 233-34.

16

On August 26, 2022, one year after filing its petition for review in state court, Tesla filed a complaint in this Court.  After defendants moved to dismiss Tesla's complaint, Tesla was granted leave to file an amended complaint, which includes seven claims.[63]  Tesla named as defendants LADA, each of the eighteen commissioners, and ten dealerships that are owned by commissioners.  After Tesla filed its complaint, the State of Louisiana intervened.[64]

Tesla brings antitrust claims under both federal and state law against all defendants, including the commissioners in both their individual and official capacities.[65]  Tesla contends that the unlawful agreement is evidenced by LADA's lobbying efforts in 2017, communications between LADA and the Commission in 2018 regarding Tesla's new service center in New Orleans, and the Commission's investigation of Tesla.  Tesla asserts that if defendants prevail in their anticompetitive scheme, Tesla will be excluded from the Louisiana market altogether, new market participants will be discouraged from operating in Louisiana, and Louisiana consumers will be harmed.[66]  Tesla contends that defendants' "concerted action to co-opt the Commission

---

[63]    All references in this Order to the "complaint" refer to Tesla's amended complaint, R. Doc. 151.

[64]    R. Doc. 91.

[65]    R. Doc. 151 ¶¶ 237-68, 333-66.

[66]    *Id.* ¶ 250.

17

to bar Tesla from Louisiana" also violates the Louisiana Unfair Trade Practices Act ("LUTPA").[67]

Tesla also brings three constitutional claims against only the commissioners in their official capacities.   The first is a Fourteenth Amendment Due Process Clause claim.   Tesla asserts that because the Commission includes nine of Tesla's competitors, the composition of the Commission violates Tesla's Fourteenth Amendment right to a neutral arbiter.[68]   Tesla thus seeks a declaration that the Commission is "unconstitutionally constituted" and lacks authority to regulate Tesla's leasing and servicing activities, as well as a permanent injunction prohibiting the Commission from regulating those activities.[69]

Tesla's next constitutional claim is an Equal Protection Clause claim in which Tesla challenges both the direct sales ban and Louisiana's warranty repairs law.  In particular, Tesla contends that the direct sales ban unfairly and irrationally singles out Tesla in violation of Tesla's right to equal protection, because Louisiana's distinction between manufacturer-owned dealerships and franchised dealerships lacks a legitimate justification.[70]

---

[67]     *Id.* ¶¶ 367-83.
[68]     *Id.* ¶¶ 269-97.
[69]     *Id.* ¶¶ 294-95.
[70]     *Id.* ¶¶ 298-305.

Tesla asserts that the warranty repairs ban for non-fleet owners likewise serves no legitimate government interests.  Rather, Tesla contends that both laws "exist solely for the purpose of protecting Louisiana's incumbent franchised auto dealers from economic competition."[71]  Tesla thus seeks a declaration that both laws violate the Equal Protection Clause of the Fourteenth Amendment and asks the Court to enjoin the commissioners from enforcing the laws against Tesla.[72]

In Tesla's final constitutional claim, it asserts that Louisiana's direct sales ban and warranty repairs law violate the Commerce Clause.  Tesla contends that the laws discriminate against interstate commerce by impeding the flow of vehicles manufactured out of state into Louisiana by favoring in-state interests, namely, Louisiana franchised dealers.[73]  Tesla thus seeks a declaration that both laws violate the Commerce Clause and an injunction prohibiting the commissioners from enforcing the laws against Tesla.[74]

Finally, Tesla brings a claim against all defendants for declaratory relief.  In particular, Tesla seeks a declaration that the Commission's

---

[71]    *Id.* ¶ 307.
[72]    *Id.* ¶¶ 313-14.
[73]    *Id.* ¶¶ 317-32.
[74]    *Id.* ¶¶ 329-30.

composition is inconsistent with due process, that the direct sales ban is unconstitutional, and that defendants' conduct violates federal and state law.[75]

### D.   Defendants' Motions to Dismiss

Defendants filed seven motions to dismiss Tesla's amended complaint.[76]  Defendants assert that Tesla has failed to state a claim on all counts, and that Tesla's lawsuit is a frivolous attempt to bypass the legislative process.

As to Tesla's federal antitrust claims, defendants contend that Tesla failed to plausibly allege that defendants entered into an agreement or that

---

[75]   *Id.* ¶¶ 384-86.

[76]   Specifically, one motion to dismiss was filed by defendants Allen Krake and Ford of Slidell, LLC.  R. Doc. 156.  One motion was filed by seven dealership defendants—T & J Ford, Inc.; Golden Motors, LLC; LeBlanc Automobiles, L.C.; Holmes Motors, LLC; Morgan Buick GMC Shreveport, Inc.; Airline Car Rental, Inc.; Shetler-Corley Motors, Ltd.—and seven commissioners in their individual capacities—V. Price Leblanc, Jr.; Keith P. Hightower; Keith M. Marcotte; Wesley Randall Scoggin; Donna S. Corley; Terryl J. Fontenot; and Maurice C. Guidry. R. Doc. 159.  One was filed by Kenneth Smith, in his individual capacity, and P.K. Smith Motors, Inc.  R. Doc. 164.  One was filed by Eric R. Lane, in his individual capacity, and Gerry Lane Enterprises.  R. Doc. 167.  One was filed by LADA.  R. Doc. 169.  One was filed by Gregory Lala and Stephen L. Guidry, Jr., in their individual capacities. R. Doc. 171.  One was filed by the eighteen commissioners in their official capacity.  R. Doc. 170.

an antitrust injury occurred as a result of the alleged agreement.  They also assert that the private defendants are entitled to immunity under the *Noerr-Pennington* doctrine.  They contend that Tesla's state antitrust claims fail for the same reason.  They assert that Tesla's state antitrust claim is independently subject to dismissal because it is untimely.  They argue that Tesla's claim under LUTPA is likewise untimely, and that the conduct Tesla alleged, taken as true, does not rise to the level of conduct prohibited by LUTPA.

Defendants argue that Tesla's constitutional claims must also be dismissed.  As to Tesla's due process claim, defendants assert that the Commission is not unconstitutionally constituted.  As to Tesla's equal protection claim, defendants assert that both laws are rationally related to legitimate government objectives.  Defendants contend that Tesla fails to state a claim under the Commerce Clause because the challenged laws do not discriminate against interstate commerce.  Defendants further contend that Tesla's Equal Protection Clause and Commerce Clause claims are squarely foreclosed by Fifth Circuit precedent.

Finally, defendants assert that Tesla's declaratory judgment claim should be dismissed as duplicative of its substantive claims.  Tesla opposes defendants' motions.  The Court considers the motions below.

## II.    LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.  The Court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff. *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 239, 244 (5th Cir. 2009).  But the Court is not bound to accept as true legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678.

On a Rule 12(b)(6) motion, the Court must limit its review to the contents of the pleadings, including attachments. *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014).  The Court may also consider documents attached to a motion to dismiss or an opposition to that motion when the documents are referred to in the pleadings and are central to a plaintiff's claims. *Id.*  The district court 'may also consider matters of which [it] may take judicial notice.'" *Hall v.*

*Hodgkins*, 305 F. App'x 224, 227 (5th Cir. 2008) (citing *Lovelace v. Software Spectrum, Inc.*, 78 F.3d 1015, 1017-18 (5th Cir. 1996)).

## III.   DISCUSSION

The Court will first assess Tesla's antitrust claims.  It will then consider Tesla's LUTPA claim, its constitutional claims, and its claim for declaratory judgment.

### A.    Tesla's Sherman Act Claim

The Sherman Act forbids unreasonable restraints of trade.  *Spec's Fam. Partners, Ltd. v. Nettles*, 972 F.3d 671, 681 (5th Cir. 2020).  To establish a violation of Section 1 of the Sherman Act, "plaintiffs must show that the defendants (1) engaged in a conspiracy (2) that produced some anticompetitive effect (3) in the relevant market."  *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 327 (5th Cir. 2014) (internal quotation marks omitted).  Plaintiffs must also show both an actual injury and an "antitrust injury," the latter of which requires a showing that "the defendants' activities caused an injury to competition."  *Jebaco, Inc. v. Harrah's Operating Co.*, 587 F.3d 314, 318-19 (5th Cir. 2009).

Tesla asserts that defendants unlawfully conspired to exclude Tesla from operating in Louisiana in violation of Section 1 of the Sherman Act. Tesla contends that the conspiracy is evidenced by (1) LADA's lobbying efforts in 2017, (2) communications between LADA members and the Commission in 2018 regarding Tesla's plans to begin its service and leasing operations in New Orleans, and (3) the "concerted and pretextual change of the Commission's interpretation of state law."[77]   Tesla asserts that the Commission's investigation of Tesla Lease Trust is the product of the unlawful conspiracy,[78] and that if the conspiracy is not thwarted now, Tesla will be excluded from the market and other manufacturers will be discouraged from operating in Louisiana.[79]

### 1.   *The Private Defendants*

The private defendants—LADA, the commissioners in their individual capacity, and the dealership defendants—are immune from liability for Tesla's Sherman Act claim.   "[T]he Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that

---

[77]   R. Doc. 151 ¶ 246.

[78]   *Id.* ¶ 247.

[79]   *Id.* ¶ 245.

would produce a restraint or a monopoly." *Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136 (1961).  Accordingly, "[j]oint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition."  *United Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965).  This doctrine—referred to as *Noerr-Pennington* immunity—applies to "any concerted effort to sway public officials," including state agencies, "regardless of the private citizen's intent." *Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 859 (5th Cir. 2000) (quoting *Pennington*, 381 U.S. at 670).

As to LADA, Tesla contends that LADA (1) demonstrated anti-Tesla animus by lobbying for the direct sales ban in 2017,[80] (2) communicated its concerns to the Commission regarding Tesla's plans to open a service center in New Orleans, and (3) encouraged the Commission to adopt an interpretation of Louisiana law that disfavored Tesla's continued leasing and warranty repairs operations in Louisiana, which culminated in the Commission's launching of an investigation of Tesla Lease Trust.  All of these alleged actions constitute, at most, "the conduct of private individuals . . . seeking anticompetitive action from the government" that the Sherman Act

---

[80]    Tesla does not contend that the lobbying was, itself, an antitrust violation.  Rather, Tesla cites LADA's lobbying efforts as evidence of LADA's hostility to Tesla.  R. Doc. 151 ¶ 148.

"do[es] not regulate." *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 379-80 (1991).  Indeed, it is well settled that "[t]he point of the *Noerr-Pennington* doctrine is to protect private parties when they petition the government for laws or interpretations of its existing laws even though those private parties are pursuing their goals with anticompetitive intent." *Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc.*, 858 F.2d 1075, 1083 (5th Cir. 1988); *see also Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510-11 (1972) ("[I]t would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interests vis-à-vis their competitors.").  *Noerr-Pennington* immunity also applies to the efforts of private entities to encourage the government to investigate their competitors.  *See, e.g.*, *Veritext Corp. v. Bonin*, 417 F. Supp. 3d 778, 788 (E.D. La. 2019) (private interest group's efforts to encourage a regulatory board to issue subpoenas to its competitor protected by *Noerr-Pennington*).

The same is true for the commissioners in their private capacity.  Tesla does not expressly allege when the commissioners were acting in their individual, as opposed to their official, capacities.  Indeed, Tesla makes very

26

few allegations related to the conduct of *any* individual commissioners. Rather, Tesla largely relies on allegations regarding the Commission's alleged misconduct as a group.[81]  Nevertheless, to the extent Tesla asserts that the commissioners acted in their individual capacities when they allegedly agreed with LADA to use the regulatory power of the Commission to investigate Tesla, such conduct is protected by *Noerr-Pennington*.  *See Herr v. Pequea Twp.*, 274 F.3d 109, 119 (3d Cir. 2001) ("It is clear that public officials sued in their individual capacity are entitled to the immunity provided under the *Noerr-Pennington* doctrine."), *abrogated on other grounds by United Artists Theatre Cir., Inc. v. Twp. of Warrington*, 316 F.3d 392 (3d Cir. 2003)); *Bayou Fleet, Inc. v. Alexander*, 26 F. Supp. 2d 894, 896 (E.D. La. 1998) ("[I]f it is [plaintiff's] position that [the parish councilman] somehow acted in his individual capacity when he made legislative proposals before the Parish Council, then he is entitled to *Noerr-Pennington* immunity on that conduct[.]"); *see also Astoria Entm't, Inc. v. Edwards*, 159 F. Supp. 2d 303, 324 (E.D. La. 2001) ("To the extent that plaintiff argues that Edwards was acting beyond his authority as a state official, the Court finds that, in his individual capacity, Edwards is entitled to *Noerr-Pennington* immunity from suit for attempts to influence state bodies.").  Notably, Tesla also makes

---

[81]    *See, e.g.*, R. Doc. 151 ¶¶ 20, 148, 178.

no specific allegations regarding the conduct of dealership defendants; rather, Tesla broadly asserts that *all* defendants conspired to block Tesla from operating in the Louisiana market by agreeing to abuse the regulatory power of the Commission.  To the extent Tesla alleges that the dealerships participated in this conspiracy, their conduct is likewise protected by *Noerr-Pennington.*

Tesla's arguments to the contrary do not change this conclusion.  First, Tesla alleges that defendants' lobbying of the Commission against Tesla has been a "sham."[82]   Under the "sham exception" to the *Noerr-Pennington* doctrine, "activity ostensibly directed toward influencing governmental action does not qualify for *Noerr* immunity if it is a mere sham to cover . . . an attempt to interfere with the business relationships of a competitor." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 556 (2014).  In other words, the exception is limited to cases in which a defendant has "use[d] the governmental *process*—as opposed to the *outcome* of that process—as an anticompetitive weapon." *City of Columbia*, 499 U.S. at 380 (emphasis in original).  But Tesla does not allege that defendants used the *process* of persuading the Commission to harm Tesla.   Rather, Tesla contends that defendants intended for the *outcome* of those efforts—the

---

[82]    R. Doc. 151 ¶ 262.

investigation itself—to do so.   Further, courts have recognized that "a successful effort to influence governmental action certainly cannot be characterized as a sham." *Pro. Real Estate Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 58 (1993) (internal quotation marks omitted).

Next, Tesla asserts that the private defendants conspired with the Commission, but *Noerr-Pennington* immunity applies when private parties conspire with government officials to achieve their desired anticompetitive result. *City of Columbia*, 499 U.S. at 382-83.   The Supreme Court has expressly refused to recognize an exception that would apply "when government officials conspire with a private party to employ government action as a means of stifling competition." *Id.* at 382.

Finally, Tesla contends that *Noerr-Pennington* is inapplicable here because the Commission was, in effect, a non-governmental entity.   In particular, Tesla contends that the Commission worked to advance private interests rather than the interests of the State of Louisiana, and it is thus not entitled to immunity under the *Parker* doctrine, a separate type of immunity that shields state action from antitrust liability, discussed further in Section III.A.2, *infra*.   Tesla thus reasons that the private defendants' efforts to influence the Commission are beyond the scope of the *Noerr-Pennington* doctrine.

The Legislature created the Commission "within the office of the governor" and provided that it consists of members appointed by the governor.   La. Rev. Stat. Ann. § 32:1253(A).   Under state law, the Commission is tasked with enforcing Louisiana's laws pertaining to motor vehicle distribution, and it is "authorized and empowered to make and enforce all reasonable rules and regulations" to accomplish that task.  *Id.* § 32:1253(E).  The Commission is clearly a governmental entity.  In support of its claim that the Court should nevertheless treat the Commission as a non-governmental entity for purposes of *Noerr-Pennington* immunity for the private defendants, Tesla relies on inapposite cases in which courts found that *Noerr-Pennington* immunity was unavailable to private parties petitioning *private* entities for anticompetitive action.  *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 501 (1988) (assessing claim related to defendant's attempts to influence a "private standard-setting association" on which "no official authority ha[d] been conferred . . . by any government"); *Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 500 (9th Cir. 2010) (assessing claim related to lobbying a private "nonprofit corporation").  Those cases have no application here, as "official authority has been conferred" on the Commission by the Legislature.  *Allied Tube & Conduit Corp.*, 486 U.S. at 501.

Further, Tesla cites no cases for the proposition that the availability of *Noerr-Pennington* immunity depends on a finding that the action resulting from the petitioning constitutes state action entitled to immunity under the *Parker* doctrine. The question of whether a government entity's actions constitute state action that is protected by *Parker* immunity is a separate and distinct inquiry from the question of whether a private party that petitioned a government entity is entitled to *Noerr-Pennington* immunity. Although the entities that private actors petition are often entitled to immunity under the *Parker* doctrine, "*Noerr* immunity for a private party's petition to the government in no way depends upon a finding of *Parker* immunity for the subsequent government action." Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 229 (4th ed. 2022) ("'Government' for *Noerr* purposes includes all state instrumentalities that one is constitutionally entitled to 'petition' . . . even when the latter lack *Parker* immunity."). Indeed, the Fifth Circuit has acknowledged that "the two doctrines," although "somewhat interrelated," nevertheless "remain mutually independent in both origin and application." *Indep. Taxicab Drivers' Emps. v. Greater Hous. Transp. Co.*, 760 F.2d 607, 612 n.9 (5th Cir. 1985). Because the private defendants allegedly conspired to influence a government entity to take anticompetitive action, which is squarely protected by the *Noerr-Pennington* doctrine, the

Court dismisses Tesla's Sherman Act claim as to the private defendants with prejudice.

### 2.  *The Commissioners in their Official Capacity*

#### i.  *Parker* Immunity

Tesla asserts that the commissioners are not entitled to immunity in their official capacity, either.  "[O]fficial-capacity suits generally represent . . . another way of pleading an action against an entity of which an officer is an agent."  *Monell v. Dep't Soc. Servs. of N.Y.*, 436 U.S. 658, 690 n.55 (1978).  Tesla's claims against the commissioners in their official capacity are thus claims against the Commission itself.  As a threshold matter, "[t]he Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state."  *Parker v. Brown*, 317 U.S. 341, 351 (1943).  The Supreme Court has thus held that "[a]nticompetitive conduct by a state is generally immune from federal antitrust law."  *Veritext Corp. v. Bonin*, 901 F.3d 287, 292 (5th Cir. 2018).[83]

---

[83]   "[A]lthough the state action doctrine is often labeled an immunity, the term is actually a misnomer because the doctrine is but a recognition of the limited reach of the Sherman Act[.]"  *Louisiana Real Estate Appraisers Bd. v. United States Federal Trade Comm'n*, 976 F.3d 596, 602, n.5 (5th Cir. 2020).  Nevertheless, the Fifth Circuit "continue[s] to refer to the doctrine as one of immunity."  *Id.*

Nevertheless, *Parker* immunity for state action is not absolute. Immunity is not available "unless the actions in question are an exercise of the State's sovereign power." *N.C. State Bd. Dental Exam'rs v. FTC*, 574 U.S. 494, 504 (2015) [hereinafter, *Dental Examiners*]. For example, state legislation is "*ipso facto* . . . exempt from the operation of the antitrust laws because [it is] an undoubted exercise of sovereign authority." *Id.* (internal quotation marks omitted). While principles of federalism justify Sherman Act immunity for the states' own anticompetitive policies, the Sherman Act "does not always confer immunity where . . . a State delegates control over a market to a nonsovereign actor." *Id.* at 505-06. State agencies like the Commission "are not simply by their governmental character sovereign actors for purposes of state-action immunity." *Id.* at 505. For the actions of such agencies to be immune, the Supreme Court has required "more than a mere façade of state involvement," reasoning that *Parker*'s rationale makes it necessary to ensure that "the States accept political accountability for anticompetitive conduct they permit and control." *Id.* Further, the Supreme Court has held that "[l]imits on state-action immunity are most essential when the State seeks to delegate its regulatory power to active market participants." *Id.* Accordingly, for *Parker* immunity to vest,

"anticompetitive conduct of nonsovereign actors" must "result from procedures that suffice to make it the State's own." *Id.* at 506.

To determine whether anticompetitive action should be deemed state action, courts apply the two-part test set forth in *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 100 (1980). *Id.* Under *Midcal*, a "state law or regulatory scheme cannot be the basis for antitrust immunity unless, first, the State has articulated a clear . . . policy to allow the anticompetitive conduct, and second, the State provides active supervision of [the] anticompetitive conduct." *Midcal*, 445 U.S. at 105. Although the Fifth Circuit formerly required state agencies to meet only the first prong of the *Midcal* test in order to qualify for *Parker* immunity, the Supreme Court held in *Dental Examiners* that "a state board on which a controlling number of decisionmakers are active market participants in the occupation the board regulates must [also] satisfy *Midcal*'s active supervision requirement in order to invoke state-action antitrust immunity." *Dental Examiners*, 574 U.S. 511-12.

Tesla contends that the commissioners are not entitled to immunity under *Parker* because the state does not actively supervise their enforcement activities. The "active supervision" requirement provides "realistic assurance" that the challenged "anticompetitive conduct promotes state

34

policy, rather than merely the party's individual interests." *Id.* at 507 (internal quotation marks omitted). Active supervision has not been defined with clarity. Rather, "the inquiry regarding active supervision is flexible and context dependent." *Id.* at 515. Active supervision does not require "day-to-day involvement in an agency's operations or micromanagement of its every decision." *Id.* Nevertheless, active supervision must "entail review [of] the substance of the anticompetitive decision, not merely the procedures followed to produce it, and the power to veto or modify particular decisions to ensure they accord with state policy." *Id.* Further, "the state supervisor may not itself be an active market participant." *Id.* "[T]he adequacy of supervision will . . . depend on all the circumstances of a case." *Id.*

For example, in *Dental Examiners*, the Supreme Court assessed an antitrust claim brought by the Federal Trade Commission against the North Carolina Board of Dental Examiners, the state agency responsible for administering a licensing system for dentists. *Id.* at 499. North Carolina vested the board with broad powers to regulate licensees, but the board's only power over unlicensed persons was to file suit to enjoin them from unlawfully practicing dentistry. *Id.* And although North Carolina prohibited the unlicensed practice of dentistry, the law was silent as to whether teeth whitening constituted the practice of dentistry. *Id.* at 500. The board, the

majority of which were licensed dentists, received complaints from other dentists regarding the practice of non-dentists offering teeth whitening services at prices considerably lower than those dentists in North Carolina charged for the service. *Id.* In response, the board opened an investigation into the practice and ultimately issued cease-and-desist letters to non-dentist teeth whitening service providers informing them that teeth whitening constituted the unlicensed practice of dentistry in violation of state law. *Id.* at 501. The FTC sued, and an ALJ determined that the board "had unreasonably restrained trade in violation of antitrust law." *Id.* at 502. The Fourth Circuit affirmed the ALJ's ruling. *Id.*

Before the Supreme Court, the board argued that it was immune under *Parker*, and that it need not meet the active-supervision prong of the *Midcal* test in order to be entitled to *Parker* immunity because it was an agency designated by the state. The Supreme Court held that the board's argument was impossible to reconcile with the Court's "repeated conclusion that the need for supervision turns not on the formal designation given by States to regulators but on the risk that active market participants will pursue private interests in restraining trade." *Id.* at 510. The Court thus held that the board must meet both prongs of the *Midcal* test to be immune under *Parker*. Because the board did not claim that the State exercised any supervision over

36

its conduct regarding non-dentist teeth whiteners, there were no "specific supervisory systems" for the Supreme Court to review. *Id.* at 515. The Court thus held that the board was not entitled to immunity. *Id.*

The Fifth Circuit relied on *Dental Examiners* to reverse a district court's finding of *Parker* immunity in *Veritext Corp. v. Bonin*. 901 F.3d 287 (5th Cir. 2018). That case centered on the enforcement actions taken by the Louisiana Board of Examiners of Certified Shorthand Reporters, which enforces Louisiana law regarding the relationship of court reporters to litigants. *Id.* at 290. The law provides, in relevant part, that depositions must be taken before an officer authorized to administer oaths "who is not an employee or attorney of any of the parties." *Id.* (citing La. Code Civ. P. art. 1434(A)(1)). The law defines "employee" to include "a person who has a contractual relationship with a party litigant to provide . . . court reporting services." *Id.* In 2012, the board began enforcing the law "more aggressively, declaring that the law prohibits all contracts between court reporters and party litigants, including volume-based discounts and concessions to frequent customers." *Id.* Veritext, a national private court reporting firm, sued the board, contending that local providers were using the regulatory power of the state to prevent competition from national and regional court reporting firms. *Id.* The district court found the board protected by *Parker*

immunity.  The Fifth Circuit reversed, holding that the plaintiff "pled facts sufficient to support a finding that the active supervision requirement [was] not met."  *Id.* at 293.  The Fifth Circuit observed that "[n]othing in the record indicate[d] that elected or appointed officials oversaw or reviewed the Board's decisions or modified the Board's enforcement policies."  *Id.*

Here, Tesla has plausibly alleged that the State of Louisiana does not actively supervise the Commission's enforcement activities and that the commissioners are thus not entitled to *Parker* immunity.  As in *Veritext*, nothing in the record indicates that the state "reviewed the [Commission's] decisions or modified the [Commission's] enforcement policies."  *Id.*  And although Tesla challenged the Commission's ruling on the motion to compel in state court, in *Dental Examiners*, the Supreme Court concluded that there were no "supervisory systems to be reviewed," even though recipients of the cease-and-desist letters could "seek declaratory rulings in state court." *Dental Examiners*, 574 U.S. at 502.  Earlier cases have likewise acknowledged that the availability of judicial review does not necessarily satisfy the active supervision requirement of *Midcal.  See Patrick v. Burget*, 486 U.S. 94, 104 (1988) ("This case . . . does not require us to decide the broad question of whether judicial review of private conduct ever can constitute active supervision, because judicial review of [hospital] privilege-

termination decisions in Oregon, if such review exists at all, falls far short of satisfying the active supervision requirement."); *Shahawy v. Harrison*, 875 F.2d 1529, 1535-36 (11th Cir. 1989) ("[A] state's judicial system does not actively supervise a peer review system if the courts do not review the peer review board's decisions to determine such decisions' consistency with the state's regulatory policy."); *Pinhas v. Summit Health, Ltd.*, 894 F.2d 1024, 1030 (9th Cir. 1989) (judicial review evaluating "if the decision was substantively rational, lawful, not contrary to established public policy and the proceedings were fair" under which a "court may not substitute a judgment for that of the governing board even if it disagrees with the board's decision" did not amount to active supervision).   Tesla also alleged that although the state has charged the Occupational Licensing Review Commission (the "OLRC")[84] and the legislature's Commerce Committee with the responsibility to review agency rules, this dispute does not arise from the Commission's adoption of a rule or regulation.   Rather, this dispute arises from the investigation undertaken by the Commission, over which neither the OLRC nor the Commerce Committee has exercised active supervision.[85]

---

[84]   In particular, the OLRC is tasked with "supervis[ing] state executive branch occupational licensing boards controlled by active market participants to ensure compliance with state policy in the adoption of occupational regulations."   La. Rev. Stat. Ann. § 37:45.

[85]   R. Doc. 151 ¶ 259.

Defendants contend that they "reserve their right to raise the *Parker* immunity defense at a later date,"[86] but do not detail what, if any, supervision the state exercises over the Commission's enforcement activities.  The Court finds that Tesla "has pled facts sufficient to support a finding that the active supervision requirement is not met in this case." *Veritext*, 901 F.3d at 292.

## ii.   Sherman Act Conspiracy

Tesla's Sherman Act claim is nevertheless subject to dismissal for failure to state a claim.  Stating a Section 1 claim "requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556.  "Asking for plausible grounds to infer an agreement . . . calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement." *Id.*  Notably, "lawful parallel conducts fails to bespeak unlawful agreement." *Id.*  Accordingly, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Id.*  In this case, Tesla has failed to "allege any specific *facts* demonstrating an intention on the part of" each of the commissioners "to engage in a conspiracy" to exclude Tesla from operating in the Louisiana

---

[86]   R. Doc. 170 at 15 n.2.  They further state that they "do not concede that *Parker* immunity does not apply."  R. Doc. 177 at 21.

motor vehicle market. *Marucci Sports, LLC v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 375 (5th Cir. 2014) (emphasis in original).

Throughout its complaint, Tesla repeatedly points out that many of the commissioners are members of LADA. But federal courts across the country have concluded that "[m]ere membership in associations is not enough to establish participation in a conspiracy with other members of those associations, much less a conspiracy between those associations and yet another association." *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 663 F.2d 253, 265 (D.C. Cir. 1981); *see also Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 396 (7th Cir. 1993); *Veritext*, 417 F. Supp. 3d at 786 ("While plaintiff alleges that members of the [agency] were simultaneously members of the [private industry association], that alone does not result in a finding that both associations are engaged in an unlawful conspiracy.").

Tesla also cites to several emails that the Executive Director of the Commission received from LADA members regarding Tesla's plans to open a service center in New Orleans. In particular, in one of the emails, an LADA member laments that it "is not good for the future of our business if the state lets this happen."[87]   But the Fifth Circuit has made clear that "one-sided

---

[87]   R. Doc. 151 ¶ 186.

complaint[s] [are] just not a suitable basis for an inference of conspiracy." *Abraham & Veneklasen*, 776 F.3d at 333. Tesla emphasizes that the Executive Director responded to the email by assuring the LADA members that the Commission is "on top of" it.[88] Tesla asks the Court to infer from this statement that the commissioners and LADA entered into an illicit agreement to wield the regulatory power of the Commission to force Tesla out of the market. But Tesla alleges no facts supporting this inferential leap. *See Twombly*, 550 U.S. at 557 (noting the "threshold requirement" of "allegations plausibly suggesting (not merely consistent with) agreement"). There are simply no specific factual allegations supporting an inference that the commissioners agreed with LADA to take any action that would keep Tesla out of the market.

Tesla next points to a letter that Allen Krake, former Chairman of the Commission, wrote in response to the Attorney General's inquiry regarding the Commission's understanding of Louisiana law. Krake represented in the letter that Louisiana law permits manufacturers like Tesla to lease their vehicles in Louisiana and to perform warranty servicing on those vehicles by virtue of their status as a "fleet owner."[89] Krake also indicated that Tesla may

---

[88]    *Id.* ¶¶ 185, 187.
[89]    *Id.* ¶ 200.

42

perform non-warranty servicing to any vehicle under Louisiana law.[90]  Krake

opined that a different interpretation would "result in an improper, activist

expansion of the law beyond the language passed by the legislature," and that

to the extent LADA wishes to see a change in the law, it must lobby the

legislature.[91]  Notably, Krake wrote that LADA met with the Commission

"numerous times" over the years in an effort to convince the Commission to

change its view of the law, but the Commission has "always openly held (and

directly stated to LADA) that it would issue a license to Tesla if Tesla met the

statutory guidelines."[92]  Although the letter on which Tesla relies expressly

*favors* Tesla's continued business operations in Louisiana and states that

LADA's efforts to persuade the Commission have been *unsuccessful*, Tesla

nevertheless seeks to capitalize on Krake's representation that the

Commission and LADA "met numerous times" in support of its claim that

the two entities formed a conspiracy.   But "[t]he mere opportunity to

conspire does not by itself support the inference that such an illegal

combination actually occurred."  *Capital Imaging Assocs., P.C. v. Mohawk*

*Valley Med. Assocs., Inc.*, 996 F.2d 537, 545 (2d Cir. 1993).  Indeed, the only

plausible inference these allegations support is that despite being asked to

---

[90]    R. Doc. 1-1 at 7.

[91]    *Id.* at 2.

[92]    *Id.*

agree with LADA's position, the Commission repeatedly refused to yield to LADA's requests.

Finally, Tesla points to the Commission's investigation of Tesla Lease Trust as evidence of the conspiracy. In particular, Tesla alleges that the Commission issued three subpoenas related to Tesla Lease Trust's activities in Louisiana.[93] Tesla responded to the first subpoena, and although the Commission withdrew the second subpoena, it did not withdraw the third one, which requested a narrower subset of information identifying warranty service and/or repairs performed in the State of Louisiana.[94] The Executive Director of the Commission ultimately moved to compel Tesla to comply with the third subpoena, and Tesla contends that fifteen of the commissioners "took action against" Tesla Lease Trust in the motion to compel proceedings, including by voting against continuing the hearing, voting to compel compliance with the subpoena, voting that the Commission had the authority to issue the subpoena, and voting to deny rehearing on the motion to compel.[95]

These allegations do not give the Court plausible grounds to infer that an anticompetitive agreement to drive Tesla out of the Louisiana market was

---

[93]   *Id.* ¶¶ 204-36.
[94]   *Id.*
[95]   *Id.* ¶¶ 224-30.

entered into by *any* of the commissioners, much less by all of them. *Twombly*, 550 U.S. at 556.  Tesla asserts that the investigation demonstrates a "concerted and pretextual change of the Commission's interpretation of state law."[96]   But this argument rests on a mischaracterization of the Commission's stated position on the law.  The Commission opined from the start that Louisiana law permits fleet owners like Tesla to provide warranty repairs to vehicles *in their fleet*.[97]   The third subpoena—which seeks to ascertain whether Tesla's warranty work was provided only on vehicles in its own fleet—is consistent with the Commission's original interpretation of the laws.  That Tesla thinks Louisiana law permits it to provide warranty repairs to *all* vehicles does not suggest that the Commission's efforts to enforce its reading of the law—notably, a reading that is considerably more favorable to Tesla than the interpretation advanced by LADA and the Attorney General— are part of a conspiracy with LADA to curtail Tesla's business operations.  As to Tesla's allegations that multiple commissioners voted against Tesla in connection with the Commission's motion to compel, Tesla has alleged no facts suggesting that these votes "stem[med] from . . . an agreement, tacit or express," rather than "independent decision." *Twombly*, 550 U.S. at 553.

---

[96]     *Id.* ¶ 246.
[97]     *Id.* ¶ 197.

In sum, Tesla's factual allegations, taken as true, indicate only that the Commission fielded concerns by LADA regarding Tesla's business operations in Louisiana; interpreted Louisiana law in a manner that favors Tesla's business operations in Louisiana, despite political pressure to interpret the laws otherwise; and investigated potential violations of those laws by Tesla in providing warranty repairs to vehicles outside of its fleet. Tesla's allegations do not "raise a reasonable expectation that discovery will reveal evidence of an illegal agreement." *Twombly*, 550 U.S. at 556.

Nor do Tesla's allegations "demonstrat[e] an intention on the part of" the commissioners "to engage in a conspiracy" for the purpose of "unreasonably restrain[ing] trade." *Marucci Sports*, 751 F.3d at 375. For example, in *Marucci Sports, LLC v. National Collegiate Athletic Ass'n*, the Fifth Circuit considered a Sherman Act challenge brought by Marucci Sports, a baseball bat manufacturer, against collegiate and high school athletic associations for the organizations' enforcement of a rule that prohibited the use of certain non-wooden baseball bats. *Id.* at 372. The organizations maintained that the purpose of enforcing the rule was to enhance player safety and "reduce technology-driven homeruns," but Marucci contended that the decision was designed to exclude new market entrants from the industry and to insulate larger incumbent baseball bat manufacturers from

46

competition.  Marucci alleged that this inured to the benefit of the defendant organizations because they received sponsorship money from incumbent baseball bat manufacturers.  *Id.*  The district court dismissed Marucci's Sherman Act claim, and on appeal, the Fifth Circuit affirmed, finding that although Marucci plausibly alleged that the organizations reached an agreement to enforce the rule, Marucci failed to plausibly allege that this concerted action "was a result of an agreement between [the defendants] to unreasonably restrain trade."  *Id.* at 375.  Here, Tesla has not plausibly alleged that the commissioners reached an agreement with LADA to investigate Tesla's business operations in Louisiana, much less that any such agreement was made with the intention "to achieve an unlawful objective."  *Id.*

This conclusion does not mean that actions consistent with an agency's regulatory authority can never amount to a Section 1 violation.  Otherwise, the *Midcal* test would be rendered a nullity.  Rather, from the facts Tesla alleges, its theory that defendants conspired to abuse the regulatory authority of the Commission is not plausible.  *Cf. SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1119-20 (9th Cir. 2022) (plaintiff plausibly alleged that its competitors on the Dental Board of California, who pursued an aggressive campaign of harassment including "coordinated statewide raids;

false statements; misconduct in front of consumers; and a retaliatory accusation," conspired in violation of Section 1).

### B. Tesla's State-Law Claims

Tesla contends that the same conduct that forms the basis of its Sherman Act claim subjects defendants to liability under Louisiana's antitrust laws and the Louisiana Unfair Trade Practices Act. As a threshold matter, to the extent that Tesla asserts state-law claims against the commissioners in their official capacity, such claims are barred by the Eleventh Amendment. "Pursuant to the Eleventh Amendment, a state's sovereign immunity in federal courts extends to private suits against state agencies, state departments, and other arms of the state." *Corn v. Miss. Dep't Pub, Safety*, 954 F.3d 268, 273 (5th Cir. 2020). The Commission is an "arm of the state" for purposes of the Eleventh Amendment.[98]  *See SkyRunner, L.L.C. v. La. Motor Vehicle Comm'n*, No. 19-49, 2019 WL 5681537, at *5 (W.D. La. Oct. 31, 2019) (concluding that the Commission is an "arm of the

---

[98]  Notably, an agency can be an "arm of the state" for purposes of the Eleventh Amendment even if its action is not entitled to immunity under *Parker*. *See Rodgers v. La. Bd. of Nursing*, 665 F. App'x 326, 329 (5th Cir. 2016) ("We conclude that sovereign immunity and *Parker* immunity are distinct doctrines, providing different—if sometimes overlapping—spheres of protection from private federal antitrust claims.").

state"); *Crefasi v. La. Motor Vehicle Comm'n*, No. 94-653, 1994 WL 548205, at *3 (E.D. La. Oct. 6, 1994) (same).  Because Tesla's "claims are against a sovereign, the Eleventh Amendment immunizes" the commissioners in their official capacity, unless an exception to immunity applies.  *Corn*, 954 F.3d at 274.

Tesla contends that the exception to Eleventh Amendment immunity found in *Ex parte Young*, 209 U.S. 123 (1908), applies because Tesla seeks only injunctive relief, rather than money damages, as to the commissioners in their official capacity.[99]  But *Ex parte Young*, which applies to cases in which plaintiffs seek to enjoin state officials from violating *federal* law, "cannot be used to redress a state official's violation of state law."  *Williams ex rel. J.E. v. Reeves*, 954 F.3d 729, 739 (5th Cir. 2020).  Accordingly, Tesla's state-law claims against the commissioners in their official capacity are barred by the Eleventh Amendment.  *See Corn*, 954 F.3d at 274 (holding that plaintiffs' claim that the Mississippi Department of Public Safety violated state law was "barred under sovereign immunity").  The Court thus assesses Tesla's state-law claims as to the private defendants only.

1.     The Louisiana Antitrust Act

---

[99]     R. Doc. 151 ¶ 116.

"Louisiana's antitrust statute, enacted in 1890, mirrors the Sherman Act, which was enacted that same year." *S. Tool & Supply, Inc. v. Beerman Precision, Inc.*, 818 So. 2d 256, 260 (La. App. 4 Cir. 2002).  The statute provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in this state is illegal." La. Rev. Stat. Ann. § 51:122.  Because Louisiana's antitrust laws are "virtually identical to Sections 1 and 2 of the Sherman Antitrust Act, . . . federal analysis of the Sherman Act is persuasive, though not controlling." *HPC Biologicals, Inc. v. UnitedHealthcare of La., Inc.*, 194 So. 3d 784, 792-93 (La. App. 1 Cir. 2016).  Louisiana state courts have recognized that "[t]he *Noerr-Pennington* doctrine sweeps broadly and is implicated by both state and federal antitrust claims that allege anticompetitive activity in the form of lobbying or advocacy before any branch of either federal or state government." *Capital House Pres. Co., L.L.C. v. Perryman Consultants, Inc.*, 47 So. 3d 408, 418 (La. App. 1 Cir. 2009); *Astoria Entm't, Inc. v. DeBartolo*, 12 So. 3d 956, 961 (La. 2009) (acknowledging that the *Noerr-Pennington* doctrine extends to efforts to lobby administrative agencies).  The Court is aware of no Louisiana case law that treats the *Noerr-Pennington* doctrine for antitrust claims rooted in Louisiana state law

differently than for Sherman Act claims.  Accordingly, Tesla's claim is subject to dismissal for the same reasons discussed in Section III.A.1, *supra*.

Even if the private defendants were not entitled to *Noerr-Pennington* immunity, Tesla's state antitrust claim would nevertheless be subject to dismissal on the independent grounds that it is untimely.  "There is no statute of limitation in . . . the Louisiana Antitrust Act."  *CamSoft Data Sys., Inc. v. S. Electrs. Supply, Inc.*, 2019 WL 2865138, at *30 (La. App. 1 Cir. 2019).  Nevertheless, the Louisiana Supreme Court has held that because an antitrust action sounds in tort, a one-year limitations period applies.  *Loew's, Inc. v. Don George, Inc.*, 237 La. 132, 146 (La. 1959).  Louisiana courts have looked to federal guidance to conclude that "in a conspiracy action, the prescriptive period begins with an overt act pursuant to the conspiracy."  *CamSoft Data Sys., Inc.*, 2019 WL 2865138, at *32 (citing *State ex rel. Ieyoub v. Bordens, Inc.*, 684 So. 2d 1024, 1027 (La. App. 4 Cir. 1996)).

Looking at Tesla's conspiracy allegations, the last conceivable act defendants took in furtherance of the alleged conspiracy was the Commission's vote to deny rehearing on the Executive Director's motion to compel on July 12, 2021, over thirteen months before this suit was filed.[100] Tesla's claim is thus time-barred.

---

[100]     *Id.* ¶ 226.

Tesla invokes the continuing tort doctrine in defense of the timeliness of its claim.  In particular, Tesla contends that the Commission continues to submit filings in defense of its subpoena in the state-court action.  Tesla asserts that these filings constitute unlawful continuing acts for purposes of the continuing tort doctrine.[101]  "In the context of a continuing conspiracy to violate antitrust laws, each time a plaintiff is injured by the act of a defendant, a cause of action accrues to recover damages caused by that act and the statute of limitations runs from the commission of the last act." *Bordens*, 684 So. 2d at 1027.  "A continuing tort is occasioned by unlawful acts, not the continuation of the ill effects of an original, wrongful act." *Miller v. Conagra*, 991 So. 2d 445, 456 (La. 2008).  Here, the Commission's filings in defense of the lawfulness of the third subpoena in the state-court action do not constitute "unlawful acts" in furtherance of the alleged conspiracy. Indeed, the Louisiana Supreme Court has made clear that a defendant's "repeated denial of liability" in litigation does not "amount to a continuous violation" of the law.  *Id.*  "To hold otherwise would require a defendant to choose between admitting liability on the one hand, and extending prescription by pursuing his defense on the other."  *Id.*  Tesla's state antitrust claim is thus dismissed with prejudice.

---

[101]    *Id.* ¶ 361.

2.     The Louisiana Unfair Trade Practices Act

LUTPA prohibits conduct that "offends established public policy and . . . is immoral, unethical, oppressive, unscrupulous, or substantially injurious." *Cheramie Servs., Inc. v. Shell Deepwater Prod., Inc.*, 35 So. 3d 1053, 1059 (La. 2010).   LUTPA claims are also subject to a one-year limitations period.   La. Rev. Stat. Ann. § 51:1409(E).   The one-year period runs "from the time of the transaction or act which gave rise to this right of action."   *Id.*   As discussed in Section III.B.1, *supra*, the "transaction or act which gave rise to" Tesla's LUTPA claim is the Commission's investigation of Tesla Lease Trust.   The last conceivable action taken in furtherance of the alleged conspiracy was the Commission's vote to deny rehearing on the Executive Director's motion to compel on July 12, 2021, over thirteen months before this suit was filed.[102]   Nor does the Commission's continued defense of its third subpoena in state court toll the limitations period.   *Miller*, 991 So. 2d at 456 (holding that defendant's "repeated denial of liability" in litigation does not "amount to a continuous violation of LUTPA").   Tesla's LUTPA claim is thus dismissed with prejudice.

---

[102]     *Id.* ¶ 226.

### C.     Tesla's Constitutional Claims

Each of Tesla's three constitutional claims against the commissioners in their official capacity are brought pursuant to 42 U.S.C. § 1983.  Section 1983 provides a cause of action to plaintiffs whose federal rights are violated under color of state law.  *Id.*; *Doe v. Dall. Indep. Sch. Dist.*, 153 F.3d 211, 215 (5th Cir. 1998).  To state a claim under section 1983, a plaintiff must first show a violation of the Constitution or of federal law, and then show that the violation was committed by someone acting "under color of state law."  *Id.* The Court will evaluate each constitutional claim in turn.

#### 1.     *The Due Process Clause*

Tesla contends that the composition of the Commission violates the Due Process Clause because it denies Tesla the right to be regulated by a neutral arbiter.   As discussed in Section I, *supra*, the Commission is composed of eighteen commissioners, fifteen of whom are required by law to be an "actively engaged licensee of the commission . . . and be a holder of such a license at all times while a member of the commission."  La. Rev. Stat. Ann. § 32:1253(A)(2).  Nine of the fifteen licensee commissioners may be primarily engaged in the business of car sales; the remaining six must be "primarily engaged" in other parts of the industry, like sales finance and

54

heavy truck sales.  *Id.*  The three non-licensee commissioners are members of the public whose sole function is hearing and deciding disputes between, *inter alia*, manufacturers and motor vehicle dealers.  *Id.* § 32:1253(A)(3)(a).  The Commission also employs an Executive Director who is "in charge of the [C]ommission's office."  *Id.* § 32:1253(D).

The Commission is granted "[t]he powers and duties necessary and proper to enable it to fully and effectively carry out" Louisiana's laws related to the distribution of motor vehicles.  *Id.* § 32:1253(E).  It is thus "authorized and empowered to make and enforce all reasonable rules and regulations and to adopt and prescribe all forms necessary" to do so.  *Id.*  The Commission must "consider and determine the action necessary upon all charges of conduct which fail to conform to" any "law or rule or regulation relating to the sale, lease or rental" of motor vehicles.  La. Admin. Code tit. 46, pt. V, § 301.  Regulations adopted by the Commission are subject to review by the OLRC.  La. Rev. Stat. Ann. § 37:45.  The Commission may issue subpoenas "to bring before the [C]omission any person in this state, to give testimony under oath, as well as for the purpose of compelling production of records and papers, relative to matters to be investigated, considered or heard by the [C]ommission."  La. Admin. Code tit. 46, pt. V, § 111.  This includes the power to issue a subpoena when, "in the opinion of the Executive Director, such a

subpoena is necessary to investigate any potential violation or lack of compliance with [Louisiana Revised Statute section 12:1251 et seq., or the rules, regulations, or orders of the [C]ommission." La. Admin. Code tit. 46, pt. V, § 303.

Tesla contends that because its direct-to-consumer sales model has been successful elsewhere, Tesla poses an existential threat to the commissioners, nine of whom directly "compete with Tesla in the market for automobile sales, leasing, and servicing."[103] Tesla contends that although the remaining licensee commissioners do not directly compete with Tesla, they may nevertheless be affiliated with franchise dealerships, and could thus have an incentive to protect the business model.[104] Tesla therefore asks the Court to declare the Commission unconstitutionally constituted and enjoin the Commission from taking any action against Tesla, including continuing its investigation.

"[A] fair trial in a fair tribunal is a basic requirement of due process." *Withrow v. Larkin*, 421 U.S. 35, 46 (1976) (quoting *In re Murchison*, 349 U.S. 133, 136 (1955)); *see also Geotes v. Miss. Bd. Vet. Med.*, 986 F. Supp. 1028, 1032 (S.D. Miss. 1997), *aff'd*, 163 F.3d 1355 (5th Cir. 1998) ("It is a

---

[103]   R. Doc. 151 ¶ 47.
[104]   *Id.* ¶ 48.

fundamental precept of due process that those responsible for decisions which affect an individual's property and/or liberty interests must be impartial."). The right to impartial tribunals applies to courts and administrative agencies alike. *Gibson v. Berryhill*, 411 U.S. 564, 579 (1973); *see also Baran v. Port of Beaumont Nav. Dist. Jefferson Cnty. Tex.*, 57 F.3d 436, 444 (5th Cir. 1995) ("A fair trial before a fair and impartial tribunal, whether a court or administrative agency, is a basic requirement of due process.").

Tesla's argument that the Commission should be enjoined from regulating Tesla merely because the Commission includes Tesla's direct competitors is meritless. Tesla relies on the 1973 Supreme Court case *Gibson v. Berryhill* to argue that because the Commission includes Tesla's competitors, any decisions the Commission makes that are adverse to Tesla could "possibly redound" to the benefit of the commissioners, thereby rendering the Commission unconstitutionally composed. 411 U.S. at 579. Tesla's argument rests on a misstatement of the Supreme Court's holding in *Gibson*. That case involved a challenge to Alabama's board of optometry, a regulatory entity on which only independent optometrists in private practice—rather than commercial optometrists—were eligible to serve. *Id.* at 567. The board charged a group of commercial optometrists with

unprofessional conduct premised on their employment with a corporation. The commercial optometrists thus faced revocation of their licenses. *Id.* at 567-68. At the time, nearly half of all optometrists in Alabama were employed by corporations, and the ultimate "aim of the board was to revoke the licenses of all optometrists in the state who were employed by business corporations." *Id.* at 578. The Supreme Court affirmed the district court's ruling that the board had a "substantial pecuniary interest" in the outcome of disputes regarding commercial optometrists' licensing that precluded the board members from adjudicating such disputes. *Id.* at 579. Notably, the Supreme Court did not hold that *any time* a board's decision could "possibly redound to the benefit" of board members, due process was violated. Rather, the Court acknowledged that it was "remote . . . from the local realities underlying the case," and had "no good reason" to disagree with the district court's conclusion that "the pecuniary interest of the members of the Board of Optometry had sufficient substance to disqualify them." *Id.* at 579.

Several years later, the Supreme Court reiterated that regulatory boards are not unconstitutional merely because they are composed of competitors of the entities they regulate. *Friedman v. Rogers*, 440 U.S. 1, 18 (1979), *reh'g denied*, 441 U.S. 917 (1979). In *Friedman*, a commercial optometrist challenged the constitutionality of Texas's optometry board, the

majority of which were professional, rather than commercial, optometrists. *Id.* at 4-5. The plaintiff contended that he was deprived of due process because he was "subject to regulation by a Board composed primarily of members of the professional faction." *Id.* at 6. Notably, the case did not involve a challenge to a particular decision by the board that adversely impacted the plaintiff's interests. Rather, the plaintiff sought a general declaration that the board was constitutionally unfit to regulate commercial optometrists. The Supreme Court rejected the plaintiff's claim, and in so doing, it distinguished *Gibson* as a case involving a challenge to disciplinary proceedings, which enabled the Court to "examine in a particular context the possibility that the members of the regulatory board" would be biased. *Id.* The *Friedman* plaintiff's generalized challenge to the board did not present such a case. The Court further noted that although the plaintiff had "a constitutional right to a fair and impartial hearing in any disciplinary proceeding conducted against him by the Board," he had "no constitutional right to be regulated by a Board that is sympathetic to the commercial practice of optometry." *Id.* at 18-19.

Tesla's argument that the composition of the Commission necessarily violates the Due Process Clause because it includes industry participants that

compete with Tesla thus misstates the law.[105]  Indeed, federal courts across the country have recognized that industry representation on regulatory boards is a "common and accepted practice."  *N.Y. State Dairy Foods, Inc. v. Northeast Dairy Compact Comm'n*, 198 F.3d 1, 13-14 (1st Cir. 1999); *see also Stivers v. Pierce*, 71 F.3d 732, 743 (9th Cir. 1995) ("[T]he system of industry representation on governing or licensing bodies is an accepted practice throughout the nation."); *Chrysler Corp. v. Tex. Motor Vehicle Comm'n*, 755 F.2d 1192, 1199 (5th Cir. 1985) (upholding challenge to the composition of Texas Motor Vehicle Commission, the majority of which were motor vehicle dealers).

Further, the Fifth Circuit has recognized that in a "system of peer review, with arbiters drawn from the same industry as the disputants, the possibilities of improper motive can always be imagined."  *Chrysler Corp.*, 755 F.2d at 1199.  Mere "possibilities of improper motive" do not necessarily give rise to a due process violation.  *Id.*  In *Chrysler Corp. v. Texas Motor*

---

[105]   R. Doc. 151 ¶ 279 n.28 (alleging that "Tesla's claim is not limited to the subpoena or similar regulatory actions: The Commission could use its authority to drive Tesla out of the market entirely"); ¶ 272 (alleging that "where an administrative board is comprised of a litigant's competitors and a particular outcome in the proceeding could simply *possibly* redound to the personal benefit of members of the board," it is "constitutionally disqualified from hearing disputes involving that litigant" (emphasis in original) (quotation omitted)).

*Vehicle Commission*, the Fifth Circuit rejected a Due Process Clause challenge to a motor vehicle commission similar to the Commission in this case.  *Id.* at 1195.  At issue in that case was Texas's "lemon law," which provided car purchasers with additional remedies against car manufacturers.  *Id.*  Disputes between purchasers and manufacturers were to be decided by Texas's motor vehicle commission, which consisted of five dealers and four consumers.  *Id.* at 1196.  Chrysler challenged the legal scheme, contending that "dealers and manufacturers are so at economic odds that a Commission composed of automobile dealers cannot constitutionally adjudicate" the disputes.  *Id.* at 1197.  In particular, Chrysler argued that because car defects are "most likely the product of either a manufacturing flaw or the dealer's negligent failure to repair the vehicle correctly," dealers adjudicating disputes related to car defects had a financial incentive to lay blame on manufacturers.  *Id.* at 1198.  The district court agreed, holding that the "dealers have the temptation of both a pecuniary and institutional interest in the decisionmaking process." *Id.*

The Fifth Circuit reversed.  *Id.*  The court noted that cases involving claims of bias exist along a "continuum of interests," with judges paid directly for their convictions at one end, and "life-tenured and wholly disinterested judge[s]" at the other.  *Id.* at 1199.  The "predictors of bias" in that case

"point[ed] in opposite directions." *Id.* Although it was possible that the dealer-commissioners would all align against manufacturers in resolving disputes, it was also possible that "a dealer [would] be quick to find fault with his direct competitor—the dealer." *Id.* The court further noted that the "suggestion of possible temptation . . . ignores the fact that four of the nine members of the commission are not dealers," which was "relevant to the possible bias of the full decisionmaker—the Commission." *Id.*

Accordingly, that some of the Commissioners may, by virtue of their status as competitors of Tesla, have an incentive to wield their power to Tesla's disadvantage is not enough to state a claim under the Due Process Clause. Were that the case, any entity regulated by its peers could ask federal courts to dismantle regulatory boards designed by state law. Rather, determining whether any particular board or commission has a "direct, personal, substantial pecuniary interest" in a particular dispute is "by necessity both case-specific and ultimately judgmental, and presents the inevitable line-drawing for cases at the edge." *Id.* at 1199.

The relevant inquiry is thus whether, in the context of the particular dispute, the "probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Withrow*, 421 U.S. at 47. Indeed, the Fifth Circuit has "refused to adopt any per se rule

disqualifying administrative hearing bodies." *Megill v. Bd. Regents Fla.*, 541 F.2d 1073, 1079 (5th Cir. 1976). Rather, "the record must support actual partiality of the body or its individual members." *Id.* "In the absence of evidence to the contrary, [courts] must assume [that] the administrative hearing body acted independently and properly in those circumstances." *Id.* (quoting *Duke v. N. Tex. State Univ.*, 469 F.2d 829, 834 (5th Cir. 1972)).

Accordingly, the Court must analyze the "probability of actual bias" in the context of actions the Commission has taken that are allegedly adverse to Tesla's interests. Notably, Tesla does not contend that the Commission has excluded Tesla from the motor vehicle sales market in Louisiana—Tesla acknowledges that the Legislature is responsible for the direct sales ban. Tesla thus does not contend that the Commission is responsible for preventing Tesla from implementing the facet of Tesla's business that Tesla believes is an "existential threat" to the businesses of the commissioners: its direct-to-consumer sales model. Rather, Tesla's complaints about the Commission are focused on the Commission's enforcement of Louisiana's laws related to leasing and warranty repairs. But Tesla does not plausibly allege that the Commission is incentivized to prevent Tesla from carrying out those operations.

Tesla alleges that the investigation itself demonstrates an anti-Tesla bias, but the facts Tesla alleges do not render this narrative plausible. As discussed in Section III.A, *supra*, the Commission expressly opined in 2020 that manufacturers like Tesla may lawfully lease their cars in Louisiana, and that fleet owners may provide warranty repairs to the vehicles in their fleet. The Commission took this position despite political pressure to adopt an interpretation of the law that is considerably worse for Tesla. Tesla contends that the Commission's subpoenas demonstrate that the Commission has since adopted a different view of the law, but as discussed in Section III.A.2, *supra*, the subpoenas, which seek to identify which cars Tesla has been servicing in New Orleans, are consistent with the Commission's stated position that fleet owners may service only the vehicles *in their fleet*. Tesla's differing view of the law does not indicate that the Commission's investigation, which is consistent with both the Commission's stated view of the law and with its responsibility to investigate potential violations of the law, deprives Tesla of its due process rights. In the absence of plausible allegations regarding "actual partiality of the [Commission] or its individual members," the Court must assume that the Commission "acted independently and properly" in its investigation. *Megill*, 541 F.2d at 1079.

Tesla also relies heavily on the non-binding case *Nissan Motor Corp. in U.S.A. v. Royal Nissan, Inc.*, to argue that the Commission has already been deemed unconstitutional.  In that case, Nissan was involved in a dispute with two dealers regarding plans to open a third dealership in the state.  757 F. Supp. 736, 740 (E.D. La. 1991).  The court held that the Commission, which, at the time, consisted entirely of dealers, could not hear that particular dispute because the dealer-commissioners had a financial incentive to rule in favor of the dealers.  *Id.*  Nevertheless, the court made clear that its ruling did not "invalidate the entire statutory scheme and bar the Commission from hearing any complaints involving manufacturers and dealers."  *Id.* at 741.  Further, the Louisiana Legislature has since revised the law to require that the Commission include three non-licensee members to hear disputes like the one at issue in *Nissan*, and at least six members that are not primarily engaged in new motor vehicle sales.  *See* La. Rev. Stat. Ann § 32:1253(A) (1991).  Tesla's argument that the composition of the Commission has already been deemed unconstitutional thus misstates the law.

As in *Chrysler*, Tesla's argument "rests on the assertedly antagonistic relationship" between it and the dealer-commissioners.  755 F.2d at 1197. Although Tesla has "a constitutional right to a fair and impartial hearing," it

has "no constitutional right to be regulated by" a Commission that is "sympathetic to" its business model. *Friedman*, 440 U.S. at 18. In light of the full composition of the Commission, which includes six members that do not directly compete with Tesla and three that are not even members of the industry, and the dearth of plausible allegations that the nine dealer-commissioners have demonstrated actual bias toward Tesla, the Court is "not persuaded that [the commissioners] have an economic stake" in their regulation of Tesla's leasing and warranty repairs activities "sufficient to constitute a violation of due process." *See Chrysler Corp.*, 755 F.2d at 1198.

2.      *The Equal Protection Clause*

Next, Tesla contends that Louisiana's direct sales ban and the warranty repairs ban for non-fleet owners violates the Equal Protection Clause of the Fourteenth Amendment. Tesla thus asks the Court to declare the laws unconstitutional and permanently enjoin the Commission from enforcing them.[106]

The Equal Protection Clause provides that "no State shall deny . . . to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. It "essentially requires that all persons similarly situated

---

[106]     R. Doc. 151 ¶¶ 313-15.

be treated alike." *Mahone v. Addicks Util. Harris Cnty.*, 836 F.2d 921, 932 (5th Cir. 1988).  To succeed on an Equal Protection Clause claim, a plaintiff must first demonstrate that "two or more classifications of similarly situated persons were treated differently" under the disputed statute. *Duarte v. City of Lewisville*, 858 F.3d 348, 353 (5th Cir. 2017).  "Being similarly situated is key." *Hines v. Quillivan*, 982 F.3d 266, 272 (5th Cir. 2020).  "Because the clause's protection reaches only dissimilar treatment among similar people, if the challenged government action does not appear to classify or distinguish between two or more relevant persons or groups, then the action does not deny equal protection of the laws." *Id.* (internal quotation marks omitted).

After determining that a law treats similarly situated people differently, courts must determine which level of scrutiny applies, which depends on whether a protected class or fundamental right is implicated. *Id.* When the alleged violation is not predicated on a protected class or fundamental right, rational basis review applies. *See Glass v. Paxton*, 900 F.3d 233, 244 (5th Cir. 2018).  Under that standard, "a legislative classification must be upheld . . . if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* at 244-45.  The legislature need not "articulate its reasons for enacting a statute [because] it is entirely irrelevant for constitutional purposes whether the

conceived reasons for the challenged distinction actually motivated the legislature." *FCC v. Beach Comms., Inc.*, 508 U.S. 307, 314-15 (1993).

"Rational-basis review is guided by the principle that [courts] don't have a license to judge the wisdom, fairness, or logic of legislative choices." *Hines*, 982 F.3d at 273 (internal quotation marks omitted). Accordingly, when, as here, "economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *Id.* (internal quotation marks omitted). Although rational-basis review vests broad discretion in legislatures, the Fifth Circuit has "made clear that 'rational' still must be actually rational, not a matter of fiction." *Id.* (quoting *St. Joseph Abbey v. Castille*, 712 F.3d 215, 233 (5th Cir. 2013)). The state may rely on a "hypothetical rationale, even post-hoc," but the means-ends connection "cannot be fantasy, and . . . the [State's] chosen means must rationally relate to the state interests it articulates." *Id.*

Tesla's first Equal Protection Clause challenge is to the direct sales ban. As discussed in Section I.A, *supra*, Louisiana Revised Statute section 32:1261(A)(1)(k) provides that manufacturers may not "sell or offer to sell a new or unused motor vehicle directly to a consumer." Rather, manufacturers must sell new vehicles through franchised dealers, which are subject to a

number of requirements.  For example, dealers must obtain state licensing, "have an enclosed new motor vehicle display showroom of not less than 400 square feet in area," and "maintain an adequate stock of replacement parts, an adequate shop area and adequate mechanical facilities for the proper servicing of the motor vehicles which he sells."  La. Admin. Code, tit. 46, pt. V, § 901(A).  The law also imposes restrictions on dealers' advertising practices.  *Id.* § 701.  Tesla contends that the direct sales ban violates the Equal Protection Clause by irrationally and unjustifiably treating manufacturer-owned dealerships differently than franchised dealerships.[107]

The Court finds that the direct sales ban passes rational-basis review.  The Louisiana Legislature determined that "the distribution and sale of motor vehicles" in the State of Louisiana "vitally affects the general economy of the state, the public interest, and the public welfare," and that regulation was necessary to "prevent frauds, impositions, and other abuses upon its citizens;" to "avoid undue control of the independent motor vehicle dealer" by manufacturers; to "protect the public against the creation or perpetuation of monopolies and practices detrimental to the public welfare;" and to "prevent disruption of the system of distribution of motor vehicles . . . to the public."  La. Rev. Stat. Ann. § 32:1251.

---

[107]     R. Doc. 151 ¶ 304.

The Fifth Circuit has already held that a substantially similar law, supported by similar justifications, passes rational-basis review.  In *Ford Motor Co. v. Texas Department of Transportation*, the court considered a challenge to a Texas law that prohibited manufacturers from "(1) own[ing] an interest in a dealer or dealership; (2) operat[ing] or control[ling] a dealer or dealership; or (3) act[ing] in the capacity of a dealer."  264 F.3d 493, 498 (5th Cir. 2001).  Much like the Louisiana Legislature, the Texas Legislature determined that "[t]he distribution and sale of new motor vehicles in [Texas] vitally affects the general economy of the state and the public interest and welfare of its citizens," so the law was intended "to insure a sound system of distributing and selling new motor vehicles through licensing and regulating the manufacturers, distributors, and franchised dealers" to "prevent frauds, unfair practices, discrimination, impositions, and other abuses of [Texas] citizens."  *Id.* at 500.

Ford, which marketed preowned vehicles directly to consumers online, filed a lawsuit challenging the constitutionality of the law.  *Id.*  Much like Tesla, Ford argued that its online sales model was superior because it permitted buyers to buy cars at the "no-haggle" price determined by Ford and listed on the website.  *Id.* at 499.  Ford contended that the law irrationally treated manufacturers differently than dealers.  *Id.* at 510.  The Fifth Circuit

rejected Ford's argument.  In so doing, it held that "prevent[ing] vertically integrated companies from taking advantage of their incongruous market position," and preventing "frauds, unfair practices, discrimination, impositions, and other abuses" in the sale of vehicles, are "legitimate state interests."  *Id.* at 503.  The court thus concluded that the law bore a reasonable relationship to the state's legitimate purpose in controlling the automobile retail market.  *Id.* at 510.

In a challenge to Texas's direct sales ban brought several years later, the Fifth Circuit reiterated that the prevention of "vertically integrated companies from taking advantage of their market position," and the prevention of "frauds, unfair practices, discrimination, impositions, and other abuses of [its] citizens," are "legitimate state interests," and that "a reasonable legislator could have believed [Texas's direct sales ban] would further those legitimate interests."  *Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 728 (5th Cir. 2004).  The Louisiana Supreme Court has likewise concluded that "[t]he regulation of [the] automobile industry is a matter of importance to the public interest."  *Benson & Gold Chevrolet, Inc. v. La. Motor Vehicle Comm'n*, 403 So. 2d 13, 23 (La. 1981).

Tesla argues that the true purpose of the law is to protect incumbent dealers at the expense of Louisiana consumers.  It analogizes the direct sales

ban to the law at issue in *St. Joseph Abbey v. Castille*, 712 F.3d 215 (5th Cir. 2013).  In that case, the Fifth Circuit considered a challenge to a Louisiana law that granted funeral homes the exclusive right to sell caskets.  *Id.* at 217-18.  The state argued that the economic protection of the funeral industry was a legitimate state interest, which the Fifth Circuit rejected.  *Id.* at 227.  In so doing, the court explained that although a law motivated by protectionism may have a rational basis, "naked economic preferences are impermissible to the extent that they harm consumers."  *Id.* at 223 (internal quotation marks omitted).  Critically, in that case, the court could imagine *no* basis for the law except pure economic protectionism—indeed, Louisiana did not even require the use of a casket in burials, much less regulate any other aspect of casket use, construction, or design.  *Id.* at 217-18 ("There are no other strictures over [caskets'] quality or use.").  The court thus held that the purported rational basis advanced by the state rose to the level of "fantasy." *Id.* at 223.  Conversely, the Fifth Circuit has repeatedly held that regulation of the automobile industry to protect consumers is a legitimate state interest. *See Ford*, 264 F.3d at 510; *Int'l Truck & Engine Corp.*, 372 F.3d at 728.

Tesla also argues that the direct sales ban is harmful to consumers, but "the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *Hines*, 982 F.3d at 273.  Tesla

further asserts that the direct sales ban was not actually motivated by the state's interest in controlling the automobile retail market. Rather, it asserts that the Legislature was motivated by anti-Tesla animus. As a threshold matter, "it is entirely irrelevant for constitutional purposes whether the conceived reasons for the challenged distinction actually motivated the legislature." *FCC*, 508 U.S. at 314-15. Even assuming Tesla's theory were viable,[108] the direct sales ban applies equally to all manufacturers, and Tesla has alleged no facts regarding anti-Tesla animus on the part of the Louisiana Legislature. The Court thus dismisses Tesla's Equal Protection Clause challenge to the direct sales ban.

The law prohibiting manufacturers from directly providing warranty repairs to vehicles likewise passes rational-basis review. As discussed in Section I, *supra*, Louisiana Revised Statute section 32:1261(A)(1)(t) provides that manufacturers may not "operate a satellite warranty and repair center" or "authorize a person to perform warranty repairs, including emergency repairs," unless that person is "a motor vehicle dealer, fleet owner, or an emergency services company or emergency services related company." For

---

[108]   "[T]he Fifth Circuit has not explicitly embraced 'personal vindictiveness' as a discrete basis for an equal protection claim or established the requirements for such a claim." *Mahon v. Pelloat*, No. 20-2396, 2021 WL 5356908, at *5 (E.D. La. Nov. 17, 2021).

purposes of the law, a "fleet owner" is "a person, including a governmental entity, who is approved and authorized by a manufacturer to perform warranty repairs and owns or leases vehicles for its own use or a renting or leasing company that rents, maintains, or leases vehicles to a third party." *Id.*

As discussed in Section III.A, *supra*, uncertainty regarding the proper interpretation of the warranty repair law permeates this case. Tesla maintains that it is a fleet owner because it leases its cars to third parties, so it may lawfully provide warranty repairs to *all* Tesla vehicles. The Commission agrees that Tesla is a fleet owner because it leases its cars to third parties, but it asserts that Tesla may lawfully provide warranty repairs only to the vehicles it leases, which are part of its "fleet." Under the Attorney General's interpretation of the law, Tesla may not lawfully lease its vehicles directly to consumers. Accordingly, it does not meet the definition of a "fleet owner," so it cannot provide warranty repairs to *any* Tesla vehicles.

The Court need not weigh in on the appropriate interpretation of the law to resolve Tesla's challenge to it because, under any interpretation, the law is rationally related to several legitimate interests. First, limiting the entities that can perform warranty repairs could help assure that all entities providing these services meet "the same basic requirements for special tools,

technician certification, and training."[109]    La. Rev. Stat. Ann.
§ 32:1261(A)(1)(t)(ii).  Indeed, the Legislature expressly stated its desire to
"prevent deterioration of facilities for servicing motor vehicles and keeping
same safe and properly functioning." *Id.* § 32:1251.  The law also rationally
relates to the Legislature's stated purpose of preventing "the creation or
perpetuation of monopolies" by manufacturers. *Id.*  Because the Court can
think of "potentially rational bases" for the law, it passes constitutional
muster under the Equal Protection Clause. *See Hines*, 982 F.3d at 274.

### 3.    *The Commerce Clause*

Tesla contends that both laws also violate the Commerce Clause.  The
Commerce Clause extends to Congress the power to "regulate Commerce . . .
among the several States."  U.S. Const. art. I, § 8 cl. 3.  "On its face, this
provision says nothing about state authority over interstate commerce."
*NextEra Energy Capital Holdings, Inc. v. Lake*, 48 F.4th 306, 317 (5th Cir.
2022).  Nevertheless, "it is settled that that because Congress can regulate

---

[109]    Tesla contends that the state could have achieved its goal by requiring
that all entities providing repairs, including manufacturers, meet the
same basic requirements.  But "[a] classification does not fail rational-
basis review because it is not made with mathematical nicety or
because in practice it results in some inequality." *Big Tyme Invs., LLC
v. Edwards*, 985 F.3d 456, 470 (5th Cir. 2021).

interstate commerce, the states cannot erect barriers to the free flow of that commerce." *Id.* "This negative aspect of that power, known as the dormant Commerce Clause, prevents the States from adopting protectionist measures and thus preserves a national market for goods and services." *Id.* (quoting *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 U.S. 2449, 2459 (2019)); *see also Dickerson v. Bailey*, 336 F.3d 388, 395 (5th Cir. 2003) (stating that the logical corollary to Congress's power to regulate commerce among the states is that states lack power to impede interstate commerce with their own regulations).

A state's authority to regulate interstate commerce is cabined by two principles: "A state (1) may not discriminate against interstate commerce and (2) may not impose undue burdens on interstate commerce." *Hignell-Stark v. City of New Orleans*, 46 F.4th 317, 325 (5th Cir. 2022) (internal quotation marks omitted). A state law can thus violate the dormant Commerce Clause in two ways: first, by "discriminat[ing] against interstate commerce either facially, by purpose, or by effect." *Allstate Ins. Co. v. Abbott*, 495 F.3d 151, 160 (5th Cir. 2007). "In this context, discrimination simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338

(2007) (internal quotation marks omitted).  Laws that discriminate in this manner are almost always *per se* invalid, unless the state can show that it has no other means to advance a legitimate local purpose.  *Id.*  Second, a law violates the dormant Commerce Clause if it imposes a burden on interstate commerce that "is clearly excessive in relation to its putative local benefits." *Allstate*, 495 F.3d at 160.  Laws that "merely impose[] an incidental burden on interstate commerce . . . face[] much smoother sailing" than those that facially discriminate against interstate commerce.  *Hignell-Stark*, 46 F.4th at 325.

In this case, the challenged legal restrictions are facially neutral, as they do not expressly favor in-state interests over out-of-state interests. Accordingly, the Court considers whether Tesla has plausibly alleged that the laws (1) were "enacted with a discriminatory purpose," or (2) have "a discriminatory effect on interstate commerce." *Wal-Mart Stores, Inc. v. Tex. Alcoholic Bev. Comm'n*, 945 F.3d 206, 214 (5th Cir. 2019).

The party challenging a statute has the burden to prove discriminatory purpose under the Commerce Clause.  *Allstate*, 495 F.3d at 160.  Plaintiffs must overcome the "presumption of legislative good faith."  *Wal-Mart*, 945 F.3d at 216.  Further, the Fifth Circuit has made clear that legislators' "awareness of a discriminatory effect is not enough: the law must be passed

because of that discriminatory effect." *Id.* (internal quotation marks omitted).   To determine whether the legislature's actions amount to purposeful discrimination against interstate commerce, courts consider the following non-exhaustive factors: whether the effect of the state action creates a clear pattern of discrimination; the historical background of the action, including any history of discrimination by the decisionmakers; the specific sequence of events leading up to the challenged state action, including any departures from normal procedures; and the legislative or administrative history of the state action, including contemporary statements by decisionmakers.  *Id.* at 214.

Tesla's complaint is bereft of allegations that the Legislature, rather than those who lobbied for the direct sales ban, intended to harm out-of-state interests.  *See id.* at 216 ("[An industry group's] motivations and actions are not sufficient indicia of legislative intent.").[110]   Tesla delves into the legislative history of the direct sales ban in its complaint, but the most that its allegations, taken as true, indicate, is that legislators acknowledged

---

[110]   Tesla's complaint focuses on anti-Tesla animus, but to the extent Tesla argues that the Legislature intended to harm all out-of-state motor vehicle manufacturers, "[u]nder the law of the Fifth Circuit, evidence that legislators intended to ban potential permittees based on company form alone is insufficient to meet the purpose element of a dormant Commerce Clause claim."  *Id.* at 217.

LADA's role in advocating for the amendment and that it was passed "without any discussion that [it] would ban direct vehicle sales to consumers in the State."[111]  This is insufficient to plausibly allege that the Legislature acted with discriminatory intent when it amended the law in 2017.  *See Allstate*, 495 F.3d at 161-62 ("[W]hile characterizing the legislative hearings . . . as 'perfunctory,' Allstate has failed to show that the Legislature departed from usual procedures in its consideration or enactment of the bill" or that the Texas Legislature had a "clear and consistent pattern of discriminatory action.").  The complaint also includes no factual allegations as to the Legislature's discriminatory purpose in relation to the warranty repair law. To the contrary, Tesla alleges that the Louisiana Legislature decided "to permit leasing and warranty servicing" by entities like Tesla.[112]  Tesla contends that discovery will substantiate its claim that the laws were motivated by discriminatory purpose, but "[t]o get discovery," a plaintiff must "allege sufficient facts in [the] complaint to state a plausible claim for relief."  *Johnson v. BOKF Nat'l Ass'n*, 15 F.4th 356, 365 (5th Cir. 2021).

Tesla likewise fails to plausibly allege that the laws have a discriminatory effect.  In *Ford*, the Fifth Circuit clarified that discriminatory

---

[111]     R. Doc. 151 ¶¶ 167-69.

[112]     *Id.* ¶ 373.

effect should be evaluated by reference to a law's "effect on similarly situated business entities." *Ford*, 264 F.3d at 501 (holding that a statute has a discriminatory effect if it provides a "competitive advantage to in-state interests vis-à-vis similarly situated out-of-state interests"). Tesla asserts that the laws have the effect of favoring in-state dealerships at the expense of out-of-state manufacturers,[113] but "discrimination does not include all instances in which a state law burdens some out-of-state interest while benefitting some in-state interest. *Int'l Truck & Engine Corp.*, 372 F.3d at 725; *Tex. Manufactured Hous. Ass'n v. City of Nederland*, 101 F.3d 1095, 1102 (5th Cir. 1996) ("[T]he mere fact that a statute has the effect of benefitting a local industry while burdening a separate industry does not in itself establish that the statute is discriminatory."). Rather, the relevant inquiry is whether "similarly situated in-state and out-of-state companies are treated identically." *Allstate*, 495 F.3d at 163. Both laws Tesla challenges treat all manufacturers identically, regardless of their residence: No manufacturers may sell new vehicles directly to consumers, nor may they directly provide warranty repairs, unless they qualify as a "fleet owner." *See Wal-Mart*, 945 F.3d at 223 (statute that prohibited all corporations,

---

[113]    *Id.* ¶ 321.

regardless of in-state or out-of-state status, from holding permit to sell liquor in Texas did not discriminate against interstate commerce).

Tesla contends that it is similarly situated to in-state franchised dealerships because it, too, advertises and sells new vehicles to consumers. It thus asserts that the law impermissibly favors in-state dealers over out-of-state dealers like itself. But the laws treat Tesla no differently than they would an in-state manufacturer that also sells the cars it manufactures.[114] Indeed, the Supreme Court has "rejected the notion that the Commerce Clause protects the particular structure or methods of operation in a . . . market." *Allstate*, 495 F.3d at 163-64 (internal quotation marks omitted). Rather, it is well settled that states may discriminate "based on business form" without implicating the Commerce Clause. *NextEra Energy Cap Holdings, Inc.*, 48 F.4th at 322 n.7. Because the challenged laws do "not discriminate on the basis of a company's business contacts with the state, but rather on the basis of its status as an automobile manufacturer," the laws do not "offend the dormant Commerce Clause." *Allstate*, 495 F.3d at 162 (citing *Ford*, 264 F.3d at 502).

---

[114] Further, the same could be said of the manufacturers that sold cars in violation of Texas's direct sales ban in *Ford* and *Int'l Truck & Engine*. The Fifth Circuit dismissed the manufacturers' dormant Commerce Clause challenges to the law in both cases. *Ford*, 264 F.3d at 505; *Int'l Truck & Engine*, 372 F.3d at 729.

Having concluded that the laws regulate "evenhandedly," the Court next considers "whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Veritext Corp.*, 901 F.3d at 291; *see also Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970) (holding that a law that does not directly discriminate against interstate commerce can still violate the dormant Commerce Clause if it imposes a burden on interstate commerce that is "clearly excessive" in relation to the "putative local benefits"). In making this determination, courts "should consider: (1) whether the law burdens interstate commerce; (2) whether there is a legitimate local interest in the law; and (3) when both are present, if the extent of the burden should be tolerated based on the local interest involved, including if the interest could be promoted *as well* with a lesser impact on interstate activities." *Wal-Mart*, 945 F.3d at 221 (internal quotation marks omitted). This "inquiry is known as the *Pike* balancing test." *Id.* "State laws frequently survive this *Pike* scrutiny." *Hignell-Stark*, 46 F.4th at 325.

In assessing a statute's putative local benefits, courts may not "second-guess the empirical judgments of lawmakers concerning the utility of legislation." *Allstate*, 495 F.3d at 164. As discussed in Section III.C.2, *supra*, the Fifth Circuit has already twice determined that the state's interest in

82

regulating the automobile industry is legitimate.  *See Ford*, 264 F.3d at 503-04 (rejecting *Pike* challenge to Texas's direct sales ban); *Int'l Truck & Engine*, 372 F.3d at 727-28 (same).  The Fifth Circuit has likewise held that the state has a legitimate interest in protecting consumers by controlling the entities that perform car servicing and repairs.  *Allstate*, 495 F.3d at 164 ("[T]he Legislature in this case sought to prevent firms with superior market position . . . from entering a downstream market (auto body repair) upon the belief that such entry would be harmful to consumers.").

Accordingly, the Court considers those putative local benefits in relation to the burdens, if any, the laws impose on interstate commerce. When applying the *Pike* test, "[a] statute imposes a burden when it inhibits the flow of goods interstate." *Allstate*, 495 F.3d at 163.  But Tesla has failed to identify a burden on interstate commerce imposed by the laws that exceed these local benefits.  Tesla contends that it did not seek a license to sell vehicles in Louisiana after 2017, and that, on information and belief, other electric vehicle manufacturers followed suit.[115]  But the Commerce Clause "protects the interstate *market*, *not* particular interstate *firms* from prohibitive or burdensome regulations."  *Wal-Mart*, 945 F.3d at 223 (internal quotation marks omitted) (emphasis in original).   Tesla's

---

[115]    R. Doc. 151 ¶ 170.

allegations regarding burdens to its own business operations are insufficient to state a claim under the dormant Commerce Clause.  Tesla's claim is thus dismissed.  *See Veritext Corp.*, 901 F.3d at 291 (affirming dismissal of Commerce Clause challenge to law that prohibited court reporters from giving litigants volume-based discounts at motion-to-dismiss stage, because "Louisiana's interest in the integrity of its court reporting system is legally sufficient," and the plaintiff "failed to clearly identify a burden on interstate commerce imposed by" enforcement of the law).

### D.    Tesla's Claim for Declaratory Judgment

In Tesla's count for declaratory relief, it seeks a declaration that "the Commission's composition does not comport with due process, the direct sales ban is unconstitutional, and that [LADA], its members, the dealerships, and the named commissioners' conduct violates state and federal law."[116]

The Declaratory Judgment Act provides: "In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration."  28 U.S.C. § 2201. The Supreme Court has "repeatedly characterized the Declaratory Judgment

---

[116]    R. Doc. 151 ¶ 386.

Act as an enabling act, which confers a discretion on the courts rather than an absolute right upon the litigant." *Wilton v. Seven Falls Co.*, 515 U.S. 277, 287 (1995) (internal quotation marks omitted).   Where, as here, the declaratory judgment claim is "redundant of the substantive legal claims," courts "uniformly dismiss declaratory judgment claims." *Perry v. H.J. Heinz Co. Brands, L.L.C.*, No. 19-280, 2019 WL 2423231, at *3 (E.D. La. June 10, 2019) (collecting cases); *see also Am. Equip. Co. v. Turner Bros. Crane & Rigging, L.L.C.*, No. 13-2011, 2014 WL 3543720, at *4 (S.D. Tex. July 14, 2014) ("Courts in the Fifth Circuit regularly reject declaratory judgment claims seeking the resolution of issues that will be resolved as a part of the claims in the lawsuit.").

Because resolving Tesla's other claims renders any potential declaratory judgment superfluous, the Court dismisses the declaratory judgment claim.   *Robinson v. Hunt Cnty., Tex.*, 921 F.3d 440, 450-51 (5th Cir. 2019).

### E.    Leave to Amend

As a general matter, courts should "freely give" leave to amend "when justice so requires."   Fed. R. Civ. P. 15(a)(2); *Leal v. McHugh*, 731 F.3d 405, 417 (5th Cir. 2013).   "Among the permissible bases for denial of a motion to

amend are . . . repeated failure to cure deficiencies by amendments previously allowed, . . . [and] futility of amendment." *Wright v. Allstate Ins. Co.*, 415 F.3d 384, 391 (5th Cir. 2005).  Tesla has already amended its complaint once, and notably, it has not requested leave to amend its complaint a second time.  Considering this, as well as the deficiencies in Tesla's claims, the Court does not grant leave for Tesla to amend its complaint.  *See ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 362 (5th Cir. 2002) (holding that it was not an abuse of discretion to deny plaintiffs a third opportunity to sufficiently state claim).

## IV.   CONCLUSION

For the foregoing reasons, the Court hereby GRANTS defendants' motions to dismiss and DISMISSES Tesla's amended complaint WITH PREJUDICE.  Defendants' motions to dismiss Tesla's original complaint[117] are hereby DISMISSED AS MOOT.

New Orleans, Louisiana, this __16th__ day of June, 2023.

*Sarah Vance*
_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

---

[117]   R. Docs. 101, 103, 105, 106, 114, 117, & 119.